# Exhibit D

**to Stern Declaration in Support of Opposition
to Class Certification**

REDACTED VERSION
SOUGHT TO BE FILED
UNDER SEAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

ROSMINAH BROWN and ERIC LOHELA      )
on behalf of themselves and all others      )
similarly situated,      )
      )
          Plaintiffs,      )
      )
v.      )      Case No.   CV-11-03082 LB
      )
THE HAIN CELESTIAL GROUP, INC.,      )
a Delaware Corporation      )
      )
          Defendant.      )
      )
      )

**<u>DECLARATION OF KEITH R. UGONE, PH.D.</u>**

**August 29, 2014**

# DECLARATION OF KEITH R. UGONE, PH.D.

## August 29, 2014

I.      OVERVIEW OF ASSIGNMENT ................................................................. 1

II.     SUMMARY OF OPINIONS ........................................................................ 3

        A. Evaluation Of The Hamilton Declaration ....................................... 4

        B. Claimed Injury And Claimed Monetary Recovery Cannot Be Reliably Calculated On A Class-Wide Basis ........................................ 7

III.    QUALIFICATIONS AND EXPERIENCE ................................................ 9

IV.     FACTS, DATA, AND INFORMATION RECEIVED.............................. 11

V.      OVERVIEW OF PARTIES ....................................................................... 12

        A. Named Plaintiffs ............................................................................ 12

            1.  Rosminah Brown ..................................................................... 12

            2.  Eric Lohela .............................................................................. 13

            3.  Differences In Named Plaintiffs' Attributes .......................... 14

        B. The Hain Celestial Group .............................................................. 15

VI.     OVERVIEW OF CHALLENGED PRODUCTS ..................................... 15

VII.    OVERVIEW OF DR. HAMILTON'S PROPOSED METHODOLOGIES .............. 18

VIII.   THE CLAIMED RESTITUTIONARY MEASURES PROPOSED BY DR. HAMILTON DO NOT YIELD A RELIABLE OR RELEVANT MEASURE OF ECONOMIC HARM ON A CLASS-WIDE BASIS ... 20

IX.     THE CLAIMED OVERCHARGE MEASURES PROPOSED BY DR. HAMILTON DO NOT YIELD A RELEVANT OR RELIABLE MEASURE OF ECONOMIC HARM ON A CLASS-WIDE BASIS ............ 23

        A. Ordinary Least Square Regression ................................................. 24

            1.  Dr. Hamilton Provided An Incomplete Description Of His Regression Analysis ....................................................... 25

            2.  Proposed Regression Has Numerous Shortcomings Rendering It Incapable Of Measuring Class-Wide Damages .................. 29

        B. Conjoint Analysis ........................................................................... 33

            1.  Dr. Hamilton's Proposed Conjoint Analysis At Best Would Measure An Average Willingness To Pay, Not An Actual Price Premium Paid ..................... 34

            2.  Dr. Hamilton's Description Of His Proposed Conjoint Analysis Omits Necessary Details And Fails To Address Common Flaws In Conjoint Analysis Studies ..................... 37

        C. Difference-In-Difference Approach ................................................ 38

            1.  Dr. Hamilton Failed To Specify Details Necessary To Evaluate Reliability Of Proposed Difference-in-Difference Approach ................................. 39

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

2.  Proposed Difference-In-Difference Approach Has Numerous Shortcomings Rendering It Incapable Of Measuring Class-Wide Damages ............................... 41

**X.    WHETHER AND TO WHAT EXTENT ANY CLASS MEMBER WAS INJURED AS A RESULT OF THE CHALLENGED CLAIMS DEPENDS UPON INDIVIDUALIZED INQUIRY .......................................................... 45**

A.  Individual Inquiry Is Required To Determine Whether Putative Class Members Purchased The Challenged Products .......................................................... 45

B.  Individual Inquiry Is Required To Determine Putative Class Members' Reasons For Purchasing Hain's Challenged Products ........................................................ 47

C.  Individual Inquiry Is Required To Determine At What Price, If Any, Putative Class Members Would Have Purchased Challenged Products .................................. 48

D.  Individual Inquiry Is Required To Determine The Specific Price Paid For Avalon Organics and Jason Products By Each Class Member ................................................. 48

1.  Description Of IRI Data ...................................................................... 49

2.  Analyses Performed Regarding Retail Prices Of Jason Products ........................ 50

3.  Analyses Performed Regarding Retail Prices Of Avalon Organics Products ....... 54

4.  Summary ............................................................................................ 57

## DECLARATION OF KEITH R. UGONE, PH.D.

### August 29, 2014

I, Keith R. Ugone, hereby declare:

## I.   OVERVIEW OF ASSIGNMENT

1.   I am an economist and have been retained by counsel for The Hain Celestial Group, Inc. ("Hain" or the "Defendant") to offer my opinions regarding various economic and associated class certification issues relevant to the matter of *Rosminah Brown and Eric Lohela v. Hain Celestial Group, Inc.*   I understand Ms. Rosminah Brown ("Ms. Brown") and Mr. Eric Lohela ("Mr. Lohela") (the "Named Plaintiffs") allege that Hain has engaged in false and misleading marketing, advertising, and labeling of (a) Avalon Organics products and (b) Jason products (collectively, the "Challenged Products").[1]

   a.   <u>Avalon Organics Products</u>.   Generally, Mr. Lohela, the putative Class representative for Avalon Organics, alleges that Avalon Organics' personal care products – which "prominently display the word 'Organic'" and include "a pledge by the Defendant that the Product is 'pro-organic'" – are misbranded.   Mr. Lohela made these claims because these products allegedly are "made from a significant amount of non-organic ingredients."[2]

   b.   <u>Jason Products</u>.   Generally, Ms. Brown, the putative Class representative for Jason products, alleges that the "Pure, Natural & Organic" claim on the labels of Jason products is misleading.   Ms. Brown made this claim because these products allegedly are "made from a significant amount of non-organic ingredients."[3]

2.   It is my understanding that the above (or similar) allegations constitute the Challenged Claims for purposes of Plaintiffs' Motion for Class Certification.   As a result of the Challenged Claims, the Named Plaintiffs assert that they and other putative Class

---

[1]  First Amended Complaint, p. 1.

[2]  First Amended Complaint, p. 3.

[3]  First Amended Complaint, p. 3.

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

members were damaged.[4]   The Plaintiffs assert two types of impact from the Challenged

Claims.   They assert the "Plaintiffs and the Class would not have purchased the

Products, and would not have paid such a high price for the Products but for the

Defendant's false and misleading identification of the Products as organic."[5]

3.    It is my understanding Ms. Brown and Mr. Lohela stated in the First Amended Complaint

that they sought to represent all California purchasers of Jason and Avalon Organics

products from May 12, 2007 to the present.[6]   I understand the Named Plaintiffs now

seek class certification of the following narrower California classes, respectively.

    a.    <u>Avalon Organics' Class</u>.   The Avalon Organics-related putative class is defined as
        "[a]ll persons who purchased a personal care product in California sold under the
        Avalon Organics brand name between May 12, 2007 and the present other than those
        Avalon brand personal care products that are USDA certified as organic."[7]

    b.    <u>Jason's Class</u>.   The Jason-related putative class is defined as "[a]ll persons who
        purchased a personal care product in California sold under the Jason brand name
        between May 12, 2007 and June 30, 2011 other than those Jason brand personal care
        products that are USDA certified as organic."[8]

4.    Dr. Stephen F. Hamilton ("Dr. Hamilton") submitted a declaration on July 14, 2014 in

support of class certification in this matter ("Hamilton Declaration").[9]   Dr. Hamilton

proposed two monetary recoveries for Class members. First, Dr. Hamilton proposed a

restitution of the "unjust gains from sales" from the Challenged Products.   Three claimed

---

[4]  First Amended Complaint, pp. 11 – 12.

[5]  First Amended Complaint, p. 1.

[6]  First Amended Complaint, pp. 11 – 12.

[7]  Plantiffs Notice of Motion and Motion for Class Certification ("Motion for Class Certification"), p. 6.

[8]  Motion for Class Certification, pp. 6 – 7.

[9]  Expert Declaration of Stephen F. Hamilton, Ph.D. in Support of Plaintiffs' Motion for Class Certification (Avalon
Organics and Jason) dated July 14, 2014 ("Hamilton Declaration").

_____
Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

_____

restitution metrics were identified by Dr. Hamilton: a refund of net sales, gross margin, or net profit before taxes associated with the Challenged Products.[10]   Second, Dr. Hamilton proposed a claimed price premium remedy (i.e., measure of damages).   His second proposed method entails calculating "Class members' overcharge on the mislabeled products." Three approaches were proposed by Dr. Hamilton to identify the claimed price premium associated with the Challenged Claims: Ordinary Least Squares (OLS) regression, conjoint analysis, and a difference-in-difference approach.[11]   Dr. Hamilton stated he likely would only use one of the identified approaches (based upon data availability and cost considerations), but has no preference ex-ante for any of these.[12]

5.      I have been requested by counsel for Hain to independently evaluate from an economic perspective:

    a.   the opinions contained in the Hamilton Declaration; and

    b.   whether standard economic analysis can be used to quantify the claimed measures of monetary recovery in this matter on a Class-wide basis.

## II.   <u>SUMMARY OF OPINIONS</u>[13]

6.      My evaluation of whether Class-wide damages can be quantified reliably using common proof and my evaluation of the opinions contained in the Hamilton Declaration are based upon (a) my economics and damage quantification training and experience, (b) documentary evidence, (c) deposition testimony from Hain representatives, the Named

---

[10]   Hamilton Declaration, p. 18.

[11]   Hamilton Declaration, p. 18.   Each of Dr. Hamilton's approaches are described later in my declaration.

[12]   Deposition Transcript Stephen F. Hamilton, Ph.D. taken August 15, 2014 ("Hamilton Deposition"), pp. 38 – 40.

[13]   This Summary of Opinions is intended to be an overview.   A full description of my opinions is contained throughout my declaration (i.e., narrative and associated exhibits).

_____

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

Plaintiffs, and Dr. Hamilton, and (d) the Hamilton Declaration, *inter alia*.   Based upon a detailed analysis, I have concluded that:

a.  the common proof approaches proposed by Dr. Hamilton to calculate a Class-wide monetary recovery would not provide a reliable or relevant measure of the economic injury (if any) suffered by putative Class members; and

b.  the claimed injury and/or claimed damages suffered by the putative Class members as a result of the Challenged Claims (if any) cannot be evaluated reliably on a Class-wide basis using common proof.

7.   As presented throughout my declaration (and summarized here), individual inquiry is required to evaluate the claimed injury and/or damages suffered by putative Class members should the Challenged Claims be found to be misleading.

### A.  Evaluation Of The Hamilton Declaration

8.   Dr. Hamilton submitted a declaration in support of class certification in this matter. However, Dr. Hamilton has not demonstrated that the claimed injury to putative Class members (and a corresponding monetary recovery) <u>resulting from the Challenged Claims</u> (if any) can be reliably or accurately determined using common proof.

a.  <u>Restitution To Consumers Purchasing Challenged Products</u>.  Dr. Hamilton's first proposed method to calculate damages is to "calculate the gain Defendant experienced in connection with its falsely labeled products, and require surrendering the gain."[14]   Dr. Hamilton proposed 3 measures of these "unjust gains:" (i) net sales revenue; (ii) gross margin; and (iii) net profit before tax associated with the Challenged Products.[15]   However, Dr. Hamilton's proposed restitution methodology, (and the three metrics associated with it) would not yield a reliable or relevant estimate of any economic harm allegedly suffered by individual putative Class members for at least the following reasons.

_____

[14]  Hamilton Declaration, p. 20.

[15]  Hamilton Declaration, p. 20.

_____

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

    i.  Dr. Hamilton's proposed approach does not take into account the value actually received by putative Class members from the purchase and use of the Challenged Products.

    ii.  There is no correlation between Dr. Hamilton's proposed restitution approach and any claimed economic injury <u>attributable to the Challenged Claims</u> – especially given the varied prices paid by putative Class members for the Challenged Products.

    iii.  Dr. Hamilton's proposed restitution methodology cannot distinguish between putative Class members who purchased the Challenged Products for reasons related to the Challenged Claims and putative Class members who purchased the Challenged Products based upon considerations unrelated to the Challenged Claims.

    iv.  Jason's wholesale pricing and suggested retail pricing strategy does not support Dr. Hamilton's proposed restitution (i.e., disgorgement) approach.  Certain Jason Products that removed the "Pure, Natural & Organic" tagline in 2011 experienced increases in wholesale and suggested retail prices (i.e., SRPs) from January 2008 through August 2012.  Hain's pricing strategy indicates the lack of profits attributable to the Challenged Claims.

    v.  Dr. Hamilton has not provided a mechanism for allocating to individual putative Class members the total monetary recovery associated with each proposed metric.  Absent individual inquiry, any allocation methodology for distributing revenues, gross margin, or net profit before taxes associated with the Challenged Products would be arbitrary.

The aforementioned issues with Dr. Hamilton's proposed restitution approach (plus other issues) are explained in detail later in my report.

b.  <u>Ordinary Least Squares</u>.  Dr. Hamilton's second proposed approach is to measure the overcharge (or price premium) allegedly attributable to the Challenged Claims.  One method Dr. Hamilton proposes to isolate a claimed price premium is to use regression analysis.[16]  Dr. Hamilton's proposed regression approach does not yield a reliable estimate of the claimed harm suffered by individual putative Class members (i.e., a loss caused by the Challenged Claims) for at least the following reasons.

    i.  Dr. Hamilton provided an incomplete description of his proposed regression analysis by failing to identify key aspects of his model, data, and variables.

_____

[16]  Hamilton Declaration, p. 25.

_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

    ii. Dr. Hamilton's preferred approach is to calculate one price premium for all putative Class members. The resulting estimate ignores the large degree of pricing variation across individuals and across Challenged Products.

    iii. Dr. Hamilton proposed to use only one source of data, meaning "if they don't gather data on attributes, we don't have those in the data set."[17]  However, failing to include relevant information can lead to bias in OLS regression.

The aforementioned issues with Dr. Hamilton's proposed regression approach (plus other issues) are explained in detail later in my report.

  c. <u>Conjoint Analysis</u>.  Dr. Hamilton proposed using conjoint analysis to estimate an overcharge (or price premium) allegedly resulting from the Challenged Claims.[18] Dr. Hamilton's proposed conjoint analysis approach does not yield a reliable estimate of the claimed harm suffered by individual putative Class members (i.e., a loss caused by the Challenged Claims) for at least the following reasons.

    i. Dr. Hamilton's proposed conjoint analysis would, at best, provide an average "willingness to pay" associated with the Challenged Claims rather than an actual price premium.  Dr. Hamilton provided no methodology that would allow him to convert a "willingness to pay" into a claimed price premium.

    ii. Conjoint analysis tends to overemphasize the product features included in the survey relative to real life, which may lead to an overestimation of a claimed price premium associated with the Challenged Claims.

    iii. Dr. Hamilton provided an incomplete description of his proposed conjoint analysis.  Dr. Hamilton failed to describe (1) the list of features to be included in his proposed survey or (2) how the survey would present the relevant attributes to survey participants.

    iv. Dr. Hamilton's proposed conjoint analysis would, at best, provide an average "willingness to pay" for the Challenged Claims at the time the survey was administered.  Dr. Hamilton provided no methodology to isolate a claimed price premium associated with earlier points in time during the putative Class period.

The aforementioned issues with Dr. Hamilton's proposed conjoint analysis approach (plus other issues) are explained in detail later in my report.

  d. <u>Difference-In-Difference Analysis</u>.  Dr. Hamilton also proposed calculating an alleged overcharge resulting from the Challenged Claims through use of difference-

_____

[17]  Hamilton Deposition, p. 62.

[18]  Hamilton Declaration, p. 27.

_____

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

in-difference analysis.  A difference-in-difference approach compares (i) Challenged Product prices before and after labeling changes relating to the Challenged Claims and (ii) changes in prices of comparable (i.e., organic) non-Challenged Products (which did not change their labels) over the same period.  Dr. Hamilton's proposed difference-in-difference approach suffers from many of the same problems as his proposed regression analysis.  Additional issues specific to this approach include the following.

    i.   Dr. Hamilton cannot construct a difference-in-difference model to estimate a claimed price premium for Avalon Organics products as the Challenged Claim has been on the labels of these products throughout the Class period.

    ii.  Jason's "Pure, Natural & Organic" tagline was removed.  Dr. Hamilton cannot isolate the effect of removing the "organic" claim from the effects of also removing the "pure" and "natural" descriptors.

The aforementioned issues with Dr. Hamilton's proposed difference-in-difference approach (plus other issues) are explained in detail later in my report.

## B. Claimed Injury And Claimed Monetary Recovery Cannot Be Reliably Calculated On A Class-Wide Basis

9.    Dr. Hamilton does not address additional important considerations in his declaration. Whether and to what extent any putative Class member was injured as a result of the Challenged Claims is not amenable to proof on a Class-wide basis for reasons beyond those stated in my evaluation of Dr. Hamilton's opinions.  Proof of alleged injury, if any, would depend upon <u>individualized inquiry</u> into the facts and circumstances of each putative Class member's purchase for at least the following reasons.

    a.   <u>Whether Purchase Was Of A Challenged Product</u>.  Not all Challenged Products sold by Jason and Avalon Organics during the Class period bore Challenged Claims that potentially could be found to be misleading.  Determining whether a purchase during the Class period bore the Challenged Claims that potentially could be found to be misleading requires individualized inquiry, because identifying such sales (and marrying such sales to putative Class members) on a Class-wide basis is not possible.

        i.   During the putative Class period, some Jason products never had the challenged tagline.  On other Jason products, the tagline was removed during the Class

_____
Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

period.  And still other Jason products contained more than 70% organic content (without bearing a USDA seal).

ii. During the putative Class period, Hain reformulated Avalon Organics products to meet the 70% organic ingredients standard.  The precise timing relating to when the new products were placed on store shelves varied by product, store, and geographic location.  No bright-line "pre" and "post" period exists for these changes.  In addition, "new" and "old" products could have been on the store shelves at the same time.

iii. Multiple Jason and Avalon Organics Products are not alleged to be misleading, including (1) those products that were labeled "USDA Organic" or (2) those Avalon Organics products made with at least 70% organic ingredients.

b. <u>Reasons For Purchase</u>.  Documentary evidence and deposition testimony indicate that sales of the Challenged Products are driven by several factors other than the Challenged Claims, including but not limited to scent, SPF, no animal testing, and brand.  Customers who purchased the Challenged Products for these reasons were not injured, or were not injured to the same degree as consumers who purchased in substantial part for the aspects of the products embodied by the Challenged Claims.

c. <u>Conflicting Claimed Damages</u>.  Named Plaintiffs allege that in the absence of the Challenged Claims, (i) some putative Class members would not have purchased the Challenged Products and (ii) some putative Class members would have purchased the Challenged Products only at a reduced price.  These two sets of putative Class members have different drivers of demand for the Challenged Products and would have experienced different damages.

d. <u>Significant Variations in Retail Prices of Challenged Products</u>.  Analysis of aggregate pricing data (which still masks significant variations in the retail prices paid by putative Class members) shows that the price paid by one consumer in one location at one time for the Challenged Products is not indicative of the price paid by another consumer in a different location at a different time.  Under these varied conditions, to determine the actual price paid by any particular putative Class member (and whether there was any price premium paid that was associated with the Challenged Claims) would require consideration of circumstances particular to that transaction.  The applicable transactions occurred at different times, in different locations, and at different retailers.  Hence, there are many individual variables affecting prices (including but not limited to distribution channel, geographic location, time, discount utilized, and particular product purchased) and many individual actual prices paid – all of which negate the ability of a Class-wide proof approach to yield a reliable and accurate estimate of claimed damages.

_____

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

10.    Calculation of a monetary recovery for putative class members absent individualized analyses into (a) reasons for purchase, (b) the specific prices paid for the Challenged Products, (c) the specific prices of alternative products as comparators, and (d) whether the Challenged Product purchased bore the Challenged Claims would not be reliable from an economic perspective.   Failure to conduct individualized inquiry would result in over-compensation to some Class members and under-compensation to other Class members. Determining claimed damages on a Class-wide basis and without individual inquiry would yield a result that has no nexus between the claimed harm and the Challenged Claims, should the Challenged Claims be found to be false.   In addition, if some putative Class members chose to purchase the Challenged Products based upon considerations unrelated to the Challenged Claims, they did not suffer harm (or suffer the same harm) because of the Challenged Claims.   None of Dr. Hamilton's proposed approaches can address these issues. Determining claimed damages on a Class-wide basis using common proof cannot address these issues.

## III.    <u>QUALIFICATIONS AND EXPERIENCE</u>

11.    I am a Managing Principal at Analysis Group, Inc. ("AG").   AG provides economic, financial, and business strategy consulting to its clients and specializes in the interpretation of economic and financial data and the development of economic and financial models.   Nationally, AG consists of approximately 600 professionals who specialize in, among other things, the fields of economics, accounting, finance, statistics, and strategy consulting.

_____
Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

12.    My primary responsibility at AG is to provide economic, financial, and/or damages-related consulting services to clients.   Throughout my career I have provided these consulting services in class certification matters, breach of contract cases, intellectual property cases, antitrust cases, fraud-related cases, business tort cases, business interruption cases, employment / loss of earnings matters, lender liability cases, and securities-related cases.   I have provided expert testimony in deposition and trial settings numerous times.

13.    In consumer product class action matters, I have addressed economic and damages-related issues relating to class-wide proof of claimed economic harm and price premium claims, including analyses of demand drivers affecting consumer purchase decisions and product pricing patterns observed at wholesale and retail levels.   Pricing analyses I have performed include the examination of pricing patterns across distribution channels, geographic areas, retailers, and by promotional activities.   I have submitted reports and provided deposition testimony on class certification issues numerous times in false advertising and commercial matters involving a variety of products and industries, including but not limited to food products, cosmetics, beverages, and other consumer products.

14.    I received my B.A. in Economics from the University of Notre Dame in 1977, my M.A. in Economics from the University of Southern California in 1979, and my Ph.D. in Economics from Arizona State University in 1983.   Attached as **Exhibit 1** is a true and correct copy of my current resume.   A listing of publications I have authored is contained in my resume.   Attached as **Exhibit 2** is my trial and deposition testimony

_____
Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

experience.  My business address is Analysis Group, Inc., Park Place Center, 2911

Turtle Creek Blvd., Suite 600, Dallas, Texas 75219.

15.     AG is being compensated based upon hours incurred and the hourly rates of the personnel

involved.  Payment to AG is not contingent upon my findings or the outcome of this

matter.  AG is being compensated at a rate of $600 per hour for my time.  Hourly rates

for other staff at AG working on this matter range from $190 to $465 per hour, depending

upon the level and experience of the staff involved.

## IV.     FACTS, DATA, AND INFORMATION RECEIVED

16.     The facts, data, and information available to me in forming my opinions are contained in

**Exhibit 3** or elsewhere in my declaration (including footnotes and exhibits).   Contained

in **Exhibit 4** is a listing of the deponents whose deposition transcripts are cited in the text

of my declaration.  Examples of the types of information available to me include the

following:

    a.  legal documents (e.g., First Amended Complaint; Motion for Class Certification);

    b.  deposition transcripts (e.g., deposition transcript of Rosminah Jean Brown taken
October 25, 2013; deposition transcript of Eric C. Lohela taken October 25, 2013;
deposition transcript of Emma E.B. Froelich-Shea taken March 27, 2014; deposition
transcript of Stephen F. Hamilton taken August, 15, 2014);

    c.  declarations (e.g., Declaration of Dr. Stephen F. Hamilton dated July 14, 2014;
Declaration of Thomas J. Maronick dated July 11, 2014; Declaration of Victor
Mencarelli dated August 29, 2014; Declaration of James Farrell dated August 29,
2014);

    d.  documents produced by Hain (e.g., wholesale pricing data relating to Jason and
Avalon Organics products; IRI sales and pricing data for Jason and Avalon Organics
products; product label information; marketing materials; consumer studies); and

    e.  information independently obtained (e.g., information from Hain's website; SEC
documents).

_____
Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

17.     My analyses and opinions are based upon the information available, standard economic

theory, and my education and training.   The information I am relying upon is

information typically relied upon by experts in my field.   I reserve the ability to (a)

review documents, deposition transcripts, expert reports, or other information still to be

produced by the Parties to this dispute and (b) supplement my opinions based upon that

review, if appropriate.   I also reserve the ability to use demonstrative exhibits and/or

other information at hearings/trial to explain and illustrate my opinions.

## V.     OVERVIEW OF PARTIES

### A.  Named Plaintiffs

#### 1.  Rosminah Brown

18.     Ms. Brown is a resident of California and has resided in the city of Santa Barbara since

about 1975.[19]   Around September 2009, Ms. Brown purchased a Jason Ester-C Super-C

Cleanser Gentle Face Wash ("Jason Face Wash") at a Whole Foods Market in Roseville,

California.[20]    Ms. Brown purchased Jason Face Wash because it "was the most

appealing and appeared organic…[b]ased on the label, [which] said 'Pure, Natural &

Organic."[21]   Although Ms. Brown does not remember an exact price that she paid for

Jason Face Wash she recalls that "the price seemed acceptable."[22]   She believes that she

---

[19]  Deposition Transcript Rosmina Jean Brown taken October 25, 2013 ("Brown Deposition"), p. 8.

[20]  First Amended Complaint, p. 2.   The Jason Ester-C Super-C Cleanser Gentle Face Wash product was later renamed to "C-Effects™ Powered by Ester C®-Pure Natural Super-C™ Cleanser."   (Declaration of Victor Mencarelli in the Support of Defendant The Hain Celestial Group, Inc.'s Opposition to Plaintiffs' Motion for Class Certification ("Mencarelli Declaration"), p. 8.)

[21]  Brown Deposition, p. 23.

[22]  Brown Deposition, p. 24.

---

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014

_____

paid a premium for the Jason Face Wash but does not know how much.[23]   She purchased

a Target store brand facial cleaner that she considered comparable to the Jason product in

terms of product effectiveness but not in how the products are utilized for around $4.00.[24]

According to Ms. Brown, when purchasing Jason Face Wash in 2009[25], the words "pure"

and "natural" did not have much value to her, only the word "organic."[26]

### 2.  Eric Lohela

19.    Mr. Lohela is a resident of California who first purchased an Avalon Organics Lavender

Hand and Body Lotion from an online retailer, Vitacost.com, in or about December 2009.

Mr. Lohela still has the receipt for this purchase.[27]   He also has purchased an Avalon

Organics facial cleaner, a lip balm, and lotions from Trader Joes.   He has bought 7

products total, including purchases made at Vitacost.com.[28]   When purchasing the

product online the "Consciousness in Cosmetics," "Avalon Organics," and "Our Pledge

and Your Assurance" claims on the label were all drivers of his purchase as they led him

to believe that "Avalon Organics is an organic brand that's focused on making a

_____

[23]  Brown Deposition, p. 46.

[24]  Brown Deposition, p. 24.

[25]  Animal testing also is important to Ms. Brown.   She recognizes that you would need to read the label of the product to know if it had been animal tested.   At the time Ms. Brown purchased the Jason product she did not read the label to see if there was animal testing.   (Brown Deposition, p.34.)

[26]  Brown Deposition, pp. 40-41.

[27]  Deposition Transcript Eric C. Lohela taken October 25, 2013 ("Lohela Deposition"), pp. 6 and 13.

[28]  Lohela Deposition, pp. 13 and 56.

_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

difference."[29]  Mr. Lohela is willing to pay more for organic products and believes that

he paid a premium because "organic products cost more."[30]

### 3.  Differences In Named Plaintiffs' Attributes

20.    While Ms. Brown is the Named Plaintiff for the Jason Products putative class and Mr.

Lohela is the Named Plaintiff for the Avalon Organics putative class, important

differences exist between these two Named Plaintiffs that could lead to conflicts in the

evaluation of claimed damages on a Class-wide basis using common proof.[31]

a.  Ms. Brown purchased a Challenged Product at a Whole Foods Market.  Mr. Lohela
    purchased the Challenged Products online and at Trader Joe's.  Empirically and
    theoretically, a price premium paid (if any) could be different at a store such as
    Whole Foods Market compared to purchasing a Challenged Product online.

b.  Ms. Brown purchased a "face wash" product.  Mr. Lohela purchased a facial cleaner,
    lip balm, and lotions.  Empirically and theoretically, a price premium paid (if any)
    associated with a face wash product could be different from a price premium paid (if
    any) associated with lip balms and lotions.

c.  Ms. Brown purchased one Challenged Product. Mr. Lohela purchased seven
    Challenged Products.  Empirically and theoretically, total claimed damages (if any)
    of a putative Class member purchasing seven products would be different than a
    putative Class member purchasing one product.

d.  Mr. Brown does not remember the price she paid for the Challenged Product.  Mr.
    Lohela has a receipt for certain of his purchases.  (In addition, Mr. Lohela purchased
    his Avalon Organics Vitamin C Refreshing Cleansing Gel (8.5 fl. oz.) for $6.37,
    which is below wholesale cost.[32])  Approach-wise, evaluating and quantifying
    claimed damages for putative Class members that have evidence of expenditures on
    the Challenged Products (and evidence of the price paid) likely would be different
    than for putative Class members that do not have evidence of purchases (and
    purchase price) on the Challenged Products.  (The same would be true for putative

_____

[29]  Lohela Deposition, p. 33.

[30]  Lohela Deposition, pp. 2 and 53.

[31]  To the extent that differences exist between the two Named Plaintiffs, it is likely the same types of differences
exist among the putative Class members.

[32]  Hamilton Deposition, p. 74.

_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

Class members that purchased the Challenged Products below wholesale cost relative to those that did not.)

e.  Ms. Brown did not place value on the words "pure" and "natural" in the Jason Product's tagline.  Ms. Brown only placed value on the word "organic."  Mr. Lohela testified "Consciousness in cosmetics" and "Our Pledge and Your Assurance" were drivers of his purchase in addition to "Avalon Organics."  Empirically and theoretically, the claimed harm by putative Class members would be different depending upon whether putative Class members purchased the Challenged Products for reasons unrelated to, or in addition to, the Challenged Claims.

21.   The aforementioned real life differences in the two Named Plaintiffs highlight that individual inquiry, not common proof, is required to evaluate claimed harm and claimed damages should the Challenged Products be found to be misleading.

## B.  **The Hain Celestial Group**

22.   The Hain Celestial Group, Inc. ("Hain") is a Delaware limited corporation with its principal place of business in Lake Success, New York.[33]   Hain was initially incorporated in 1993 and is one of North America's leaders in organic and natural products.   Hain sells many leading brands including Alba Botanica, Jason, Queen Helene, Zia, Avalon Organics, Earth's Best, Ella's Kitchen, Celestial Seasonings, and Terra.[34]

## VI.   **OVERVIEW OF CHALLENGED PRODUCTS**

23.   There are two types of Challenged Products: Avalon Organics and Jason.  Plaintiffs contend that under California law products must contain 70% organic content in order to be labeled as organic.[35]   For both types of products, Plaintiffs have excluded from the

_____

[33]  Hain Celestial Group, Inc- Investor Relations – Company Overview, August 21, 2014.

[34]  Hain Celestial Group, Inc. SEC Form 10-K for the fiscal year ended June 30, 2013, p. 2.

[35]  First Amended Complaint, p. 2.

_____

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

Class those products that contain a USDA Organic seal on the label.   After excluding

these USDA certified products, differences within each brand still exist.   I provide below

an overview of the varieties of the Challenged Products and the Challenged Claims (if

any) that appear on these products.

a.  <u>Avalon Organics Products</u>.   There is a wide variety of Avalon Organics ("Avalon") personal care products which vary across segments, scents, and sizes.   There are four segments of Avalon's personal care products: skin care, hair care, bath & body, and baby.[36]   Within each segment, there are a variety of different product offerings that vary in terms of function, scent, and size.   For example, there are 9 product lines and at least 60 different products within the skin care segment.[37]   The brand name "Avalon Organics" appears on all Avalon products, and some products state a pledge that the products are "pro-organic."[38]   It is my understanding Named Plaintiffs allege that "up until its reformulation in 2011, all Avalon Organics Products contained less than 70% organic ingredients" and dispute that after the reformulation, Avalon Organics products meet the 70% organic content requirement.[39]   In actuality, I understand that some Avalon Organics products have been labeled USDA Organic since at least 2010, and that additional Avalon Organics products were reformulated to contain at least 70% organic content between late 2009 and early 2010.   These products were not labeled USDA Organic, but nonetheless met the 70% threshold.[40]

b.  <u>Jason Products</u>.   Jason products generally are organized into seven product segments: face, body, hair, oral, sun, kids, and gluten free.[41]   It is my understanding Named Plaintiffs contend that the Challenged Products carried the tagline "Pure, Natural & Organic" on the label.[42]   In actuality, some Jason products in the putative class did not include this tagline.   There is variation even within a given product line, so that (for example) some "Kids Only" products contained the tagline, while others did not. The tagline was removed from all products at some point during the class period,

---

[36]  Avalon Organics Home – Skin Care – August 21, 2014, p. 1.

[37]  Avalon Organics Home – Skin Care – August 21, 2014, p. 1.

[38]  Motion for Class Certification, p. 4.

[39]  Motion for Class Certification, p. 4.

[40]  Declaration of Victor Mencarelli in the Support of Defendant The Hain Celestial Group, Inc.'s Opposition to Plantiffs' Motion for Class Certification ("Mencarelli Declaration"), p. 10.

[41]  Body _ JĀSÖN - Natural Pioneer since 1959 – August 22, 2014, p. 1.

[42]  First Amended Complaint, p. 5.

_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

> beginning in early 2010.   In addition, some Jason products that did not bear a USDA
> Organic seal contained more than 70% Organic content during the class period.[43]

24.    This current dispute is not about one product that allegedly contained a misleading

labeling claim.  From an economics and damages-related perspective, it is important to

note the variety differences that exist even within the Challenged Products.   For

example, there are two "brands" (i.e., Avalon Organics and Jason) carrying different

Challenged Claims.   Within these brands, there are a multitude of different types of

products (e.g., face, body, hair, oral, sun, kids, and gluten free Jason products). Within

each type of product, there are a significant number of individual products (e.g., within

the Avalon Organics skin care segment, there are 9 product lines and at least 60 different

products).   Finally, the prices of these products vary by geographic location, distribution

channel, time period, and discount utilized.   At a minimum, the aforementioned variety

of attributes associated with the Challenged Product dictates that individual inquiry is

required to evaluate the reasons for purchase, the influence of the Challenged Claims (if

any) on the purchase decision, and the prices paid – all of which would be inputs into an

economic investigation into the fact of harm and the quantum of harm in this matter.   At

a minimum, the aforementioned variety of attributes weighs against being able to

evaluate claimed Class-wide damages using common proof.

_____

[43] Mencarelli Declaration, p. 6.

_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

## VII.    OVERVIEW OF DR. HAMILTON'S PROPOSED METHODOLOGIES

25.    Dr. Hamilton proposed the following two approaches to calculate a claimed monetary

recovery for Class members "using only data and information that is common to the

proposed Class."[44]

a.  Restitution to Consumers Purchasing Challenged Products.  Dr. Hamilton's first
proposed approach is to "calculate the gain the Defendant experienced in connection
with its falsely labeled products, and require surrendering of the gain."[45]  He
proposes three metrics to calculate claimed Class-wide damages using this approach.

i.  Net Sales Revenue. Net sales revenue "deducts adjustments (such as returns or
allowances) as well as Sales Promotional Expense.  As a result, it represents the
revenue Defendant was actually able to generate and retain through selling falsely
labeled products to California consumers."[46]

ii.  Gross Margin.  Gross margin deducts from net sales the cost of goods sold
("COGS") as well as delivery and warehousing costs.   This method "accounts for
the idea that even though consumers did not get what they paid for, i.e., an
organic cosmetic product, they did get a cosmetic product."[47]

iii.  Net Profit Before Tax.  This method deducts selling expense as well as an
allocation of general and administrative expense from gross margin.[48]

b.  Overcharge to Consumers Purchasing Challenged Products.  Dr. Hamilton's
second proposed approach attempts to calculate the alleged price premium that the
putative Class members have paid for Defendant's alleged mislabeled products.
According to Dr. Hamilton, "[t]his premium represents the additional price
consumers are willing to pay for an organic product relative to a non-organic
product with the same characteristics (e.g., ingredient quality, brand, purpose,
etc.)."[49]  Dr. Hamilton has proposed three ways to calculate this claimed price
premium.

_____

[44] Hamilton Declaration, p. 18.

[45] Hamilton Declaration, p. 20.

[46] Hamilton Declaration, p. 20.

[47] Hamilton Declaration, p. 20.

[48] Hamilton Declaration, p. 20.

[49] Hamilton Declaration, p. 24.

_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

_____

      i.   <u>Ordinary Least Squares ("OLS") Regression.</u>  OLS regression is an econometric (computer-related) technique that attempts to uncover associations between a metric of interest (e.g., price or price per ounce) and various hypothesized explanatory variables (e.g., brand, whether the product is labeled "organic", etc.). According to Dr. Hamilton, this model estimates "the (adjusted) average difference between the price per ounce of organic and conventional products; that is, the organic premium."[50]

      ii.   <u>Conjoint Analysis.</u>  According to Dr. Hamilton, "[t]his contingent valuation method is based on consumer surveys aimed at directly capturing the consumers' willingness to pay for organic products relative to conventional products that differ only in the lack of the organic attribute."[51]

      iii.   <u>Difference-in-Difference.</u>  A difference-in-difference approach uses the fact that some products have removed the organic label.  A difference-in-difference approach can be considered a modified "before" and "after" approach. According to Dr. Hamilton, "[t]he difference-in-difference approach relies on estimating the market price response to the change in the organic label."[52]  It subtracts price changes observed for comparable products without a label change from price changes occurring after labeling changes on the Challenged Products.

26.    Named Plaintiffs allege that "Plaintiffs and the Classes would not have purchased the Products, and would not have paid such a high price for the Products, but for Defendant's false and misleading identification of the Products as organic."[53]  Plaintiffs thus present a theory that there were two types of putative Class members, those who "would not have purchased [Challenged Products] at all" and those who "would only have purchased [Challenged Products] at a reduced price."[54]  These two types of putative Class members were harmed in different ways and require different measures of damages.  However,

_____

[50] Hamilton Declaration, p. 26.

[51] Hamilton Declaration, p. 27.

[52] Hamilton Declaration, p. 29.

[53] First Amended Complaint, p. 1.

[54] Hamilton Declaration, p. 3.

_____

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

Dr. Hamilton has not proposed a way that isolates these two types of putative Class members.

27.    I evaluate throughout this declaration Dr. Hamilton's proposed restitution damages approach and Dr. Hamilton's proposed price premium damages approaches recognizing his failure to propose any methodology that would isolate the putative Class members to which these proposed claimed damages methods would apply.

## VIII.    THE CLAIMED RESTITUTIONARY MEASURES PROPOSED BY DR. HAMILTON DO NOT YIELD A RELIABLE OR RELEVANT MEASURE OF ECONOMIC HARM ON A CLASS-WIDE BASIS

28.    Dr. Hamilton asserted in his declaration that "[o]ne approach to damages is to calculate the gain Defendant experienced in connection with its falsely labeled [Jason and Avalon Organics] products, and require surrendering of the gain."[55]    This approach proposed by Dr. Hamilton is the restitution of the alleged "unjust enrichment" or to "strip out the benefits the company may have made from mislabeling that product."[56]    Dr. Hamilton proposed 3 metrics that could be used in assessing these damages: net sales revenue, gross margin, and net profit before tax.    However, Dr. Hamilton's proposed methodology (and associated three metrics) would not provide a reliable or relevant measure of calculating a monetary remedy.    This is because the 3 metrics are not correlated to economic injury (if any) suffered by individual putative Avalon Organics and Jason Class members (i.e., a loss caused by the Challenged Claims) for at least the following reasons.

---

[55]  Hamilton Declaration, p. 20.    (Bracketed text added for clarification.)

[56]  Hamilton Deposition, p. 41.

_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014

_____

a.  <u>No Adjustment For Value Received By Consumers</u>.  Dr. Hamilton proposed a full surrendering of net sales, gross margin, or net profit before taxes.  However, these approaches do not appropriately take into account the value received by each putative Class member from the purchase of the Challenged Products.  With respect to net sales, accurately assessing economic injury suffered by a consumer purchasing the Challenged Products requires that Dr. Hamilton deduct from the purchase price (or wholesale price) the value actually received by the consumer.  A similar deduction would be required at the gross margin and net profit before taxes level.  The proposed full refund of net sales, gross margin, or net profit cannot yield a reliable or relevant estimate of the harm (if any) suffered by a putative Class member as they aggregate the total revenues or profits associated with the Challenged Products without apportioning (i.e., isolating) the amount attributable to the Challenged Claims or without apportioning (i.e., separating out) the benefits a putative Class member actually received.  There is no correlation between Dr. Hamilton's proposed restitution methodology (or calculation) and the claimed economic injury attributable to the Challenged Claims (especially if putative Class members received some benefits from the use of the Challenged Products).

b.  <u>Total Sales Revenue Is Not Attributable To Challenged Claims</u>.  Measuring the economic loss suffered by putative Class members requires identifying the claimed damages or economic losses that are attributable to the alleged wrongful conduct.  Simply aggregating total sales revenues represents a mathematical calculation, but not an approach for measuring monetary recovery correlated to economic injury (or a claimed damages calculation).  If some putative Class members chose to purchase the Challenged Products based upon considerations unrelated to the Challenged Claims, they did not suffer harm because of the Challenged Claims.

c.  <u>Jason's Wholesale And Suggested Retail Price ("SRP") Pricing Does Not Support Dr. Hamilton's Proposed Restitution Approach</u>.[57]  Dr. Hamilton testified that "[w]hat should happen, if you remove that organic attribute from the label, the product will be selling at a lower price."[58]  However, as evidenced by Jason's Wholesale Pricing Lists, Jason's prices to its retail customers (abstracting away from adjustments for quantity purchased and other retailer-specific adjustments) have not varied based upon the label claims being present.  In other words, Hain has not made pricing distinctions among Jason's products based upon the presence or absence of any reference to "organic" on the label.  If putative Class members actually paid a price premium for the Challenged Claims, Dr. Hamilton has not explained why a profit maximizing firm would allow that gain to accrue to retailers rather than capturing the gain for themselves.

_____

[57]  The five products examined in this section are all explicitly named in the First Amended Complaint, pp. 5 and 8 – 9.

[58]  Hamilton Deposition, p. 31.

_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

    i.  For example, neither Jason PowerSmile[59] All-Natural Whitening Toothpaste, nor the Jason Ester-C Super-C Cleanser Gentle Face Wash ██████████████████████ ████████████████████████████████████████

    ii.  Contrary to Named Plaintiffs' assertions, Jason Aloe Vera Soothing Body Scrub and Jason Curl Defining Cream ██████████████████████████████████ ████████████████████████ The Body Scrub was priced at ███████████████████████ and the Curl Defining Cream at ████████ ████████████████████████████████

    iii.  Similarly, Jason Thin to Thick Extra Volume Conditioner ███████████ ████████████████████████████ as well over this time period. ███████████████████████████████████████████████ **(Exhibit 5**.)

These price observations are inconsistent with Dr. Hamilton's claims that the price should decrease when the organic label is removed. Jason's pricing demonstrates a lack of nexus between the prices associated with these Challenged Products and a pricing component attributable to the Challenged Claims.

d.  <u>Proposed Approach Requires Individual Inquiry And Receipts</u>.  Although Dr. Hamilton proposes to provide a total refund of the net sales revenue, gross margin, or net profit before taxes earned by Hain from its sales of the Challenged Products, he has not been asked to provide a mechanism for allocating to individual putative Class members the portion of these metrics associated with each individual Class member's purchase(s).[60]  Any allocation of such a refund would require individual inquiry for at least the following reasons.

    i.  <u>Putative Class Members Likely Purchased The Challenged Products At Different Prices</u>.  Prices vary by geographic location, distribution sales channel, time period, and whether the product was purchased on promotion or at an everyday price.  Without individual inquiry, two putative Class members who purchased the Challenged Products at different purchase prices (and/or in different geographic areas or through different distribution channels) would receive an identical monetary recovery under this approach in the absence of individual inquiry.  Dr. Hamilton does not address that *any* type of allocation methodology divorced from actual individual purchase patterns will over-compensate some Class members and under-compensate other Class members.  Therefore, there is

_____

[59] Jason's PowerSmile toothpaste sometimes is written as "Power Smile" and/or "Powersmile."  For consistency, I refer to this product as "PowerSmile" throughout this declaration.

[60] Hamilton Deposition, p. 67.

_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

no single refund of revenues, gross profits, or net profits before taxes that can be determined for all putative Class members on a Class-wide basis.

ii.   Putative Class Members Likely Do Not Have Proof of Purchases.   To the extent that this restitution method requires each consumer to provide proof of purchase, this proposed approach by Dr. Hamilton would require individual inquiry to obtain information relating to the purchase price paid and the quantity of the Challenged Products purchased by each putative Class member.   Dr. Hamilton's proposed restitution approach is further complicated by the fact that many putative Class members likely did not retain receipts relating to their purchases of the Challenged Products.   Thus, any approach to allocate net sales revenue, gross margin, or net profit before taxes would be arbitrary (i.e., not related to price paid or quantity purchased).

29.   Based upon the above considerations, the restitution approach proposed by Dr. Hamilton is not reliable or relevant to calculating claimed damages in this matter (on a Class-wide basis).

## IX.   THE CLAIMED OVERCHARGE MEASURES PROPOSED BY DR. HAMILTON DO NOT YIELD A RELEVANT OR RELIABLE MEASURE OF ECONOMIC HARM ON A CLASS-WIDE BASIS

30.   Dr. Hamilton also proposed a claimed "overcharge" (or price premium) approach to evaluating putative Class members' claimed damages.   Dr. Hamilton proposed three price premium-related ways that he would consider using to calculate an "overcharge" or price premium associated with the Challenged Claims (i.e., a regression analysis, a conjoint analysis, and a difference-in-difference analysis).[61]

31.   In support of his overcharge approaches, Dr. Hamilton reviewed research that evaluated organic price premiums for food products.[62]   However, the reviewed studies are not relevant when considering the market for personal care products because food and

_____

[61]  Hamilton Declaration, pp. 25-31.

[62]  Hamilton Declaration, pp. 8 – 15.

_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014

_____

agricultural products permit more direct comparisons than personal care products, *inter alia*.   The comparison between an organic apple and a non-organic apple, for example, is more direct than any attempt to evaluate a price premium associated with a multi-feature organic, lavender-scented shampoo that is marketed to prevent dandruff.   In addition, food products are different from personal care products.   There is no a priori reason why an organically-related price premium would be the same across food products and personal care products.[63]

32.    Dr. Hamilton has not demonstrated that these approaches to evaluating a claimed price premium can provide a relevant or reliable measure of damages on a Class-wide basis using common proof relating to the Challenged Products.   In addition to these general flaws, each proposed approach has specific flaws that render them incapable of providing a relevant or reliable measure of Class-wide damages.

**A.  Ordinary Least Square Regression**

33.    Dr. Hamilton's first proposed way to calculate a claimed overcharge is by using ordinary least squares ("OLS") regression.   Dr. Hamilton's proposed regression analysis would attempt to estimate a claimed price premium by "adjust[ing] for systematic differences between products in a category apart from the organic or conventional attribute contained in each product."[64]   However, Dr. Hamilton's proposed regression approach will not yield a reliable estimate of the claimed harm suffered by individual putative Class

_____

[63] Organic food products are ingested (i.e., go into the body) while personal care products generally go onto the body.

[64] Hamilton Declaration, p. 25.   (Bracketed text added for clarification.)

_____

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

members (i.e., a loss <u>caused by</u> the Challenged Claims) for at least the following two reasons.

   a.  Dr. Hamilton provided an incomplete description of his regression analysis.

   b.  Dr. Hamilton's proposed regression analysis suffers from significant shortcomings that render it incapable of yielding a reliable estimate of Class-wide damages.

### 1. Dr. Hamilton Provided An Incomplete Description Of His Regression Analysis

34.   Ordinary Least Squares regression is a generally accepted econometric approach for investigating statistical correlations between a variable of interest and potential explanatory considerations (i.e., looking for associations between changes in the variable of interest and changes in considerations that may explain those changes). However, the issue here is not the acceptability of the approach, but the implementation of the approach. Here, Dr. Hamilton provided an incomplete discussion of his proposed regression approach, failing to specify numerous important details. These details are necessary for evaluating whether his proposed regression approach could reliably determine a price premium attributable to the Challenged Claims (if one exists).

   a.  <u>Non-Exhaustive List Of Variables</u>. Dr. Hamilton stated in his declaration that his regression model would compare price per ounce against various control variables, including:

      i.  an indicator that the product is organic;

      ii.  an indicator that the product is natural;

      iii.  indicator variables for the time period;

      iv.  brand-level indicator variables; and

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014

_____

v. indicator variables for the store or chain where the product is sold.[65]

Dr. Hamilton also testified that he would include quantity sold.[66]  In addition to these definitive statements, Dr. Hamilton testified that he <u>could</u> include various other attributes such as "no animal testing"[67] or advertising.[68]  However, aside from these variables, Dr. Hamilton did not provide a comprehensive list of the explanatory considerations he would include in his regression model.

> Q: Have you identified in Paragraph 44 all of the product characteristics that your regression approach would attempt to control for?
> A: As I mentioned before, in equation one on page 25, which is in Paragraph 44, the variable "$X_{it}$" denotes a vector of product characteristics to be controlled.  The individual elements of that vector, which product characteristics are actually available in the data to control, are not specified here.[69]

"$X_{it}$" is not helpful to the Court in evaluating whether Class-wide damages can be evaluated using common proof.  While in econometric jargon it signifies anything else that may be an important explanatory variable, this presentation is theoretical in nature.  It says nothing about what exactly those explanatory variables may be.  Without a clearly-defined list of variables he would include, Dr. Hamilton's proposed regression model is incomplete and does not provide assurances to the Court that such an analysis could be reliably undertaken or that such an analysis would provide reliable or relevant results.  For example, Dr. Hamilton did not acknowledge attributes that may drive purchase of the various product types, such as fragrances, sun protection/SPF levels (especially for facial products and hand and body lotion products), packaging type (especially for facial products), and dermatologist or dentist recommendation or approval.  Most importantly, Dr. Hamilton never mentioned in his report how he would handle promotional pricing.

b. <u>No Analysis Of Whether Sufficient Variation In The Variables Exists</u>.  As part of his proposed regression analysis, Dr. Hamilton assumes that there is sufficient variation (or frequency in the observations) in the variables he proposes using to estimate the claimed price premium associated with the Challenged Claims.  However, in order to independently estimate those effects, Dr. Hamilton testified that he would need variation in the data.[70]  When limiting the consideration to the variables Dr.

_____

[65] Hamilton Declaration, pp. 25-26.

[66] Hamilton Deposition, p. 70.

[67] Hamilton Deposition, p. 60-61.

[68] Hamilton Deposition, p. 90.

[69] Hamilton Deposition, p. 89.

[70] Hamilton Deposition, pp. 98-99.

_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

Hamilton has definitively stated he will include, he has not addressed whether there will be sufficient variation in the variables to isolate the effects of organic from the effects of the other variables.

c.   <u>Availability of Necessary Data</u>.   Dr. Hamilton testified that he would use Nielsen or IRI InfoScan data for the regression analysis.[71]   Dr. Hamilton stated that these data contain "different characteristics of the products, for instance whether the product is organic, natural, or conventional, the brand, and stores (chains) where the product is sold, among others."[72]   However, Dr. Hamilton testified that these data are limited and may omit important product characteristics such as "no animal testing" or "paraben-free."[73]

d.   <u>No Identification Of Comparable (Or "Conventional") Products</u>.   Dr. Hamilton described his regression model as containing organic and conventional products.[74] However, Dr. Hamilton did not identify the list of products that he will include in his regression analysis as comparators, instead testifying that he would include all products in the dataset that he acquired.[75]   Using a decision rule that "all products in the dataset" will be included in the regression analysis is not helpful in evaluating proposed methods for determining a claimed price premium.   The dataset may include too few comparator products or include products that (for a variety of reasons) may not be a close enough comparator.   For example, Dr. Hamilton may obtain a dataset that contains low-end store brands or very high end designer brands. These products are not directly comparable to the Challenged Products and including them would distort Dr. Hamilton's proposed premium calculations.   Dr. Hamilton did not articulate the criteria that should be evaluated to decide if a product should be included in the analysis.[76]   Without this information, Dr. Hamilton's proposed regression model cannot be fully evaluated because he is not identifying important variables that he may or may not use to isolate a claimed price premium.

e.   <u>Undetermined Number Of Claimed Price Premiums to Estimate</u>.   Dr. Hamilton stated that he can estimate a distinct organic premium for products according to five categories: (i) facial products; (ii) hand and body lotion products; (iii) hair conditioners and treatments; (iv) shampoos; and (v) lip remedies.[77]   Dr. Hamilton testified that he could use regression analysis to estimate separate price premiums for

---

[71] Hamilton Deposition, p. 62.

[72] Hamilton Declaration, p. 26.

[73] Hamilton Deposition, pp. 62 – 64.

[74] Hamilton Declaration, p. 25.

[75] Hamilton Deposition, p. 105.

[76] Hamilton Deposition, p. 62.   *See also* Hamilton Declaration, p. 26.

[77] Hamilton Declaration, p. 25.

_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014

---

Avalon Organics products and Jason products.[78]  He also testified that he could estimate time-specific premiums related to organic claims.[79]  Dr. Hamilton further testified that his report was "agnostic" on the number of price premiums he would estimate and that his determination would "depend on what the data is saying."[80]  The possibility of estimating an indeterminate number of price premiums increases the need for individual inquiry to determine which premium applies to each individual.  Furthermore, Dr. Hamilton did not explain how he would make this determination (i.e., the number of price premiums to estimate), making it impossible to evaluate his proposed regression approach.  (I discuss later in my declaration the flaws associated with estimating only a limited number of claimed price premiums.)

f.  <u>Specification of Model</u>.    Dr. Hamilton presented a general equation in his declaration,[81] but he has not made important decisions necessary for his equation to actually determine a price premium for the Challenged Claims (if one exists).

i.  In his declaration Dr. Hamilton specified that the dependent variable would be price per ounce,[82] in which case his regression results would be interpretable as a (claimed) price premium in dollar terms.   However, Dr. Hamilton testified that he expected he would calculate price premiums in percentage terms.[83]  Doing so requires Dr. Hamilton to take the natural logarithm of price per ounce.   Adding to the uncertainty, Dr. Hamilton also testified in his deposition that he could use units sold as the dependent variable.[84]  (This alternative was not specified in his declaration.)  Not only did Dr. Hamilton not specify the dependent variable he would use for units sold (i.e., packages or ounces), but Dr. Hamilton did not address how he would make that determination.  This is a particularly important issue to evaluate if Dr. Hamilton chooses to determine a smaller number of claimed price premiums than Challenged Products – especially given the different sizes and prices of the Challenged Products.

ii.  Dr. Hamilton did not specify how he would create variables out of product characteristics.  For example, Dr. Hamilton specified that he would control for "brand."   However, IRI data generally contains different classifications for brands (e.g., Brand, Major Brand, Manufacturer, and Parent Company).  Dr. Hamilton has not specified what "level" of branding he will use.   He also

---

[78]  Hamilton Deposition, pp. 52-54.

[79]  Hamilton Deposition, p. 96.

[80]  Hamilton Deposition, p. 57.

[81]  Hamilton Declaration, p. 25.

[82]  Hamilton Declaration, p. 25.

[83]  Hamilton Deposition, p. 52.

[84]  Hamilton Deposition, pp. 103-104.

---

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

specified that he would control for time using "indicator variables", but he did not specify over what period he would measure time (e.g., weeks, months, etc.).[85] Choosing different time periods may mask important effects in the determination of a claimed price premium.

## 2. Proposed Regression Has Numerous Shortcomings Rendering It Incapable Of Measuring Class-Wide Damages

35.    Dr. Hamilton's proposed regression model suffers from numerous additional shortcomings. These additional shortcomings prevent Dr. Hamilton's proposed regression model from providing a reliable estimate of Class-wide damages.

a.    Cannot Properly Account For Variation In Labels And Product Formulae.    Dr. Hamilton's proposed regression model cannot account for the variation in labels and products throughout the Class period.

i.    Transition Period.    The Challenged Products changed labels (Jason) or formulae (Avalon) during the Class period. These changes are not associated with a fixed transition period because (1) the length of time before new products are on shelves varies by product, store, and geographic location and (2) both old and new products may have been on shelves at the same time. Data on these transitions likely do not exist, meaning Dr. Hamilton cannot account for them in his analysis. Individual inquiry would be required to overcome this issue.

ii.    Differing Product Labels.    In addition to the removal of the Challenged Claims, Challenged Jason Products vary within the product line as to when they carried the "Pure, Natural & Organic" tagline, if at all. For example, under the Kids Only! franchise, the "Kids Only Shampoo, Daily Clean" (J00722) and the "Kids Only Every Day Conditioner" (J00723) never had the tagline. However, Tropical Twist Kids Only Bath Gel (J00725F), part of the same Kids Only! franchise as the Daily Clean Shampoo and Every Day Conditioner, carried the Jason tagline for a period of time after November 2009.[86] Similarly, the Aloe Vera deodorant roll on (J09007) did not carry the tagline between 2009 and 2011, whereas the Tea Tree deodorant (J09047) roll on did carry the tagline. However, the Tea Tree deodorant (J09045) stick and the Aloe Vera deodorant stick (J09025) products did not carry the tag line.[87] The different labeling within product lines

---

[85]  Hamilton Declaration, pp. 25-26.

[86]  Mencarelli Declaration, pp. 6-7.

[87]  Mencarelli Declaration, p. 8.

_____

necessitates individual inquiry to determine whether the Jason products purchased by the putative Class members actually bore the Challenged Claims.

b.  <u>Assumes The Existence Of A Price Premium</u>.  Dr. Hamilton's proposed regression model assumes that the Challenged Products would have sold at a reduced price in the absence of the Challenged Claims.

i.  Contrary to the price reduction assumption underlying Dr. Hamilton's proposed regression model, Defendant's Wholesale Price Lists reveal that wholesale costs and suggested retail prices for Challenged Jason Products either remained constant or increased following the removal of the Challenged Claims.  (**Exhibit 5**.)  The aforementioned price observations weigh against a price premium associated with the claimed organic labeling.

ii.  Given differences in prices across geographic areas, distribution channels, time periods, and promotions, Dr. Hamilton has not clearly articulated how he would test the existence of a price premium (as opposed to assuming it exists).  As illustrative examples, price variations that exist across time and geography can be seen in **Figure 1** (next page) for Jason's 6 oz. PowerSmile organic toothpaste. This product was specifically identified by Plaintiffs in the First Amended Complaint.[88]   In a given California city (available in IRI data), prices vary across years by as much as ███████████████   Similarly, in a given year, prices vary across California cities by as much as █████████████

_____

[88] First Amended Complaint, pp. 8 – 9.

_____

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

**Figure 1**
**Jason's 6 oz. PowerSmile Organic Toothpaste**
**Average Prices Across California Cities**



c.  "Preferred Method" Assumes Only One Organic Premium.   Although Dr. Hamilton testified that his report was "agnostic" as to the number of organic premiums he would need to estimate,[89] he stated that he "would prefer to estimate a single willingness to pay premium for the organic attribute."[90]   However, estimation of only one claimed price premium for an organic claim is troubling for several reasons.

    i.  Assumes One Premium For All Brands.   Dr. Hamilton's preferred regression approach assumes one organic premium for all brands and products included in the regression analysis.   As a result, Dr. Hamilton's preferred regression method assumes without evidence that the two brands with Challenged Products received the same premium as one another and as other brands.   Beyond that, there are 5 product types that Dr. Hamilton identified.   This leads to at least 10 different product type / brand categories of products.   Dr. Hamilton has not established that the claimed price premium would be equal across all of these consumer options (especially as they are very different products and/or product categories.)

    ii.  Assumes One Premium For All Product Types.   Dr. Hamilton's preferred regression approach assumes one organic premium for all product types (e.g., shampoos and lip remedies).   However, Dr. Hamilton's own report documents

_____

[89]  Hamilton Deposition, p. 57.

[90]  Hamilton Deposition, p. 55.

_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

that this assumption is untenable: for example, organic premiums varied widely by food product, ranging from less than 50% for carrots to over 200% for rice.[91] In such a situation, determining one claimed price premium would create a situation where many putative Class members are over-compensated and many putative Class members are under-compensated – meaning there is no nexus between Dr. Hamilton's proposed approaches for evaluating a claimed price premium and the Challenged Claims.

    iii. <u>Assumes One Premium For Entire Class Period</u>.  Dr. Hamilton's preferred regression approach assumes one organic premium for all time periods Challenged Products were sold.  However, this assumption is unjustified and is tantamount to assuming that consumer tastes and preferences, production processes and costs, and other market forces were unchanged during the time period in question.  This criticism remains even if Dr. Hamilton evaluates more than one price premium across all of the different Challenged Products.

    iv. <u>Assumes One Premium For All Retailers</u>.  Dr. Hamilton's preferred regression approach assumes one organic premium for all retailers.  However, this assumes without evidence that customers purchasing at stores such as Whole Foods have the same willingness to pay for organic products as customers shopping at stores such as Wal-Mart.  In fact, the former set of customers is likely willing to pay a larger premium for organic products than the latter set.  As discussed elsewhere in my declaration, this criticism remains even if Dr. Hamilton evaluates more than one price premium across all of the different Challenged Products.

    v. <u>Assumes One Premium For All Geographic Locations</u>.  Dr. Hamilton's preferred regression approach assumes one organic premium across all locations in California.  However, this assumes without evidence that customers in cities such as San Francisco and Los Angeles have the same willingness to pay for organic products as customers in other locations in California.  As discussed elsewhere in my declaration, this criticism remains even if Dr. Hamilton evaluates more than one price premium across all of the different Challenged Products.

    d. <u>Limited Set Of Control Variables</u>.  Dr. Hamilton testified that he would use Nielsen or IRI data for the regression analysis and that "if they don't gather data on attributes, we don't have those in the data set."[92]  It appears Dr. Hamilton's approach is to utilize only one dataset and if the dataset does not contain all important explanatory variables, he will not search elsewhere for the data – it will just be omitted.  Dr. Hamilton did acknowledge that this could cause him to omit such important variables as "no animal testing" or "paraben-free" from his

_____

[91]  Hamilton Declaration, p. 10.

[92]  Hamilton Deposition, p. 62.

_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

regression analysis.[93]   Dr. Hamilton stated that, in spite of potentially omitting important variables from his analysis, that he could "estimate an unbiased model" to determine a claimed premium.[94]   However, failing to include relevant control variables can lead to bias in OLS regression (i.e., components of the price of the Challenged Products may be spread across the explanatory variables that are in the regression).[95]

e.   <u>Inability To Identify Premium In Presence Of Confounding Variables</u>.   Dr. Hamilton testified that if there are confounding or collinear variables, he cannot "tease out independent effects for those variables."[96]   Confounding explanatory variables are variables whose values vary in the same way as the variable of interest – limiting the ability to isolate reasons for changes in the variable of interest.   For example, if all organic products were paraben-free, and all paraben-free products were organic, then paraben-free is a confounding variable for organic.   In these cases regression analysis may not be able to isolate the parameter of interest.[97]   However, Dr. Hamilton also testified that "you can still estimate the organic attribute even if you don't control for these other attributes."[98]   Dr. Hamilton appears to gloss over a critical issue in attempting to estimate the price premium associated with the Challenged Claims.   If a "confounding variable" is omitted, Dr. Hamilton's regression will be unable to determine whether the price premium is driven by the organic attribute or his omitted variable, rendering his analysis unreliable.   Dr. Hamilton provided no explanation of how he could estimate the price premium associated with the organic attribute in the presence of confounding variables.

### B.  <u>Conjoint Analysis</u>

36.    Dr. Hamilton's second proposed method for calculating a claimed organic price premium is conjoint analysis.   Conjoint analysis is performed by surveying potential consumers.   Dr. Hamilton describes a potential survey question for conjoint analysis as "asking survey respondents to consider a product with the same ingredients and brand name,

_____

[93]  Hamilton Deposition, pp. 63-64.

[94]  Hamilton Deposition, p. 64.

[95]  Undergraduate Econometrics, Second Edition, Hill, R.C., Griffiths, W.E., and Judge, G.G., pp. 185-187.

[96]  Hamilton Deposition, p. 98.

[97]  Undergraduate Econometrics, Second Edition, Hill, R. C., Griffiths, W.E., and Judge, G.G., p. 189.

[98]  Hamilton Deposition, pp. 98-99.

_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014

_____

where the two products are otherwise identical apart from the organic label." [99]

However, the conjoint analysis methodology presented in the Hamilton Declaration would not yield a reliable estimate of harm suffered by individual putative Class members (i.e., a loss caused by the Challenged Claims) for at least the following two reasons.

a. Dr. Hamilton's proposed conjoint analysis at best would measure an average willingness to pay, not an actual price premium paid.

b. Dr. Hamilton's description of his proposed conjoint analysis omits necessary details and fails to address common flaws in conjoint analysis studies.

## 1. Dr. Hamilton's Proposed Conjoint Analysis At Best Would Measure An Average Willingness To Pay, Not An Actual Price Premium Paid

37.    Dr. Hamilton does not explain how conjoint analysis can be used to estimate the price premium a product labeled as organic commands.   Dr. Hamilton conflated two fundamentally different economic concepts: (a) the amount a consumer might hypothetically be *willing to pay* for a product or feature and (b) the actual price charged for the product or feature in the marketplace.   For example, immediately after asserting that conjoint analysis "can be used to calculate the organic [price] premium," he specified that the conjoint analysis method is "based on consumer surveys aimed at directly capturing the consumers' willingness to pay for organic products relative to conventional products." [100]    Additionally, Dr. Hamilton wrote "the [conjoint analysis] method to calculate organic premiums has been previously used in the economics literature" and then cited several academic papers which estimate consumers' willingness to pay rather

_____

[99]  Hamilton Declaration, p. 28.

[100]  Hamilton Declaration, p. 27.    (Emphasis added.)

_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014

_____

than estimating actual price premiums.[101]    At no point did Dr. Hamilton acknowledge that willingness to pay and actual price premium paid are different concepts.

38.    Basic economic theory dictates that price is determined by the interaction between supply and demand factors.    Thus, a consumer's "willingness to pay" for a product or feature is not the same thing as the *price* of that product or feature.    The difference between those two amounts is called "consumer surplus" – a universally accepted economic distinction.[102]    Generally, the market price of a product or service is lower than all but the marginal purchaser's willingness to pay – providing incentives to purchase the product or service for those consumers with a *higher* willingness to pay (because the actual price they pay is less than the value they place upon the product).[103]

39.    Furthermore, the proposed conjoint analysis approach measures a hypothetical willingness to pay even if performed in a manner that avoids the many potential biases and uncertainties involved in designing and implementing a consumer survey of this type. Willingness to pay may have little or no systematic relationship with the prices actually charged by retailers and paid by consumers.    The prices actually charged by retailers and paid by consumers depend upon a combination of demand and supply factors (in addition

_____

[101]    Hamilton Declaration, p. 28. *See, for example,* Ott, S.L.,"Supermarket shoppers' pesticide concerns and willingness to purchase certified pesticide residue-free fresh produce," *Agribusiness* 6.6 (1990), 593-602; "Differences between buyers and non-buyers of organic produce and willingness to pay organic price premiums," *Journal of Agribusiness* 9.1 (1991), 97-111; and Beaverson, J., "Putting their money where their mouths are: Consumer willingness to pay for multi-ingredient, processed organic food products," *Food Policy* 32 (2007), 145-159.

[102]    *See, e.g.*, Jeffrey M. Perloff, <u>Microeconomics</u> (5th Edition), p. 272.

[103]    Market conditions ultimately determine the price of a product.

_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014

_____

to consumer preferences and hypothetical perceptions of value for a particular feature).

Other considerations might include:

    a.  the value of other features or attributes provided in the same product (including features or attributes not tested in the proposed survey);

    b.  features and prices of other products that consumers might choose as alternatives;

    c.  costs of production and distribution;

    d.  practical pricing considerations; and/or

    e.  other strategic considerations that can affect the pricing decisions of manufacturers and retailers.

40.    Personal care products such as Avalon Organics and Jason products are sold with a variety of attributes (e.g., type of product including facial products, shampoos, hair conditioners; fragrance; moisturizing attributes; etc.) and by a variety of competitors.  In this context, there may be no nexus between (a) some consumers' hypothetical willingness to pay for a given feature of a multi-featured product and (b) a manufacturer's or retailer's ability to charge an actual price premium or the market's actual placement of a price premium on that specific feature.  Hence, any claimed "willingness to pay" derived by Dr. Hamilton from a conjoint analysis is likely to have little or no correlation with any <u>actual</u> premium observed in the market associated with the Challenged Claims.

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

**2. Dr. Hamilton's Description Of His Proposed Conjoint Analysis Omits Necessary Details And Fails To Address Common Flaws In Conjoint Analysis Studies**

41.     Dr. Hamilton's brief and incomplete description of his proposed analysis overlooks many

known challenges in performing a conjoint analysis, including at least the following

potential drawbacks that Dr. Hamilton failed to acknowledge or explain.

   a.   Overemphasis On Certain Product Features.   Conjoint analysis necessarily draws
        attention to features used in the survey exercise (e.g., the Challenged Claims) at the
        expense of features not included in the survey.   By drawing additional attention to
        the Challenged Claims, the conjoint analysis runs the risk of measuring a larger
        impact of the features on consumer preferences than that actually observed in the
        marketplace.   Presented with a description of the Challenged Claims in a survey,
        respondents may ascribe more value to the Challenged Claims in the survey setting
        than they would when making actual purchase decisions.[104]   Dr. Hamilton did not
        address how he will overcome this drawback.   Dr. Hamilton did not provide sample
        survey feature descriptions for evaluation.

   b.   No Details Regarding Proposed Survey.   Conjoint analysis is unreliable when
        important features of the product are omitted from the survey.   Dr. Hamilton failed to
        provide a list of features to be included in his proposed survey – making it impossible
        to properly evaluate the reliability of his proposed analysis or the reliability of the
        proposed features to be included in the survey.   Dr. Hamilton also did not explain
        how the relevant product attributes (e.g., foaming action, fragrance, or moisturizing
        effect, among others) would be described or represented to survey participants.

   c.   No Account Of Variation Over Time.   Survey methodologies such as conjoint
        analysis generally measure the value of features of the product at the point in time of
        the survey and cannot easily determine the value of features in the past.   To the
        extent that the value consumers place on the Challenged Claims varies over time, Dr.
        Hamilton's proposed methodology would be unable to measure reliably the value of

_____

[104]  In a store environment (when an actual purchase is being considered), the consumer chooses the product attributes upon which to focus; in a survey environment, the consumer is told the product attributes upon which to focus.   In addition, Dr. Hamilton did not state the sampling population for his survey. That is, would the survey be administered to (a) actual purchasers of Avalon Organics or Jason products (who did in fact purchase Avalon Organics or Jason products rather that alternative brands), (b) purchasers of Avalon Organics, Jason, and/or competing products (i.e., those consumers who evaluated the attributes of Avalon Organics / Jason products and other similar products and may have decided to purchase the alternative product), or (c) non-purchasers of Avalon Organics / Jason products or any similarly situated products (i.e., consumers who have not purchased any such products).

_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

the Challenged Claims to individuals who purchased the Challenged Products earlier in the Class period (which began as early as May 2007). Dr. Hamilton provided no support for his implicit assumption that the value consumers would attribute to the Challenged Claims has remained constant over time.

42.     Because Dr. Hamilton has not actually conducted his proposed conjoint analysis or offered pilot survey questions, pilot surveys, or other developed economic models for evaluation, there can be no assurances that Dr. Hamilton's proposed conjoint analysis approach could reliably isolate a claimed "willingness to pay" for the Challenged Claims, let alone an actual "premium paid."

### C. Difference-In-Difference Approach

43.     Dr. Hamilton's final proposed way to estimate a price premium is to use a difference-in-difference approach. Difference-in-difference models attempt to isolate the effect of one change by comparing products that changed one attribute (i.e., the experimental or treatment group) to comparable products that did not change that attribute (i.e., the control group). However, Dr. Hamilton's proposed difference-in-difference approach does not yield a reliable estimate of the claimed harm suffered by individual putative Class members for at least the following reasons.

a. Dr. Hamilton provided an incomplete description of his difference-in-difference approach.

b. Dr. Hamilton's proposed difference-in-difference approach suffers from significant shortcomings that render it incapable of yielding a reliable estimate of Class-wide damages.

_____

_____

### 1. Dr. Hamilton Failed To Specify Details Necessary To Evaluate Reliability Of Proposed Difference-in-Difference Approach

44.    Dr. Hamilton provided a general description of his proposed difference-in-difference approach. [105]    Evaluating Dr. Hamilton's proposed difference-in-difference approach requires much of the same information as his regression approach.   As a result, some of the information-related deficiencies discussed in **Section IX.A.1** with regard to his proposed regression approach apply to the difference-in-difference approach, including (a) a non-exhaustive list of variables and (b) an undetermined number of premiums to estimate.    As with his proposed regression approach, Dr. Hamilton's proposed difference-in-difference approach cannot be fully evaluated in the absence of this information.

45.    Dr. Hamilton failed to provide the following additional information needed to evaluate whether his proposed difference-in-difference approach could reliably estimate a claimed premium associated with the Challenged Claims.

    a.    <u>Availability Of Necessary Data</u>.    Dr. Hamilton stated that the difference-in-difference approach would require a list of the products that removed the organic label and the time period in which the label change was in effect. [106]   In other words, Dr. Hamilton's difference-in-difference approach requires information on (i) the time periods during which certain products sold had an organic label claim; (ii) the transition time periods (for each product) during which products containing old and new labels are both available; and (iii) the time periods during which certain products sold no longer had an organic label claim.   The precise time periods likely vary across products, retailers, and geographic location, and thus the required data likely do not exist.   Individual inquiry would be required in such instances.

    b.    <u>No Identification Of Control Group(s)</u>.   Dr. Hamilton stated that the control group for his difference-in-difference analysis would consist of "organic products that are

_____

[105]  Hamilton Declaration, pp. 29-31.

[106]  Hamilton Declaration, p. 31.

_____

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014

_____

similar in composition to the products that removed the organic label (e.g., same or similar brand, same product definition) but that did not switch their label."[107]  This description is insufficient for at least the following reasons.

    i.   No List Of Control Products.  Dr. Hamilton did not identify the products that matched his description of a control group.  This list is necessary to evaluate whether his control group is an adequate set of products.

    ii.   No Discussion Of Multiple Control Groups.  Dr. Hamilton stated that the appropriate control group for a product should be "similar in composition" to that product, such as having the "same product definition."[108]  However, Dr. Hamilton did not discuss whether he would use different control groups for different product types (e.g., shampoos versus lip remedies).  Knowledge of the number and contents of control groups is necessary to evaluate whether Dr. Hamilton is making appropriate comparisons.

  c.  Specification Of Model.  Dr. Hamilton has not provided important details about how he would specify his model.  Dr. Hamilton has failed to provide information about how his proposed difference-in-difference model would handle the following issues:

    i.   Choice Of Dependent Variable.  Dr. Hamilton's proposed difference-in-difference approach uses "sales" as the dependent variable.[109]  According to Dr. Hamilton, this could mean dollar sales or price per ounce.[110]  Dr. Hamilton's choice of dependent variable is an important part of his proposed difference-in-difference approach.  However, Dr. Hamilton has identified neither the dependent variable nor how he would choose it.

    ii.   Timing Of Product Label Changes.  Dr. Hamilton's proposed difference-in-difference model works by comparing the prices of two groups (an experimental or treatment group and a control group) both before and after a label change.[111]  In addition to the various Challenged Jason Products that underwent label changes, Dr. Hamilton identified skincare products from 2 brands (Aubrey Organics and Kiss My Face) and hair care products from 3 brands (Aubrey Organics, Natures Gate, and Giovanni) that made similar label changes.[112]

_____

[107]  Hamilton Declaration, p. 30.

[108]  Hamilton Declaration, p. 30.

[109]  Hamilton Declaration, p. 29.

[110]  Hamilton Declaration, p. 31.

[111]  Hamilton Declaration, p. 30.

[112]  Hamilton Declaration, p. 29.

_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

However, it is reasonable to expect that the various products changed labels at different times, in which case Dr. Hamilton would have to decide how to address this timing issue.  For example, the Challenged Jason products had the "Pure, Natural, & Organic" tagline removed at different points in time, and for each Jason product, the exact time period over which it was <u>sold</u> with the Challenged Claim is not known with certainty.   Mr. Mencarelli stated that "the newly labeled products would hit store shelves between two weeks and six months after the effective date." [113]   Dr. Hamilton has not discussed how he would address the uncertainty surrounding the timing of product label changes under his proposed method.

### 2. <u>Proposed Difference-In-Difference Approach Has Numerous Shortcomings Rendering It Incapable Of Measuring Class-Wide Damages</u>

46.     Dr. Hamilton's proposed difference-in-difference approach suffers from similar shortcomings to his proposed regression analysis, summarized above in **Section IX.A.2**. These shortcomings include (a) assuming the existence of a proposed price premium; (b) preferring to estimate only one price premium for organic claims; (c) having a limited set of control variables; and (d) being unable to identify a premium in the presence of confounding variables.   As with his proposed regression approach, these shortcomings render Dr. Hamilton's proposed difference-in-difference approach incapable of measuring Class-wide damages.

47.     Dr. Hamilton's proposed difference-in-difference approach suffers from additional shortcomings.   These shortcomings prevent Dr. Hamilton's proposed difference-in-difference approach from providing a reliable estimate of Class-wide damages.

a.   <u>No Description Of How To Isolate A Price Change From A Quantity Change</u>.   Dr. Hamilton's proposed difference-in-difference approach uses "sales" as the dependent variable. [114]   He later states that this could mean "dollar sales" [115] (or revenue), a

_____

[113]  Mencarelli Declaration, p. 3.

[114]  Hamilton Declaration, p. 29.

[115]  Hamilton Declaration, p. 31.

_____

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

measure he discussed during his deposition testimony.[116]   Revenue (or "dollar sales") is the equivalent of expenditures made by consumers and is the product of price times quantity.   Total revenue (or total dollar sales) is the sum of the expenditures made on all products purchased.   Such a measure conflates both price and quantity.   If Dr. Hamilton were to use his proposed difference-in-difference approach to calculate a change in revenue attributable to Challenged Claims (if any exists), that value could represent a change in the price, a change in the quantity, or both.   Dr. Hamilton would have to separate the price change, reflecting a price premium, from the quantity change.   Dr. Hamilton has provided no description of how he would isolate the price premium.

b.   <u>Limited Ability To Estimate Time-Specific Premiums</u>.   Dr. Hamilton's proposed difference-in-difference approach works by comparing the prices of two groups (an experimental or treatment group and a control group) before and after a label change.[117]   This means that Dr. Hamilton can only estimate premiums for the specific point(s) in time that products change their labels.   For example, if no products changed their labels until 2011, then Dr. Hamilton would only be able to estimate a premium for 2011 and would have to assume the premium was the same for all time periods.   Dr. Hamilton has shown no evidence that he will be able to identify products that change labels at multiple points in time.   Furthermore, Dr. Hamilton has provided no evidence to support the assumption of a constant premium over the period.

c.   <u>No Separate Premium For Avalon Organics</u>.   Dr. Hamilton testified that he was unaware of a difference-in-difference example for the Avalon Organics line.[118]   Dr. Hamilton acknowledged that, were he to use the difference-in-difference approach, he would have to estimate one general price premium and assume it covered all brands.[119]   However, Dr. Hamilton has provided no evidence to justify that assumption.

d.   <u>Cannot Isolate "Organic" Effect</u>.   Dr. Hamilton's proposed difference-in-difference approach measures the overall effect of changing a label.   Dr. Hamilton acknowledged that the Challenged Products under the Jason line removed the tagline "Pure, Natural & Organic" from the label.[120]   If Dr. Hamilton were to use the difference-in-difference approach and estimate a premium for Jason products associated with that tagline, then he would have to isolate the effect of the word

_____

[116]  Hamilton Deposition, pp. 78 – 80.

[117]  Hamilton Declaration, p. 30.

[118]  Hamilton Declaration, p. 82.

[119]  Hamilton Deposition, p. 82.

[120]  Hamilton Declaration, p. 19.

_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014

_____

"organic" from "pure" and "natural." Dr. Hamilton has not discussed how he would isolate this effect. Furthermore, although Dr. Hamilton has testified that Nielsen and IRI data contain information on "natural" and "organic" label claims,[121] he has made no indication that these data contain information on "pure" label claims. The lack of data and the lack of a proposed method to isolate the effect of the "organic" claim call into question the ability of Dr. Hamilton's proposed difference-in-difference approach to isolate the effect of the "organic" claim.

e.   <u>Unjustified Creation Of Experimental Group</u>.  Dr. Hamilton described his proposed difference-in-difference approach as a comparison based upon two groups: an experimental or treatment group and a control group.[122]  Dr. Hamilton's experimental group would be composed of products that removed the organic label. In addition to the Challenged Jason Products, Dr. Hamilton identified non-challenged brands (e.g. Aubrey Organics, Kiss My Face) that had products he would classify in the experimental group.[123]  However, in order for the indicated products to be appropriately classified in the experimental group, the products must have undergone only changes in the "organic" label at the indicated times.  If the products in question also changed product formulae, then Dr. Hamilton's proposed difference-in-difference approach will be unable to separate the price effects of an organic claim (if such effects exist) from the price effects of reformulating the products.

f.   <u>Simplistic Use of Jason Sales Revenue Data</u>.  Dr. Hamilton presented a simple example of how to use before and after information to evaluate (and calculate) a claimed organic price premium for Jason products.  Dr. Hamilton concluded that the simple example he presented suggested a ▮▮▮▮▮ premium associated with the Challenged Claims (based upon certain sales revenue decreases).[124]  Dr. Hamilton then testified that a better first approximation would be to compare the ▮▮▮▮▮ ▮▮▮▮▮ with an industry-wide revenue growth rate of 9% - implying an organic premium of almost ▮▮▮.[125]  Dr. Hamilton's example is too simplistic and should not be taken as evidence of the existence of a price premium associated with the Challenged Claims for at least the following reasons.[126]

---

[121] Hamilton Deposition, p. 63.

[122] Hamilton Declaration, p. 30.

[123] Hamilton Declaration, p. 29.

[124] Hamilton Declaration, p. 29.

[125] Hamilton Deposition, pp. 79-80.

[126] Dr. Hamilton acknowledged the limitations of this exercise, referring to it as an "approximation" and "not an accurate figure" as well as testifying that a difference-in-difference estimator "would have to be much more carefully done."   (Hamilton Deposition, pp. 79-80.)

_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014

_____

i.  <u>Conflation of Price and Quantity Effects</u>.  Dr. Hamilton determined these figures (████ and approximately ████) by comparing total revenue for Jason products from before and after the removal of the Jason tagline.  However, the Hain presentation that indicated a ████████ in total revenue also indicated a ████ in the average retail price of Jason skincare products.[127]  Thus the ████████████ does not represent a ████ price premium but rather a decrease in the quantity of Jason skincare products sold.  Furthermore, the decrease in quantity of Jason products sold was likely, at least in part, due to the price increase.  With this example, Dr. Hamilton has not isolated the effect of removing the tagline (i.e., resulting in a posited decrease in price) from the fact that prices actually increased in some cases.

ii.  <u>Lack of Controls for Other Attributes</u>.  Dr. Hamilton commented on these figures using aggregate data and without a detailed investigation of specific product attributes and market conditions that may affect unit sales and prices.  As a result these figures conflate many product differences between Challenged Products and other products in the industry into one approximation.  For example, the claimed ████████████ could be a function of other changes in the market place occurring roughly during the period that the ████████████ was observed.

iii.  <u>Inappropriate Control Groups</u>.  Dr. Hamilton determined these figures without a control group (i.e., the ████ claim) or with the entire industry as his control group (i.e., the approximately ████ claim).  However, Dr. Hamilton acknowledged that the products in the control group need to be "similar in composition to the products that removed the organic label (e.g., same or similar brand, same product definition) but that did not switch their label."[128]  Neither figure presented by Dr. Hamilton was determined with a control group that met his own criteria.

iv.  <u>Lack of Ability to Isolate Organic Claim</u>.  Dr. Hamilton determined these figures by comparing sales revenue from after the tagline was removed with sales revenue from before the tagline was removed.[129]  However, the tagline contained three separate claims (i.e., pure, natural, and organic).  Dr. Hamilton did not acknowledge or isolate the three separate components of the tagline that were removed.  Also, Dr. Hamilton did not provide a methodology that would isolate what part of his approximations represents each of these claims.

_____

[127]  Avalon Organics NSF Transition Review Presentation by The Hain Celestial Group dated February 2012 ("Avalon Organics Transition Review"), p. 48.

[128]  Hamilton Declaration, p. 29.

[129]  Hamilton Declaration, p. 29.

_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

## X.    WHETHER AND TO WHAT EXTENT ANY CLASS MEMBER WAS INJURED AS A RESULT OF THE CHALLENGED CLAIMS DEPENDS UPON INDIVIDUALIZED INQUIRY

48.    Determining (a) whether a Jason putative Class member suffered any economic injury as a result of the "Pure, Natural & Organic" Challenged Claim and (b) whether an Avalon Organics Class member suffered any economic injury as a result of "pro-organic" claims and/or the brand name "Avalon Organics" requires individualized information relating to each Class member.   This individualized information includes, *inter alia*: (a) whether the putative class members actually purchased Challenged Products (as opposed to non-challenged products) under the Avalon Organics or Jason brands; (b) the putative Class member's reasons for purchasing Avalon Organics and/or Jason products; (c) the price paid by the putative Class member for Avalon Organics and/or Jason products; and (d) whether individual putative Class members only would have purchased the Challenged Products at an assumed reduced price or would not have purchased the Challenged Products at all if the Challenged Claims are found to be misleading.   The above circumstances relating to each individual putative Class member's purchasing decision must be considered in order to determine whether or not the individual was injured as a result of the Challenged Claims.

### A.    Individual Inquiry Is Required To Determine Whether Putative Class Members Purchased The Challenged Products

49.    For Jason personal care products, Hain removed the "Pure, Natural & Organic" tagline from all of its Jason products that carried the tagline during the 2009 – 2011 time period. Due to the gradual phasing out of the Challenged Claim on Jason products, there is a period where both Challenged Products and non-challenged products were present in the

_____
Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

market.    The precise timing that new products were placed on store shelves would vary
across product, store, and location.    Even if receipts existed, a determination as to
whether any particular package of Jason products contained the "Pure, Natural &
Organic" claim could not be determined on a Class-wide basis during the transition
periods when Hain was changing the labels associated with various Challenged Jason
Products.    Additional complicating factors related to identifying whether putative Class
members purchased the Challenged Jason Products include the following.

   a.  Multiple Jason products (i.e., (1) products labeled "USDA Organic" and (2) products
       not labeled "USDA Organic" but meeting the 70% organic ingredients) are not
       alleged to have been mislabeled.[130]

   b.  Multiple Jason product lines carried the tagline for only certain products during a
       portion of the Class period.    These products pose even greater challenges to the
       identification of purchases that qualify as Challenged Product purchases than
       products that always or never had the tagline.    For example, within the Kids Only
       products, the Kids Only "extra gentle" shampoo had the tagline for a portion of the
       Class period whereas the "daily clean" shampoo did not have the tag line for any part
       of the Class period.[131]    Similarly, the Aloe Vera deodorant roll on (J09007) did not
       carry the tagline between 2009 and 2011, whereas the Tea Tree deodorant (J09047)
       roll on did.    However, the Tea Tree deodorant (J09045) stick did not carry the tag
       line; nor did the Aloe Vera deodorant stick (J09025).[132]

Therefore, individual inquiry would be required to determine whether Jason product(s)
purchased by putative Class members actually bore the Challenged Claim.

50.    With regard to Avalon Organics products, I understand that all Avalon Organics products
       were reformulated between 2009 and 2010 to meet the 70% COPA standard.[133]    Again,
       the transition from the old formula to the new formula occurred gradually, meaning there

_____

[130]  Hamilton Declaration, p. 20.

[131]  Mencarelli Declaration, pp. 6-7.

[132]  Mencarelli Declaration, p. 8.

[133]  Motion for Class Certification, p. 4.

_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014

_____

was a period during which both Challenged Avalon Organics Products and reformulated versions of them were present in the market.  And, as with the Jason products, some Avalon Organics products in the class period contained a "USDA Organic" seal and are not alleged to be part of the class.

51.    As a result of the variation in claims over the Class period and across the Challenged Products, common proof cannot be used to evaluate the economic impact of the claims present on purchases of putative Class members.  Individual inquiry would be required to determine precisely what claims were on the products purchased by putative Class members, and whether the products purchased even bore the Challenged Claim.

**B.    Individual Inquiry Is Required To Determine Putative Class Members' Reasons For Purchasing Hain's Challenged Products**

52.    The Challenged Product sales are driven by numerous factors unrelated to the Challenged Claims (e.g., brand value, product, appearance, and fragrance, inter alia).  Hain undertook a marketing evaluation of natural and organic products and concluded that natural or organic ingredients were one of many factors that drove purchase decisions. Also listed as important decision factors were scent, brand, and SPF.[134]  In addition, the Named Plaintiffs testified that they cared about products' not engaging in animal testing.[135]

53.    These purchase drivers are unrelated to the Challenged Claims, and consumers who purchased Avalon Organics and/or Jason personal care products for these reasons were not injured (or were not injured to the same degree) as consumers who purchased in

_____

[134]  Avalon Organics Transition Review, p. 16.

[135]  Brown Deposition, p. 23 and Lohela Deposition, p. 24.

_____

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014

_____

substantial part because of the Challenged Claims.  The fact that a given customer can purchase Avalon Organics and/or Jason products based upon multiple, different considerations necessitates individualized inquiry to determine a putative Class member's rationale for purchasing Avalon Organics and/or Jason products and the extent of any claimed injury and corresponding damages.

### C. Individual Inquiry Is Required To Determine At What Price, If Any, Putative Class Members Would Have Purchased Challenged Products

54.    Plaintiffs allege that (a) some putative Class members would not have purchased the Challenged Products at all and (b) other putative Class members would have purchased the Challenged Products only at an assumed reduced price.[136]  These two types of putative Class members would have suffered different damages from the Challenged Claims.  At a minimum, in order to calculate damages according to Plaintiffs' theory, Plaintiffs would have to (a) identify the price reduction, if any, that would have applied to Challenged Products during the relevant time period and (b) identify whether putative Class members would have purchased at the reduced price.  Even assuming that a price premium exists and that damages could reliably be calculated for members of both groups, individual inquiry still would be required to determine to which group any individual would belong (should the Challenged Claims be found to be misleading).

### D. Individual Inquiry Is Required To Determine The Specific Price Paid For Avalon Organics and Jason Products By Each Class Member

55.    Individual Class members purchased Avalon Organics and/or Jason Challenged Products at prices that varied by large amounts, based in part on the distribution channel in which

---

[136]  First Amended Complaint, p. 1.

_____

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

they purchased the Challenged Product, the retailer where they purchased the product, the geographic location of their purchase, and whether they paid an everyday price or a promotional price. The extent to which any individual Class member could have suffered economic harm depends in part upon the price paid by that individual Class member – especially relative to a comparable or benchmark product. The Named Plaintiffs' testimony reinforces these points. The Named Plaintiffs testified that they purchased the Challenged Products at three different retailers: Whole Foods Market, Trader Joes, and Vitacost.com.[137] Additionally, Mr. Lohela purchased some of his Avalon Organics products at prices below wholesale cost.[138]

56.    Therefore, knowing the prices paid by individual Class members (which differed greatly across Class members) will be a necessary factor in evaluating whether an individual Class member suffered economic harm. Without individual inquiry, one cannot determine the price an individual Class member paid for a Challenged Product or the extent to which they did or did not pay a "price premium" – rendering attempts to quantify damages on a Class-wide basis inaccurate and unreliable.

### 1.  Description Of IRI Data

57.    In conducting my analyses, I relied in part upon retail sales and pricing data for Jason and Avalon Organics personal care products collected by IRI in 4-week intervals. The data contain (a) total unit sales, (b) total dollar sales, (c) average prices, (d) promotional units sold, (e) promotional prices, (f) non-promotional units sold, and (g) non-promotional

_____

[137]  First Amended Complaint, p. 2, and Lohela Deposition, p. 13.

[138]  Declaration of James Farrell in Support of Defendant The Hain Celestial Group, Inc.'s Opposition to Plaintiffs' Motion for Class Certification ("Farrell Declaration"), p. 1.

_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014

_____

prices.   The data are available from July 18, 2011 to July 13, 2014 for various Jason and

Avalon Organics products in the following categories:

a. U.S. sales and prices aggregated across all distribution channels (i.e., grocery stores, drug stores, and mass merchandisers (excluding Wal-Mart));

b. grocery store sales and prices in four California metropolitan areas (i.e., Los Angeles, San Francisco/Oakland, Sacramento, and San Diego); and

c. U.S. sales and prices in natural food stores.

58. For both Jason and Avalon Organics products, data are available at the UPC level (i.e. a specific product and size).   A summary of unit sales of Jason products in the four California cities available in IRI data is contained in **Exhibit 6**.   Three Jason products accounted for over ▮ of all California sales between 2011 and 2014: Jason Sea Fresh organic toothpaste (6 oz.); Jason lavender body wash (30 oz.); and Jason PowerSmile organic toothpaste (6 oz.).   Subsequent analyses of Jason products focus on these three products.

59. A similar summary of unit sales of Avalon Organics products for the same four California cities available in IRI data is contained in **Exhibit 7**.   Three Avalon Organics products represent almost ▮ of all Avalon Organics sales between 2011 and 2014: Avalon Organics lavender organic Shampoo (11 oz.); Avalon Organics lavender organic conditioner (11 oz.); and Avalon Organics lavender organic hand and body lotion (12 oz.).   Subsequent analyses of Avalon Organics products focus on these three products.

## 2. Analyses Performed Regarding Retail Prices Of Jason Products

60. Analysis of the pricing data for the three top-selling products demonstrates that there are wide variations in the retail price of Jason personal care products depending upon (a)

_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

promotions utilized and (b) geographic location.  The data support the conclusion that there is no "single" average purchase price that can be used to evaluate claimed damages on a Class-wide basis.

### i.  Jason's Prices Vary Depending Upon Promotional Activity

61.  Large variations exist between Jason's non-promoted prices and promoted prices.  A not insignificant proportion of Jason products sold in California are sold on promotion during the claimed Class period.  During the July 18, 2011 – July 13, 2014 time period, the annual proportion of Jason's products sold on promotion in four major California markets ranges from (a) ██████████ for Jason's Sea Fresh toothpaste (6 oz.), (b) ██████████ for Jason's lavender body wash (30 oz.), and (c) ██████████ for Jason's PowerSmile toothpaste (6 oz.).  (**Exhibit 8**.)  Hence, whether the purchase is made during an active promotion is important in determining the actual prices paid by individual putative Class members, whether the individual putative Class members paid a price premium, and the amount of any alleged price premium.

62.  As an example, I present in **Exhibit 9** the difference between promoted and non-promoted prices in Los Angeles.  Across all time periods, the difference between non-promoted and promoted prices ranges from (a) ██████████ for Jason's Sea Fresh organic toothpaste (6 oz.),[139] (b) ██████████ for Jason's lavender body wash (30 oz.), and (c) ██████████ for Jason's PowerSmile organic toothpaste (6 oz.).  Illustrative examples of the variation between non-promoted prices and promoted prices in Los Angeles are presented

_____
[139] Jason's Sea Fresh organic toothpaste had no recorded promotional sales for 2011.  As a result, a price difference cannot be calculated.

_____

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014

_____

in (a) **Table 1** for the three top-selling Jason's products in 2013 and (b) **Figure 2** for

Jason's PowerSmile organic toothpaste (6 oz.) over the July 18, 2011 – July 13, 2014

time period.

**Table 1**
**Jason's Top-Selling Products**
**Promoted And Non-Promoted Prices in Los Angeles (2013)**

| Jason's Product | Non-Promoted Price | Promoted Price | Difference | % Difference |
|---|---|---|---|---|
| Jason's 6 oz. Sea Fresh organic toothpaste | ▉ | ▉ | ▉ | ▉ |
| Jason's 30 oz. lavender body wash | ▉ | ▉ | ▉ | ▉ |
| Jason's 6 oz. PowerSmile organic toothpaste | ▉ | ▉ | ▉ | ▉ |

**Figure 2**
**Jason's 6 oz. PowerSmile Organic Toothpaste**
**Promoted And Non-Promoted Prices in Los Angeles**



63.    The price variations discussed above <u>do not</u> take into account usage of coupons or other

promotional opportunities (such as buy-one-get-one-free promotions) – which would

_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

contribute to the price dispersion associated with Jason Products.  The observed price dispersion as a result of promotional pricing demonstrates the need for individual inquiry to determine whether a purchase by a putative Class member involved promotional pricing.

### ii.  Jason's Prices Vary Depending Upon Geographic Location

64.    Analysis of the IRI data indicates that average retail price of the Challenged Products varies across geographic areas.  Specifically, across all time periods, the difference in average retail prices between the highest and lowest priced California markets ranges from (a) ████████ for Jason's Sea Fresh organic toothpaste (6 oz.)[140], (b) ████████ for Jason's lavender body wash (30 oz.), and (c) ████████ for Jason's PowerSmile organic toothpaste (6 oz.).  (**Exhibit 10**.)  An illustrative example of price variation across the four California markets for the three top-selling Jason's products is presented in **Table 2**.

**Table 2**
**Jason's Top-Selling Products**
**Average Retail Prices By California Markets (2013)**

| Jason's Product | Market With Lowest Average Price | Market With Highest Average Price | Difference | % Difference |
|---|---|---|---|---|
| Jason's 6 oz. Sea Fresh organic toothpaste | ████ | ██████ | ██ | ██ |
| Jason's 30 oz. lavender body wash | █████ | ██████ | ██ | █ |
| Jason's 6 oz. PowerSmile organic toothpaste | ████ | █████ | ██ | ██ |

_____

[140] Jason's Sea Fresh organic toothpaste had no recorded promotional sales for 2011.  As a result, a price difference cannot be calculated.

_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

### 3.  Analyses Performed Regarding Retail Prices Of Avalon Organics Products

65.    Similar to that performed for Jason products above, analysis of the pricing data for the three top-selling products demonstrates that there are wide variations in the retail price of Avalon Organics personal care products depending upon (a) promotions utilized and (b) geographic location.  The data support the conclusion that there is no "single" average purchase price that can be used to evaluate claimed damages on a Class-wide basis.

### i.  Avalon Organics' Prices Vary Depending Upon Promotional Activity

66.    Large variations exist between non-promoted prices and promoted prices for Avalon Organics products.  A significant proportion of Avalon Organics products sold in California are sold on promotion during the claimed Class period.  During the July 18, 2011 – July 13, 2014 time period, the annual proportion of Avalon Organics products sold on promotion in four major California markets ranges from (a) ▮▮▮▮▮▮▮ for Avalon Organics lavender shampoo (11 oz.), (b) ▮▮▮▮▮▮▮ for Avalon Organics lavender conditioner (11 oz.), and (c) ▮▮▮▮▮▮ for Avalon Organics lavender head and body lotion (12 oz.).  (**Exhibit 11**.)  Hence, whether the purchase is made during an active promotion is important in determining the actual prices paid by individual putative Class members, whether the individual putative Class members paid a price premium, and the amount of any alleged price premium.

67.    As an example, I present in **Exhibit 12** the difference between promoted and non-promoted prices in Los Angeles.  Across all time periods, the difference between non-promoted and promoted prices ranges from (a) ▮▮▮▮▮▮ for Avalon Organics lavender shampoo (11 oz.), (b) ▮▮▮▮▮ for Avalon Organics lavender conditioner (11

_____
Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014

_____

oz.), and (c) ███████ for Avalon Organics lavender head and body lotion (12 oz.).

Illustrative examples of the variation between non-promoted prices and promoted prices

in Los Angeles are presented in (a) **Table 3** for the three top-selling Avalon Organics

products in 2013 and (b) **Figure 3** for Avalon Organics lavender shampoo (11 oz.) over

the July 18, 2011 – July 13, 2014 time period.

**Table 3**
**Avalon Organics' Top-Selling Products**
**Promoted And Non-Promoted Prices in Los Angeles (2013)**

| Avalon Organics Product | Non-Promoted Price | Promoted Price | Difference | % Difference |
|---|---|---|---|---|
| Avalon Organics 11 oz. lavender shampoo | ███ | ███ | ███ | ███ |
| Avalon Organics 11 oz. lavender conditioner | ███ | ███ | ███ | ███ |
| Avalon Organics 12 oz. lavender hand and body lotion | ███ | ███ | ███ | ███ |

**Figure 3**
**Avalon Organics 11 oz. Lavender Shampoo**
**Promoted And Non-Promoted Prices in Los Angeles**



_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

68.   The price variations discussed above <u>do not</u> take into account usage of coupons or other promotional opportunities (such as buy-one-get-one-free promotions) – which would contribute to the price dispersion associated with Avalon Organics products.    The observed price dispersion as a result of promotional pricing demonstrates the need for individual inquiry to determine whether a purchase by a putative Class member involved promotional pricing.

### ii.   Avalon Organics' Prices Vary Depending Upon Geographic Location

69.   Analysis of the IRI data indicates that average retail price of the Challenged Products varies across geographic areas.    Specifically, across all time periods, the difference in average retail prices between the highest and lowest priced California markets ranges from (a) ███████ for Avalon Organics lavender shampoo (11 oz.), (b) ███████ for Avalon Organics lavender conditioner (11 oz.), and (c) ███████ for Avalon Organics lavender hand and body lotion (12 oz.).   (**Exhibit 13**.)   An illustrative example of price variation across the four California markets for the three top-selling Avalon Organics products is presented in **Table 4**.

**Table 4**
**Avalon Organics' Top-Selling Products**
**Average Retail Prices By California Markets (2013)**

| Avalon Organics Product | Market With Lowest Average Price | Market With Highest Average Price | Difference | % Difference |
|---|---|---|---|---|
| Avalon Organics 11 oz. lavender shampoo | ████ | ████ | ██ | ██ |
| Avalon Organics 11 oz. lavender conditioner | ████ | ████ | ██ | ██ |
| Avalon Organics 12 oz. lavender hand and body lotion | ████ | ████ | ██ | ██ |

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

Declaration of Keith R. Ugone, Ph.D.
August 29, 2014
_____

### 4. __Summary__

70.    Based upon the analyses discussed above relating to geographic location and promotional

pricing, evaluating Class-wide damages using common proof would not produce a

reliable or accurate way to evaluate the fact of injury or the quantum of injury associated

with the Challenged Claims.   Prices of these products likely have similar variation across

sales distribution channel and retailer as well.   An evaluation of Class-wide damages

using common proof would not correlate with actual harm (if any) to putative Class

members.   Any determination of claimed damages absent individualized inquiry likely

would result in a windfall gain to a significant number of putative Class members who

suffered no injury.   Similarly, such a Class-wide approach could result in under-

compensation to other putative Class members.

\* \* \* \* \* \*

71.    My analyses, observations, and opinions contained in this declaration are based upon

information available to date.   I reserve the ability to review documents, deposition

transcripts, or other information still to be produced by the Parties to this dispute and to

supplement my opinions based upon that review.


I declare under penalty of perjury that the foregoing is true and correct and that I am

competent to testify to the facts contained in this Declaration if called as a witness.


*Keith R. Ugone*

Keith R. Ugone, Ph.D.
August 29, 2014

_____

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

# Exhibit 1



Main 1 214 523 1400    Fax 1 214 523 1401    www.analysisgroup.com
2911 Turtle Creek Boulevard    Suite 600    Dallas, TX    75219

**KEITH R. UGONE, PH.D.**
**Managing Principal**
Phone: (214) 523-1405
keith.ugone@analysisgroup.com

Dr. Keith R. Ugone has provided economic and damages consulting services in antitrust cases, breach of contract cases, business interruption cases, employment / loss of earnings cases, intellectual property cases, lender liability cases, professional negligence cases, and securities-related cases, among others. He specializes in the application of economic principles to complex business disputes and is generally retained in cases requiring economic analyses and/or damages-related analyses. Damage models constructed or evaluated by Dr. Ugone have had as components revenue analyses, lost sales analyses, cost analyses, assessments of the capacity to produce additional units, assessments of profitability, the competitive business environment in which the damages claim was being made, claimed lost profits, claimed lost business value, and claimed reasonable royalties. During the course of Dr. Ugone's career, he has frequently evaluated lost profits and valuation-related damages using large databases of information and complex computer models. Dr. Ugone also has performed economic liability analyses in antitrust matters including defining relevant markets, assessing market power, and evaluating alleged anticompetitive behavior. Dr. Ugone has testified at trial and in deposition over 300 times.

Dr. Ugone has a PhD in Economics from Arizona State University, an MA in Economics from the University of Southern California, and a BA in Economics from the University of Notre Dame. Subject areas of expertise include microeconomics, macroeconomics, industrial organization, antitrust/regulation, and econometrics. He is a member of the American Economic Association, the American Statistical Association, the National Association of Forensic Economists, and the Western Economics Association.

## EDUCATION

| | |
|---|---|
| 1983 | Ph.D., Economics, Arizona State University. |
| 1979 | M.A., Economics, University of Southern California. |
| 1977 | B.A., Economics, University of Notre Dame. |

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2004 - Present | Analysis Group, Dallas, Texas – Managing Principal. |
| 1985 – 2003 | PricewaterhouseCoopers LLP (and legacy firms) – Partner (Principal) 1992 – 2003; Senior Manager 1989 – 1992; Manager 1987 – 1989; Senior Consultant 1985 – 1987. Member of United States Admissions Committee (2003). Chairman of PricewaterhouseCoopers Intellectual Property Leadership Forum (2000 – 2003). |
| 1983 – 1985 | California State University, Northridge - Assistant Professor/Lecturer in Department of Economics, Full-time: 1983 – 1985, Part-time: 1986 – 1992. |
| 1979 – 1983 | Arizona State University - Faculty Associate/Teaching Assistant in Department of Economics. |
| 1977 – 1979 | Jet Propulsion Laboratory - Economic/Energy Analyst. |

**PROFESSIONAL AND BUSINESS AFFILIATIONS**

American Economic Association
American Statistical Association
National Association of Forensic Economists
Western Economics Association

**SELECTED LITIGATION CONSULTING EXPERIENCE (by Nature of Suit)**

<u>Securities:  10b-5 / Section 11 Cases</u>

- Evaluated the economic damages being asserted by shareholders and debt holders of a bankrupt energy trading company against a brokerage firm.  Plaintiffs alleged the brokerage firm recommended the stock and debt securities associated with the company even though it knew or should have known the deteriorating pre-bankruptcy financial condition of the company.  Analyzed the trading patterns of the brokerage account customers and the stock price movements of the company upon issuance of analyst reports, and researched confounding events contributing to investors' trading of the securities-in-question.  Demonstrated an economic causal link did not exist between the alleged wrongful conduct and the claimed trading patterns.  Also evaluated the event study conducted by Plaintiffs' damages expert and the claimed inflation component embedded in the company's stock price.  Demonstrated Plaintiffs' damages expert failed to remove the economic impact of confounding events.  Performed an alternative damages evaluation.

- Evaluated shareholder and debt holder claimed damages against a major accounting firm relating to the issuance of allegedly false and misleading financial statements that did not identify certain assets of a communications company as impaired.  Researched industry reports and analyst reports regarding the company's common stock and debt securities, evaluated an event study conducted by Plaintiff's damages expert, analyzed loss causation in accordance with *Dura*, studied the company's stock price movements before and during the claimed class period, and analyzed the company's stock price movement on the day of the alleged corrective disclosure.  Demonstrated Plaintiffs' event study did not appropriately isolate the stock price movement associated solely with the alleged corrective disclosure as confounding events were not removed from the analysis.  Performed an alternative damages calculation.

- Evaluated Plaintiffs' damages claim in a shareholder suit relating to the manufacturer of decoding equipment used in the wireless cable industry.  Analysis demonstrated Plaintiffs' financial expert did not consider market speculation related to the wireless cable industry or Defendant's higher-than-expected earnings when calculating claimed damages.   Additional errors included aggregating into claimed damages stock price increases unrelated to Plaintiffs' allegations and on "no announcement days".

- Evaluated damages claim against a major investment banking/underwriting firm relating to an aborted initial public offering in the temporary staffing industry.  Analysis demonstrated methodological and conceptual errors in Plaintiff's econometrically-based claim that the projected post-IPO stock price of the company justified proceeding with the IPO.  Also evaluated various components of Plaintiff's damages claim, including the profitability of Plaintiff's business, projected use of funds raised, ownership percentages in the company, and the funds that would have inured to the original owners of the company.

- Evaluated Plaintiffs' damages claim in a shareholder suit involving an international airline carrier.  At issue were alleged misrepresentations concerning the airline's ability to reduce its maintenance costs.  Demonstrated that the fifty percent decline in the company's stock price over a one-month period was for reasons unrelated to corrective disclosures concerning maintenance costs.  Also reconstructed Plaintiffs' trading history, comparing the trading pattern to public announcements concerning the airline, and demonstrating a trading pattern inconsistent with Plaintiffs' theory of reliance on the alleged misrepresentations.

- <u>General Overview</u>.  Performed an "event study" and/or evaluated claimed damages in various securities litigation cases involving firms in industries such as:  airlines, biotechnology, computer software, commodities, banking, real estate development, life insurance, entertainment, communications, energy trading, investment banking, computer printers, health care, medical equipment, hotels, non-traditional automotive insurance, information technology services, workmen's compensation insurance, computer hardware, camera and photo finishing, intelligent disk drives, market research, trucking, temporary staffing, real estate investment trusts, computer networking, specialty stores, skilled nursing facilities, wireless cable encoding devices, the provision of software computer services to insurance companies, and the provision of professional services to power plants and large scale industrial facilities.  Analyses included development of an appropriate peer group and isolation of economy-wide, industry-specific, and company-specific factors impacting the particular firm's stock price.  Company-specific events often included unfavorable news announcements unrelated to the alleged misrepresentations and the ending of potential takeover bids.  Also involved was a comparison of the firm's actual stock price to its "true value" line, the construction of a matrix to track ins-and-outs traders and retention shareholders, and an evaluation of damages under Section 10b-5 and Section 11 claims.

## Securities:  Merger/Takeover Related Cases

- Evaluated claimed damages against a major accounting firm by a transportation company that acquired another transportation company in alleged reliance upon the audited financial statements of the acquired company and its Mexican subsidiary.  Plaintiff wrote down its investment in the Mexican subsidiary after the acquisition and based its damages claim on a subsequent decline in its stock price.  Analyses included researching competing transportation companies, considerations associated with consummating the merger, analyst reports regarding the merger announcement and the investment write-down announcement, and earnings announcements from comparable companies.  Demonstrated Plaintiff's damages expert did not establish an economic causal link between the alleged wrongful conduct of the Defendant and the claimed economic damages suffered by the Plaintiff and that confounding events were not taken into account appropriately.

- Evaluated Plaintiffs' damages claim relating to a merger in the banking industry.  At issue was whether material adverse changes regarding loan loss reserves had occurred but were not disclosed.  Analyzed whether the complained of events were related to conditions and circumstances in the banking industry.  Also analyzed the value of alternative offers for the target bank and the pre-merger volatility in the acquiring bank's stock price.

- Evaluated Plaintiffs' claimed damages in a breach of contract matter involving the aborted sale of assisted living facilities.  Analyzed current trends in the assisted living industry, the financial condition of the target company, the projected financial results of certain to-be-constructed properties, and the target company's performance relative to projections.  Also at issue was whether a material adverse change had occurred in the target company's operations and business.  Lost profit damages, interest-related damages, lost contract fees, and diminution-in-value damages were evaluated.

- Evaluated Plaintiffs' damages claim in a merger/acquisition-for-stock litigation in the information technology services industry.  At issue was whether material adverse changes had occurred in the business condition of the acquiring company prior to the closing of the merger.  Damages issues included investigating the nature of the agreed upon warranties and representations contained in the merger agreement, the stock price performance of similarly-situated firms, the length of the alleged damages period, the appropriate length of certain event windows, industry downturns, and the failure to account for the proper mitigation of damages.

- Analyzed a major entertainment company's stock price movement to determine the takeover premium paid by an acquiring company.  Involved was quantifying the impact of takeover rumors prior to the takeover announcement to isolate that portion of the company's pre-acquisition increase in stock price due to takeover speculation as opposed to general industry trends.

- Served as financial advisor to a Special Litigation Committee ("SLC") investigating a shareholder approved merger vote in the telecommunications industry. The merger was not consummated, but the vote triggered the acceleration of vesting of options owned by the officers and directors of the target company. Assisted the SLC in analyzing the acceleration of options and various alternative settlement strategies.

## Securities/Commodities: Other Cases

- Evaluated Plaintiff's claimed lost enterprise value damages relating to Defendants' allegedly fraudulent conduct resulting in an artificial acceleration of income, restatement of income, and ultimate bankruptcy of a food distribution company. Analyses included isolating the dollar magnitude of the alleged artificial acceleration of income allegedly created by Defendant's actions compared to other artificial accelerations of income, an assessment of alternative reasons for Plaintiff's business decline and ultimate bankruptcy, and evaluation of Plaintiff's valuation approaches.

- Evaluated the spot price of a base metal in a major commodities-related market manipulation matter. Developed an econometric model to explain the spot price movements of the base metal in an un-impacted period. Used the econometric model to evaluate what the spot price of the base metal would have been in the absence of the alleged manipulation.

- Calculated short-swing trading profits under Section 16(b) of the Securities Exchange Act of 1934 relating to the stock trading activities of an officer of a long distance telecommunications company. Issues analyzed included allocating stock purchases to stock sales of differing numbers of shares and accounting for a 3-for-1 reverse stock split during the period under consideration.

- Evaluated damages in an alleged lack of suitability, lack of supervision, and failure to execute matter in the securities industry. At issue was an investment strategy of selling short the same stock in which a restricted long position was also held. Demonstrated errors in Plaintiff's damages claim, including the failure to recognize that the financial objectives stated at the time of the development of the investment strategy were in fact met.

- Evaluated the stock price performance of a major distiller over a forty-year period. At issue was whether a portion of the increase in the stock price could be attributed to the efforts of one senior official in the corporation. Company-specific, industry-specific, and economy-wide factors were investigated to determine the reasons for the stock price performance of the distilling company.

## Antitrust: Monopolization/Attempted Monopolization Cases

- Evaluated claimed antitrust damages asserted by a major airline company against a global distribution system ("GDS") operator for alleged anticompetitive behavior relating to the provision of booking services to travel agencies. Evaluated Plaintiff's claimed damages relating to claimed lost profits resulting from the Defendant's alleged actions to impede the rollout of a competing technology for booking services, contractual restrictions allegedly preventing the airline from offering targeted discounts to price-sensitive customers, allegedly imposing retaliatory booking fee increases, and allegedly biasing fare search results displayed to travel agencies.

- Analyzed Plaintiff's allegations that Defendant monopolized or attempted to monopolize the market for magnetic brakes for amusement park rides. Evaluated Plaintiff's assessment of the relevant product market, allegations of market power, and the impact of Defendant's alleged anti-competitive conduct. Also evaluated claimed damages, including assumptions underlying Plaintiff's claimed damages model and economic causal connection between the alleged wrongful conduct and claimed losses. Determined that Plaintiff's expert failed to account for alternative explanations for Plaintiff's claimed losses. Also demonstrated that Plaintiff's expert made inappropriate assumptions regarding growth in the claimed relevant product market and whether Plaintiff was damaged in perpetuity.

- Evaluated Plaintiff's economic liability arguments in an antitrust matter relating to a restriction on the registration of cloned American Quarter Horses with the American Quarter Horse Association. Evaluated Plaintiff's expert's theoretical economic model. Demonstrated that there was no economic harm to the market as a result of the at-issue registration restriction. Also identified numerous flaws in Plaintiff's expert's assumptions regarding the supply and demand of high quality American Quarter horses (including excess breeding capacity). Evaluated Plaintiff's damages claim relating to lost sales of cloned American Quarter horses and lost breeding opportunities.

- Evaluated the claimed anticompetitive impact of an alleged conspiracy by a major oil and gas exploration company to monopolize the market for Helicopter Underwater Egress Training ("HUET"). Evaluated the relevant product and geographic markets and the alleged market power of the Defendant. Demonstrated that the Defendant lacked the market power necessary to monopolize the relevant market. Also demonstrated the flaws in Plaintiffs' damages claim, including but not limited to, loss of Plaintiffs' market share for reasons other than the alleged anticompetitive acts (e.g., self-imposed price increases and the loss of a large customer unrelated to the alleged wrongful conduct), failure to take into account the general economic downturn in the U.S. economy during the relevant period, the use of an inappropriate discount rate for quantifying claimed future damages, and the use of an inappropriate assumption relating to future claimed market shares in the absence of the alleged wrongful conduct.

- Evaluated the competitive impact of certain covenants not to compete associated with restricted stock unit awards issued to operations management employees by a major dairy processor. Evaluated the relevant product and geographic markets. Concluded that the covenants not to compete were overly broad and restrictive, outweighing any precompetitive benefits associated with the covenants. Concluded that the covenants did not contain reasonable limitations as to time frame and scope of activity. The covenants effectively restricted competition and raised rivals' costs in the relevant market.

- Evaluated Plaintiff's damages claim associated with the assertion that certain freight forwarders engaged in bid rigging, price fixing, group boycott, and illegal tying arrangements in a traffic channel for transporting military household goods. Demonstrated the flaws in Plaintiff's damages claim, including but not limited to, declines in revenues and profits prior to the alleged conspiracy period, alternative reasons for the Plaintiff's poor performance during the claimed damages period (e.g., the closing of military bases and increased competition in one leg of the channel), and the use of an inappropriate benchmark period for quantifying claimed damages.

- Evaluated the anticompetitive impact of an alleged conspiracy between a distributor and manufacturer whereby the manufacturer refused to ship certain aftermarket automotive exhaust systems and catalytic converters to a competing distributor in Washington and Oregon. Analyses included evaluating the relevant product and geographic markets for aftermarket automotive exhaust products and the damages suffered by the competing distributor. Also evaluated the competing distributor's direct and indirect price discrimination claims (including differential discounts in areas where shipments did occur) and associated claimed damages.

- Analyzed various monopolization allegations in an antitrust counterclaim to a patent infringement matter in the home lighting control systems industry. Analyzed the trade practices of the home lighting control system manufacturers (e.g., sales channels, advertising and promotion, etc.), product and geographical markets, and the potential substitutes to the products at issue. Analyses demonstrated counterclaim Defendant did not possess the ability to monopolize the relevant market for home lighting control products given the channels through which manufacturers made sales and the availability of close substitute products.

- Evaluated Plaintiff's economic liability arguments in an antitrust counterclaim relating to a supply agreement for an ingredient (i.e., larch arabinogalactan) contained in certain patented dietary and nutritional supplements for the promotion and maintenance of good health. Concluded that (a) the sales agreement in question did not constitute an unreasonable restraint on trade, (b) the Defendant did not possess monopoly power, and (c) the Defendant did not engaged in anticompetitive behavior in any properly defined relevant market. Observed that the prices of dietary supplements containing arabinogalactan did not increase since the signing of the sales agreement, the output of dietary supplements containing arabinogalactan did not decline since the signing of the sales agreement, (c) the capacity to produce additional arabinogalactan had been increasing, and (d) Plaintiff did not face a dangerous probability of being harmed by the supply agreement.

- Evaluated claimed antitrust damages asserted by the holder of certain common packet channel ("CPCH") technology patents against a group of handheld mobile device hardware and infrastructure manufacturers for an alleged conspiracy to deprive the patent holder of the value of its patented technology in the third generation partnership project ("3GPP"). The patent holder's technology had been removed as an optional standard. Damages-related analyses included conducting a *Georgia-Pacific* analysis and analyzing the licenses identified by Plaintiff's expert as comparable to the patents at issue. Also determined that Plaintiff's expert had not established an economic causal link between the alleged wrongful conduct and the damages being claimed.

- Evaluated the claimed anticompetitive activities of Defendant hospital's alleged exclusionary arrangements and practices relating to managed care contracts. Evaluated the relevant antitrust markets (product and geographic) for primary care services provided by physicians to managed care-covered patients in Smith County, Texas. Also evaluated the volume of commerce impacted by the claimed exclusionary practices and the impact of these claimed exclusionary practices on competition in the relevant markets. In addition, evaluated the economic damages suffered by the Plaintiff hospital as a result of Defendant's alleged anticompetitive activities.

- Evaluated Plaintiff's claim of antitrust injury in the markets for orthodontic brackets and orthodontic services allegedly due to the advertising guidelines promulgated by a national orthodontic trade association. Analysis demonstrated the advertising guidelines were efficiency enhancing (by lowering consumer search costs), promoted competition, and did not stifle innovation in the relevant markets. Also empirically demonstrated that legitimate advertising through a variety of media was not impacted by the advertising guidelines.

- Evaluated distributors' claims of past lost profits, future lost profits, and reductions in franchise values in a carbonated soft drink antitrust litigation. Defendants allegedly entered into a series of anti-competitive marketing agreements with retailers relative to the promotion and sale of national brand carbonated beverages. Analysis demonstrated Plaintiffs' expert did not take into account the brand composition of Plaintiffs' case sales, underestimated variable costs of distribution, did not adjust for increased competition from private-label brands and other drinks, and failed to account for the lack of advertising and other promotional support from the distributors' parent company.

- Analyzed the impact of a proposed merger of two insurance companies on the long term care and medicare supplement insurance markets in the state of Oklahoma. Evaluated whether the merger would substantially lessen competition or have a tendency to create a monopoly. Evaluated the number of competitors, the reasonable interchangeability of the insurance products offered, insurance company sizes, ease of entry, the impact of regulation, and the ability of consumers to acquire price information in a low-cost manner.

- Analyzed the alleged anticompetitive impact of an exclusive provider arrangement between a hospital and a group of anesthesiologists on the market for anesthesia services. Analyses included determining inpatient services market shares, anesthesia procedures market shares, and recent entry into the hospital service area. Also evaluated the damages claims being alleged by a group of Certified Registered Nurse Anesthetists.

- Conducted an economic analysis in a vertical non-price (advertising) restraint antitrust case dealing with tennis ball throwing machines. Analysis demonstrated the pro-competitive nature of the advertising restraint and that the termination of a non-complying dealer did not substantially reduce competition in the relevant market.

- <u>General Overview</u>. Provided economic analyses and developed damages models and/or critiqued the opposition's damages models in various antitrust cases involving the following industries and/or markets: anesthesia services, printed circuit boards, nutritional supplements, carbonated soft drinks, aftermarket automotive exhaust systems, telecommunications switching equipment, dairy processing, radio control model airplanes, local area networks, entertainment lighting, integrated casino bonusing software, home lighting control systems, medicare supplement/long term care insurance, commercial air conditioning units, disposable dust/mist respirators, immunodiagnostic tests, in-patient hospital services and managed care contracts, PBX systems, military freight forwarding, underground storage tanks, long distance telephone lines, tennis ball throwing machines, check processing readers/sorters, local television advertising, personal watercraft, automobile refinishing paint, Christian music, subsea horizontal extraction wells, orthodontic braces, DRAM microcomputer chips, women's designer clothes, single point of contact telecommunication services, non-prescription reading glasses, and the provision of temporary electrical services to convention centers. Damages models were constructed or critiqued that involved lost sales analyses, incremental cost analyses, and assessments of capacity increases. Also investigated were economic forces external to the company that may have impacted the company's performance. Economic analyses included defining the relevant market, assessing the presence or absence of market power, evaluating whether a business activity was pro-competitive or anti-competitive, and/or evaluating the level of competition in a particular market.

## Antitrust: Price Fixing Cases

- Evaluated Plaintiffs' claimed damages relating to allegations of an industry-wide price fixing conspiracy among the defendant manufacturers of polyether polyol products. At issue were the alleged overcharges relating to sales of TDI, MDI, and polyether polyols during the alleged conspiracy period. Analyses included evaluating Direct Action Plaintiffs' and Class Plaintiffs' econometric pricing models which purported to show alleged overcharges (and the unreasonableness of the claimed overcharges in light of existing profitability levels). Also assessed indicators of competition in the relevant market, including evidence of supplier switching by Plaintiffs, changes in defendants' market shares, and pricing patterns of the at-issue products.

- Evaluated allegations of price-fixing among freight companies relating to bids to ship the household goods of U.S. Armed Forces' members and civilian employees of the U.S. Department of Defense between Germany and the U.S. Analyses included an investigation of the efficiency-enhancing economic benefits provided by the at-issue "landed rate" pricing system. Also evaluated Plaintiff's claimed damages allegedly associated with elevated rates and alternative factors contributing to claimed elevated rates unrelated to claimed conspiracy. Evaluated Plaintiff's econometric model used to purportedly identify claimed overcharges.

## Antitrust: Predatory Pricing/Price Discrimination Cases

- Evaluated differences in prices paid by a plaintiff distributor relative to those paid by a competitor in a price discrimination case involving the distribution of aftermarket exhaust systems. Analyses included an evaluation of the relevant product and geographic market for the at-issue products as well as damages caused by the alleged anticompetitive behavior.

- Evaluated the relevant product and geographic markets and impact on competition in a price discrimination case involving a manufacturer of lighting products and the prices charged to various distributors. Analyses included an investigation of the primary-line market (i.e., competition among manufacturers of lighting products) and the secondary-line market (i.e., competition among distributors). The impact on competition among the distributors of lighting products was investigated (and whether a substantial lessening of competition occurred) given the pricing policies of the manufacturer.

- Reviewed the newly proposed pricing structure of a major magazine distributor to identify the efficiency enhancing attributes of the proposed pricing structure as well as potential discriminatory effects. The proposed pricing structure was a major change from industry practices and included per copy distribution fees and excess return fees.

- Evaluated the economic and damages-related claims made in a major price discrimination case in the pharmaceutical industry. At issue were the additional sales and profits that would have been made by grocery drug stores and retail drug chains in the absence of the alleged price discrimination.

- Conducted various industry and firm-specific analyses in a major wholesale bread predatory pricing case. Bread industry studies included analyses of industry profitability rates, the changing size distribution of firms in the industry, and general trends in wholesale bread prices. Firm-specific studies included analyses of advertising rates, "cripple" (i.e., reject) rates, and "stale" (i.e., return) rates. Also involved was a critique of Plaintiff's calculation of Defendant's average variable cost of producing and distributing a loaf of bread.

- Calculated the average cost of servicing a three-yard bin of trash in a solid waste disposal predatory pricing case. Also included was an analysis of number of routes and bin pickups per route.

## Antitrust: Tying Cases

- Evaluated certain economic and damages claims made by a local television station against a television program syndicator. At issue was an alleged unlawful tying arrangement relating to the claimed requirement to license *Becker* in order to license *Judge Judy* and *Judge Joe Brown*. Demonstrated the syndicator did not possess market power in a properly defined market since substitution existed between different genre of television programs, between different syndicators, between different demographic groups, and between different types of syndicated programming (i.e., first-run, off-network, and evergreen programming). Also demonstrated that the pricing patterns of the syndicator were inconsistent with the antitrust claims being made.

- Evaluated an unlawful tying claim brought by a pizza franchisee against its franchisor. Franchisees were required to purchase equipment and supplies from an approved supplier owned by the pizza franchisor. Plaintiff alleged the claimed unlawful tying arrangement was enforced through threats of termination of the franchise agreement. Demonstrated that the pizza franchisor did not possess market power in the consumer market for pizza, in the provision of equipment and supplies to franchisees, or in the market for pizza franchises. Also demonstrated the economic justifications for the requirement (i.e., maintaining quality standards, uniformity of operations, and protection of brand name).

- Critiqued Plaintiff's damage model in an alleged tying case dealing with automotive CAD/CAM design software (the "tying" good) and mainframe timesharing (the "tied" good). At issue was the total size of the market, the likelihood of entry, and the market share of the Plaintiff in the absence of the alleged tie. Also investigated was the likelihood that design vendors would place the software on their own mainframes rather than timeshare.

- Analyzed the fast food point-of-sale ("POS") equipment and software industry in an alleged tying case. Demonstrated that a particular POS product was not a relevant market based on the reasonable interchangeability of various brands of fast food POS equipment from the perspective of the consumer (fast food restaurants). Also analyzed the degree of price competition, non-price competition, ease of entry, and relative market shares of fast food POS equipment manufacturers.

## Business Interruption/Interference Cases

- Evaluated Plaintiffs' claimed damages in a tortious interference, business disparagement, and breach of contract matter dealing with the licensing of testing equipment in the petrochemical piping inspection industry. Demonstrated Plaintiff's expert committed errors relating to the duration of the contracts in dispute, system license fees, cost of replacement systems, pricing of services, utilization of the test systems, and mitigation of future damages.

- Evaluated Plaintiff's claimed damages from a lost bid to retrofit a refinery in Pakistan. Analyzed Plaintiff's allegations that Defendants made untrue statements to the bid evaluation team concerning Plaintiff's net worth, working capital, and profitability trends. Evaluated Plaintiff's claimed damages using as a benchmark prior engineering projects completed by Plaintiff.

- Calculated damages suffered by the owner of numerous mobile home parks due to the actions of a Defendant in a case involving alleged intentional interference with contractual relations. Involved was an analysis of occupancy rates, a projection of park revenues in the absence of the alleged interference, and an analysis of mobile home park incremental profitability rates.

- Evaluated the damages sustained by a cosmetic company as a result of defective decorated glass containers being furnished for its new therapy products. Evaluated and/or verified product retrieval costs, retrieval program administration costs, customer goodwill replacement gift costs, waste disposal costs, and lost profits on the therapy products. The lost profits analysis included assessing the life cycle sales pattern of new cosmetic products introduced by the company.

- Evaluated damages relating to the introduction of a new popcorn product line in a business interruption dispute. The introduction of the new popcorn product line was aborted due to defective containers. Analyses undertaken included determining the cost of popcorn, the cost of popcorn bags, freight costs, as well as the projected revenues associated with popcorn sales. An assessment was also made of the supermarket outlets and territories in which the popcorn would have been sold.

- Evaluated Plaintiffs' damages claim relating to the installation of an allegedly defective computer software system at an automobile dealership. Plaintiffs contended the software had defects adversely affecting the accounting system and day-to-day operations of the dealership, and submitted an "increased cost" damages claim. Analysis demonstrated Plaintiffs' expert used an inappropriate methodology for measuring damages and submitted cost increases unrelated to the allegedly defective software.

- <u>Other Matters</u>. Provided deposition questions, economic analyses, and a critique of opposing economists' damage models in various business interruption cases resulting from (e.g.) fires, "lockouts", electrical outages, defective products, and/or injuries to key personnel. Businesses evaluated included a workout facility (gym), a pediatric practice, a balloon manufacturing plant, a radiology practice, and a packaging machine manufacturer.

## Intellectual Property: Patent Infringement and Patent-Related Cases

- Evaluated the claimed royalty damages the owners of a patent related to the processing of documents with arbitrary XML elements were asserting against a major software manufacturer for allegedly incorporating the patented technology into its software applications. Based upon an evaluation of the historical financial performance of the Plaintiffs before and after the time of the hypothetical negotiation, market demand for and supply of products similar to the allegedly embodying products, the respective economic contributions of the Parties to the successful commercialization of the accused products, and the *Georgia-Pacific* factors, opined to an alternative royalty damages estimate. Also evaluated the four factors outlined in *eBay Inc. v. Mercexchange L.L.C.* and opined that based upon economic considerations an injunction against the accused products was not warranted.

- Analyzed Plaintiff's lost profits and reasonable royalty damages in two separate patent infringement matters relating to scanning, counting, and counterfeit detection technologies in currency discriminators. In both matters, analyzed the *Panduit* and *Georgia-Pacific* factors, constructed a hypothetical negotiation framework, conducted market and industry research, and compiled an accused product sales database. With respect to Plaintiff's lost profits-related damages, performed incremental profit analyses on lost unit sales and ancillary sales. Evaluated Plaintiff's reasonable royalty-related damages taking into account the economics associated with currency discriminator sales. Evaluated damages under a variety of scenarios based upon potential findings of infringement on patents and claims contained in these patents.

- Evaluated the claimed damages of a foam ear sleeve manufacturer who brought suit against a high-performance professional and personal audio earphone manufacturer alleging patent infringement relating to ear pieces having disposable compressible polymeric foam sleeves.  Evaluated Plaintiff claimed royalty damages using market and industry data, a *Georgia-Pacific* factor analysis, and the changing licensing policies of the patent holder over time. Provided an alternative royalty damages analysis.  Also analyzed from an economic perspective Defendant's countersuit of alleged patent misuse. Reviewed the patent holder's licensing strategy and certain provisions contained in the licenses into which the patent holder entered.  Analyses demonstrated the patent holder's licensing strategy and the provisions contained in its licenses were consistent with the allegation of patent misuse.

- Evaluated Plaintiffs' claimed royalty damages in two separate patent infringement matters relating to video game controllers.  The first matter related to six degrees of freedom video controller technology; the second matter related to controller-to-processor voltage technology.   In both matters, conducted market and industry research, performed a *Georgia-Pacific* analysis, and evaluated company-specific and controller-related licenses.  Also evaluated the key drivers of Defendant's sales including its brand name, innovative products and games, and installed base of gaming console owners.   Provided an alternative royalty damages figure.

- Evaluated Plaintiff's lost profits and price erosion damages in a patent infringement matter relating to a method for delivering internet content from a network of content delivery network ("CDN") servers. The suit was brought by a CDN services provider.  Evaluated Plaintiff's lost profits-related damages using market share data, adjusting for customer and market segment differences and the likelihood of supplemental sales.  Evaluated Plaintiff's price erosion-related damages for selected customers for whom Plaintiff was required to lower rates and/or renegotiate contracts based upon the alleged unlawful competition of the Defendant.

- Analyzed Plaintiff's lost profits and reasonable royalty damages in two separate patent infringement matters relating to status feedback in home lighting control systems.  Performed analyses on a large database of invoices relating to sales of the accused products, analyzed end-user surveys, and identified ancillary sales based upon consumer purchasing patterns.  Conducted *Panduit* and *Georgia-Pacific* analyses.  Calculated Plaintiff's lost sales based upon market share data reflected in industry surveys. Calculated Plaintiff's royalty damages based upon comparable license analyses.

- In a patent infringement matter relating to the air interface protocol of UMTS/WCDMA cellular phone technology, evaluated whether the Plaintiff had offered Defendant a license to the patents-in-suit on fair, reasonable, and non-discriminatory ("FRAND") terms (as required by the European Telecommunications Standards Institute's intellectual property rights policy).  Analyzed the economic benefits associated with patents, the economic benefits associated with standard setting organizations, and the economic evidence related to the FRAND principles.  Concluded that none of Plaintiff's licensing offers comported with FRAND principles.

- Evaluated Plaintiff's claimed lost profits in a patent infringement suit against a medical device manufacturer producing trocars with floating septum seals.  Analyzed market data relating to trocar products, competitors, and market share information. Also analyzed hospital data with respect to product use and conversion between different manufacturers.  Demonstrated that Plaintiff had not demonstrated Defendant would have lost sales and Plaintiff would have gained sales in the absence of the alleged infringement.  Concluded a claim for lost profits was not warranted.

- Evaluated Plaintiff's claimed royalty damages asserted against a major software manufacturer in a patent infringement matter relating to a pre-fetch concept allowing for the faster loading of operating systems and software applications.  Analyzed the financial performance of the patent holder at the time of the hypothetical negotiation, the drivers of demand for the products allegedly embodying the patent-in-suit, the Parties' respective contributions to the successful commercialization of the accused products, the Parties patent licensing approaches, and the relevant *Georgia-Pacific* factors.  Opined to an alternative royalty damages estimate.

- Evaluated the joint venture lost profits and reasonable royalty damages in a patent infringement suit brought by a natural gas producer against an energy producer relating to a system for producing natural gas from unconventional reservoirs. Constructed an economic model incorporating complex technical and economic relationships to determine the value of the natural gas likely to be captured from the reservoirs in question. Conducted a *Panduit* factor and a *Georgia-Pacific* factor analysis.

- Evaluated claimed royalty damages in a patent infringement suit against a nutritional supplement manufacturer and distributor for the alleged infringement of two patents relating to hydrosoluble organic salts and certain compositions and methods for enhancing muscle performance and recovery from fatigue in humans. Concluded Plaintiff's expert inappropriately constructed the hypothetical negotiation framework, failed to consider non-infringing alternative compositions, and overstated the claimed reasonable royalty rate in light of licensing evidence.

- Evaluated claimed damages in a patent infringement matter relating to course management system ("CSM") products and services using the Internet to facilitate the interaction of students and instructors. Conducted a *Panduit* and a *Georgia-Pacific* factor analysis. Calculated lost profits and reasonable royalty damages. Also analyzed Plaintiff's business model and revenue types, Defendant's infringing sales based upon customer licensing agreements and contracts, Plaintiff's prior relationship with Defendant's customers, and Plaintiff's incremental profitability.

- Evaluated Plaintiff's royalty damages claim in a suit brought by a patent holding company against a major software manufacturer relating to certain pivot table functionalities in software. Opined to an alternative royalty damages figure based upon an analysis of the *Georgia-Pacific* factors, the demand for the products allegedly embodying the patent-in-suit, the failed licensing attempts by the former owners of the patent-in-suit, and the relative contributions of the Parties to the commercialization of the accused products.

- Evaluated the royalty damages allegedly suffered by a patent holder against a major internet services provider relating to a method for streaming media over the internet (which facilitated the transmission of real-time, high-quality audio information over a communications network to multiple users simultaneously). Demonstrated that the patent holder's economic expert overstated the claimed reasonable royalty rate, overstated the claimed royalty base, and reached conclusions that failed numerous reliability tests. Also demonstrated that the patent holder's economic expert failed to properly recognize the economics associated with internet radio, leading to an incorrect conclusion as to the proper royalty base that would have been agreed upon at the hypothetical negotiation.

- Evaluated claimed damages in a patent infringement matter filed by an operator of a web-based market place against a competing company relating to the submission of automobile purchase requests over the internet. Analyzed market and industry data relating to Plaintiff's line of business, Plaintiff's and Defendant's financial performance, and Plaintiff's and Defendant's respective market shares. Estimated Plaintiff's lost profits damages.

- Evaluated claimed reasonable royalty damages in a patent infringement matter involving 5 defendants relating to congestion management in ATM networks. Analysis included an assessment of sales of ATM network products allegedly containing the patented feature, an analysis of the price of the integrated circuits embodying the accused functionality relative to the price of the entire ATM product, and a review of industry license agreements. Provided alternative reasonable royalty damages based upon the *Georgia-Pacific* factors in addition to a determining the important negotiating points in a hypothetical licensor / licensee negotiation.

- Evaluated claimed reasonable royalty damages in a patent infringement matter relating to implantable rate responsive pacemakers and implantable cardioverter devices ("ICDs"). Analysis included an assessment of alleged infringing sales of pacemakers and ICDs, a review of license agreements, and an analysis of the defendant's cost savings associated with the allegedly infringing technology as compared to its next best alternative. Determined reasonable royalty damages based upon the *Georgia-Pacific* factors, and the important negotiating points in a hypothetical licensor / licensee negotiation.

- Evaluated Plaintiff's lost profits and reasonable royalty damages in a patent infringement matter relating to DVR technology. Analysis included an assessment of Plaintiff's sales of DVR products and monthly subscriptions in the absence of the alleged infringement and an incremental revenue and cost analysis. Determined reasonable royalty damages based upon the *Georgia-Pacific* factors and a determination of important negotiating points in a hypothetical licensor / licensee negotiation.

- Evaluated lost profit damages in a patent infringement matter involving blasting hole drilling rigs. At issue were the lost profits stemming from lost rig sales and lost replacement part sales. With respect to lost rig sales, evaluated the model types, geographic sales coverage, and model prices of the entities involved. Also evaluated the capacity of the Plaintiff to make the additional claimed sales. With respect to lost replacement part damages, evaluated the likely stream of replacement part sales over the life of the drilling rig. Royalty calculations were performed on sales not subject to lost profit calculations.

## Intellectual Property: Theft of Trade Secrets Cases

- Evaluated Plaintiff's claimed damages in a trade secret theft case in the golf equipment industry. Plaintiff claimed disgorgement of global profits and other unjust enrichment due to the alleged misappropriation of certain golf club design trade secrets through the Defendant's sale of the company and assets to a large sporting goods company. Analysis included calculating net profits from the sale of the accused golf clubs and evaluating claimed reasonable royalty damages.

- Evaluated Defendant's assessment of the incremental costs associated with a contract to provide integrated bonusing software to a casino. The contract allegedly was won through the use of misappropriated trade secrets from the Plaintiff. At issue was the allocation of development and common costs to the contract in dispute. Also evaluated Plaintiff's antitrust counterclaim to Defendant's patent infringement suit relating to the technology used as a foundation for the integrated bonusing software.

- Evaluated damages in a theft of trade secrets matter dealing with next generation switching equipment in the telecommunications industry. At issue was the alleged theft of trade secrets when the Defendant firm hired nine employees of the Plaintiff firm. Analyzed Plaintiff's claimed inability to maintain its projected market share, the alleged accelerated entry of the Defendant firm into the next generation switching equipment market, disgorgement measures of damages, and reasonable royalty measures of damages.

- Evaluated damages suffered by a Plaintiff in the business of installing systems delivering ultra-high purity air, water, gas and chemicals to companies manufacturing integrated circuits. Plaintiff alleged a former managerial employee breached his fiduciary duty by engaging in wrongful use of trade secrets, wrongful solicitation of employees and customers, and unfair competition with the original employer. Analysis involved estimating the lost sales and lost profits to the original employer by estimating the number of bid opportunities missed because of the alleged actions of the former employee, adjusting for changing industry conditions.

- Critiqued Plaintiff's damage model in a trade secrets case in the printed circuit board industry. Plaintiff was claiming lost profits due to the misappropriation of trade secrets through Defendant's hiring of four key management personnel from the Plaintiff's company. Issues evaluated included the appropriateness of the "proxy/yardstick" approach undertaken to estimate lost revenues, and the incremental profit rates used to translate lost revenues into lost profits.

## Intellectual Property: Copyright/Trademark/Trade Dress Infringement/False Advertising Cases

- Evaluated Plaintiff's claimed damages relating to the alleged failure of a TV station to deliver contracted gross rating points over a 6-year period. Plaintiff was claiming lost sales and lost profits based upon a regression analysis used to isolate a relationship between sales revenues and advertising. Demonstrated Plaintiff's regression omitted important explanatory variables (e.g., consumer income, promotions, discounts, competitors' prices, and other print and TV advertising conducted by the Plaintiff). Also demonstrated a failure to account for diminishing returns to advertising. Each of these errors served to increase the magnitude of the claimed relationship between sales revenues and advertising.

- Evaluated Plaintiff's unjust enrichment damages claims in a copyright infringement matter brought against a hospital and a construction company relating to a medical building design. Compared budgeted construction costs to actual construction costs and analyzed the revenues received by the construction company associated with the copyrighted attributes of the building design as opposed to unrelated construction costs. Also analyzed the likely demand-related reasons for revenues that would accrue to the hospital unrelated to the design of the hospital.

- Evaluated claimed damages in a false advertising matter involving tooth-whitening products between two large consumer product companies. At issue were allegedly false, misleading, and disparaging statements about Plaintiff's tooth-whitening products in comparative advertisements shown on television. Plaintiff sought to recover lost profits damages associated with reduced sales resulting from the alleged false advertising. Analyses included an evaluation and critique of Plaintiff's expert's claimed damages model including analysis of A.C. Nielsen scanner data and CMR media data. Analysis demonstrated that Plaintiff's expert did not measure properly the impact of the alleged misleading content, failed to account for alternative reasons for Plaintiff's sales declines, and implemented an incorrectly specified econometric model.

- Provided economic analysis relating to claims of unfair competition and misleading advertising in the pizza industry. Using economic indicia such as dollar sales revenue, trends in market share, growth in number of stores opened, same-store sales data, and store closure rates, evaluated whether the commercial success of a particular pizza company was due to customer acceptance of its pizza product or allegedly deceptive advertising. Also investigated the buying patterns of pizza consumers with respect to cross-chain patronage.

- Critiqued Plaintiff's damage claim in a matter involving alleged tortious interference with business relations and allegations of trade dress infringement. At issue was the projected sales and profitability of Plaintiff's tape dispensing machines during a period of alleged tortious interference by the Defendant and Plaintiff's simultaneous alleged trade dress infringement.

- Analyzed the lost profits of a Plaintiff in a trademark infringement case involving a law enforcement product sold through a mail-order catalog. Also analyzed the profits of the alleged infringer and the cost of remedial advertising.

- Assessed damages resulting from the alleged infringement of copyrighted training manuals. Analysis included identifying the corporate clients of the Plaintiff and Defendant firms and the reasons for customer switching unrelated to the use of the proprietary training manuals.

## Intellectual Property: Commercial Success Cases

- Evaluated indicators of commercial success relating to a surgical hernia mesh fixation device employing a patented helical tacker design. Demonstrated that the patented device had achieved significant and sustained sales and sales growth. Also demonstrated that sales of the patented device had grown faster than the sales of other hernia mesh fixation devices and achieved a majority share of sales when compared to staplers and other hernia mesh fixation products.

- Submitted a rebuttal declaration to the U.S. Patent and Trademark Office relating to the claimed commercial success of intrusion prevention system ("IPS") products asserted to practice a patent undergoing an *Inter Partes* reexamination. Opined that an economic nexus had not been established between the claimed teachings of the patent and the commercial success of stand-alone IPS products. The patent holder had not demonstrated that the claimed teachings of the patent were commercially successful separate and apart from (a) features not claimed by the patent, (b) economic factors extraneous to the claimed invention, or (c) features covered by other patents present in the IPS products.

- Evaluated Plaintiff's analysis regarding the claimed nexus between a patented technology and the commercial success of the accused devices in this patent infringement matter relating to text messaging using a limited keypad such as those found on cell phones. Analyses demonstrated Plaintiff's failed to consider many factors that lead to the commercial success of the accused devices unrelated to the patent in dispute.

## Breach of Contract / Breach of Fiduciary Duty Cases

- Evaluated Counter-Plaintiff's claimed damages arising from Counter-Defendant's failure to honor a most-favored licensee provision in a licensing agreement relating to a semiconductor patent portfolio. Opined as to the economic interpretation of certain licensing terms and the differences and similarities between lump sum, per unit, and percentage of revenue royalty payments. Compared the licensing terms between the Counter-Defendant and another party with the licensing terms between Counter-Defendant and Counter-Plaintiff.

- Evaluated Plaintiffs' claimed damages arising from an alleged breach of contract related to the sale of a community club house and other recreational facilities in an age-restricted residential neighborhood. Plaintiffs' claimed that since they were not given the opportunity to exercise their right-of-first refusal to purchase the contested real estate assets, they lost the value of the equity associated with the real estate assets and they were required to make excessive operating expense payments. Determined that Plaintiffs' expert failed to properly consider the economic factors driving the value of the real estate assets in question.

- Evaluated Plaintiff's breach of contract damages claim relating to the use of a national brand name and other support for the development of a time share resort. Concluded Plaintiff had not demonstrated an economic causal link between Plaintiff's allegations and the quantum of damages being claimed. Adjusted Plaintiff's claimed damages for various conceptual and computational errors, including alternative actions that might have been undertaken by the Plaintiff in the absence of the alleged wrongful conduct.

- Evaluated claimed damages in an alleged breach of fiduciary duty matter between a franchisee and a major fast food franchisor relating to the development and managing of fast-food franchises. Plaintiff claimed economic harm due to franchisor's refusal to grant certain additional franchisees to Plaintiff that Plaintiff claimed would otherwise be in competition with the Plaintiff's existing franchises. Concluded Plaintiff's impact analysis failed to take into account many factors affecting the performance of the Plaintiff's existing franchises that were unrelated to the alleged wrongful conduct.

- Evaluated claimed breach of contract and misrepresentation damages in a suit brought by a global information technology company against a global professional services company relating to a joint venture agreement under which a human resources outsourcing company was formed. Analysis included conducting a client-by-client analysis regarding the specific wrongful conduct associated with each client of the joint venture and estimated the associated economic damages. Based upon certain parameters contained in the contract, also calculated the purchase price overpayment had certain performance issues come to light prior to the closing of the joint venture agreement.

- Evaluated a developer's/franchisee's damages claim against a major sandwich franchisor for the alleged breach of a five-state area development agreement. Reviewed the area development agreement, analyzed the revenues, costs, and profitability associated with franchised outlets, and estimated the Plaintiff's lost franchise fees and lost royalty income based upon various alternative scenarios discussed by the Parties.

- Evaluated the claimed damages of a calling card distribution company due to Defendant's alleged breach of a contract relating to the servicing of the calling cards. Conducted market research on the calling card industry, analyzed alternative reasons for the alleged decline in calling card sales, and evaluated Plaintiff's damages expert's report.

- Evaluated Plaintiff's damages claim concerning the alleged failure of a call center to properly process inquiries relating to the newspaper and television marketing of a collectible doll in the likeness of a recently deceased public figure. Analyzed advertising expenditures, response rates across cities, major news announcements related to the marketing of such merchandise, and contributing problems caused by Plaintiff's actions. Estimated damages by comparing sales in an unimpacted period with sales in the alleged impacted period.

- Evaluated Plaintiffs' damages claim relating to the underwriting and loan servicing of subprime automobile loans. Plaintiffs' contended the servicing company did not properly administer the portfolio of subprime automobile loans thereby causing excessive loan losses. Analysis demonstrated that Plaintiffs' financial experts failed to take into account alternative reasons for Plaintiffs' performance. Analysis of Plaintiffs' loan volume, interest income, loan loss rate, and deteriorating industry conditions also demonstrated that Plaintiffs' business plan did not provide a reasonable basis from which to calculate claimed damages.

- Evaluated Plaintiff's claim of lost profits relating to the collection of ballots for a Mexican telecommunication company in Mexico's Equal Access program. Analyzed a database of telephone customers, including statistics such as the length of service, average monthly consumption patterns, current billing status, and differences between residential and commercial customers. Developed an alternative claimed damages model taking into account consumption patterns and the turnover rate of customers, among other factors.

- Evaluated Plaintiffs' claim of lost success fees, lost closing fees, and underpayment of value relating to Defendant's acquisition of an oncology laboratory and the alleged failure to consummate additional acquisitions. Analysis demonstrated Plaintiffs' projections regarding the profitability of the proposed acquisitions were not reasonable given the historical financial performance of the targets. Also demonstrated Plaintiffs were not underpaid for the assets of the acquired laboratory since no investor or buyer was willing to provide funds to Plaintiffs pre-acquisition and since Plaintiffs in their valuation approach inappropriately assigned all post-acquisition synergies and gains to the Plaintiffs.

- Evaluated Plaintiff's damage claim arising from an alleged misappropriated opportunity to develop a computer superstore franchise in Mexico based on the equivalent U. S. concept. Demonstrated Plaintiffs overstated per store revenue, understated store-level costs, and used inappropriate financial and strategic assumptions regarding the number of stores opened, the amount of capital required, outside investor contribution, equity shares, and strategic acquisitions. Plaintiffs also conducted a valuation based on companies bearing little or no resemblance to a computer superstore.

- Evaluated Plaintiff's claim of lost profits arising from an alleged breach of contract involving two tubular inspection equipment manufacturing companies. Analyses demonstrated that Plaintiff's expert overstated the projected utilization rate of the company's equipment and associated revenue and understated the projected incremental costs that would have been incurred by Plaintiff. Analyses demonstrated market demand would not support the equipment utilization rate projected by Plaintiff's expert.

- Evaluated Plaintiff's claim of damages in a breach of contract matter in the magazine publishing and distribution industry. Plaintiff claimed Defendants breached a distribution agreement by suspending distribution pending the resolution of a trademark infringement dispute. Plaintiff abandoned the magazine, claiming lost profits and the estimated lost value of the magazine had it been sold after its fourth year of publication. Analysis demonstrated Plaintiff's expert overstated subscription-based revenues, distorted the cost/revenue structure that would have existed for the magazine, and overstated the likelihood of success by ignoring the failure of similar genre magazines.

- Evaluated the damages sustained by the public safety division of an information technology services firm due to the early termination a ten-year services agreement to provide enhanced 9-1-1 services to a governmental agency. One-time up-front implementation costs in setting up the 9-1-1 system and ongoing operational costs were compiled in constructing a cost reimbursement damage claim. Also evaluated the reasonableness of an early termination charge schedule designed to represent the one-time buyout total if the governmental entity opted to terminate the contract before the ten-year term expired.

- Evaluated the damage claim of a bank arising from an allegedly defective conversion of the bank's data processing system. Areas investigated included the softening macroeconomic environment surrounding the bank during the relevant time period, the changing financial services market, internal bank ratios, and technical flaws contained in Plaintiff's damage calculations.

- Estimated lost sales and lost royalty payments to a "thick" potato chip producer due to a breach of contract. Involved was the construction of a damage model, analyses of the market for potato chips and per capita potato chip consumption, and projecting the rate of introduction of a new potato chip into regional markets.

- Calculated damages and provided other economic analyses in a "lack of best efforts" breach of contract case in the carbonated soft drink industry. At issue was the impact on sales due to the "lack of best efforts" vs. the impact on sales from contemporaneous new entrants into the market.

- Calculated damages in a breach of contract matter involving an association of nephrologists and a management company operating 12 kidney dialysis clinics. Areas of investigation included the "profitability available for distribution" from the clinics, the projected rate of growth in patients, the rate of introduction of new clinics, and the costs associated with running the clinics. A damage model was developed which projected the profits that would have been distributed to the management company over the life of the contract in the absence of the breach.

- Evaluated claimed damages against a hospital for allegedly breaching a contract allowing hyperbaric oxygen services on hospital premises. Investigations included assessing the local market for hyperbaric services, evaluating Plaintiff's business growth potential given the physical space constraints at the hospital, and demonstrating Plaintiff had fully mitigated claimed future damages through the establishment of an alter ego firm at a nearby local hospital.

## Class Certification Engagements

- Evaluated Plaintiff's position that the claimed economic injury suffered by putative Class members could be quantified on a Class-wide basis in a class action matter relating to anti-aging skin care products marketed as preventing and repairing signs of aging "in just one week." Demonstrated that the approaches proposed by the opposing expert to calculate Class-wide damages would not yield reliable or relevant estimates of the alleged harm suffered by individual Class members. Arguments presented included that the large number of repeat buyers, the wide variations in the retail prices associated with the accused products, and the wide variations in the retail price differences relative to other anti-aging products would prevent a reliable calculation of putative Class members' damages on a Class-wide basis.

- Evaluated Plaintiffs' position that the claimed economic injury allegedly suffered by putative Class members could be quantified on a Class-wide basis in a matter brought by an institutional investor against a bank associated with the bank's securities lending program. Demonstrated that a class-wide approach would obfuscate important differences among putative Class members' individual investment expectations and tolerances. Differences requiring individualized inquiry included the variability in maturity guidelines, credit-quality guidelines, prohibited investments, and diversification requirements.

- Evaluated Plaintiffs' position that the claimed economic injury allegedly suffered by putative Class members could be quantified on a Class-wide basis in a matter where a beverages company marketed certain beverages as containing beneficial vitamins and allegedly failed to disclose the sugar content of the beverages. Evaluated the wide variations in the beverages' retail prices across distribution outlets, across geographic areas, and across the time periods considered. A comparison of the average retail prices of the at-issue beverages relative to identified benchmark products did not support the allegation that the at-issue beverages possessed a systematic price premium as a result of the company's allegedly misleading marketing campaign.

- Evaluated Plaintiffs' position that the claimed economic injury allegedly suffered by putative Class members could be quantified on a class-wide basis in a matter where an automobile company allegedly did not inform purchasers that actual vehicle miles per gallon performance could vary from the 40 miles per gallon EPA estimated fuel efficiency. Demonstrated that individualized inquiry would be required to ascertain consumers' valuation of vehicle characteristics (including their expected fuel economy) when purchasing an accused vehicle, actual prices paid, driving patterns, driving conditions, and whether putative Class members' expectations were influenced by the company's alleged wrongful conduct. Evaluated Plaintiffs' class certification expert's opinion that alleged damages could be evaluated on a class-wide basis using a hedonic regression methodology.

- Evaluated Plaintiffs' position that the claimed economic injury allegedly suffered by putative Class members could be quantified on a class-wide basis in a matter relating to the issuance of a special assessment fee by a timeshare vacation club. Demonstrated that potential damages-related conflicts were likely to arise among putative Class members (including among the Named Plaintiffs) – making Class-wide proof an unreliable measure of economic injury for each putative Class member. Also demonstrated that evaluating claimed damages on a Class-wide basis would result in potentially awarding damages to putative Class members who suffered no injury.

- Evaluated Plaintiffs' position that the economic injury allegedly suffered by putative class members could be quantified on a class-wide basis in a matter where a beverages company marketed certain beverages as "All Natural" when they contained high fructose corn syrup ("HFCS"). Demonstrated that wide variations existed in the beverages' retail prices across distribution outlets, across geographic areas, and across the time periods considered. Also demonstrated that wide variations existed in the beverages' retail prices because of promotional discounts and coupons and because the company did not sell directly to consumers. Consequently, whether consumers paid a price premium because of the "All Natural" labeling (and how much, if any) could not be determined by proof common to the proposed class. A comparison of the average retail prices of the "All Natural" beverages in dispute to identified benchmark products did not support the allegation that the "All Natural" beverages possessed a systematic price premium as a result of the "All Natural" labeling.

- Evaluated the commonality of purchasing circumstances of proposed Class members in a class action matter against a national quick service restaurant ("QSR") chain. Plaintiffs alleged the QSR misrepresented the trans fat levels contained in the QSR's french fries. Plaintiffs also alleged the proposed Class paid a price premium for certain food products based upon the alleged misrepresentations. After reviewing survey data, marketing materials, and pricing data, concluded that individual inquiries were required to establish different customer's awareness of the alleged misrepresentations, different customer's reliance upon the alleged misrepresentations in their purchasing decisions, and other important economic factors impacting each customer's purchase decision.

- Evaluated Plaintiffs' claim that Class members' alleged damages could be "mechanically calculated" in a class action matter against a payphone company's auditor. The payphone company had filed bankruptcy and the Class members alleged the auditor misrepresented the company's financial statements, upon which the Class members allegedly relied. Conducted economic and market research and identified factors that caused a general decline in the payphone industry which contributed to the bankruptcy of the company. Analyzed the claimholders' database and identified issues relating to the database that precluded Plaintiffs' expert from mechanically calculating the damages allegedly suffered by class members.

## Lender Liability Cases

- Evaluated Plaintiff's allegations that it was capital constrained and consequently economically damaged as a result of its loans being placed into the special assets department of its lender. Analyzed the Plaintiff's unused cash, credit, and other available funds. Also analyzed Plaintiff's successful access to the capital markets, acquisition spending, R & D spending, sales performance, and profitability relative to peer companies.

- Analyzed Plaintiffs' damage claim in a lender liability suit relating to Defendant's alleged failure to fund certain residential housing development and construction loans. Evaluated Plaintiffs' changing five-year business plan projections, including revenue growth, geographic expansion, market share, salesmen coverage, cost structure, and profitability assumptions. Also evaluated Plaintiffs' strategy for "exiting" the business and the alleged value of their ownership at that time.

- Evaluated damages in a lender liability case involving the bankruptcy of a gear manufacturing company. The bankruptcy was allegedly due to the failure of a bank to fully fund a previously committed loan. Investigations included researching alternative market-related reasons for the decline in the gear manufacturer's business as well as evidence of internal mismanagement on the part of the company's owners.

- Other Matters. Evaluated damages, causation issues, and liability issues in various lender liability cases involving the calling in of loans, the failure to fund previously committed loans, the failure to release collateral, and the misappropriation of loan payments. Cases involved firms in the wire and cable, drywall/construction, PVC piping, and auto dealership industries, among others.

## Professional Negligence (Non-Securities / Non-Merger) Cases

- In an alleged professional negligence matter, a lender to distressed companies sought $40 million in damages from an auditor in connection with a $130 million credit facility extended to an HDTV company. The lender failed to collect when the borrower filed for bankruptcy. The auditor was alleged to have made negligent misrepresentations associated with the borrower's financial statements; the lender asserted it had relied upon the borrower's financial statements when entering into the credit facility. Performed economic causation and damages-related analyses. Identified the known or knowable risks associated with providing a credit facility to the borrower, including certain accounts receivable collection risks and market softness risks. Opined that it was the materialization of these known and knowable risks that caused the lender's claimed losses.

- Evaluated claimed damages against a major law firm for alleged professional negligence when filing a patent for the treatment of septic shock. Researched (among other things) the FDA approval process, associated statistics regarding the product category allegedly covered by Plaintiff's patent, and various industry projections regarding the category growth. Performed a discounted cash flow analysis, an incremental profitability analysis, a licensing analysis, and provided an alternative calculation of claimed damages.

- Evaluated Plaintiffs' claimed damages relating to an alleged failure by a law firm to properly file certain patent applications relating to a video processor recorder. Plaintiffs' business opportunities and licensing fees in the United States and Europe were allegedly lost due to the ensuing delays. Analyzed Plaintiffs' causation linkages to claimed damages, length of the claimed damages period, forecasted units sold, forecasted market share, forecasted costs of production, and claimed licensing rate.

- Evaluated claims by a Department of Insurance appointed liquidator that alleged the auditor of a bankrupt insurance company breached its fiduciary duty, resulting in a $100 million deficit on the insurance company's books. Conducted various analyses of a claims register database, including a comparison of indemnity payments and reserves per claim before and after the appointed liquidator took control of the liquidation process. Analyses demonstrated both the indemnity payments and reserves per claim were higher after the appointed liquidator took over the liquidation process, implying the liquidator over-paid and over-reserved claims.

### Entertainment/Sports-Related Engagements

- Evaluated the claimed damages of a movie production company against a major home video rental company. At issue was the claim that the refusal of the home video rental company to commit to carry a particular movie in its stores caused the movie production company to suffer lost profits when its distributor then refused to release the movie theatrically. Demonstrated that Plaintiff's methodology for estimating lost box office revenues was inappropriate and failed to account for important determinants of movie attendance.

- Analyzed Plaintiffs' lost profits and reasonable royalty damages in a patent infringement matter relating to offset head lacrosse sticks. Analysis included an assessment of Plaintiffs' sales in the absence of the infringement, the distribution of the lost sales to the models that would have been sold in the absence of the infringement, and an incremental revenue and cost analysis. Also analyzed Plaintiffs' competitors, pricing patterns, productive capacity, and geographic coverage in support of the lost profits claim. Reasonable royalty damages were assessed using the *Georgia-Pacific* factors and a determination of important negotiating points in a hypothetical licensor / licensee negotiation.

- Estimated the diminished box office revenues suffered by a theatrical release due to the breach of a quick service restaurant promotional tie-in arrangement with a major pizza chain. Developed a database of recently released films and related film characteristics such as genre, rating, critics review, box office revenues, media spending, production budget, season of release, and talent. A regression model was then developed to quantify the relationship between media spending and box office revenue. An industry review of quick service restaurant promotional tie-in arrangements was also conducted.

- Evaluated Plaintiffs' claimed damages in a breach of contract matter involving the sale of certain minority interests in a National Basketball Association team. At issue were Plaintiffs' tag-along rights whereby limited partnership interests could be included in any sale by the general partner on the same terms and conditions. Damages were calculated as the difference between the formulaic value of the minority interests versus the market value of the minority interests when sold separately. Discounts for lack of control and reduced marketability were analyzed.

- Evaluated Plaintiff's damages claim relating to a NASCAR racing team sponsorship agreement. Plaintiff contended the Internet service provider sponsor interfered with the racing team's ability to sell advertising banners that were part of the sponsorship agreement. Analyses included assessing the appropriate methodology for valuing a NASCAR race team and assessing comparable transactions. Also analyzed the financial performance of the race team, the economic terms of the sponsorship agreement, and the risks associated with a barter arrangement.

- Estimated damages arising from a breach of contract claim between an electronic retailer and a local television station. At issue was the lost profits to the electronic retailer when the local television station discontinued broadcasting the electronic retailer's programming.

- Analyzed the market and evaluated damages on behalf of a television station denied access to a cable system. At issue was whether the cable operator was attempting to monopolize the market for local television advertising. Analysis included an estimation of the advertising revenues that would have been received by the local television station had it been allocated a channel on the cable system.

- Estimated damages arising from a breach of contract claim between a video-cassette manufacture/distributor and a theatrical motion picture producer/distributor. At issue was whether the motion picture distributor manipulated the theatrical release of certain titles distorting the films the video-cassette producer could distribute under the terms of the agreement.

### Tax-Related Engagements

- Participated in an analysis of the impact on tax revenues to the State of Texas from a change in tax laws relating to pension fund managers. Helped demonstrate that changing the apportionment rule from "location in which the investment services were performed" to "residence of the investment beneficiaries" would not result in a negative fiscal impact.

- Served as consulting partner on an engagement estimating qualifying research and expenditure costs in response to certain expenses disallowed by the IRS. Analysis included developing a methodology to estimate qualifying hours and qualifying costs for groupings of employees with missing data.

- Analyzed whether the salaries paid to the owners/managers of a heavy and highway construction company were reasonable in a matter before the IRS. Areas investigated included the cyclical nature of the construction industry, the resulting cyclical nature of compensation paid to construction industry executives, and the 50th and 75th percentile salaries paid to various types of executives in the construction industry.

- Participated in an analysis of the tax benefit versus detriment to a Plaintiff as a result of ownership in certain partnership interests over the 1982-1998 time period. Also involved was an analysis of cumulative suspended tax losses, partnership income available for distribution, and changing tax rates over time.

- Quantified the net out-of-pocket cash position of investors who purchased limited partnership interests in nine real estate partnerships in an alleged non-disclosure matter. Also quantified the impact caused by changes in the Federal income tax laws. Supporting analyses included comparing the actual and projected performance of the partnerships taking into account restructurings, refinancings, and dissolutions.

### Personal Injury and Wrongful Death Cases

- General Overview (Personal Injury). Assessed damages and lost earnings in various personal injury cases involving movie production workers, management consultants, financial consultants, nurses, medical doctors, chiropractors, secretaries, truck drivers, airline stewardesses, mechanics, engineers, maintenance personnel, carpenters, masonry workers, crane operators, machine operators, actresses, military aircraft production workers, tankermen, teachers, film editors, portfolio managers, hair stylists, automobile assemblers, landscape architects, sole proprietors, and real estate agents (among others). In each case, issues investigated included an assessment of the projected undamaged income, damaged income, expected work life of the individual, and appropriate discount rate to use. Assistance to the attorney included the preparation of deposition questions, economic analyses, and a critique of the opposing economist's damage model.

- General Overview (Wrongful Death). Developed numerous damage models in wrongful death cases. Issues investigated included the projection of lost earnings, the projected personal consumption expenditures of the decedent, and projected lost pension benefits. Professions of the decedents included various types of entrepreneurs (e.g., boat store owners, etc.), white-collar workers (e.g. attorneys, architects, etc.), and blue-collar workers (e.g., demolition contractors, grocery store clerks, etc.). Ages of the decedents ranged from adults to teenagers to children.

- Evaluated claims of damages submitted by the family members of 88 decedents from an airplane crash. Family members were seeking damages in state and federal courts against the airline and certain parts manufacturers. Most of the decedents resided and worked in Asian countries. Researched various data sources for information regarding social security benefits, interest rates, and the relevant economic statistics for workers in these countries. Evaluated four Plaintiff damages experts' reports and testimonies, summarized our evaluation of these damage models, and calculated alternative damages figures. Analysis included evaluating lost earnings, lost business value, lost non-salary benefits, lost retirement funds, and lost savings.

## Wrongful Termination Cases

- Evaluated Plaintiff's alleged lost earnings and lost future earnings capacity in a matter against a major shipping company in which the Plaintiff claimed to have resigned his legal counsel position due to the Defendant's alleged criminal conduct and its refusal to conduct an independent investigation. Analyzed various employee benefits offered by the Defendant including but not limited to the salaries of similarly-situated employees, long term incentive plans, 401(k) plan, paid vacation, stock options, and retirement benefits. Also analyzed promotion criteria, similar benefits received by the Plaintiff at alternative employment, and the lower cost of living associated with the geographical location of the alternative employment.

- Evaluated Plaintiff's claimed economic harm in a wrongful termination / negligent misrepresentation matter. Plaintiff claimed that pre-termination certain representations by the company dissuaded him from resigning and selling his stock holdings, thereby causing economic harm from the subsequent decline in the company's stock price. Analysis included quantifying the salary, bonuses, pension benefits, and severance pay the Plaintiff received during the additional time spent with the company as compared to the stock price declines that formed the basis of Plaintiff's damages claim.

- Evaluated Plaintiff's loss of earnings claim in an alleged wrongful termination matter in the long distance telecommunications industry. Plaintiff was an independent representative with a "downline" working for a company using a multilevel marketing sales approach. Analyzed the Plaintiff's historical earnings, business expenses, and the earnings of Plaintiff's peers to evaluate Plaintiff's net earnings in the absence of the alleged wrongful termination.

- Evaluated Plaintiff's damage claim in a wrongful termination matter involving an insurance broker/branch manager. Evaluated Plaintiff's alleged damage period, earnings in the absence of the termination, fringe benefits, business expenses, and offsetting earnings. The sales patterns of the relevant insurance products at the state and national level were incorporated into the analysis. Also analyzed trends within the company with respect to branch manager positions.

- Evaluated the damages suffered by the manager of an over-the-counter trading department in an alleged wrongful termination action. Since the compensation of the manager was based on the profitability of the department, one issue investigated was the reason for the decline in the post-termination performance of the department.

- <u>Other Matters</u>. Assessed damages and lost earnings in other wrongful termination cases involving internal medicine specialists, neurosurgeons, anesthesiologists, entertainment company executives, brokers/traders, secretaries, accountants, attorneys, quality assurance managers, company presidents, real estate brokers, property managers, insurance brokers/managers, and military aircraft production workers. Areas investigated include many of the same items as described in personal injury cases.

### Other Economic Engagements

- Conducted an economic analysis of historical and projected lost revenues due to SEC-related independence constraints for an information technology consulting entity. The analysis demonstrated that SEC rules requiring SEC registrants to disclose the amount of non-audit fees paid to its auditor, as well as constraints on the consulting entity's ability to perform outsourcing or managed application services for audit clients significantly impacted business growth relative to the market and its closest competitors. The analysis also demonstrated that certain revenue projections assuming independence relief were appropriate in light of market conditions and the independence constraints.

- Conducted an economic cost/benefit analysis of the SEC's proposed rule changes relating to non-audit services performed by auditing firms for audit clients. Analyses demonstrated that public accounting firms have an incentive to protect their brand name capital and that purchasers of non-audit services have an incentive to maintain investor confidence in the reliability of the audited financial statements.

- Performed an economic impact analysis on behalf of a major pipeline corporation seeking to gain regulatory approval for the construction of an oil pipeline in the Pacific Northwest. Evaluated the net economic impact of the project on employment, income, and consumer expenditures in the region. New employment opportunities resulting from construction and maintenance of the pipeline were compared to the potential lost jobs associated with the alternative means of transporting the petroleum.

- Participated in a major antitrust risk assessment exercise for a large industrial corporation. Work performed included evaluating the major litigation risks in the areas of monopolization, price discrimination, price fixing, illegal tying, and exclusive dealing. A detailed questionnaire designed to collect relevant economic data and identify potential risks was constructed and sent to the corporation's division managers.

- Evaluated revenue projections relating to an electronic toll collection system. The system was designed to recover lost toll revenue and other administrative fees from toll violators traveling along a consortium of tollways in New York, New Jersey, and Delaware. Analyzed four critical revenue drivers in the projections (number of transactions, violation rates, citation rates, and collections rates) and the potential variability of certain components of the projections by compiling comparative data through interviews with industry participants. Analysis was used in assisting lenders evaluating the economic viability of the project.

- In a bankruptcy matter, analyzed the expected rate of return that could be earned on a portfolio of assets. Included in the analysis was determining the investment portfolio of a prudent pension fund manager and the historical risk premiums earned on each category of assets in the portfolio. The assets were being held to meet future pension plan liabilities.

- Conducted an analysis of low-cost housing in Los Angeles County (CA) to determine whether sufficient housing was available to house the County's general relief recipient population. In separate engagements, conducted similar studies for San Bernardino County (CA) and Alameda County (CA). The Alameda County study also analyzed earned income incentives and food stamp allotments as a source of income in addition to the County's monthly general relief assistance. An affordable housing analysis was also conducted for the State of New Jersey's Department of Health relating to the state's child exclusion policy and AFDC recipients.

- Conducted an economic analysis on behalf of the California Public Utilities Commission. Tasks included incorporating elasticities into alternative rate design and pricing models, analyzing subsidies accruing to various residential consumer groups under alternative rate designs, and estimating the relative welfare loss associated with each alternative rate design.

## Fraud/Criminal-Related Engagements

- Evaluated claimed damages in a suit brought by Plaintiff relators against a major information technology company for allegedly submitting false and fraudulent claims to the U.S. government under a Medicaid program providing health-cost reimbursements to school districts. Conducted various benchmarking analyses including analyzing a "claimed amount" versus "paid" pattern analysis and a reimbursement rate analysis across Defendant-administered school districts and non-Defendant-administered school districts. Also conducted a reimbursement rate benchmarking analysis associated with school districts before and after administration by the Defendant. Concluded there was no economic evidence of a systematic effort to defraud the U.S. government.

- Evaluated Plaintiff's claim of damages stemming from the alleged embezzlement of funds and falsification of income statements by a bank official relating to a mortgage lending division of a bank. Analysis identified errors made by the bank in specifying the length of the damage period and not properly accounting for accounts receivable collections made post-discovery of the alleged illegal acts.

- Analyzed skilled nursing facility nursing ratios in a criminal health care fraud matter relating to Medicare reimbursements. At issue was Defendant's ratio of skilled nursing costs to unskilled nursing costs alleged to be outside of governmental guidelines. Analyzed facility-level ratios by establishing peer groups of facilities based upon size of facility, number of participating beds, skilled utilization percentage, state location, average length of stay, and facilities with similar levels of acuteness.

- Estimated freight overcharge damages on behalf of a major multinational information technology services firm. Analysis required the utilization of a database of all freight shipments made over a five-year period, including incorporating subsequent credit memos, discounts, and dimensional weight charges. Analysis compared actual freight charges to rates charged by alternative carriers for shipments of identical ship method (e.g., ground, next day, two day), weight, and destination.

- Performed economic analysis relating to a health care criminal matter in which a group of doctors and a hospital were alleged to have conspired to receive remuneration in return for the referral of Medicare-eligible patients. Analyze included evaluating the savings from reduced admissions rates and from reduced average length of stays. Also analyzed the profitability of certain laboratory-related work.

## TEACHING EXPERIENCE

### Macroeconomic Principles and Intermediate Macroeconomics

Topics covered included unemployment/full employment, inflation/price stability, economic growth/gross domestic product, determination of national income, and monetary and fiscal policies.

### Microeconomic Principles and Intermediate Price Theory

Topics covered included functioning of markets (demand and supply analysis), elasticities, theory of the firm (profit maximization), industry performance, allocation of resources, and government regulation.

### Companies In Crisis

Topics covered included companies, markets, and industries in contemporary crisis situations from external or internal changes in the operating environment or significant conflict. Topics included case studies focusing on solutions for companies facing competitive issues, management issues, or litigation-related issues.

## PUBLICATIONS

"An Economic Framework for Analyzing Covenants Not to Compete" (with Elaine Fleming and Steven Herscovici), Expert Witnesses, ABA Section of Litigation, Spring/Summer 2011, Vol. 7 No. 1.

"Financial Expert Witness Challenges and Exclusions: Results and Trends in Federal and State Cases Since Kumho Tire" (with Lawrence F. Ranallo), Accountants' Handbook, Tenth Edition 2004 Supplement, *forthcoming*, edited by D.R. Carmichael, New York: John Wiley & Jones, Inc., 2004.

"Accounting for Damages in Intellectual Property Litigation" (with Tony Samuel and John Davis), Building and Enforcing Intellectual Property Value – an International Guide for the Boardroom 2003.

"Challenges to the Admissibility of Financial Expert Witness Testimony" (with Lawrence F. Ranallo), <u>Litigation Services Handbook,</u> 2002 Supplement, edited by Roman L. Weil, Michael J. Wagner, and Peter B. Frank, 2A.1 – 2A.17, New York:  John Wiley & Sons, Inc., 2001.

"Calculation of Lost Earnings" (with Carlyn R. Taylor and Randi L. Firus), <u>Litigation Services Handbook,</u> edited by Roman L. Weil, Michael J. Wagner, and Peter B. Frank, 11.1 – 11.16, New York:  John Wiley & Sons, Inc., 2001.

"Preparing the Financial Expert or Economist" (with George G. Strong, Jr.), <u>Witness Preparation</u>, V. Hale Starr, 13.4 – 13.4.1, New York: Aspen Law & Business, A Division of Aspen Publishers, Inc., 1998.

"The Effect of Institutional Setting on Behavior in Public Enterprises:  Irrigation Districts in the Western States" (with John M. McDowell), <u>Arizona State Law Journal</u>, Vol. 1982, No. 2, 453 – 496.

## SELECTED CLIENTS OVER THE PAST FIVE YEARS

Selected clients over approximately the past five years include but are not limited to: Abbott Laboratories; Akamai Technologies, Inc.; America Online, Inc.; Apple Inc; Autobytel Inc.; Blackboard Inc.; Blackstone Group; Blockbuster Inc.; Bioengineered Supplements & Nutrition, Inc.; CDX Gas; Chrysler; Cigna; Coca Cola Company; Covidien; Crane Co.; Cummins-Allison Corp.; DirecTV, Inc.; Dow Chemical Company; Electronic Data Systems; Ernst & Young LLP; GoDaddy.com, Inc.; Google; Gorlick Distribution Centers; Haggar; Halliburton; Hyundai Motor America; Idearc; Ingenico Inc.; Juniper; LG Electronics, Inc.; Lutron Electronics Co., Inc.; McDonald's Corporation; Medtronic, Inc.; Merial Limited; Microsoft Corporation; National Dairy Holdings, L.P.; New York Times, Company; Nike, Inc.; Nintendo; Nortel Networks Inc.; Research in Motion; Rohm Co. Ltd.; Sabre Inc.; Samsung; Shure, Inc.; Shell Exploration & Production Company; SIGA Technologies; Snapple Beverage Corporation; St. Jude Medical, Inc.; Stolt Nielson; TiVo Inc; T-Mobile USA, Inc.; Tyco Heathcare; UBS; United States Surgical Corporation; VeriFone Systems, Corp.; Verizon; Versata (f/n/a Trilogy); Volkswagen Group of America, Inc.; Waste Management; Wachovia Corporation; Wells Fargo & Company; Wendy's; Wyndham International, Inc.; Yahoo!

**Exhibit 2**

# KEITH R. UGONE, PH.D.
## TRIAL, HEARING, AND ARBITRATION TESTIMONY[1]

United States of America *ex rel*. Kurt Bunk and Daniel Heuser v. Birkart Globistics GMBH & Co. Logistik Und Service KG, et al. and United States of America *ex rel*. Ray Ammons v. The Pasha Group, **Gosselin World Wide Moving, N.V., and Gosselin Group, N.V.** (In The United States District Court For The Eastern District Of Virginia, Alexandria Division, No. 1.02cv1168 (AJT/TRJ)) (2014)

NuVasive, Inc. vs. **Laura Lewis** (In The United States District Court For the Western District Of Texas, Austin Division, Civil Action No. 1:12-CV-01156) (2014)

**Magnum Oil Tools International, Ltd.** vs. Tony D. McClinton, JayCar Energy Group. L.L.C., Surf Frac Wellhead Equipment Company, Inc., McClinton Energy Group, L.L.C., Motors Mills Snubbing, L.L.C., and Stan Keeling (In The United States District Court For The Southern District Of Texas, Corpus Christi Division, Civil Action No: 2-12-cv-00099) (2014: preliminary injunction hearing)

NXP B.V. vs. **Research In Motion, Ltd. and Research In Motion, Corp.** (United States District Court For The Middle District Of Florida, Orlando Division, Case 6:12-cv-498-ORL-22GJK) (2014)

In The Matter Of Certain Wireless Devices With 3G And/Or 4G Capabilities And Components Thereof (InterDigital Communications, Inc., InterDigital Technology Corporation, et al. vs. **Samsung Electronics Co., Ltd., Samsung Electronics American, Inc., and Samsung Telecommunications America, LLC**; United States International Trade Commission, Washington, D.C., Investigation No. 337-TA-868) (2014)

Sabatino Bianco, M.D. vs. **Globus Medical, Inc.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:12-cv-147-JRG) (two testimonies: trial (2014) and evidentiary hearing on on-going royalties (2014))

SimpleAir, Inc. vs. Microsoft Corporation, **Motorola Mobility, Inc., Google Inc.**, et al. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:11-cv-00416) (two trials; 2014)

PharmAthene, Inc. vs. **SIGA Technologies, Inc.** (In The Court Of Chancery In The State Of Delaware, Civil Action No. 2627-VCP) (2013)

Brightstar Corp. and Flipswap Services, LLC vs. **Flipswap, Inc.** (Judicial Arbitration And Mediation Services, Case No. 1460000526) (2013)

---

[1] Trial, hearing, and arbitration testimony over the 1990-2014 time period. Case citations and dates subject to verification. **Clients bolded.** Deposition testimony begins on page 10.

1

Lake Cherokee Hard Drive Technologies, L.L.C. vs. Bass Computers, Inc., LSI Corporation, **Marvell Semiconductor, Inc.**, Samsung Semiconductor, Inc., and Tech Data Corporation (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:10-cv-216 (TJW-CE)) (2013)

Abraham & Veneklasen Joint Venture, Abraham Equine, Inc. and Jason Abraham vs. **American Quarter Horse Association** (In The United States District Court For The Northern District Of Texas, Amarillo Division, Civil Action No. 02:12-cv-00103-J) (2013)

Hitachi Consumer Electronics Co., Ltd. and Hitachi Advanced Digital, Inc. vs. **Top Victory Electronics (Taiwan) Co. Ltd., TPV Int'l (USA), Inc., Envision Peripherals, Inc., Top Victory Electronics (Fujian) Co. Ltd., TPV Electronics (Fujian) Co. Ltd., TPV Technology Ltd., and VIZIO, Inc.** (United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:10-CV-260) (2013)

*e*Plus Inc., vs. Lawson Software, Inc. (In The United States District Court For The Eastern District Of Virginia, Richmond Division, Civil Action No. 3:09-CV-620 (RFP)) (2013)

Alexsam, Inc. vs. **IDT Corporation** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:11-CV-362-RSP) (2013)

In Re: Urethanes Antitrust Litigation (Class) – Seegott Holdings, Inc., et al. vs. **The Dow Chemical Company** (In The United States District Court For The District Of Kansas, MDL-04-1616 (JWL/JPO), No. 05-2265-JWL) (2013)

**FLIR Systems, Inc.** vs. Sierra Media, Inc. and Fluke Corporation (The United States District Court, District Of Oregon, Portland Division, Case No. 3:10-CV-971-HU) (2012) (two trial testimonies: affirmative case and counterclaim)

I/P Engine, Inc. vs. **AOL, Inc., Google Inc., IAC Search & Media, Inc., Gannett Company, Inc., and Target Corporation** (In The United States District Court For The Eastern District Of Virginia, Norfolk Division, Civil Action No. 2:11-cv-512-RAJ) (2012)

DDR Holdings, LLC vs. **Hotels.com, L.P.**; **Expedia, Inc.**; **Travelocity.com, L.P.**; Site59.com, LLC; Internetwork Publishing Corporation d/b/a Lodging.com; Neat Group Corporation; Orbitz Worldwide, LLC; **International Cruise & Excursion Gallery, Inc.; OurVacationStore.com, Inc.**; **National Leisure Group, Inc. / World Travel Holdings, Inc.**; and **Digital River, Inc.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:06-CV-42-JRG) (2012)

**Tyco Healthcare Group LP and United States Surgical Corporation** vs. Ethicon Endo-Surgery, Inc. (In The United States District Court For The District Of Connecticut, Civil Action No: 3:10-cv-00060 (JBA)) (2012)

CardSoft, Inc. and CardSoft (Assignment For The Benefit Of Creditors), LLC vs. **VeriFone Systems Corporation; Hypercom Corporation; Ingenico S.A.; Ingenico Corp.; Ingenico Inc.**; Shera International Ltd.; and Blue Bamboo (UUSA), Inc. (United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:08-cv-00098) (2012)

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

**Merial Limited and Merial SAS** vs. Cipla Limited, Velcera, Inc., and FidoPharm, Inc. (In The United States District Court For The Middle District Of Georgia, Athens Division, Case No. 3:07-CV-125 (CDL)) (2012; injunction hearing)

Geoffrey L. Berman, Trustee of the SB Liquidation Trust vs. **Ernst & Young LLP** (International Institute For Conflict Prevention & Resolution, New York, NY) (2012)

CEATS, Inc. vs. **Continental Airlines, Inc.; Ticketmaster, L.L.C.; Tickets.com, Inc.; TicketNetwork, Inc.; TicketsNow.com, Inc.; AirTran Airways, Inc.; Alaska Airlines, Inc.; Delta Air Lines, Inc.; Jet Blue Airways Corporation; United Air Lines, Inc.; US Airways, Inc.; and Virgin America, Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:10-cv-120 LED) (2012)

**Halliburton Energy Services, Inc.** vs. Weatherford International, Inc. and BJ Services Company (In The United States District Court For The Northern District Of Texas, Dallas Division, Civil Action No. 307-cv-2144-K) (2012)

Convolve, Inc. vs. Dell, Inc., Western Digital Corporation, **Hitachi Global Storage Technologies, Inc., and Hitachi, Ltd.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:08-cv-244) (2011)

Personal Audio, LLC vs. **Apple Inc.**; Sirius XM Radio, Inc.; XM Satellite Radio, Inc.; Coby Electronics, Corp.; Archos, Inc. (United States District Court For The Eastern District Of Texas, Lufkin Division, Case 9:09-cv-00111-RC) (2011)

Bedrock Computer Technologies LLC vs. **Yahoo! Inc**. (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:09-cv-269) (2011)

Bedrock Computer Technologies LLC vs. **Google Inc**. (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:09-cv-269) (2011)

Cheetah Omni LLC vs. **Verizon Services Corporation, Verizon Business Network Services Inc., and Verizon Enterprise Delivery LLC** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:09-cv-260-LED) (2011)

Alexsam, Inc. vs. **IDT Corporation** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:07-CV-420-TJW) (2011)

PharmAthene, Inc. vs. **SIGA Technologies, Inc.** (In The Court Of Chancery In The State Of Delaware, Civil Action No. 2627-VCP) (2011)

**St. Jude Medical, Inc. and St. Jude Medical Puerto Rico LLC** vs. Access Closure, Inc. (In The United States District Court For The Western District Of Arkansas, Texarkana Division, Case No. 4:08-cv-04101-HFB) (2010)

Affinity Labs of Texas, LLC vs. BMW North America, LLC; BMW Manufacturing Co., LLC; Hyundai Motor America, Inc.; Hyundia Motor Manufacturing Alabama, LLC; Kia Motors America, Inc.; Mercedes-Benz USA, LLC; Mercedes-Benz U.S. International, Inc.; **Volkswagen Group of America, Inc.** (In The United States District Court For The Eastern District Of Texas, Lufkin Division, Civil Action No. 9:08-cv-164-RC) (2010)

Mirror Worlds, LLC vs. **Apple, Inc.** (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:08-CV-88-LED) (2010)

VirnetX Inc. and Science Applications International Corporation vs. **Microsoft Corporation** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 607CV80 (LED)) (2010)

Carpathia Hosting, Inc., Carpathia Hosting, Inc. as nominee and trustee, for Triumviri, Inc., and Triumviri, Inc. vs. **Electronic Data Systems, LLC** (JAMS Arbitration, Washington, D.C., No. 1410005118) (2010)

**Cummins-Allison Corp.** vs. Shinwoo Information & Telecommunications Co., Ltd., n/k/a SBM Co., Ltd., and Amro-Asian Trade, Inc. (In The United States District Court For The Eastern District Of Texas, Lufkin Division, Civil Action No. 9:07cv196 and Civil Action No. 9:07cv228, Consolidated) (2009)

i4i Limited Partnership and Infrastructures for Information Inc. vs. **Microsoft Corporation** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:07-CV-113-LED) (2009)

**Paradox Security Systems, Ltd., Shmuel Hershkovitz, and Pinhas Shpater** vs. ADT Security Services, Inc., Digital Security Controls, Ltd., Monitronics International, Inc., and Protection One, Inc. (In The United States District Court For The Eastern District Of Texas, Marshall Division, C. A. No. 2:06-CV-462 (TJW)) (2009)

Hearing Components, Inc. vs. **Shure, Inc.** (In The United States District Court For The Eastern District of Texas, Lufkin Division, Civil Action No. 9:07-cv-104 (RHC)) (2009)

Rambus, Inc. vs. **Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Semiconductor, Inc., and Samsung Austin Semiconductor, L.P.** (United States District Court, Northern District Of California – San Jose Division, Case No. 05 02298 RMW) (2008)

**Abbott Laboratories and TheraSense, Inc.** vs. Becton, Dickinson and Company and Nova Biomedical Corp. (In The United States District Court, Northern District of California, Civil Action No. C04-2123 WHA) (2008)

In the Matter of Certain 3G Wideband Code Division Multiple Access (WCDMA) Handsets and Components Thereof (InterDigital Communications Corporation and InterDigital Technology Corporation vs. **Samsung Electronics Co., Ltd, Samsung Electronics America, Inc., and Samsung Telecommunications America LLC**; The United States International Trade Commission, Washington, D.C., Investigation No. 337-TA-601) (2008)

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

**Bueno Conato, LLC** vs. Bajio LLC, Bajio National LLC, Bajio Franchising LLC, and Doctor's Associates, Inc. (American Arbitration Association, Western Case Management Center, Case No. 77 114 Y 00254 06 WYGI) (2008)

**Akamai Technologies, Inc. and Massachusetts Institute of Technology** vs. Limelight Networks, Inc. (In The United States District Court, District of Massachusetts, Civil Action No. 06 CA 11109 RWZ and Civil Action No. 06 CA 11585 RWZ) (2008)

**Blackboard Inc.** vs. Desire2Learn Inc. (In The United States District Court For The Eastern District of Texas, Lufkin Division, Case No 9:06CV155) (2008; trial and injunction hearing)

Applied Medical Resources Corp. vs. **United States Surgical Corporation** (In The United States District Court For The Central District Of California, Southern Division, Case No. SACV 03-1267 CJC (MLGx)) (2008)

**Electronic Data Systems Corporation** vs. Towers, Perrin, Forster & Crosby, Inc. (American Arbitration Association Northeast Case Management Center, Case No. 13 489 Y 00146 07) (2007)

Computer Acceleration Corporation vs. **Microsoft Corporation** (In the United States District Court for the Eastern District of Texas, Lufkin Division, Civil Action No. 9:06-CV-140-RHC) (2007)

YC Partners, LTD. d/b/a Yantis Company vs. Zach Hall; **Rodman Excavation, Inc. d/b/a Rodman Companies, San Antonio Division; Rodman Utilities, L.P.; Rodman Power & Communications, LLC; Rodman Natural Resources, Inc.; Rodman Paving, Inc.** (In The District Court, Bexar County, Texas, 285th Judicial District, No. 2007-CI-03027). (2007; hearing regarding Motion to Compel Plaintiff's Documents)

QPSX Developments 5 Pty Ltd vs. **Nortel Networks Inc.** (In the United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:05CV-268) (2007)

**AVID Identification Systems, Inc.** vs. Philips Electronics North America Corporation, Koninklijke Philips Electronics N.V., The Crystal Import Corporation, Medical Management International, Inc., and Datamars SA (In The Eastern District of Texas, Marshall Division, Case No. 2:04-CV-183) (2006)

**TiVo Inc.** vs. EchoStar Communications Corporation, EchoStar DBS Corporation, EchoStar Technologies, and Echosphere Limited Liability Company (United States District Court for the Eastern District of Texas, Marshall Division, Case No. 2 – 04CV01 DF) (2006)

William Ziegler and DenLou, Inc. vs. **Synergistic International, LLC** (American Arbitration Association, Dallas, Case No.: 71 114 E 00733 04) (2005)

Dr. Phillips, Inc. vs. **Control Laser Corporation and Excel Technology, Inc.** (In the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida, Case No. 02-CA-000075, Division: 32, Business Court) (2005)

**William A. Wise** vs. El Paso Corporation (American Arbitration Association, Houston, Case No. 70-Y-116-00327-04) (2005)

**Aviall Services, Inc.** vs. Honeywell International, Inc. and Kelly Aerospace, Inc. (American Arbitration Association, Los Angeles, Arbitration No. 71 Y 181 00717 03) (2005)

**MCI Worldcom Network Services, Inc.** vs. Twister Communications Network, Inc. (In the District Court of Montgomery County, Texas, 221st Judicial District, Civil Action No. 00-05-03124CV) (2005)

Kathleen C. Cailloux, Kenneth F. Cailloux, Paula L. Heilman, and Robert Stephen Andresakis vs. **Baker Botts, L.L.P.**, Wells Fargo Bank Texas, N.A., William R. Goertz, S. Stacy Eastland, and Stephen T. Dyer (In the 198th Judicial District Court of Kerr County, Texas, Civil Action No. 03-603-B) (2005)

**Brooktrout, Inc.** vs. Eicon Networks Corporation, Eicon Networks, Inc. (In the United States District Court for the Eastern District of Texas, Marshall Division, Case Number 03-CV-59) (2004)

Colgate-Palmolive Company vs. **The Procter & Gamble Company** (In the United States District Court for the Southern District of New York, 03 Civ. 9348 (LLS) (DFE)) (2004)

**Electronic Data Systems Corp.** vs. Aspect Communications Corp. (American Arbitration Association, San Francisco, Case No. 74 Y 117 00586 03 GAP) (2004)

**PK Ventures, Inc. and Subsidiaries, PK Ventures Limited Partnership, and Robert M. Rose and Alice N. Rose** vs. Commissioner of Internal Revenue (United States Tax Court, Jacksonville, Florida, Docket Nos. 005836-99, 006395-99, and 10154-99) (2004)

**Brine, Inc. and Sports Licensing, Inc.** vs. STX, Inc. and STX, LLC (In the United States District Court for the District Massachusetts, Worchester Division, Civil Action No. 99-40167) (2003)

Teleplus, Inc., vs. **Avantel, S.A.** (In the United States District Court Western District of Texas, San Antonio Division, Civil Action No. SA-98-CA-0849 FB) (2003)

Cavalry Investments, L.L.C. vs. **Sunstar Acceptance Corporation and NationsCredit Commercial Corporation** (County Court at Law, Number 4, Dallas County, Texas, Cause No. 99-02296-D) (2003)

Steven R. Keene d/b/a Pagers Plus vs. **AT&T Wireless, Inc., a/k/a AWS National Accounts, L.L.C., and First Cellular Group of Shreveport, Inc. d/b/a AT&T Wireless Services** (Judicial Arbitration and Administration Services, Inc.) (2003)

**Poly-America, Inc.** vs. Serrot International, Inc. (In the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:00CV1457-D) (2002)

Morgan Howard, L.L.C. vs. **Immedient, Inc.** (In the County Court at Law No. 3, Dallas County, Texas, Cause No. 01-899-C) (2002)

Andrew Cumming vs. **J. C. Penney Company, Inc.** (In the District Court of Dallas County, Texas, 160th Judicial District, Civil Action No. 71-160-00077-01) (2002)

Inter-Tel, Incorporated vs. **Bank of America, Arizona** (In the Superior Court of the State of Arizona in and for the County of Maricopa, Case No. CV 96-00867) (2002)

COC Services, Ltd. vs. **CompUSA, Inc., Grupo Carso S.A. de C.V., Grupo Sanborns S.A. de C.V., TPC Acquisition Corp., Carlos Slim Helu and James Halpin** (In the District Court 116th Judicial District of Dallas County, Texas, Case No. 0000023) (2001)

United States of America vs. **Dan Anderson** (In the United States District Court for the District of Kansas, Civil Action No. 2:99mc205 and 2:99mc207) (2000)

Scott K. Ginsburg vs. **Goldman, Sachs & Co.** (Before the National Association of Securities Dealers, Inc., Dallas) (2000)

**TCP Holdings, LLC, Robert Neely, and David Thomas** vs. Tim Kirk (Before the American Arbitration Association, Dallas, Case No. 71 18000564 98) (2000)

United States of America vs. **Dan Anderson and Baptist Medical Center** (In the United States District Court for the District of Kansas, Civil Action No. 2:99mc205 and 2:99mc207) (1999; Sentencing Hearing)

In the Matter of Application No. 96-1, **Olympic Pipe Line Company**: Cross Cascade Pipeline Project (Before the State of Washington Energy Facility Site Evaluation Council) (1999)

Magnetic Technologies, S.P.R.L. vs. **Connectware, Inc.** (In the District Court Dallas County, Texas, 68th Judicial District) (1998; Daubert/Robinson Hearing Testimony and Trial Testimony)

Jeannean Heller, CRNA; Joanne Lewis, CRNA; Harold Newsom, CRNA; and Lola H. Wright, CRNA vs. **Raymond M. Dunning, Jr. and Columbia Medical Center of Lewisville Subsidiary L.P., d/b/a Columbia Medical Center of Lewisville, Dallas, Texas** (American Arbitration Association, Dallas, Texas Region) (1998)

Proposed Form A Acquisition of Control of Universal Fidelity Life Insurance Company, an Oklahoma Domestic stock insurer, by **Conseco, Inc.**, A Delaware Corporation (Before the Insurance Commissioner of the State of Oklahoma, Case No. 97-207-TRN) (1998)

Sledge W. Killion vs. **Metropolitan Life Insurance Company**, et al. (Before the National Association of Securities Dealers, Inc., Dallas, NASD Arbitration No. 95-05997) (1997)

**Reedrill Corporation** vs. Driltech, Inc. (U.S. District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:95CV189) (1997)

7

Robert Tuck vs. **Westec Security, Inc.** (Superior Court of the State of California for the County of Los Angeles, Case No. BC131221) (1996)

Exar Corporation vs. **SGS-Thomson Microelectronics Srl** (Court of International Arbitration of the International Chamber of Commerce, New York) (1996)

Nationwide Business Telephones and Team Centrex vs. **Introlink Communications System, Inc. and Pacific Bell, Inc.** (Superior Court of the State of California for the County of Los Angeles, Case No. BC009783) (1996)

TriCom, Inc. vs. **Electronic Data Systems Corporation** (U.S. District Court for the Eastern District of Michigan, Southern Division, Civil Action No. 2:92CV76374) (1995)

**Rauscher, Pierce, Refsnes, Inc.** vs. Alfred W. Anderson, Jr. (Before the National Association of Securities Dealers, Inc., Dallas) (1995)

**Ivy Goth** vs. City of Los Angeles and Department of Water and Power (Superior Court of the State of California for the County of Los Angeles, Case No. SC013502) (1995)

**Bio-Medical Applications Management Company, Inc.** vs. Dallas Nephrology Associates (U.S. District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:94CV37) (1995)

Cybor Corporation vs. **FAS Technologies, Inc.** (U.S. District Court for the Northern District of California, San Jose, Civil Action No. 5:93CV20712) (1995)

Phillips Petroleum Company vs. **Rexene Corporation** (U.S. District Court for the District of Delaware, Civil Action No. 1:90CV208) (1994)

**Donald J. Dougher**, et al. vs. Gerard J. Dougher, Sr., et al. (Superior Court of the State of California for the County of Orange, Case No. 677451) (1994)

Texas State Bank, et al. vs. **Electronic Data Systems Corporation** (206th District Court of Hidalgo County, Texas) (1994)

**Union Oil Company of California** vs. International Insurance Company, et al. (Superior Court of the State of California) (1993)

Chroma Lighting and Charles T. Von Der Ahe vs. **GTE Products Corporation and Sylvania Lighting Services Corporation** (U.S. District Court for the Central District of California, Civil Case No. 2:91CV6424) (1993)

Arley Del Gado vs. **County of Los Angeles** (Superior Court of the State of California for the County of Los Angeles) (1993)

**Villarreal** vs. East Union High School District (Superior Court of the State of California) (1993)

**Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.**

**Sunbelt Television, Inc.** vs. Jones Intercable, Inc. (U.S. District Court for the Central District of California, Civil Case No. 2:91CV3506) (1992)

**Clayton Jacobson** vs. Kawasaki Heavy Industries, Ltd., Japan; Kawasaki Motors Corporation, USA; and Kawasaki Motors Manufacturing Corporation, USA (U.S. District Court for the Central District of California) (1991)

Advanced Building Maintenance, Inc. vs. **Premier Ventures, Inc., dba Premier Building Maintenance** (Superior Court of the State of California for the County of Los Angeles) (1990)

**Southwest Tank Liners** vs. Joor Manufacturing, Inc. (U.S. District Court for the Central District of California) (1990)

Deposition Testimony of Keith R. Ugone, Ph.D.

# KEITH R. UGONE, PH.D.
## DEPOSITION TESTIMONY[2]

Uniloc USA, Inc. and Uniloc Luxembourg S.A. vs. **Activision Blizzard, Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:13-cv-00256) (2014)

**Ultratec, Inc. and CapTel, Inc.** vs. Sorenson Communications, Inc. and CaptionCall, LLC (United States District Court, Western District Of Wisconsin, Case No.:3:13-cv-00346) (2014)

Personal Audio, LLC vs. **CBS Corporation, NBCUniversal Media, LLC, FOX Broadcasting Company, FOX Networks Group, Inc., Lotzi Digital, Inc. et al.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:13-cv-00270-JRG-RSP, 2:13-cv-00271-JRG-RSP, 2:13-cv-577-JRG-RSP, 2:13-cv-00014-JRG-RSP) (2014)

In Re **ConAgra Foods, Inc.** (Wesson Oil) (United States District Court, Central District Of California, Western District, Case No. CV 11-05379-MMM, MDL No. 2291) (2014)

Optimize Technology Solutions, LLC vs. Staples, Inc., Dillard's, Inc., HSN, Inc., J.C.Penney Corporation, Inc., and **Recreational Equipment, Inc.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:11-CV-00419-JRG) (2014)

NuVasive, Inc. vs. **Laura Lewis** (In The United States District Court For the Western District Of Texas, Austin Division, Civil Action No. 1:12-CV-01156) (2014)

Connecticut Ironworkers Employers Association, Inc., et al. vs. **New England Regional Council of Carpenters** (United States District Court, District Of Connecticut, Docket No. 3:10-CV-165-SRU) (2014)

**United Services Automobile Association** vs. Mitek Systems, Inc. (In The United States District Court For The Western District Of Texas, San Antonio Division, Case No. 5:12-cv-00282-FB) (2014)

Florida Atlantic University Research Corporation and Domaine Associates, LLC vs. **Acer Inc, ASUS Computer International, and TPV Technology Limited**, et al. (United States District Court, Southern District Of Florida, Case No.: 9:12-cv-80694-PAS, Case No.: 9:12-cv-80697, and Case No.: 9:12-cv-80701-PAS, respectively) (2014)

In Re: Urethanes Antitrust Litigation (Direct Action) – Carpenter Co., Woodbridge Foam Corporation, Dash Multi-Corp, Inc., et al. vs. Bayer AG, **The Dow Chemical Company**, Huntsman International LLC, Lyondell Chemical Company, BASF Corporation, et al. (In The United States District Court For The District Of Kansas, 04-MD-1616 (JWL), No. 08-2617, No. 09-2026, No. 10-2077) (2014)

---

[2] Deposition testimony over the 1990-2014 time period.  Case citations and dates are subject to verification.  **Clients bolded.**

Deposition Testimony of Keith R. Ugone, Ph.D.

Brightstar Corp. and Brightstar, US, Inc. vs. **e-Recycling, LLC** (In The Circuit Of The 11th Judicial Circuit In And For Miami-Date County, Florida, Case No. 12-08985 CA 40) (2014)

US Airways, Inc. vs. **Sabre Holdings Corporation, Sabre Inc., and Sabre Travel International Limited** (United States District Court, Southern District Of New York, Civil Action No. 1:11-cv-02725-MGC) (2014)

**ASUS Computer International** vs. Round Rock Research, LLC (United States District Court, Northern District Of California, Civil Action No. 3:12-CV-02099-JST) (2014)

Yanira Algarin and Patsy Murdock, on behalf of themselves and all others similarly situated vs. **Maybelline, LLC d/b/a Maybelline New York** (United States District Court, Southern District of California, Case No. 12CV3000 AJB DHB) (2014)

Jean Melchior vs. **Hilite International, Inc.** (United States District Court For The Northern District Of Texas, Dallas Division, Civil Action No.: 3:11-CV-03094-M) (2014)

Becton, Dickinson and Company vs. **Insulet Corporation** (In The United States District Court For The District Of New Jersey, Case No. 2:10-cv-04371-PGS-ES) (2014)

NuVasive, Inc. vs. **Globus Medical, Inc.** (In The District Court Of Travis County, Texas, Cause No. D-1-GN-11-002134) (2013)

PharmAthene, Inc. vs. **SIGA Technologies, Inc.** (In The Court Of Chancery In The State Of Delaware, Civil Action No. 2627-VCP) (2013)

SimpleAir, Inc. vs. Microsoft Corporation, **Motorola Mobility, Inc., Google Inc.**, et al. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:11-cv-00416) (2013)

Ethicon Endo-Surgery, Inc. and Ethicon Endo-Surgery, LLC vs. **Covidien, Inc. and Covidien, LP** (In The United States District Court For The Southern District Of Ohio, Western Division, Civil Case No.: 1:11-cv-871) (2013)

Applied Medical Resources Corporation vs. **Tyco Healthcare Group LP d/b/a Covidien** (In The United States District Court For The Central District of California, Southern Division, Civil Action No.: SACV11-01406JVS (ANx)) (2013)

**Microsoft Corporation** vs. LBS Innovations LLC and LBS Innovations LLC, a Texas LLC (In the United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:12-cv-759-JRG) (2013)

**Magnum Oil Tools International, Ltd.** vs. Tony D. McClinton, JayCar Energy Group. L.L.C., Surf Frac Wellhead Equipment Company, Inc., McClinton Energy Group, L.L.C., Motors Mills Snubbing, L.L.C., and Stan Keeling (In The United States District Court For The Southern District Of Texas, Corpus Christi Division, Civil Action No: 2-12-cv-00099) (two depositions: 2013 (damages) and 2014 (preliminary injunction))

Deposition Testimony of Keith R. Ugone, Ph.D.

NeuStar, Inc. and Quova, Inc. vs. **F5 Networks, Inc.** (In The United States District Court For The Northern District Of California, San Jose Division, Case No. CV12-02574) (2013)

Sabatino Bianco, M.D. vs. **Globus Medical, Inc.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:12-cv-147-JRG) (2013)

**Swivelpole Group Pty Ltd. and Swivelpole Patent Pty Ltd** vs. Swivelpole USA, Ltd., Swivelpole Holdings, LLC, Swivelpole Canada Holdings, Inc., ILS Products, LLC, ILS Products Holdings, LLC, ILS Manufacturing, LLC, and Andrew Grant (In The District Court Of Harris County, Texas, 164th Judicial District, Cause No. 2012-42402) (2013)

In The Matter Of Certain Wireless Devices With 3G And/Or 4G Capabilities And Components Thereof (InterDigital Communications, Inc., InterDigital Technology Corporation, et al. vs. **Samsung Electronics Co., Ltd., Samsung Electronics American, Inc., and Samsung Telecommunications America, LLC**; United States International Trade Commission, Washington, D.C., Investigation No. 337-TA-868) (2013)

Lodsys, LLC, et al. vs. **Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Telecommunications America, LLC**, et al. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No.: 2:11-CV-90) (2013)

**One Technologies, L.P.** vs. Profinity, LLC and Chad D. Ertel (In The District Court Dallas County, Texas, 14th Judicial District, Cause No. 12-03980-A) (2013)

Eidos Display, LLC and Eidos III, LLC vs. AuOptronics Corporation, AU Optronics Corporation America, **Chimei Innolux Corporation, Chi Mei Optoelectronics USA, Inc.**, Chunghwa Picture Tubes, Ltd., Hannstar Display Corporation, and Hannspree North America, Inc. (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:11-cv-201) (2013)

Brightstar Corp. and Flipswap Services, LLC vs. **Flipswap, Inc.** (Judicial Arbitration And Mediation Services, Case No. 1460000526) (2013; three depositions)

SFA Systems, LLC vs. **Amazon.com, Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:11-cv-00052) (2013)

Palomar Medical Technologies, Inc. and The General Hospital Corporation vs. **TRIA Beauty, Inc.** (In The United States District Court, District Of Massachusetts, Civil Action No. 09-CV-11081-RWZ) (2013)

Maureen Stewart, Kelly Lamicella, and Nicole Bello vs. **Beam Global Spirits & Wine, Inc., Jim Beam Brands Co., SGC Global, L.L.C., Skinny Girl Cocktails, L.L.C., and Bethenny Frankel** (United States District Court For The District Of New Jersey, Civil Action No. 1:11-cv-05149 (NLH) (KMW) (2013)

Deposition Testimony of Keith R. Ugone, Ph.D.

Securities and Exchange Commission vs. **Life Partners Holdings, Inc.**, Brian Pardo, R. Scott Peden, and David M. Martin (The United States District Court For The Western District of Texas, Austin Division, Civil Action No.: 1-12-cv-00033-JRN) (2013)

**St. Jude Medical, Cardiology Division, Inc., St. Jude Medical Systems AB, and St. Jude Medical S.C., Inc.** vs. Volcano Corporation (In The United States District Court For The District Of Delaware, C.A. No. 10-631-RGA) (2013)

In Re **Dial Complete** Marketing and Sales Litigation (MDL No. 2263) (United States District Court, District of New Hampshire, MDL Docket No. 11-md-2263-SM ALL CASES) (2013)

**Sound Design Technologies, Ltd.** vs. Oticon, Inc., SeboTech Hearing Systems, LLC, and Gennum Corp. (The United States District Court For The District Of Arizona, No. CV11-1375-PHX-SRB) (2013)

Lake Cherokee Hard Drive Technologies, L.L.C. vs. Bass Computers, Inc., LSI Corporation, **Marvell Semiconductor, Inc.**, Samsung Semiconductor, Inc., and Tech Data Corporation (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:10-cv-216 (TJW-CE)) (2013)

Abraham & Veneklasen Joint Venture, Abraham Equine, Inc. and Jason Abraham vs. **American Quarter Horse Association** (In The United States District Court For The Northern District Of Texas, Amarillo Division, Civil Action No. 02:12-cv-00103-J) (2013)

Hitachi Consumer Electronics Co., Ltd. and Hitachi Advanced Digital, Inc. vs. **Top Victory Electronics (Taiwan) Co. Ltd., TPV Int'l (USA), Inc., Envision Peripherals, Inc., Top Victory Electronics (Fujian) Co. Ltd., TPV Electronics (Fujian) Co. Ltd., TPV Technology Ltd., and VIZIO, Inc.** (United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:10-CV-260) (2013)

SmartPhone Technologies, LLC vs. Research In Motion, Corp., **Apple, Inc.**, et al. (The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:10-CV-74-LED) (2013)

**Lutron Electronics Co., Inc.** vs. Crestron Electronics, Inc., Face Group, Inc. d/b/a Lifestyle Electronics, Lava Corp., Audio Vision Systems, LLC (In The United States District Court, District Of Utah, Central Division, Case: 2:09-cv-707) (2012)

Oasis Research, LLC vs. AT&T Corp., **Carbonite, Inc., EMC Corp., Decho Corp., IOMEGA Corp., GoDaddy.com, Inc., Iron Mountain Incorporated, Iron Mountain Information Management, Inc., Pro Softnet Corp.**, et al. (In The United States District Court For The Eastern District Of Texas, Sherman Division, Civil Action No. 4:10-cv-00435-MHS-ALM) (2012)

Secure Axcess, LLC vs. Bank of America Corp., **Arvest Bank, Bank of the Ozarks, Inc., Compass Bancshares, Inc., First National Bank Texas, First National Bank of Omaha, Zions Bancorporation**, et al. (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:10-cv-00670) (2012)

13

Kehlie R. Espinosa, Lillian E. Levoff, Thomas Ganin, and Daniel Baldeschi vs. **Hyundai Motor America** (United States District Court, Central District Of California, Case No. 2:12-cv-00800 GW (FFMx)) (2012)

Axcess International, Inc. vs. **Savi Technology, Inc.** (In The United States District Court For The Northern District Of Texas, Dallas Division, Case No. 3:10-cv-01033-F) (2012)

American Airlines, Inc. vs. **Sabre Inc.**, et al. (In The Judicial District Of Tarrant County, Texas, 67th Judicial District, No. 067-249214-10) (2012)

I/P Engine, Inc. vs. AOL, Inc.; **Google Inc.**; IAC Search & Media, Inc.; Gannett Company, Inc.; and Target Corporation (In The United States District Court For The Eastern District Of Virginia, Norfolk Division, Civil Action No. 2:11-cv-512-RAJ) (2012)

Realtime Data, LLC d/b/a IXO vs. MetroPCS Texas, LLC; MetroPCS Communications, Inc.; MetroPCS Wireless, Inc.; AT&T, Inc.; AT&T Mobility LLC; **Cellco Partnership d/b/a Verizon Wireless International, Inc.**; Leap Wireless International, Inc.; Cricket Communications, Inc. a/k/a Cricket Wireless, Inc.; Sprint Nextel Corp.; and T-Mobile USA, Inc. (United States District Court, Eastern District of Texas, Tyler Division, Case No. 6:10-cv-00493-LED) (2012)

Realtime Data, LLC d/b/a IXO vs. MetroPCS Texas, LLC; MetroPCS Communications, Inc.; MetroPCS Wireless, Inc.; AT&T, Inc.; AT&T Mobility LLC; Cellco Partnership d/b/a Verizon Wireless International, Inc.; Leap Wireless International, Inc.; Cricket Communications, Inc. a/k/a Cricket Wireless, Inc.; Sprint Nextel Corp.; and **T-Mobile USA, Inc.** (United States District Court, Eastern District of Texas, Tyler Division, Case No. 6:10-cv-00493-LED) (two depositions: 2012 and 2013)

Technical Resource Services, Inc., et al. vs. **Shell Exploration & Production, Company** (In The United States District Court For The Eastern District Of Louisiana, Civil Action No. 09-7339) (2012)

U.S. Bank National Association, Litigation Trustee of the Idearc Inc. et al. Litigation Trust vs. **Verizon Communications Inc., Verizon Financial Services, LLC, GTE Corporation**, and John W. Diercksen (In The United States District Court For The Northern District Of Texas, No. 3:10-CV-1842-G) (2012)

Eon Corp. IP Holdings, LLC vs. T-Mobile USA, Inc., Research In Motion Corporation, **Cellco Partnership d/b/a Verizon Wireless**, et al. (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:10-cv-00379-LED) (2012)

My485, Inc. vs. **Riverside Partners, LLC, d/b/a The Riverside Company and HealthcareFirst, Inc.** (In The District Court, 67th Judicial District, Tarrant County, Texas, Cause No. 067 251767 11) (2012)

In Re Glaceau Vitamin Water Marketing and Sales Practice Litigation (No. II): **The Coca Cola Company and Energy Brands, Inc.** (In The United States District Court, Eastern District Of New York, Case No. 1:11-md-02215-DLI-RML) (2012)

**FLIR Systems, Inc.** vs. Sierra Media, Inc. and Fluke Corporation (The United States District Court, District of Oregon, Portland Division, Case No. 3:10-CV-971-HU) (2012; two depositions)

In Re: Urethanes Antitrust Litigation (Direct Action) – Carpenter Co., Woodbridge Foam Corporation, Dash Multi-Corp, Inc., et al. vs. Bayer AG, **The Dow Chemical Company, Huntsman International LLC, Lyondell Chemical Company, BASF Corporation**, et al. (In The United States District Court For The District Of Kansas, 04-MD-1616 (JWL), No. 08-2617, No. 09-2026, No. 10-2077) (2012)

In Re: Urethanes Antitrust Litigation (Class) – Seegott Holdings, Inc., et al. vs. Bayer AG, **The Dow Chemical Company, Huntsman International LLC, Lyondell Chemical Company, BASF Corporation**, et al. (In The United States District Court For The District Of Kansas, MDL-04-1616 (JWL/JPO), No. 05-2265-JWL) (2012)

LSQ Funding Group, L.C. vs. **EDS Field Services n/k/a HP Enterprise Services, LLC** (United States District Court, Middle District Of Florida, Orlando Division, Case No.: 6:10-CV-1246-ORL-ACC-DAB) (2012)

**e**Plus Inc.**, vs. Lawson Software, Inc. (In The United States District Court For The Eastern District Of Virginia, Richmond Division, Civil Action No. 3:09-CV-620 (RFP)) (2012)

CardSoft, Inc. and CardSoft (Assignment For The Benefit Of Creditors), LLC vs. **VeriFone Systems Corporation; Hypercom Corporation; Ingenico S.A.; Ingenico Corp.; Ingenico Inc.**; Shera International Ltd.; and Blue Bamboo (UUSA), Inc. (United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:08-cv-00098) (2012)

**Mitsubishi Heavy Industries, Ltd.** vs. General Electric Co. (In The United States District Court, Middle District Of Florida, Orlando Division, Civil Action No. 6:10-cv-812) (2012)

CEATS, Inc. vs. **Continental Airlines, Inc.; Ticketmaster, L.L.C.; Tickets.com, Inc.; TicketNetwork, Inc.; TicketsNow.com, Inc.; AirTran Airways, Inc.; Alaska Airlines, Inc.; Delta Air Lines, Inc.; Jet Blue Airways Corporation; United Air Lines, Inc.; US Airways, Inc.; and Virgin America, Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:10-cv-120 LED) (2012)

W.L. Gore & Associates, Inc. vs. **GI Dynamics, Inc.** (United States District Court, District Of Arizona, No. CV 10-8088 PCT GMS) (2011)

LML Patent Corp. vs. JPMorgan Chase & Co.; **Wells Fargo Bank, N.A.; Wachovia Bank, N.A.**; Citigroup, Inc.; HSBC Bank USA, N.A.; Capital One National Association; Northern Trust Company; Deutsche Bank Trust Company; PayPal, Inc. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:08-cv-448 DF) (2011)

Deposition Testimony of Keith R. Ugone, Ph.D.

**Halliburton Energy Services, Inc.** vs. Weatherford International, Inc. and BJ Services Company (In The United States District Court For The Northern District Of Texas, Dallas Division, Civil Action No. 307-cv-2144-K) (2011; two depositions)

**Tyco Healthcare Group LP and United States Surgical Corporation** vs. Ethicon Endo-Surgery, Inc. (In The United States District Court For The District Of Connecticut, Civil Action No: 3:10-cv-00060 (JBA)) (2011 and 2012; two depositions)

Curtis Berrien; Rose Huerta; Tina Musharbash; Fern Prosnitz; Michael Andler; Marcus Boness; Timothy Bonnell; Richard Buford; Elaine Cefola; Kenneth Davis; Jerome Garoutte vs. **New Raintree Resorts International, LLC; RVC Members, LLC; Douglas Y. Bech** (In The United States District Court For The Northern District Of California, Oakland Division, Case No. CV10-3125 CW) (2011)

Convolve, Inc. vs. Dell, Inc., Western Digital Corporation, **Hitachi Global Storage Technologies, Inc., and Hitachi, Ltd.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:08-cv-244) (2011)

United States of America *ex rel.* Kurt Bunk and Daniel Heuser v. Birkart Globistics GMBH & Co. Logistik Und Service KG, et al. and United States of America *ex rel.* Ray Ammons v. The Pasha Group, **Gosselin World Wide Moving, N.V., and Gosselin Group, N.V.** (In The United States District Court For The Eastern District Of Virginia, Alexandria Division, No. 1.02cv1168 (AJT/TRJ)) (2011)

Cheetah Omni LLC vs. **Verizon Services Corporation, Verizon Business Network Services Inc., and Verizon Enterprise Delivery LLC** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:09-cv-260-LED) (2011)

Eon Corp. IP Holdings, LLC vs. **Sensus USA Inc.** (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:09-cv-00116) (2011)

Bedrock Computer Technologies LLC vs. **SoftLayer Technologies, Inc.; CitiWare Technology Solutions, LLC; Google Inc.; Yahoo! Inc.; MySpace Inc.; Amazon.com Inc.; PayPal Inc.; Match.com, LLC; and AOL Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:09-cv-269) (2011)

Personal Audio, LLC vs. **Apple Inc.**; Sirius XM Radio, Inc.; XM Satellite Radio, Inc.; Coby Electronics, Corp.; Archos, Inc.  (United States District Court For The Eastern District Of Texas, Lufkin Division, Case 9:09-cv-00111-RC) (2011)

Beneficial Innovations, Inc. vs. Blockdot, Inc.; CareerBuilder, LLC; CNET Networks, Inc.; Digg, Inc.; Ebaums's World, Inc.; Jabez Network, Inc.; **The New York Times Company**; The Washington Post Company; and The Weather Channel Interactive, Inc. (United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:07-CV-263-TJW-CE) (2010)

Deposition Testimony of Keith R. Ugone, Ph.D.

**St. Jude Medical, Inc. and St. Jude Medical Puerto Rico LLC** vs. Access Closure, Inc.  (In The United States District Court For The Western District Of Arkansas, Texarkana Division, Case No. 4:08-cv-04101-HFB) (2010)

Eon Corp. IP Holdings, LLC vs. **Verizon Clinton Center Drive Corp.** (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:08-cv-00385) (2010)

**Tyco Healthcare Group LP** vs. C.R. Bard, Inc. and Davol, Inc. (In The United States District Court For The District Of Delaware, C.A. No. 09-264 (SLR)(MPT)) (2010)

Affinity Labs of Texas, LLC vs. BMW North America, LLC; BMW Manufacturing Co., LLC; Hyundai Motor America, Inc.; Hyundia Motor Manufacturing Alabama, LLC; Kia Motors America, Inc.; Mercedes-Benz USA, LLC; Mercedes-Benz U.S. International, Inc.; and **Volkswagen Group of America, Inc.** (In The United States District Court For The Eastern District Of Texas, Lufkin Division, Civil Action No. 9:08-cv-164-RC) (2010)

Mirror Worlds, LLC vs. **Apple Inc.** (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:08-CV-88-LED) (2010)

SP Syntax LLC and SP3 Syntax LLC vs. James Ching Hua Li, Man Kit (Thomas) Chow, Michael K. Chan, Vincent F. Sollitto, Jr, Wayne A. Pratt, John S. Hodgson, David P. Chavoustie, Christopher C. L. Liu, Alice Phang, **Ernst & Young LLP**, and Grobstein, Horwath & Company LLP (Superior Court Of The State Of California, County Of Los Angeles, Case No. BC402910) (2010)

**Gorlick Distribution Centers, LLC** vs. Car Sound Exhaust System, Inc. and Allied Exhaust Systems, Inc. (United States District Court, Western District of Washington at Seattle, Case No. C07-1076 RAJ) (2010)

Stacy Holk, on behalf of Herself and all others similarly situated vs. **Snapple Beverage Corporation** (United States District Court, District of New Jersey, Civil Action No. 3:07-cv-03018-MJC-JJH) and Evan Weiner and Timothy McCausland on behalf of themselves and all others similarly situated vs. Snapple Beverage Corporation (United States District Court For The Southern District Of New York, Civil Action No. 07-cv-08742) (2010)

PharmAthene, Inc. vs. **SIGA Technologies, Inc.** (In The Court Of Chancery In The State Of Delaware, Civil Action No. 2627-VCP) (2010; two depositions)

Good Sportsman Marketing, LLC and IP Holdings, Inc. vs. **Non Typical, Inc., Mark Cuddeback, and Richard Scales Advertising Associates, Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 06:07-cv-00177-LED) (2010)

DataTreasury Corporation vs. **Wachovia Corporation, Wachovia Bank National Association**, et al. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2-06CV-072) (2009)

Deposition Testimony of Keith R. Ugone, Ph.D.

DataTreasury Corporation vs. **Wells Fargo & Company, Wells Fargo Bank, National Association**, et al. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2-06CV-072) (2009)

Carpathia Hosting, Inc., Carpathia Hosting, Inc. as nominee and trustee, for Triumviri, Inc., and Triumviri, Inc. vs. Brookshire Enterprises, LLC, Custom Computer Cable, Inc., Jackson Browne, LLC, Courtney Matthews, and **Electronic Data Systems, LLC** (Virginia: In The Circuit Court For Loudoun County, Civil Case No. CL 46964) (2009)

MHL Tek, LLC vs. Nissan Motor Co., Nissan North America, Inc., Nissan Technical Center North America, Inc., Hyundai Motor Co., Hyundai Motor America, Hyundai Motor Manufacturing Alabama, LLC, Kia Motors Corporation, Kia Motors America, Inc., Dr. Ing. H.C.F. Porsche AG, Porsche Cars North America, Inc., Bayerische Motoren Werke AG, BMW of North America LLC, BMW Manufacturing Co., LLC, Isuzu Motors Ltd., Isuzu Motors America, Inc., Subaru of America, Inc., Subaru of Indiana Automotive, Inc., **Audi AG, Volkswagen AG, and Volkswagen Group of America, Inc.** (In The United States District Court For The Eastern District of Texas, Marshall Division, Civil Action No. 2:07-cv-289-TJW) (2009)

**Crane Co. and Dixie-Narco Inc.** vs. SandenVendo America, Inc. and Royal Vendors, Inc. (In The United States District Court For The Eastern District of Texas, Marshall Division, Civil Action No. 2:07-cv-42) (2009)

**LG Electronics Inc.** vs. Hitachi, Ltd., Hitachi Automotive Products (USA), Inc., Clarion Co. Ltd., Clarion Corporation of America and Xanavi Informatics Corporation. (In The United States District Court, Eastern District Of Texas, Texarkana Division, Civil Action No. 5:07-CV-90) (2009)

**Paradox Security Systems, Ltd., Shmuel Hershkovitz, and Pinhas Shpater** vs. ADT Security Services, Inc., Digital Security Controls, Ltd., Monitronics International, Inc., and Protection One, Inc. (In The United States District Court For The Eastern District Of Texas, Marshall Division, C. A. No. 2:06-CV-462 (TJW)) (2009)

i4i Limited Partnership and Infrastructures for Information Inc. vs. **Microsoft Corporation** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:07-CV-113-LED) (2009)

**The Compliance Source, Inc. and Digital Docs, Inc.** vs. GreenPoint Mortgage Funding, Inc. (In The United States District Court, Northern District Of Texas, Dallas Division, Civil Action No. 3-06-cv1057-L (ECF)) (2008)

Hearing Components, Inc. vs. **Shure, Inc.** (In The United States District Court For The Eastern District of Texas, Lufkin Division, Civil Action No. 9:07-cv-104 (RHC)) (2008)

**Lutron Electronics Co. Inc.** vs. Control4 Corporation (In The United States District Court For The District Of Utah, Central Division, Civil Action No. 2-03-CV-00401 DAK) (2008)

Deposition Testimony of Keith R. Ugone, Ph.D.

ELB Enterprises of Dallas, L.P. and Bai-Mac, Inc. vs. **McDonald's Corporation, McDonald's USA, LLC, and Golden Arch of Texas, Inc., and Ricardo Colon** (In The Court At Law, Court No. 4, Dallas County, Texas, Cause No. CC-06-17226-D) (2008)

Rambus, Inc. vs. **Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Semiconductor, Inc., and Samsung Austin Semiconductor, L.P.** (United States District Court, Northern District Of California – San Jose Division, Case No. 05 02298 RMW) (2008)

**TiVo Inc.** vs. EchoStar Communications Corporation, EchoStar DBS Corporation, EchoStar Technologies, and Echosphere Limited Liability Company (United States District Court for the Eastern District of Texas, Marshall Division, Case No. 2 – 04CV01 DF) (2008)

Iovate Health Sciences, Inc., University of Florida Research Foundation, Inc. and Flamma SpA vs. **Bio-Engineered Supplements & Nutrition, Inc., d/b/a BSN, Inc.** and Medical Research Institute (In The United States District Court For The Eastern District Of Texas, Lufkin Division, Case No. 9:07-cv-46) (2008)

Ronald A. Katz Technology Licensing, L.P. vs. **The DIRECTV Group, Inc., DIRECTV, Inc., DIRECTV Holdings, LLC, DIRECTV Enterprises, LLC, and DIRECTV Customer Services, Inc.** (In The United States District Court, Central District of California, Case No. 2:07-CV2322 RGK (FFMx) and Case No. 2:07-ML-1816-B RGK (FFMx), originally filed in the Eastern District of Texas as Case No. 9:06-CV-00193-RHC) (2008)

Quantum Unlimited, LLC, Quantum of Troon North, LLC, and Redsky Resorts of Troon North, LLC n/k/a Redsky Resorts, LLC vs. **Wyndham International, Inc.**, Tempus Resorts International, Ltd, **The Blackstone Group L.P.**, et al. (In The District Court Of Dallas County, Texas, 298th Judicial District) (2008)

In the Matter of Certain 3G Wideband Code Division Multiple Access (WCDMA) Handsets and Components Thereof (InterDigital Communications Corporation and InterDigital Technology Corporation vs. **Samsung Electronics Co., Ltd, Samsung Electronics America, Inc., and Samsung Telecommunications America LLC**; The United States International Trade Commission, Washington, D.C., Investigation No. 337-TA-601) (2008; two depositions)

**Bueno Conato, LLC** vs. Bajio LLC, Bajio National LLC, Bajio Franchising LLC, and Doctor's Associates, Inc. (American Arbitration Association, Western Case Management Center, Case No. 77 114 Y 00254 06 WYGI) (2008)

$O_2$Micro International Limited vs. **Rohm Co. Ltd.**, Sony Corporation, Sony EMCS Corporation, Sony Corporation of America, and Sony Electronics Inc. (In The United States District Court For The Eastern District of Texas, Marshall Division, Case No. 2-05-CV-00211-TJW) (2008)

**Blackboard Inc.** vs. Desire2Learn Inc. (In The United States District Court For The Eastern District of Texas, Lufkin Division, Case No 9:06CV155) (2008)

19

Deposition Testimony of Keith R. Ugone, Ph.D.

**Abbott Laboratories and Abbott Diabetes Care Inc.** vs. Roche Diagnostics Corporation, Roche Diagnostics Operations, Inc., and Bayer Healthcare LLC; Abbott Laboratories and TheraSense, Inc. vs. Becton, Dickinson and Company and Nova Biomedical Corp. (In The United States District Court, Northern District of California, Civil Action No. C04-2123 MJJ, Civil Action No. C04-3327 MJJ, Civil Action No. C04-3732 MJJ, and Civil Action No. C05-3117 MJJ) (2008; two depositions)

United States of America, ex rel Toni R. Barron and Vicky J. Scheel vs. Deloitte & Touche, LLP, Deloitte Touche Consulting Group, LLC, Deloitte & Touche Consulting Group Holding, LLC, Medicaid Solutions of Texas, and **National Heritage Insurance Company** (In The United States District Court, Western District of Texas, Civil Action No. SA-99-CV-1093FB) (2007)

**Akamai Technologies, Inc. and Massachusetts Institute of Technology** vs. Limelight Networks, Inc. (In The United States District Court, District of Massachusetts, Civil Action No. 06 CA 11109 RWZ and Civil Action No. 06 CA 11585 RWZ) (2007)

**Electronic Data Systems Corporation** vs. Towers, Perrin, Forster & Crosby, Inc. (American Arbitration Association Northeast Case Management Center, Case No. 13 489 Y 00146 07) (2007)

Computer Acceleration Corporation vs. **Microsoft Corporation** (In The United States District Court For The Eastern District of Texas, Lufkin Division, Civil Action No. 9:06CV140-RHC) (2007)

**Tinkers & Chance** vs. LeapFrog Enterprises, Inc. (In The United States District Court, Eastern District of Texas, Marshall Division, Civil Action No. 2-05cv-349-TJW) (2007)

**DEJ Productions, Inc., Blockbuster Inc., and First Look Studios, Inc.** vs. Media 8 Entertainment and MDP Distribution, Inc. (In The District Court of Dallas County, Texas, M-298[th] Judicial District, Cause No. 06-01887) (2007)

Art International Forwarding, Inc. vs. **The Pasha Group and Gosselin Worldwide Moving, N.V.** (In The United States District Court, Eastern District of Missouri, Eastern Division, Case No. 4:05-CV-01410-RWS) (2007)

Applied Medical Resources Corp. vs. **United States Surgical Corporation** (In The United States District Court For The Central District Of California, Southern Division, Case No. SACV 03-1267 CJC (MLGx)) (2007)

**Nike, Inc.** vs. adidas Salomon North America, Inc., adidas America Inc. d/b/a adidas International, and adidas Promotional Retail Operations Inc. (In The United States District Court For The Eastern District of Texas, Lufkin Division, Case No. 9:06-cv-43-RHC) (2007)

**BIAX Corporation** vs. Intel Corporation and Analog Devices, Inc. (In The United States District Court For The Eastern District of Texas, Marshall Division, Civil Action No. 2-05cv-184-TJW) (2007)

Deposition Testimony of Keith R. Ugone, Ph.D.

Two-Way Media, LLC vs. **America Online, Inc.** (In The United States District Court For The Southern District of Texas, Corpus Christi Division, Civil Action No. C-04-089) (2007)

In re Enron Corporation Securities Litigation; Kevin Lamkin, Janice Schuette, Robert Ferrell and Stephen Miller vs. **UBS Financial Services, Inc. and UBS Securities LLC** (Civil Action No. H:02-CV-0851; Consolidated MDL) and Samuel Giancarlo vs. **UBS Financial Services, Inc., UBS Securities LLC., and UBS AG** (Civil Action No. H-03-4359; Consolidated MDL) (In The United States District Court For The Southern District of Texas, Houston Division) (2007)

$O_2$Micro International Limited vs. **Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.** (In The United States District Court For The Eastern District of Texas, Marshall Division, Case No. 2:04-CV-323 (Ward)) (2007)

CNX Gas Corporation and CNX Gas Company LLC vs. **CDX Gas Company LLC** vs. CONSOL Energy, Inc. (In The United States District Court For The Western District of Pennsylvania, Civil Action No. 05-CV-1574) (2007)

**Parkade Center, Inc.** vs. Simon Property Group (Texas), L.P. and Simon Property Group (Delaware), Inc. (In The District Court 398th Judicial District of Hildalgo County, Texas, Cause No. C-2584-06-1) (2007)

The Post Confirmation Trust (The Fleming Companies) vs. **Digital Exchange Systems, Inc.** (In The United States District Court for the Eastern District of Texas, Texarkana Division, No. 5:05-CV-165(TJW)) (2007)

Golden Bridge Technology, Inc. vs. **Nokia, Inc., Motorola, Inc., T-Mobile USA, Inc., Ericsson, Inc., Qualcomm Incorporated, and Lucent Technologies, Inc.** (In The United States District Court for the Eastern District of Texas, Tyler Division, Civil Action No: 6:06-cv-00163-LED) (2006)

John P. Rochon, Nick G. Bouras, Nu-Kote International, Inc., J.R. Investment Corporation, Richmont Corporation and Nu-Kote Acquisition Corporation vs. **Akin Gump Strauss Hauer & Feld, LLP and Alan Feld** (In The District Court of Dallas County, Texas, 192nd Judicial District, Cause No. 04-03311-K) (2006)

**Autobytel Inc.** vs. Dealix Corporation (United States District Court Eastern District of Texas, Marshall Division, Case No. 2:04-cv-338-LED) (2006)

**Electronic Data Systems Corporation and EDS Information Systems, L.L.C.** vs. MCI Communications Services, Inc. (Before the American Arbitration Association, Arbitration No. 13 181 00976 06) (2006)

Jeffrey A. Kozak vs. **Medtronic Sofamor Danek** (In The United States District Court for the Southern District of Texas, Houston Division, Civil Action Number H-03-4400) (2006)

Alcon Manufacturing, Ltd. and Alcon Laboratories, Inc. v **Advanced Medical Optics, Inc.** (In The United States District Court for the Northern District of Texas, Fort Worth Division, Civil Action No. 4-05CV-496-A) (2006)

21

Deposition Testimony of Keith R. Ugone, Ph.D.

Eckhard U. Alt, MD vs. **Medtronic, Inc.** (In The United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:04CV370) (2006)

**AVID Identification Systems, Inc.** vs. Philips Electronics North America Corporation, Koninklijke Philips Electronics N.V., The Crystal Import Corporation, Medical Management International, Inc., and Datamars SA (In The Eastern District of Texas, Marshall Division, Case No. 2:04-CV-183) (2006)

In re: **Williams** Securities Litigation (WCG Subclass) (In The United States District Court for the Northern District of Oklahoma, Case No. 02-CV-72H(M)) (2006)

Immunocept, LLC, Patrice Anne Lee, and James Reese Matson vs. **Fulbright & Jaworski, LLP** (United States District Court Western District of Texas, Austin Division, Cause No. A 05 CA 334 SS) (2006)

Children's Medical Center of Dallas vs. **Columbia Hospital at Medical Center Dallas Subsidiary L.P.** (In The United States District Court Northern District Of Texas, Dallas Division, Civil Action No. 3:04-CV-2436-BD) (2006)

Vantage Controls, Inc. vs. **Lutron Electronics Co., Inc.** (In The United States District Court for the District of Utah, Central Division, Case No. 2:03-CV-00488TC) (2006)

Blueberry Sales, L.P., f/k/a Blueberry Confections, Inc. vs. **ED&F Man Sugar, Inc.** (United States District Court for the Western District of Texas, El Paso Division, EP-04-CA0193) (2005)

**Cummins-Allison Corp.** vs. Glory LTD., Glory Shoji Co., LTD., and Glory (U.S.A.), Inc. (United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2-03-CV-358 (TJW)) (2005)

Gilbert R. Sada and Victor L. Hernandez vs. **Jack In The Box Inc.** (United States District Court for the Western District of Texas, San Antonio Division. Civil Action No. SA04CA0541 (OG)) (2005)

Trinity Mother Frances Health System and Mother Frances Hospital vs. **East Texas Medical Center Regional Healthcare System and East Texas Medical Center** (United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:03CV464) (2005)

**TiVo Inc.** vs. EchoStar Communications Corporation, EchoStar DBS Corporation, EchoStar Technologies, and Echosphere Limited Liability Company (United States District Court for the Eastern District of Texas, Marshall Division, Case No. 2 – 04CV01 DF) (2005; two depositions)

William Rutledge Scott, Individually and as Independent Executor of the Estate of Mozelle Rutledge Scott, Deceased vs. **Hughes & Luce, L.L.P., Kathryn G. Henkel, and Laurel Stephenson** (In the County Court of Tom Green County, Texas, Cause No. 02P211-L) (2005)

Deposition Testimony of Keith R. Ugone, Ph.D.

Junitha Bee, et al. vs. Kavilico Corporation, ITT Neodyne, **Parker Hannifin**, and the Boeing Company (Superior Court of the State of California, County of Los Angeles, Case No. C99-589C) (2005)

**William A. Wise** vs. El Paso Corporation (American Arbitration Association, Houston, Case No. 70-Y-116-00327-04) (2005)

Dr. Phillips, Inc. vs. **Control Laser Corporation and Excel Technology, Inc.** (In the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida, Case No. 02-CA-000075, Division: 32, Business Court) (2005)

MOSAID Technologies Incorporated vs. **Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Semiconductor, Inc., and Samsung Austin Semiconductor, L.P.** (In the United States District Court for the District of New Jersey, Civil Action No. 01-4340 (WJM)) (2004)

Kathleen C. Cailloux, Kenneth F. Cailloux, Paula L. Heilman, and Robert Stephen Andresakis vs. **Baker Botts, L.L.P.**, Wells Fargo Bank Texas, N.A., William R. Goertz, S. Stacy Eastland, and Stephen T. Dyer (In the 198th Judicial District Court of Kerr County, Texas, Civil Action No. 03-603-B) (2004)

**Brooktrout, Inc.** vs. Eicon Networks Corporation, Eicon Networks, Inc. (In the United States District Court for the Eastern District of Texas, Marshall Division, Case Number 03-CV-59) (2004)

**MCI Worldcom Network Services, Inc.** vs. Twister Communications Network, Inc. (In the District Court of Montgomery County, Texas, 221st Judicial District, Civil Action No. 00-05-03124CV) (2004)

Colgate-Palmolive Company vs. **The Procter & Gamble Company** (In the United States District Court for the Southern District of New York, 03 Civ. 9348 (LLS) (DFE)) (2004)

Airbel Wireless, Inc. and JAVS Telecom, Inc. vs. **AT&T Wireless Services, Inc.** (American Arbitration Association, New York, Case No. 13 Y 199 00709 03) (2004)

**Electronic Data Systems Corp.** vs. Aspect Communications Corp. (American Arbitration Association, San Francisco, Case No. 74 Y 117 00586 03 GAP) (2003 and 2004; two depositions)

Anthony Stella and Mary S. Stella, Individually and on Behalf of all Persons Similarly Situated in the State of Texas vs. **Grant Thorton, L.L.P.** (In the District Court of Galveston County, 212th Judicial District) (2003)

Administaff, Inc. and Administaff of Texas, Inc. vs. **Aetna Life Insurance Company** (In the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. 4:01CV3802) (2003)

23

Deposition Testimony of Keith R. Ugone, Ph.D.

GATT Trading, Inc. vs. **Sears, Roebuck and Co.** (In the United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:01CV260) (2003)

**IEX Corporation** vs. Blue Pumpkin Software, Inc. (In the United States District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:01CV16) (2003 and 2005; two depositions)

Steven R. Keene d/b/a Pagers Plus vs. **AT&T Wireless, Inc., a/k/a AWS National Accounts, L.L.C., and First Cellular Group of Shreveport, Inc. d/b/a AT&T Wireless Services** (Judicial Arbitration and Administration Services, Inc.) (2003)

Teleplus, Inc., vs. **MCI Telecommunications Corporation, MCI International Telecommunications Corporation, MCI International Inc., MCI Communications Corporation, MCI Worldcom, Inc., MCI Global Support Corporation, MCI Global Access Corporation, and Avantel, S.A.** (In the United States District Court Western District of Texas, San Antonio Division, Civil Action No. SA-98-CA-0849 FB) (2003)

Cavalry Investments, L.L.C. vs. **Sunstar Acceptance Corporation and NationsCredit Commercial Corporation** (County Court at Law, Number 4, Dallas County, Texas, Cause No. 99-02296-D) (2002)

Customedia Technologies, LLC and William H. Lewis vs. Joby Hughes, Felsman, Bradley, Gunter & Dillon, Stephen Perkins, **Sidley & Austin**, Litigation Risk Management, Inc., and Granite Ventures, Inc. (In the District Court of Harris County, Texas, 125th Judicial District, Case No. 2000-26667) (2002 and 2003; two depositions)

Edward Ahearn vs. **Ernst & Young, L.L.P.** (Before the American Arbitration Association, Case No. 13-107-00136-01) (2002)

John H. Houser and Frederick A. Raffa vs. **Wachovia Corporation** (In the United States District Court, Middle District of Florida, Tampa Division, Case No. 8:01-CV1041-T-17MSS) (2002)

**Brine, Inc. and Sports Licensing, Inc.** vs. STX, Inc. and STX, LLC (In the United States District Court for the District Massachusetts, Worchester Division, Civil Action No. 99-40167) (2002 and 2003; two depositions)

Morgan Howard, L.L.C. vs. **Immedient, Inc.** (In the County Court at Law No. 3, Dallas County, Texas, Cause No. 01-899-C) (2002)

**Poly-America, Inc.** vs. Serrot International, Inc. (In the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:00CV1457-D) (2002)

Andrew Cumming vs. **J. C. Penney Company, Inc.** (In the District Court of Dallas County, Texas, 160th Judicial District, Civil Action No. 71-160-00077-01) (2002)

Inter-Tel, Incorporated vs. **Bank of America, Arizona** (In the Superior Court of the State of Arizona in and for the County of Maricopa, Case No. CV 96-00867) (2002)

**Deposition Testimony of Keith R. Ugone, Ph.D.**

Tyler Jet, L.L.C., TeamXtreme Racing, L.L.C., and Burl Outlaw vs. **Lycos, Inc.** (In the United States District Court for the Eastern District of Texas, Lufkin Division, Civil Action No. 9:00CV-179) (2001)

EPI Environmental Products, Inc. vs. **In-Line Plastics, L.C.** (In the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. 4:98CV4209) (2001)

Health Laboratories of North America, Inc., et al. vs. **Neodata Services, Inc.** (In the Superior Court of the State of Arizona In and For the County of Maricopa, Civil Action No. CV1998-008143) (2001)

Acres Gaming Inc. vs. Mikohn Gaming Corporation and **Casino Data Systems** (In the United States District Court District of Nevada, Civil Action No. CV-S-01462-PMP (RJJ)) (2000)

COC Services, Ltd. vs. **CompUSA, Inc., Grupo Carso S.A. de C.V., Grupo Sanborns S.A. de C.V.**, et. al. (In the District Court 116th Judicial District of Dallas County, Texas, Case No. 0000023) (2000)

Healthtech Diagnostics, Corporation and Oncogenetics, Inc. vs. **Impath, Inc. and Impath-HDC, Inc.** (In the District Court of Dallas County, Texas, L-193[rd] Judicial District, Case No. 97-08552) (2000)

Pacific Southwest Bank and NAFCO Holding Company, LLC vs. **Electronic Data Systems Corporation** (In the District Court of Dallas County, Texas, 191st Judicial District, Cause No. 98-5954) (2000)

Anthony D. Viazis, et. al. vs. **American Association of Orthodontists**, et. al. (In the United States District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:98-CV-245) (2000)

**Kvaerner Oilfield Products, Inc.** vs. Cooper Cameron Corp. (In the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. H-98-3369) (2000)

J.V. Smith, et al. vs. Randyl Louis Harrell, **Enterprise Products Company**, et. al. (In the District Court of Liberty County, Texas, 75th Judicial District) (2000)

Norman Yourish, et. al. vs. **California Amplifier**, et. al. (Superior Court of the State of California for the County of Ventura, Civil Action No. CIV173569) (2000)

David Kimberly Hackett, individually and Samuel G. Swope, individually and as Assignees of Courtesy Auto Group, Inc. vs. **Electronic Data Systems, Inc.** (In the United States District Court for the Northern District of Illinois, Eastern Division, Civil Action No. 98-1065-CIV-19-A) (2000)

County Council of Northampton County vs. **SHL Systemhouse Corp.** vs. Northampton County (In the United States District Court for the Eastern District of Pennsylvania, Civil Action No. 98-CV-0088) (1999)

**Natural Reserves Group, Inc.** vs. Baker Hughes, Inc., et. al. (In the United States District Court for the Southern District of Texas, Harris County Division, Civil Action No. 96-31380) (1999)

**BeautiControl, Inc.** vs. Ryco Packaging Corp. vs. Arrowpak, Inc. and Custom Decorative Systems, Inc. (In the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3-98CV1775-H) (1999)

Peoples National Bank, Peoples National Mortgage Corp., and Texas Peoples National Bancshares, Inc. vs. Russell A. McClendon, **St. Paul Mercury Insurance Company**, Smith-Reagan Life and Health Insurance Agency, Inc. and Gary Robertson (In the District Court Lamar County, Texas, 62nd Judicial District) (1999)

In the Matter of Application No. 96-1, **Olympic Pipe Line Company**: Cross Cascade Pipeline Project (Before the State of Washington Energy Facility Site Evaluation Council) (1999)

Petrofac, Inc. and Petrofac International, Ltd. vs. **Howe-Baker Engineers, Inc. and Omar J. Ghalayini** (In the County Court at Law; Smith County, Texas, Cause No. 39,839) (1998)

L & S Concrete Company, Inc., Gilliam Brothers, Inc., Webco, Inc., Charles T. Weaver, Gus Blass, III, Bob Townsell, Alex Lieblong, and Dr. Thomas Robinson vs. **Trans World Airlines, Inc.** (In the United States District Court for the Eastern District of Arkansas Western Division, Case No. Civ-97-378) (1998)

Magnetic Technologies, S.P.R.L. vs. **Connectware, Inc.** (In the District Court Dallas County, Texas, 68th Judicial District) (1998)

Jeannean Heller, CRNA; Joanne Lewis, CRNA; Harold Newsom, CRNA; and Lola H. Wright, CRNA vs. **Raymond M. Dunning, Jr. and Columbia Medical Center of Lewisville Subsidiary L.P., d/b/a Columbia Medical Center of Lewisville, Dallas, Texas** (American Arbitration Association, Dallas, Texas Region) (1998)

Proposed Form A Acquisition of Control of Universal Fidelity Life Insurance Company, an Oklahoma Domestic stock insurer, by **Conseco, Inc.**, A Delaware Corporation (Before the Insurance Commissioner of the State of Oklahoma, Case No. 97-207-TRN) (1997)

**Excel Telecommunications, Inc., Excel Communications, Inc., Steve Smith, and Kenny Troutt** vs. Linden Wood, Brad Campbell, Candy Campbell, Jerry Szeszulski, and Team Excel of Independent Representatives (American Arbitration Association, Dallas, Texas Region) (1997)

**Gourmet Award Foods** vs. Continental Extrusion, Genpak Corporation, and Heartland Packaging Corporation (Judicial District Court of Dallas County, Texas, D-95th Judicial District) (1997)

L. Anne H. Frazier vs. **Owsley Brown Frazier** (Jefferson Family Court, Division Eight; Louisville, Kentucky, Case No. 94-FD-01957) (1997)

Dodee Frost Crockett vs. **Randy Miller and Gina Kaiser** (In the District Court of Dallas County, Texas; 192nd Judicial District) (1996)

Deposition Testimony of Keith R. Ugone, Ph.D.

**Reedrill Corporation** vs. Driltech, Inc. (U.S. District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:95CV189) (1996)

Robert Tuck vs. **Westec Security, Inc.** (Superior Court of the State of California for the County of Los Angeles, Case No. BC131221) (1996)

James Hylsky and Terri Hylsky vs. **Fruehauf Trailer Corporation**, et. al. (In the Circuit Court Twentieth Judicial Circuit St. Clair County, Illinois) (1996)

In Re: **CSC Industries, Inc.** and In Re: **Copperweld Steel Company** (In the United States Bankruptcy Court for the Northern District of Ohio, Eastern Division, Civil Case No. 4:93bk41898) (1996)

Nationwide Business Telephones and Team Centrex vs. **Introlink Communications System, Inc. and Pacific Bell, Inc.** (Superior Court of the State of California for the County of Los Angeles, Case No. BC009783) (1996)

TriCom, Inc. vs. **Electronic Data Systems Corporation** (U.S. District Court for the Eastern District of Michigan, Southern Division, Civil Action No. 2:92CV76374) (1995)

Lacerta Enterprises, Inc. dba Frontline Systems, Inc. vs. **Geac Computers, Inc. and Fasfax Corporation** (U.S. District Court for the District of Arizona, Case No. CIV 95-0649 PHX (ROS)) (1995)

Bluebonnet Savings Bank, et. al. vs. **Federal Deposit Insurance Corporation**, et. al. (U.S. District Court for the Northern District of Texas, Dallas, Civil Action No. 3:91CV1066) (1995)

Circo Craft Company, Inc. vs. **AMP-AKZO Corporation**, et. al. (Superior Court of the State of California for the County of San Diego, North County District) (1995)

BancTec USA, Inc. vs. **Advanced Financial Solutions**, et. al. (U.S. District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:93CV1277) (1994)

**Ivy Goth** vs. Datsun-Nissan Motor Company, Ltd., et. al. (Superior Court of the State of California for the County of Los Angeles, Case No. SC013502) (1994)

Cybor Corporation vs. **FAS Technologies and FAStar Ltd.** (U.S. District Court for the Northern District of California, San Jose, Civil Action No. 5:93CV20712) (1994)

Texas State Bank, et. al. vs. **Electronic Data Systems Corporation** (206th District Court of Hidalgo County, Texas) (1994; two depositions)

Auto Color Specialists, Inc. and Polly Chen vs. **BASF** (Superior Court of the State of California for the County of Orange, Case No. 677861) (1994)

**Tactical Edge, Inc.** vs. Gall's, Inc. (District Court of the Fourth Judicial District of the State of Idaho in and for the County of Ada) (1994)

27

Deposition Testimony of Keith R. Ugone, Ph.D.

Arley Del Gado vs. **County of Los Angeles** (Superior Court of the State of California for the County of Los Angeles) (1993)

Dominquez vs. **Holy Cross Hospital** (Superior Court of the State of California for the County of Los Angeles) (1993)

**Union Oil Company of California** vs. International Insurance Company, et. al. (Superior Court of the State of California) (1993)

Maranatha Music! vs. **Capital Cities, Inc./ABC, Inc., and Word, Inc.** (U.S. District Court for the Western District of Texas, Waco Division) (1993)

**Villarreal** vs. East Side Union High School District (Superior Court of the State of California) (1993)

Official Committee of Creditors Holding Unsecured Claims on behalf of First Capital Holdings Corporation vs. **Shearson Lehman Brothers Holdings Inc.**, et. al. (U.S. District Court for the Central District of California) (1993)

Chroma Lighting and Charles T. Von Der Ahe vs. **GTE Products Corporation and Sylvania Lighting Services Corporation** (U.S. District Court for the Central District of California, Civil Case No. 2:91CV6424) (1993; three depositions)

**Sunbelt Television, Inc.** vs. Jones Intercable, Inc. (U.S. District Court for the Central District of California, Civil Case No. 2:91CV3506) (1992)

Holabird Sports Discounters vs. **Tennis Tutor, Inc.** (U.S. District Court for the District of Maryland, Civil Action No. 1:91CV2208) (1992)

Expo-Tech Electrical & Plumbing Services vs. **Greyhound Exposition Services** (1992)

**De Laurentiis Entertainment Group, Inc.** Securities Litigation; **De Laurentiis Film Partners** Securities Litigation (U.S. District Court for the Central District of California) (1991; two depositions)

James T. Ryan vs. **Crowley Towing and Transportation and Shell Oil Company** (Superior Court of the State of California for the County of Los Angeles) (1991)

**Clayton Jacobson** vs. Kawasaki Heavy Industries, Ltd., Japan; Kawasaki Motors Corporation, USA; and Kawasaki Motors Manufacturing Corporation, USA (U.S. District Court for the Central District of California) (1991)

Advanced Building Maintenance, Inc., vs. **Premier Ventures, Inc., dba Premier Building Maintenance** (Superior Court of the State of California for the County of Los Angeles) (1990)

Frank V. and Gloria Lumbert vs. **Robert C. Skinner and Lillian R. Skinner**, et. al. (Superior Court of the State of California for the County of Los Angeles) (1990)

**Deposition Testimony of Keith R. Ugone, Ph.D.**

Plaintiff vs. **Valley Hunt Club**, Tournament of Roses, et. al. (Superior Court of the State of California) (1990)

Kippy Thomas vs. **Mary Lendo and Circle K**, (Superior Court of the State of California for the County of Riverside) (1990)

**Exhibit 3**

# Facts, Data, and Other Information Received

| Description | Bates Prefix | Start | End |
|---|---|---|---|

### Legal Documents/Declarations

Declaration Of James Farrell In Support Of Defendant The Hain Celestial Group, Inc.'s Opposition To Plaintiffs' Motion For Class Certification

Declaration of Mark N. Todzo in Support of Plaintiffs' Administrative Motion to File Under Seal Exhibits in Support of Plaintiffs' Motion for Class Certification

Declaration of Thomas J. Maronick in Support of Plaintiffs' Motion for Class Certification

Declaration of Victor Mencarelli in the Support of Defendant The Hain Celestial Group, Inc.'s Opposition to Plaintiffs' Motion for Class Certification

Expert Declaration of Stephen F. Hamilton, Ph.D. in Support of Plaintiffs' Motion for Class Certification

First Amended Complaint

Plaintiffs' Notice of Motion and Motion for Class Certification; Memorandum of Points and Authorities

### Deposition Transcripts and Associated Exhibits

Deposition 30(b)(6) of The Hain Celestial Group, Inc. by Emma E.B. Froelich-Shea taken March 27, 2014 and Associated Exhibits

Deposition of Eric C. Lohela taken October 25, 2013

Deposition of Rosminah Jean Brown taken October 25, 2013

Deposition of Stephen F. Hamilton, Ph.D. taken August 15, 2014 and Associated Exhibits

### Documents Produced by Hain

2014.08.25 - Avalon Jason Data.xlsx

Avalon Direct Price List effective August 2006

Avalon Direct Price List effective January 2007

Avalon Organics NSF Transition Review Presentation by The Hain Celestial Group dated February 2012

Avalon Wholesale Price List 2 effective August 2011 (ANP Wholesale Price List August 2011 (PL2) with SPECS.pdf)

Avalon Wholesale Price List 2 effective August 2011 (ANP Wholesale Price List August 2011 (PL2).pdf) (ANP Wholesale Price List August 2011 (PL2).xls)

Avalon Wholesale Price List 2 effective December 2012

Avalon Wholesale Price List 2 effective February 2012 (ANP Wholesale Price List February 2012 (PL2) with SPECS.xls)

Avalon Wholesale Price List 2 effective January 2012 (ANP Wholesale Price List January 2012 (PL2) with SPECS.xls)

Avalon Wholesale Price List 2 effective January 2012 (ANP Wholesale Price List October 2011 (PL2) with SPECS.xls)

Avalon Wholesale Price List 2 effective July 2011 (ANP Wholesale Price List effective July 2011 (PL2).xls)

# Facts, Data, and Other Information Received

| Description | Bates Prefix | Start | End |
| --- | --- | --- | --- |
| Avalon Wholesale Price List 2 effective July 2012 (ANP Wholesale Price List July 2012 (PL2) with SPECS.xls) | | | |
| Avalon Wholesale Price List 2 effective July 2012 (ANP Wholesale Price List March 2012 (PL2) with SPECS.xls) | | | |
| Avalon Wholesale Price List 2 effective March 2012 | | | |
| Avalon Wholesale Price List 2 effective November 2010 (ANP Wholesale Price List Novemberr 10 (PL2).xls) | | | |
| Avalon Wholesale Price List 2 effective November 2012 (ANP Wholesale Price List November 2012 (PL2) with SPECS.xls) | | | |
| Avalon Wholesale Price List 2 effective October 2010 (ANP Wholesale Price List October 10 (PL2).xls) | | | |
| Avalon Wholesale Price List effective April 2008 | | | |
| Avalon Wholesale Price List effective April 2008 (ANP Wholesale Price List January 2008.xls) | | | |
| Avalon Wholesale Price List effective August 2006 | | | |
| Avalon Wholesale Price List effective August 2006 (ANP Wholesale Price List 7-06.xls) | | | |
| Avalon Wholesale Price List effective August 2007 (ANP Wholesale Price List 06-07.xls) | | | |
| Avalon Wholesale Price List effective August 2007 (ANP Wholesale Price List 08-07.xls) | | | |
| Avalon Wholesale Price List effective February 2010 (ANP Wholesale Price List Feb 10.xls) | | | |
| Avalon Wholesale Price List effective January 09 (ANP Wholesale Price List January 09.xls) | | | |
| Avalon Wholesale Price List effective January 2007 (ANP Wholesale Price List 01-07.xls) | | | |
| Avalon Wholesale Price List effective January 2008 | | | |
| Avalon Wholesale Price List effective January 2010 | | | |
| Avalon Wholesale Price List effective January 2010 (ANP Wholesale Price List January 10.xls) | | | |
| Avalon Wholesale Price List effective July 2008 (ANP Wholesale Price List June 2008.xls) | | | |
| Avalon Wholesale Price List effective June 2007 | | | |
| Avalon Wholesale Price List effective June 2008 | | | |
| Avalon Wholesale Price List effective June 2009 (ANP Wholesale Price List June 09.xls) | | | |
| Avalon Wholesale Price List effective June 2010 (ANP Wholesale Price List June10.xls) | | | |
| Avalon Wholesale Price List effective May 2007 | | | |
| Avalon Wholesale Price List effective May 2008 (ANP Wholesale Price List April 2008.xls) | | | |
| Avalon Wholesale Price List effective May 2008 (ANP Wholesale Price List May 2008.xls) | | | |
| Avalon Wholesale Price List effective November 2008 (ANP Wholesale Price List November 2008.xls) | | | |
| Avalon Wholesale Price List effective October 2006 (ANP Wholesale Price List 10-06.xls) | | | |

# Facts, Data, and Other Information Received

| Description | Bates Prefix | Start | End |
|---|---|---|---|
| Avalon Wholesale Price List effective October 2009 (ANP Wholesale Price List October 09.xls) | | | |
| Avalon Wholesale Price List effective September 2006 (ANP Wholesale Price List 8-06.xls) | | | |
| Hain Celestial Avalon Organics, Wholesale Price List 2 dated July 1, 2013 (ANP Wholesale Price List July 1 2013 (PL2) with SPECS.xlsx) | | | |
| Hain PC 2007 - 2013 Avalon Jason CA sales.xlsx | | | |
| Hain PC 2011-2013 Avalon Jason CA sales.xlsx | | | |
| Items Introduced in the Last Two Years List (ANP Wholesale Price List 05-07.xls) | | | |
| Jason Product Exclusions 2008 - 2011 | | | |
| Jason Wholesale Price List 2 effective December 2012 (JNP Wholesale Price List December 2012 (PL2) with SPECS.xls) | | | |
| Jason Wholesale Price List 2 effective February 2012 (JNP Wholesale Price List February 2012 (PL2) with SPECS.xls) | | | |
| Jason Wholesale Price List 2 effective July 1, 2013 (JNP Wholesale Price List July 1 2013 (PL2) with SPECS.xls) | | | |
| Jason Wholesale Price List 2 effective July 2011 (JNP Wholesale Price List January 2012 (PL2) with SPECS.xls) | | | |
| Jason Wholesale Price List 2 effective July 2011 (JNP Wholesale Price List JULY 2011 (PL2).xls) | | | |
| Jason Wholesale Price List 2 effective July 2011 (JNP Wholesale Price List November 2011 (PL2) with SPECS.xls) | | | |
| Jason Wholesale Price List 2 effective July 2011 (JNP Wholesale Price List October 2011 (PL2) with SPECS.xls) | | | |
| Jason Wholesale Price List 2 effective March 2012 (JNP Wholesale Price List March 2012 (PL2) with SPECS.xls) | | | |
| Jason Wholesale Price List 2 effective October 2010 | | | |
| Jason Wholesale Price List 2 effective October 2010 updated March 24, 2011 (JNP Wholesale Price List October 2010 (PL2).xls) | | | |
| Jason Wholesale Price List December 2008 (JNP Wholesale Price List November 2008.xls) | | | |
| Jason Wholesale Price List effective August 2008 (JNP Wholesale Price List August 2008.xls) | | | |
| Jason Wholesale Price List effective August 2012 (JNP Wholesale Price List August 2012 (PL2) with SPECS.xls) | | | |
| Jason Wholesale Price List effective December 2008 | | | |
| Jason Wholesale Price List effective January 2008 (JNP Wholesale Price List - January 2008.xls) | | | |
| Jason Wholesale Price List effective January 2009 (JNP Wholesale Price List January 2009.xls) | | | |
| Jason Wholesale Price List effective January 2010 (JNP Wholesale Price List January 2010.xls) | | | |
| Jason Wholesale Price List effective January 2010 (JNP Wholesale Price List October 2009.xls) | | | |
| Jason Wholesale Price List effective July 2007 Updated November 27, 2007 (JNP Wholesale Price List (July 07).xls) | | | |
| Jason Wholesale Price List effective July 2007 Updated September 26, 2007 (JNP Wholesale Price List (July 07) (2).xls) | | | |
| Jason Wholesale Price List effective July 2011 Updated August 31, 2011 | | | |

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

# Facts, Data, and Other Information Received

| Description | Bates Prefix | Start | End |
| --- | --- | --- | --- |
| Jason Wholesale Price List effective July 2011 updated May 5, 2011 | | | |
| Jason Wholesale Price List effective June 2008 (JNP Wholesale Price List June 2008.xls) | | | |
| Jason Wholesale Price List effective June 2009 (JNP Wholesale Price List June 2009.xls) | | | |
| Jason Wholesale Price List effective March 2008 | | | |
| Jason Wholesale Price List effective March 2008 (JNP Wholesale Price List.xls) | | | |
| Jason Wholesale Price List effective March 2010 (JNP Wholesale Price List March 2010.xls) | | | |
| Jason Wholesale Price List effective May 2008 (JNP Wholesale Price List May 2008.xls) | | | |
| Jason Wholesale Price List effective November 2008 | | | |
| Jason Wholesale Price List effective October 2009 | | | |
| Label Start Use Date (5-2007 to 6-2014).xlsx | | | |
| The Hain Celestial Group Personal Care Wholesale Price List 2 effective February 2013 (ANP Wholesale Price List December 2012 (PL2) with SPECS.xls) | | | |
| The Hain Celestial Group Wholesale Price List 2 effective February 2013 | | | |
| The Hain Celestial Group Wholesale Price List 2 effective May 2013 (ANP Wholesale Price List February 2013 (PL2) with SPECS.xls) | | | |
| The Hain Celestial Wholesale Price List 2 effective May 2013 (ANP Wholesale Price List May 2013 (PL2) with SPECS.xls) | | | |
| Avalon Total Sales and U.S. Sales 2008 - 2013 (HAIN_BROWN00092474_HIGHLY CONFIDENTIAL.XLSX) | HAIN_BROWN | 00092474 | 00092474 |

## Documents Independently Obtained

"Differences between buyers and non-buyers of organic produce and willingness to pay organic price premiums," Journal of Agribusiness 9.1 (1991)

Avalon Organics Home – Skin Care – August 21, 2014

Beaverson, J., "Putting their money where their mouths are: Consumer willingness to pay for multi-ingredient, processed organic food products," Food Policy 32 (2007)

Body _ JĀSÖN - Natural Pioneer since 1959 – August 22, 2014

Hain Celestial Group, Inc- Investor Relations – Company Overview, August 21, 2014

Hain Celestial Group, Inc. SEC Form 10-K for the fiscal year ended June 30, 2013

Jeffrey M. Perloff, Microeconomics (5th Edition)

Ott, S.L.,"Supermarket shoppers' pesticide concerns and willingness to purchase certified pesticide residue-free fresh produce," Agribusiness 6.6 (1990)

Undergraduate Econometrics, Second Edition, Hill, R.C., Griffiths, W.E., and Judge, G.G.

# Exhibit 4

## Individuals Cited In The Declaration Of Keith R. Ugone

| Deponent | Context of Reference in Report |
| --- | --- |

### *Named Plaintiffs*

| | |
| --- | --- |
| Rosminah Brown | - Details on the Challenged Jason Product purchased<br>- Reasons for purchase<br>- Belief in a price premium for organic products |
| Eric Lohela | - Details on the Challenged Avalon Organics Products purchased<br>- Reasons for purchase<br>- Willingness to pay more for organic products |

### *Plaintiffs' Expert*

| | |
| --- | --- |
| Dr. Stephen F. Hamilton | - Details regarding proposed damages approaches<br>- Data to be used for proposed approaches<br>- Statement that preferred method is to calculate one price premium for all Class members |

# Exhibit 5

**Wholesale and Suggested Retail Prices ("SRP") of Jason Products Identified in the Complaint**
**Assuming Dr. Hamilton's Cut-Off Date for the Removal of the Challenged Claim of June 30, 2011**



# Exhibit 6

**Jason Personal Care Products**

**Unit Sales by Product - Total of 4 California Cities Available in IRI Data[a]**

**July 18, 2011 - July 13, 2014[b]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Jason Personal Care Products**

**Unit Sales by Product - Total of 4 California Cities Available in IRI Data[a]**

**July 18, 2011 - July 13, 2014[b]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Jason Personal Care Products**

**Unit Sales by Product - Total of 4 California Cities Available in IRI Data[a]**

**July 18, 2011 - July 13, 2014[b]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Jason Personal Care Products**

**Unit Sales by Product - Total of 4 California Cities Available in IRI Data[a]**

**July 18, 2011 - July 13, 2014[b]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**- THIS PAGE INTENTIONALLY LEFT BLANK -**

**Jason Personal Care Products**
**Unit Sales by Product - Los Angeles**
**July 18, 2011 - July 13, 2014[a]**



Page 1 of 4

**Jason Personal Care Products**
**Unit Sales by Product - Los Angeles**
**July 18, 2011 - July 13, 2014[a]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Jason Personal Care Products**
**Unit Sales by Product - Los Angeles**
**July 18, 2011 - July 13, 2014[a]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Jason Personal Care Products**
**Unit Sales by Product - Los Angeles**
**July 18, 2011 - July 13, 2014[a]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Jason Personal Care Products**
**Unit Sales by Product - San Francisco / Oakland**
**July 18, 2011 - July 13, 2014[a]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Jason Personal Care Products**
**Unit Sales by Product - San Francisco / Oakland**
**July 18, 2011 - July 13, 2014[a]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Jason Personal Care Products**
**Unit Sales by Product - San Francisco / Oakland**
**July 18, 2011 - July 13, 2014[a]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Jason Personal Care Products**
**Unit Sales by Product - San Francisco / Oakland**
**July 18, 2011 - July 13, 2014[a]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Jason Personal Care Products**
**Unit Sales by Product - San Diego**
**July 18, 2011 - July 13, 2014**[a]



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Jason Personal Care Products**
**Unit Sales by Product - San Diego**
**July 18, 2011 - July 13, 2014[a]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Jason Personal Care Products**
**Unit Sales by Product - San Diego**
**July 18, 2011 - July 13, 2014[a]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Jason Personal Care Products**
**Unit Sales by Product - San Diego**
**July 18, 2011 - July 13, 2014[a]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Jason Personal Care Products**
**Unit Sales by Product - Sacramento**
**July 18, 2011 - July 13, 2014[a]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Jason Personal Care Products**
**Unit Sales by Product - Sacramento**
**July 18, 2011 - July 13, 2014[a]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Jason Personal Care Products**
**Unit Sales by Product - Sacramento**
**July 18, 2011 - July 13, 2014[a]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Jason Personal Care Products**
**Unit Sales by Product - Sacramento**
**July 18, 2011 - July 13, 2014**[a]



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

# Exhibit 7

**Avalon Personal Care Products**

**Unit Sales by Product - Total of 4 California Cities Available in IRI Data[a]**

**July 18, 2011 - July 13, 2014[b]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Avalon Personal Care Products**

**Unit Sales by Product - Total of 4 California Cities Available in IRI Data[a]**

**July 18, 2011 - July 13, 2014[b]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Avalon Personal Care Products**

**Unit Sales by Product - Total of 4 California Cities Available in IRI Data[a]**

**July 18, 2011 - July 13, 2014[b]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**- THIS PAGE INTENTIONALLY LEFT BLANK -**

**Avalon Personal Care Products**
**Unit Sales by Product - Los Angeles**
**July 18, 2011 - July 13, 2014**[a]



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Avalon Personal Care Products**
**Unit Sales by Product - Los Angeles**
**July 18, 2011 - July 13, 2014[a]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Avalon Personal Care Products**
**Unit Sales by Product - San Francisco/Oakland**

**July 18, 2011 - July 13, 2014[a]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Avalon Personal Care Products**
**Unit Sales by Product - San Francisco/Oakland**
**July 18, 2011 - July 13, 2014[a]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Avalon Personal Care Products**
**Unit Sales by Product - San Francisco/Oakland**

**July 18, 2011 - July 13, 2014[a]**

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Avalon Personal Care Products**
**Unit Sales by Product - San Francisco/Oakland**

**July 18, 2011 - July 13, 2014[a]**

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Avalon Personal Care Products**
**Unit Sales by Product - San Diego**
**July 18, 2011 - July 13, 2014[a]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Avalon Personal Care Products**
**Unit Sales by Product - San Diego**
**July 18, 2011 - July 13, 2014**[a]



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Avalon Personal Care Products**
**Unit Sales by Product - Sacramento**
**July 18, 2011 - July 13, 2014[a]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Avalon Personal Care Products**
**Unit Sales by Product - Sacramento**
**July 18, 2011 - July 13, 2014[a]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Avalon Personal Care Products**
**Unit Sales by Product - Sacramento**
**July 18, 2011 - July 13, 2014[a]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

# Exhibit 8

**Jason Personal Care Products**

**Proportion of Jason's 6 oz. Sea Fresh Organic Toothpaste Sold on Promotion - 4 California Cities Available in IRI Data[a]**

**July 18, 2011 - July 13, 2014[b]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Jason Personal Care Products**

**Proportion of Jason's 6 oz. Sea Fresh Organic Toothpaste Sold on Promotion - 4 California Cities Available in IRI Data[a]**

**July 18, 2011 - July 13, 2014[b]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Jason Personal Care Products**

**Proportion of Jason's 30 oz. Lavender Body Wash Sold on Promotion - 4 California Cities Available in IRI Data[a]**

**July 18, 2011 - July 13, 2014[b]**

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Jason Personal Care Products**

**Proportion of Jason's 30 oz. Lavender Body Wash Sold on Promotion - 4 California Cities Available in IRI Data[a]**

**July 18, 2011 - July 13, 2014[b]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Jason Personal Care Products**

**Proportion of Jason's 6 oz. PowerSmile Organic Toothpaste Sold on Promotion - 4 California Cities Available in IRI Data[a]**

**July 18, 2011 - July 13, 2014[b]**

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Jason Personal Care Products**

**Proportion of Jason's 6 oz. PowerSmile Organic Toothpaste Sold on Promotion - 4 California Cities Available in IRI Data[a]**

**July 18, 2011 - July 13, 2014[b]**



Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB

**Exhibit 9**

**Jason's 6 oz. Organic Sea Fresh Toothpaste
Promoted and Non-Promoted Retail Prices
Los Angeles, CA - Food (July 18, 2011 - July 13, 2014)**





**Jason's 30 oz. Lavender Body Wash**
**Promoted and Non-Promoted Retail Prices**
**Los Angeles, CA - Food (July 18, 2011 - July 13, 2014)**



**Jason's 6 oz. Organic PowerSmile Toothpaste
Promoted and Non-Promoted Retail Prices
Los Angeles, CA - Food (July 18, 2011 - July 13, 2014)**

**Jason Personal Care Products**
**Promoted and Non-Promoted Retail Prices (July 18, 2011 - July 13, 2014)[a]**
**Los Angeles, CA - Food**



# Exhibit 10



**Jason's 6 oz. Organic Sea Fresh Toothpaste**
**Average Retail Prices in All California Geographies Available in IRI Data**
**July 18, 2011 - July 13, 2014**



Jason's 30 oz. Lavender Body Wash
Average Retail Prices in All California Geographies Available in IRI Data
July 18, 2011 - July 13, 2014

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB



**Jason's 6 oz. Organic PowerSmile Toothpaste**
**Average Retail Prices in All California Geographies Available in IRI Data**
**July 18, 2011 - July 13, 2014**

**Jason's 6 oz. Organic Sea Fresh Toothpaste**
**Average Retail Prices in All California Geographies Available in IRI Data**
**July 18, 2011 - July 13, 2014**[a]



**Jason's 30 oz. Lavender Body Wash**
**Average Retail Prices in All California Geographies Available in IRI Data**
**July 18, 2011 - July 13, 2014[a]**



**Jason's 6 oz. Organic PowerSmile Toothpaste**
**Average Retail Prices in All California Geographies Available in IRI Data**
**July 18, 2011 - July 13, 2014[a]**



# Exhibit 11

**Avalon Personal Care Products**
**Proportion of Avalon's 11 oz. Organic Lavender Shampoo Sold on Promotion[a] - Total of 4 California Cities Available in IRI Data[b]**
**July 18, 2011 - July 13, 2014[c]**



**Avalon Personal Care Products**
**Proportion of Avalon's 11 oz. Organic Lavender Conditioner Sold on Promotion[a] - Total of 4 California Cities Available in IRI Data[b]**
**July 18, 2011 - July 13, 2014[c]**



**Avalon Personal Care Products**
**Proportion of Avalon's 12 oz. Organic Lavender Hand and Body Lotion Sold on Promotion[a] - Total of 4 California Cities Available in IRI Data[b]**
**July 18, 2011 - July 13, 2014[c]**



# Exhibit 12



**Avalon's 11 oz. Organic Lavender Shampoo**
**Promoted and Non-Promoted Retail Prices**
**Los Angeles, CA - Food (July 18, 2011 - July 13, 2014)**



**Avalon's 11 oz. Organic Lavender Conditioner
Promoted and Non-Promoted Retail Prices
Los Angeles, CA - Food (July 18, 2011 - July 13, 2014)**



**Avalon's 12 oz. Organic Lavender Hand and Body Lotion
Promoted and Non-Promoted Retail Prices
Los Angeles, CA - Food (July 18, 2011 - July 13, 2014)**

**Avalon Personal Care Products**
**Promoted and Non-Promoted Retail Prices (July 18, 2011 - July 13, 2014)[a]**
**Los Angeles, CA - Food**



# Exhibit 13



**Avalon's 11 oz. Organic Lavender Shampoo**
**Average Retail Prices in All California Geographies Available in IRI Data**
**July 18, 2011 - July 13, 2014**



Avalon's 11 oz. Organic Lavender Conditioner
Average Retail Prices in All California Geographies Available in IRI Data
July 18, 2011 - July 13, 2014

Declaration of Keith R. Ugone in Support of Opposition to Class Certification
Case No. CV-11-03082 LB



**Avalon's 12 oz. Organic Lavender Hand and Body Lotion**
**Average Retail Prices in All California Geographies Available in IRI Data**
**July 18, 2011 - July 13, 2014**

**Avalon's 11 oz. Organic Lavender Shampoo**
**Average Retail Prices in All California Geographies Available in IRI Data**
**July 18, 2011 - July 13, 2014[a]**



**Avalon's 11 oz. Organic Lavender Conditioner**
**Average Retail Prices in All California Geographies Available in IRI Data**
**July 18, 2011 - July 13, 2014[a]**



**Avalon's 12 oz. Organic Lavender Hand and Body Lotion**
**Average Retail Prices in All California Geographies Available in IRI Data**
**July 18, 2011 - July 13, 2014[a]**

