1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                          NORTHERN DISTRICT OF CALIFORNIA

10                               San Francisco Division

11

12     ROSMINAH BROWN, et al.,

                   Plaintiffs,                    Case No.  11-cv-03082-LB

13

14          v.                                    **ORDER GRANTING PARTIAL
                                                  SUMMARY JUDGMENT**
15     THE HAIN CELESTIAL GROUP, INC.,
                                                  [Re: ECF Nos. 244, 296]
16                 Defendant.

17                                     **INTRODUCTION**

18                                           **1.**

19          This is a consumer-products mislabeling case. The plaintiffs allege that defendant Hain

20   Celestial Group sold two lines of cosmetics whose front labels used the word "organic," but that

21   did not contain at least 70% organic ingredients as required by the California Organic Products

22   Act ("COPA"), Cal. Health & Safety Code § 110810 *et seq.* For this alleged violation, the

23   plaintiffs bring claims under COPA itself and under two general California remedial statutes: the

24   Unfair Competition Law ("UCL"), Cal. Bus. & Profs. Code §§ 17200-10; and the Consumers

25   Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750-84. (*See generally* 1st Am. Compl. –

26   ECF No. 68 at 16-22.)[1,2] The court has certified two plaintiff classes (corresponding to the two

27   _____

28   [1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the
     ECF-generated page numbers at the tops of the documents.

United States District Court
Northern District of California

1    Hain product lines) under federal procedural Rule 23(b)(3). (ECF No. 269 at 33.)

2         The plaintiffs now bring two summary-judgment motions on five issues of California law. The

3    rather abstract nature of those motions permits this analysis to travel on a concise review of the

4    facts. The plaintiffs allege that they bought various Hain cosmetic products under the brand names

5    *Avalon Organics* and *Jason*.[3] The word "organic" obviously appears in the very name of — and so

6    was on the front labels of — Avalon Organics products. And, for some time, Jason products

7    carried the front-label tagline, "Pure, Natural, and Organic." Cosmetics in both lines underwent

8    reformulations during the class period, as well as relabeling that (among other things) removed the

9    "Pure, Natural, and Organic" tagline from Jason products.

10        It is undisputed that, before they were reformulated or relabeled, at least some Hain cosmetics

11   were labeled and sold as "organic" without meeting COPA's organic-content requirement. The

12   plaintiffs' summary-judgment motions reach only such products. They reach those products,

13   moreover, in the abstract. This limitation is important. The parties do not agree on which specific

14   products are "cosmetics" under COPA. They do not agree on which specific products fell short of

15   COPA's 70% minimum. But such disagreements are immaterial to the present inquiry. The

16   plaintiffs are not now seeking to establish that any specific product violated COPA, the UCL, or

17   the CLRA; they are instead seeking to fix a handful of somewhat abstract doctrinal propositions

18   that (they say) will apply to any cosmetic product that is later proved to have been "sold, labeled,

19   or represented as organic" (*see* Cal. Health & Safety Code § 110838(a)) without containing at least

20   70% organic content. The court's analysis and holdings are thus equally limited. The reasoning

21   and conclusions below confirm aspects of California law (as the court understands them) but do

22   not yet apply to any specific Hain products. Much less does the court hold that any specific

23   product violated COPA, the UCL, or the CLRA.

United States District Court
Northern District of California

---

27   [2] The plaintiffs' claim for breach of express warranty under Cal. Comm. Code § 2313 (*see* ECF No. 68 at 22-23) is not involved here.

28   [3] The latter brand, strictly speaking, is "JĀSÖN."

**2.**

The plaintiffs' first motion (ECF No. 244) asks the court to summarily decide that: 1) Hain violated COPA by selling any cosmetic that used one of the front-label organic representations (the Avalon Organics brand name, or the Jason "Pure, Natural, and Organic" tagline) but had less than 70% organically produced ingredients; and 2) COPA violations are "predicate unlawful acts" under the UCL's unlawful prong. The plaintiffs' second motion (ECF No. 296) asks the court to rule that: 3) Representations on COPA-violating products are *per se* "material" under the UCL; 4) Such representations are *per se* deceptive under the UCL's fraud prong; and 5) Material misrepresentations create a "presumption of classwide reliance" under the CLRA.

The core of the plaintiffs' motions may be slightly recast as posing the following questions: If Hain's products were mislabeled and thus violated COPA, what doctrinal consequences follow? Are the plaintiffs correct that a COPA violation alone establishes materiality and likely deception under the UCL, and reliance under the CLRA? Those conclusions are striking and their impact potentially far-reaching. From a mislabeling, after all, the plaintiffs effectively argue that most of their case is proved. This is the most complicated part of the analysis; but Ninth Circuit and California law seem to compel the conclusion that the plaintiffs are correct. *Infra*, Analysis, Parts III-IV.

The court held a hearing on the plaintiffs' motions on March 19, 2015. (*See* ECF No. 309.) After carefully considering the parties' arguments and the governing law, for the reasons below, the court grants the plaintiffs' motions.

\* \* \*

## SUMMARY-JUDGMENT LAW

### I.  RULE 56

The court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for

United States District Court
Northern District of California

the non-moving party. *Id.* at 248-49. Federal courts sitting in diversity normally apply the substantive law of the forum state. *E.g., Nelson v. Int'l Paint Co.*, 716 F.2d 640, 643 (9th Cir. 1983).

## II.  THE PLAINTIFFS' MOTIONS ARE A PROPER USE OF RULE 56

The plaintiffs' motions are unusually abstract. They essentially ask the court to agree with several key points of law. Or, put differently, they ask the court to confirm key aspects of California doctrine. They do not seek or claim to prove that any given product violated COPA. The plaintiffs expressly limit their motion in this way. They do not, in other words, ask the court to summarily decide liability — though the legal points on which they seek decision would significantly advance their case. This makes Hain uncomfortable. Hain essentially complains that it should not be pinned to legal determinations before it knows which products, and how many products, the plaintiffs can prove violated COPA and so are ultimately at issue.

Hain's discomfort is understandable. The plaintiffs' summary-judgment motions apply obvious tactical pressure. Nevertheless, this is an appropriate use of summary judgment. Rule 56 provides: "A party may move for summary judgment, identifying each claim or defense — *or the part of each claim or defense* — on which summary judgment is sought." Fed. R. Civ. P. 56(a) (emphasis added). If the movant shows that it is "entitled to judgment as a matter of law," then the court "shall enter summary judgment." *Id.* Modern courts applying the express language of Rule 56 seem comfortable entertaining partial summary judgments of the type sought here. *See, e.g., Pound v. Airosol Co.*, 368 F. Supp. 2d 1158 (D. Kan. 2004) (court entered summary judgment holding that pesticide sales — if the plaintiffs could prove that any were made — would violate Clean Air Act); *France Stone Co. v. Charter Twp. of Monroe*, 790 F. Supp. 707, 710 (E.D. Mich. 1992) (allowing partial summary-judgment motion "upon one issue in one of [plaintiff's] claims").

An important function of Rule 56 is to streamline cases for trial. This case features a slightly dizzying array of products and labels. The parties themselves have not yet agreed on which specific products and labels are implicated by the classes' claims. Resolving now those legal issues that can be resolved now will reduce the number of questions that remain unanswered, will streamline any later trial, and will help the parties and the court to better focus on the disputes that

remain. The ultimate liability questions — centering on whether specific products were at least 70% organic — will surely be more fact-intensive. If we can resolve clearer issues now, and get them out of the way, so much the better. Rule 56 allows for that.

At the hearing, Hain suggested that having to face this type of partial summary-judgment motion deprives it of due process, because it wrongly shifts to Hain the burden of proving that its products did not violate COPA. Hain also argued that ruling on the plaintiffs' motions would constitute an impermissible advisory opinion. The court agrees on neither count. The plaintiffs will ultimately have to prove that specific products indeed violated COPA: that they were "sold, labeled, or represented as being organic" but did not contain at least 70% organic ingredients. No one has suggested otherwise. There is no burden-shifting here and no disruption of normal judicial process. Furthermore, as just noted, Rule 56 expressly contemplates partial summary-judgment motions, and case law recognizes that such motions can pose abstract, doctrinal issues for decision as a matter of law, while other aspects of a claim are suspended for later decision. Hain agreed at the hearing that the plaintiffs' motions effectively present a "case-management" question: *i.e.,* an administrative opportunity to pare off certain issues now in order to streamline later stages of this case. To the extent that it is a case-management issue, the decision to entertain the plaintiffs' motions is within the court's discretion. Finally, Hain itself suggested that the court could properly consider partial summary-judgment motions that teed up other questions not dissimilar in kind from those that the plaintiffs now ask. Hain agreed that the court could entertain motions to rule classes of products as falling inside or outside COPA. (Products with certain characteristics are soaps and not cosmetics, for example.) That is not so different from the questions raised in the plaintiffs' present motions. The court does not see why the product-type questions that Hain condones should be appropriate for Rule 56 analysis, while the more purely doctrinal issues that the plaintiffs pose should be forbidden. The plaintiffs' motions reflect a proper use of Rule 56 and the court proceeds to consider them.

*   *   *

**ANALYSIS**

## I.   MISLABELED HAIN PRODUCTS TRIGGER COPA — DEFERENCE TO CDPH

The relevant part of COPA provides that, "Cosmetic products sold, labeled, or represented as organic or made with organic ingredients shall contain, at least 70 percent organically produced ingredients." Cal. Health & Safety Code § 110838(a). The plaintiffs first move the court to hold that Hain violated COPA by selling any product that used a variant of the word "organic" on the label but had less than 70% organically produced ingredients. Hain responds that this conclusion is foreclosed by a February 2013 "notice of resolution" from the California Department of Public Health ("CDPH"). In Hain's view, the court should "defer" to that letter.

The court discussed this letter at length in its order of February 10, 2014, which denied Hain's motion for summary judgment. (ECF No. 172.) There, Hain had asked the court to hold that, with its letter, the CDPH had found that Hain's labels complied with COPA and thus barred the plaintiffs' claims. (*See* ECF No. 156.) In brief, the CDPH's February 2013 letter was the culmination of a process in which Hain, responding to the agency's inquiry, sent the CDPH several hundreds of pages of documents consisting of product labels, product formulas, and organic certificates for Hain products. Among this material was a chart showing that Hain would be discontinuing all but two Jason products. Hain also sent the CDPH the pre-2011 (*i.e.,* pre-reformulation) labels and formulas for four Avalon Organics products: three of these are not at issue in this case, while the fourth was being discontinued. (*See* ECF No. 172 at 4-7.) Sometime later, Hain described or sent the CDPH samples of revised Avalon Organics and Jason labels. The new Avalon Organics labels (Hain told the CDPH) now stated that the products conformed to "ANSI/NSF-305" organic-content standards (which means that they are not at issue in this case). The new Jason labels no longer carried the "Pure, Natural, and Organic" tagline. (*See id.* at 9-10.) The CDPH's "notice of resolution" letter acknowledged the Avalon Organics certification and the removal of the Jason tagline. It suggested that these products did not use the word "organic" so as to trigger COPA and stated that the CDPH "consider[ed] the matter resolved." (*Id.*)

This court held that the CDPH letter did not bar the plaintiffs' claims that the term "organic" on the Hain products triggered COPA and that, if such a product contained less than 70% organic

1    ingredients, then it violated COPA. The CDPH inquiry was *ex parte* and too "informal" to have a

2    preclusive effect, this court held, amounting only to the agency's decision not to further

3    investigate. (*Id.* at 16-23.)

4      Hain now argues that the CDPH letter (ECF No. 164-11) warrants "deference" — enough that

5    the court should find that no Hain product violated, or even "triggered," COPA by using the term

6    "organic" on its front label. (*See* ECF No. 228 at 15-20; ECF No. 303 at 7.)

7      The court does not agree. The court stands by the reasons that led it to refuse to give the

8    CDPH letter preclusive effect barring the plaintiffs' claims. (*See* ECF No. 172.) That letter was

9    informal and *ex parte*. It was more a record of the agency's decision not to inquire further than it

10    was a quasi-judicial adjudication or quasi-legislative rulemaking. The analysis and answer are not

11    importantly different now, where Hain asks the court only to "defer" to the CDPH letter, rather

12    than give it full-blown preclusive effect.

13      Federal courts applying state law apply state rules about judicial deference to administrative

14    decisions. *See Alvarez v. IBP, Inc.*, 339 F.3d 894 (9th Cir. 2003). The seminal California case on

15    judicial deference to administrative agencies is *Yamaha Corp. of Am. v. State Bd. of Equalization*,

16    19 Cal. 4th 1 (1998). Among other things, *Yamaha* rejected the idea that an agency's interpretation

17    of a statute is entitled to the same "great deference" that normally attends its "quasi-legislative,"

18    rulemaking function. *See id.* at 6-7. Whether and how much a court should defer to an

19    administrative interpretation is above all "contextual." *Id.* at 7. "The standard for judicial review

20    of agency interpretation of law is the *independent judgment* of the court, giving *deference* to the

21    determination of the agency *appropriate* to the circumstances of the agency action." *Id.* at 8

22    (emphases in *Yamaha*). There are "two broad categories of factors relevant to a court's assessment

23    of the weight due an agency's [statutory] interpretation." *Id.* at 12. The first are "those indicating

24    that the agency has a comparative interpretive advantage over the courts." *Id.* The second are those

25    indicating that the agency's decision is "probably correct." *Id.* at 12-13.

26      Both considerations militate for giving the CDPH letter little deference. This case presents a

27    question of straightforward statutory interpretation in plain English. This is not the CDPH

28    applying technical expertise to interpret an exotic statutory term. Its "notice of resolution"

     7

United States District Court
Northern District of California

1  involves no "special familiarity with satellite legal and regulatory issues." *See id.* at 11. The

2  agency thus has no "comparative interpretive advantage" over the court. To the contrary: Given

3  that the court's workaday job consists largely of reading and applying statutes, it probably has the

4  interpretive advantage over the CDPH. Nor do the circumstances suggest that the CDPH is

5  "probably correct." Reading COPA's very comprehensible language, it would seem that the

6  CDPH baldly erred if it held that a product labeled "organic" but having less than 70% organic

7  ingredients does not trigger COPA. (That is not the conclusion that the CDPH reached, but that is

8  the effect that the plaintiffs would give it here.) Such a product would seem to be exactly what

9  triggers COPA. California and Ninth Circuit cases emphasize that it is the judiciary's

10  constitutional role to interpret statutes; that is not the primary domain of administrative agencies.

11  Even when deferring to administrative agencies, cases remind us, a court is doing only that: giving

12  agency decisions due consideration in the course of reaching its own conclusion. *See id.* at 8.

13  When, as here, the statute needs no technical interpretation outside a court's normal expertise, then

14  the agency's construction of a statute is due little if any deference.

15                                                      * * *

## II.  COPA VIOLATIONS ARE UCL "UNLAWFUL" PREDICATES

16

17     The plaintiffs next move the court to hold that, as matter of law, COPA violations are

18  "predicate unlawful acts" under the UCL term that outlaws "any unlawful . . . business act or

19  practice." *See* Cal. Bus. & Profs. Code § 17200. This "unlawful prong" of the UCL "incorporates

20  other laws to make them actionable." *Jordan v. Paul Fin., LLC*, 745 F. Supp. 2d 1084, 1098 (N.D.

21  Cal. 2010). "Generally, 'violation of almost any law may serve as a basis for a UCL claim.'" *Id.*

22  (quoting in part *Plascencia v. Lending 1st Mortg.*, 259 F.R.D. 437, 448 (N.D. Cal. 2009) (citing in

23  turn *Chabner v. United Omaha Life Ins. Co.*, 225 F.3d 1042, 1048 (9th Cir. 2000)). Hain does not

24  contest this particular aspect of the plaintiffs' motion. (*See* ECF No. 228 at 21.) The court has no

25  difficulty concluding that COPA violations of the sort alleged here are predicate acts under the

26  UCL's unlawful prong.

27                                                      * * *

28

United States District Court
Northern District of California

### III. MATERIALITY, DECEPTION, RELIANCE — CAN THE PLAINTIFFS PROVE MOST OF THEIR CASE THROUGH PRESUMPTIONS AND INFERENCES?

The plaintiffs contend that California law fixes three key conclusions in their favor once they have shown a basic COPA violation — *i.e.*, that a cosmetic product was labeled "organic" but was not at least 70% organic. Specifically, they argue that the COPA violation entitles them as a matter of law to: 1) a holding that the mislabeling was "material" under the UCL; 2) a holding that the mislabeling was "likely to deceive reasonable consumers" under the UCL; and 3) an "inference" that absent class members relied on the label for their CLRA claim. (*See generally* ECF No. 296.)

More narratively, the plaintiffs' argument runs like this: The California legislature in passing COPA determined that mislabeled organic products are "material" to the ordinary consumer. The court "must defer" to this determination, and this supplies the "materiality" component of the plaintiffs' UCL claims. This legislative determination of materiality compels the further conclusion that, as a matter of law, the label was "likely to deceive" the ordinary (read: reasonable) consumer. Finally, California law holds that, if a CLRA plaintiff proves that a misrepresentation was "material," then absent class members need not prove that they actually relied on the misrepresentation. The law will infer that they did. (Pl. Mot. – ECF No. 296 at 6-10); *see Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011).

The plaintiffs are correct. Four appellate decisions govern this area. The first pair, discussing UCL "standing," are *Hinojos v. Kohl's Corp.*, 718 F.3d 1098 (9th Cir. 2013), and its California source case, *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310 (2011). The second pair, discussing class certification in consumer-fraud suits under the UCL and CLRA, are *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013 (9th Cir. 2011), and its primary California source, *In re Tobacco II Cases*, 46 Cal. 4th 298 (2009).

\* \*

### A.  UCL – Materiality presumed

The decisions in *Kwikset* and *Hinojos* compel the conclusion that, by enacting COPA, the California legislature has determined that organic-content representations are material. Both cases asked whether mislabeling plaintiffs had suffered economic injury and so had standing under the

United States District Court
Northern District of California

UCL. *See Kwikset*, 51 Cal. 4th at 316; *Hinojos*, 718 F.3d at 1101-02. A brief recap of UCL standing will thus help the following discussion.

The story is familiar. Before 2004, the "broad" UCL had proven susceptible to abuse; or, at least, to being used excessively. *See, e.g., Hinojos*, 718 F.3d at 1103-04. Lawyers "fil[ed] suits on behalf of clients who [had] not used the defendant's product or service, viewed the defendant's advertising, or had any other business dealings with the dealings with the defendant." *Id*. (quoting *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758 (2010)). "In 2004, however, the voters of California passed Proposition 64" to "curtail" this practice. *Hinojos*, 718 F.3d at 1103-04. Proposition 64 "restrict[ed] standing for individuals alleging UCL . . . claims" to people who had "suffered injury in fact and ha[d] lost money or property," and so could demonstrate "some form of economic injury" "as a result of the [allegedly] unfair competition." *Id.* (quoting Cal. Bus. & Profs. Code § 17204 and citing *Kwikset*). Though it tightened UCL standing requirements, "Proposition 64 'just as plainly preserved standing for those who *had* had business dealings with a defendant and had lost money or property as a result of the defendant's unfair business practices.'" *Hinojos*, 718 F.3d at 1104 (quoting *Clayworth*, 49 Cal. 4th at 788). A false-labeling plaintiff sufficiently alleges economic injury, and thereby UCL standing, "by alleging . . . that he or she would not have bought the product but for the misrepresentation." *Kwikset*, 51 Cal. 4th at 330.

In *Kwikset*, the California Supreme Court held that a plaintiff had alleged sufficient economic injury, and thus had standing, to state product-mislabeling claims under the UCL and California's False Advertising Law. *Id.* at 316-17. The plaintiffs alleged that the defendant had sold them locksets that were labeled "Made in U.S.A." but that contained foreign-made parts. *Id.* This, the plaintiffs claimed, violated two California statutes. The first is a general prohibition against "deceptive representations or designations of geographic origin in connection with [the sale or lease of] goods or services." *Id.* at 317-18 and n. 2 (quoting Cal. Civ. Code § 1770) (interpolation in *Kwikset*). The second, much like COPA, addresses the product-content claim that was specifically in issue in *Kwikset*; that statute provides:

> It is unlawful for any person, firm, corporation or association to sell or offer for sale in this State any merchandise on which merchandise or on its container there appears the words "Made in U.S.A.,"

1                     "Made in America," "U.S.A.," or similar words when the
                    merchandise or any article, unit, or part thereof, has been entirely or
2                     substantially made, manufactured, or produced outside of the United
                    States.

3   *Kwikset*, 51 Cal. 4th at 317-18 and n. 1 (quoting Cal. Bus. and Profs. Code § 17533.7). Like this

4   case, then, *Kwikset* involved a statute that outlawed specific misrepresentations about a product's

5   composition.

6         The *Kwikset* defendant argued that, even if the locks were not entirely U.S.-made, the plaintiffs

7   had no economic injury because they had received "fully functioning" locks and so had gotten the

8   "benefit of the bargain." *See Kwikset*, 51 Cal. 4th at 332-34. The California high court rejected this

9   view. The "Made in U.S.A." representation "matter[ed]" to some plaintiffs; if the locks were not

10   made in the U.S., then those plaintiffs had not received the promised bargain and had been injured.

11   *See id.* at 328, 332-34 ("[T]he parent who purchases food . . . represented to be, but not in fact,

12   organic, has . . . not received the benefit of . . . [the] bargain."). The misrepresentation was in other

13   words material. *See id.* at 329, 332-33. The court acknowledged that "materiality is generally a

14   question of fact," and is "not a basis on which to decide [a] case on demurrer." *Id.* at 333.

15   Nevertheless, the court wrote that, "the [California] Legislature has by statute made clear that

16   whether a product is manufactured in the United States or elsewhere is precisely the sort of

17   consideration reasonable people can and do attach importance to in their purchasing decisions." *Id.*

18   Which is to say — in the language most salient for our present inquiry: "The Legislature *has*

19   *recognized the materiality of this representation* by specifically outlawing deceptive and

20   fraudulent 'Made in America' representations." *Id.* at 329 (emphasis added).

21         The Ninth Circuit applied this reasoning in *Hinojos v. Kohl's Corp.*, 718 F.3d 1098 (9th Cir.

22   2013). The plaintiff there claimed to have bought goods that the defendant falsely represented as

23   being "on sale." *Id.* at 1101-02. The plaintiff claimed that the defendant had thereby violated a

24   California statute that "expressly prohibits [this] type of false advertising." *Id.* at 1103.[4] The

25

26      _____

  [4] The statute in question is part of California's False Advertising Law and provides: "No price shall be
27   advertised as a former price of any advertised thing, unless the alleged former price was the prevailing
  market price . . .  within three months next immediately preceding the publication of the advertisement
28   or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated
  in the advertisement." *Hinojos*, 718 F.3d at 1103 (quoting Cal. Bus. & Profs. Code § 17501).

United States District Court
Northern District of California

*Hinojos* court held that the plaintiff had suffered economic injury and thus had standing under the UCL; it accordingly reversed a dismissal of the plaintiffs' claims. *Id.* at 1101-02. As in *Kwikset*, the defendant in *Hinojos* argued that the plaintiff had no injury "because [he] had acquired the merchandise he wanted at the price advertised," and had thus received the "benefit of the bargain." *Id.* at 1102, 1107. The Ninth Circuit rejected this argument on the authority of *Kwikset*. The statute compelled the decision that the false "on sale" representation was material — so that the plaintiff had not received the promised bargain. The Ninth Circuit wrote: "[T]he legislature's decision to prohibit a *particular misleading advertising practice* is evidence that the legislature has deemed that the practice constitutes a 'material' misrepresentation, and *courts must defer to that determination.*" *Id.* at 1107 (citing *Kwikset*) (emphases added).

A December 2014 decision in this court applied *Kwikset* and *Hinojos* in reasoning that the alleged violation of a California food-labeling statute "gives rise to a presumption of materiality." *Rahman v. Mott's LLP*, 2014 WL 6815779 (N.D. Cal. Dec. 3, 2014) (citing *Kwikset* and *Hinojos*). The *Rahman* plaintiff complained that the defendant had falsely labeled its apple juice as having "No Sugar Added." *Id.* at *1. That representation (the plaintiff claimed) did not comply with federal regulations and so violated California's Sherman Food, Drug, and Cosmetic Law (Cal. Health & Safety Code § 109875 *et seq.*). *Rahman*, 2014 WL 6815779 at *1. Unlike COPA, or the statutes involved in *Kwikset* and *Hinojos*, the statute in *Rahman* did not outlaw a specific mislabeling; instead, it "broadly prohibit[ed] the misbranding of food." *Id.* at *2 (citing Cal. Health & Safety Code § 110765 ("It is unlawful for any person to misbrand any food.")). Partly because of the materiality presumption, the *Rahman* court held that the plaintiff had satisfied Rule 23(b)(3)'s common-issue "predominance requirement as to issues of liability." *Id.* at *7.

This court concludes that, under *Kwikset* and *Hinojos*, the California legislature's decision in COPA to prohibit the sale, labeling, or representation of products as "organic," when they contain less than 70% organic ingredients, establishes as a matter of law that violations of COPA are "material" misrepresentations under the UCL. This conclusion is bolstered by the discussion, below, of *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013 (9th Cir. 2011), and *In re Tobacco II Cases*, 46 Cal. 4th 298 (2009) — two cases that also address the UCL's elements. Before

1   discussing *Stearns* and *Tobacco II*, though, the court considers the issue of "likely deception."

2                                        *  *

3   **B.  "Likely to deceive"**

4       The plaintiffs next argue that, as a matter of law, COPA violations are "likely to deceive

5   reasonable consumers." (*See* ECF No. 296 at 4, 6-10.) This conclusion would be significant. "[T]o

6   state a claim under . . . the UCL . . . , based on false advertising or promotional practices, it is

7   necessary only to show that members of the public are likely to be deceived." *Stearns*, 655 F.3d at

8   1020 (quoting *Tobacco II*, 46 Cal. 4th at 312).

9       The plaintiffs derive this "likely to be deceived" conclusion from the same legislative

10  determination that drove the materiality decision just discussed. That is to say, the plaintiffs argue

11  that the California legislature's determination that COPA violations are material "similarly"

12  means, as a matter of law, that organic-content representations that violate COPA are "likely to

13  deceive reasonable consumers." (ECF No. 296 at 4-10.)

14      The court has seen no California or Ninth Circuit law deriving a "likely to deceive" finding

15  under the UCL's fraud prong from the legislatively compelled "materiality" determination that,

16  correctly speaking, courts have recognized in analyzing economic injury under the UCL's

17  standing requirement. *See Kwikset*, 51 Cal. 4th at 327-29, 332; *Hinojos*, at 718 F.3d at 1107.

18  Nevertheless, the court agrees with the plaintiffs: That COPA violations are legally deemed

19  material must imply that the attendant organic-content misrepresentations are likely to deceive

20  reasonable consumers. A misrepresentation is by definition prone to deceive. A "material"

21  representation is one that "a *reasonable* consumer would attach importance to." *Id* at 1107 (citing

22  *Kwikset*) (emphasis added). The court thinks it correct to say, as a matter of law, that using the

23  word "organic" on a product label will likely lead reasonable consumers to believe that the

24  product in fact is organic (which, in California, is legislatively defined to mean containing at least

25  70% organic ingredients). That would seem to be exactly the point of labeling something

26  "organic." If the product does not meet the 70% threshold, then that consumer has been *misled*

27  into believing that the product is (as COPA defines it) organic. Which is to say that the consumer

28  — that "reasonable consumer" who deems the organic claim material — has been deceived.

United States District Court
Northern District of California

1    This conclusion, too, is supported by the doctrinal descriptions of the UCL given in *Stearns*

2    and *Tobacco II*. It is to those cases that the discussion now turns.

3                                                    * *

4    **C.  Elements of UCL fraud**

5        The preceding decisions (on materiality and likely deception) are bolstered by two additional

6    appellate cases under the UCL's fraud prong: *Stearns* and its California root decision, *Tobacco II*.

7    If somewhat indirect, their impact on the present analysis is nonetheless decisive.

8        Neither *Stearns* nor *Tobacco II* was a summary-judgment case. Both asked whether plaintiff

9    classes could be certified. But their language about what attends a UCL fraud claim — what

10   elements and proof are required — are too strong to ignore. The Ninth Circuit in *Stearns* tracked

11   the California Supreme Court's language in *Tobacco II* about what UCL plaintiffs must prove.

12   The key passages are these:

13           [T]o state a claim under . . . the UCL . . . , based on false advertising
             or promotional practices, ***it is necessary only to show that members***
14           ***of the public are likely to be deceived***. . . .

15           The fraudulent business practice prong of the UCL has been
             understood to be distinct from common law fraud. A [common law]
16           fraudulent deception must be actually false, known to be false by the
             perpetrator and reasonably relied upon by a victim who incurs
17           damages. ***None of these elements are required to state a claim for***
             ***injunctive relief under the UCL***. This distinction reflects the UCL's
18           focus on the defendant's conduct, rather than the plaintiff's
             damages, in service of the statute's larger purpose of protecting the
19           general public against unscrupulous business practices.

20   *Stearns*, 655 F.3d at 1020 (quoting *Tobacco II*, 46 Cal. 4th at 312) (emphasis added). The district

21   court had therefore wrongly denied certification by deciding that individual issues of reliance and

22   causation predominated:

23           The [district] court had no doubt that California law had been
             changed [by Proposition 64] so that a person who sought to be a
24           class representative did have to show some additional factors as to
             himself, including injury in fact and causation. That repaired the
25           danger of frivolous strike suits, but ***it decidedly did not change the***
             ***California rule that relief under the UCL is available without***
26           ***individualized proof of deception, reliance and injury.*** Thus, the
             district court's concerns about reliance and causation were not well
27           taken.

28

United States District Court
Northern District of California

*Stearns*, 655 F.3d at 1020 (quotation and citations omitted) (emphasis added).[5] The Ninth Circuit noted the apparent upshot:

> One might even say that, in effect, California has created what amounts to a ***conclusive presumption*** that when a defendant puts out tainted bait and a person sees it and bites, the defendant has caused an injury; restitution is the remedy.

*Id.* at 1021 n. 13 (emphasis added).

This last comment is not mere *dicta*. It is a gloss on the *Stearns* court's main line of reasoning, which confirmed that UCL plaintiffs can get restitution "without a more particularized proof of injury and causation." *See id.* at 1021. It also reflects the Ninth Circuit's understanding of California law in this area. If that is *dicta*, it is *dicta* worth observing. It is a conclusion that follows from the California Supreme Court's statements about UCL fraud doctrine. The *Stearns* gloss is drawing the final — and striking — analytical point.

There is one important qualification to all this. *Named* class representatives in UCL cases must still show "additional factors as to [themselves], such as injury in fact and causation." *Id.* at 1020 (citing *Tobacco II*, 46 Cal. 4th at 313-16). But absent members need not. *See Stearns*, 655 F.3d at 1020; *Tobacco* II, 46 Cal. 4th at 316 ("[T]he plain language of the [UCL] lends no support to the trial court's conclusion that all unnamed class members in a UCL class action must demonstrate section 17204 standing" by showing injury and causation.).

The clarity and strength of what these four cases — *Kwikset*, *Hinojos*, *Stearns*, and *Tobacco II* — say about the UCL's elements push the court to conclude as a matter of law that COPA violations are *per se* "material" for purposes of UCL standing, and that a COPA-violating "organic" misrepresentation is "likely to deceive the reasonable consumer." Given the clarity of the legislative determination in COPA (plus the Ninth Circuit's and California Supreme Court's recognition of it), COPA's focus on the defendants' conduct, and that law's consequent remedies of injunction and restitution (rather than damages), the legislative determination of materiality

---

[5] This rule is not poorly established. The language of the UCL "has led courts repeatedly and consistently to hold that relief under the UCL is available without individualized proof of deception, reliance, and injury." *Tobacco II*, 46 Cal. 4th at 320 (citing, among others, *Bk. of the West v. Superior Court*, 2 Cal. 4th 1254 (1992)).

cannot be read as relevant only to the pleading stage of a UCL standing inquiry. (As Hain suggests.) COPA violations are material: full stop. From that initial conclusion, the likely-deception inference flows.

Classwide presumptions of materiality and likely deception would be harder to accept, conceptually, if UCL remedies were tuned in the normal way to individual plaintiffs. For this would allow individually defined recoveries while denying the defendant the ability to show — what might in fact be the case — that in a specific transaction the "organic" claim did not matter to the buyer. But the UCL is not keyed to individual recovery. As California's courts have repeatedly explained, the UCL "focus[es] on the defendant's conduct." *Stearns*, 655 F.3d at 1020 (quoting *Tobacco II*, 46 Cal. 4th at 312). Thus the UCL's "limited" remedies are injunctive relief and restitution. *See Stearns*, 655 F.3d at 1020 (quoting *Tobacco II*, 46 Cal. 4th at 312). Given this orientation, it is less troubling to say that the California legislature has deemed certain conduct material and that the courts must presume — even, as *Stearns* suggests, conclusively presume — that that conduct is "likely to deceive" ordinary consumers.

\* \*

**D.  District-Court Cases**

In response to all this, Hain points to a number of decisions from courts in this district, and argues that no previous case has found materiality or reliance to follow from a legislative proscription, under the UCL's fraud prong or under the CLRA. (*See* ECF No. 303 at 10-13.)

These cases do not change the court's analysis. They do not speak to the situation presented here. As Judge Breyer recognized in one of these cases — *Jones v. ConAgra Foods, Inc.*, 2014 WL 2702726, \*1 (N.D. Cal. June 13, 2014) — food-labeling cases are "multiform[]." They differ from one another along several vectors and in ways that matter. So, too, for the cases that Hain cites.

Consider *Jones*. Hain argues that, in that decision, Judge Breyer "refused to presume materiality" under the UCL's fraud prong "based solely on allegations that the challenged labels were 'illegal.'" (ECF No. 303 at 11.) *Jones* is critically different from this case. The *Jones* defendant had allegedly mislabeled its food products as "natural." Unlike in this case, in *Jones*

there was "no relevant legislation" defining that term. *Jones*, 2014 WL 2702726 at 14 n. 26. There was indeed "no fixed meaning for the word 'natural,'" "no single, controlling definition." *Id.* at *14-*15. On this ground, Judge Breyer expressly distinguished *Hinojos*. *Id.* at *14 n. 26. The "only evidence" that the "natural" representation was material was "rather weak," consisting of the plaintiffs' expert's "*ipse dixit*." *Id.* at *15-*16. That is all visibly different from this case.

The plaintiff in *Bruton v. Gerber Prods. Co.*, 2014 WL 7206633 (N.D. Cal. Dec. 18, 2014) challenged "nutrient-content" and "sugar-related" claims that appeared on the defendant's various baby foods. *Id.* at *1. Hain observes that, in *Bruton*, Judge Koh granted summary judgment against the plaintiff's UCL fraud claim and, more specifically, found the alleged violations of FDA regulations "insufficient to even *raise* a genuine factual issue as to whether [the] defendant's product labels were deceptive." (ECF No. 303 at 10-11) (emphasis by Hain). *Bruton*, too, is crucially different from this case. It does not mention *Kwikset, Hinojos, Stearns,* or *Tobacco II* — and does not grapple with the rule that the plaintiffs here discern in those cases. The *Bruton* plaintiff, in arguing that the labels would likely deceive reasonable consumers, moreover made only "vague references" to "FDA[] regulations and . . . warning letters" that the defendant had supposedly violated, and supported this with no citation to legal authority. *Bruton*, 2014 WL 7206633 at *6. *Bruton* does not speak to the present issues.

The plaintiff in *Figy v. Frito-Lay N. Am., Inc.*, 2014 WL 3953755 (N.D. Cal. Aug. 12, 2014) challenged as deceptive several claims ("All Natural," "LOW FAT, "FAT FREE") made on the labels of the defendant's snack foods. *Id.* at *1. That case considered *Kwikset, Hinojos*, and *Tobacco II* and, rejecting the sought presumptions of reliance, held: "[T]hese cases required *named* [UCL] plaintiffs to plead actual reliance on the misrepresentations at issue." *Id.* at *8 (emphasis added). This court has reached the same conclusion. It says nothing about the presumptions running to, or allegations and proof required from, absent plaintiffs. It says nothing about whether a legislatively grounded finding of materiality implies that the misrepresentation in question is "likely to deceive" reasonable consumers. Furthermore, *Figy* had nothing like the statutorily specified misrepresentation that COPA supplies. The *Figy* plaintiffs offered no "plausible objective definition" of "All Natural." *Id.* at *9. Similarly, their claims about fat content

could not "plausibly" have deceived them (as they claimed) about other nutrients contained in the products. *See id.* at *10. The FDA regulations that the *Figy* defendant had allegedly violated were, unlike COPA, general proscriptions against "false or misleading" label statements concerning "nutrition levels and health-related claims." *Id.* at *3. The *Figy* court held in this context that "deception claims must be predicated on more than simple regulatory violations." *Id.* at *10. Fair enough for that situation, but it does not address the case that is now before this court. Finally, strangely, and again unlike this case, in their "misbranding theory" the *Figy* plaintiffs did not even allege that they had relied on the challenged representations; instead, they "only allege[d] reliance on the 'salability' of the products." *Id.* at *8. The *Figy* court found this "insufficient" under *Kwikset. Id.*

Hain cites *Trazo v. Nestle U.S.A., Inc.*, 2013 WL 4083218, *10 (N.D. Cal. Aug. 9, 2013) for the proposition that "regulatory violations" are "alone . . . not enough" to establish that misrepresentations were likely to mislead the reasonable consumer. (ECF No. 303 at 11 n. 5.) That is accurate but is not the situation presented here. In other respects, too, *Trazo* does not speak to this case. That decision cites *Hinojos* but only for basic elements of UCL standing. *See Trazo*, 2013 WL 4083218 at *3 n. 25. Moreover, the *Trazo* plaintiffs flatly "fail[ed] to allege either that a 'reasonable consumer' would be deceived" by the challenged labels, or how "they themselves" were deceived. *See id.* at *10. Again, this is all too different to make *Trazo* very helpful for this case — never mind to impede the apparent consequences of *Kwikset, Hinojos, Stearns,* or *Tobacco II*.

Finally in this area, Hain cites *Gitson v. Trader Joe's Co.*, 2013 WL 5513711 (N.D. Cal. Oct. 4, 2013). Hain accurately writes that, in *Gitson*, Judge Orrick would "not presume" that the challenged representations would have led the "reasonable consumer" to buy the products in question. (ECF No. 303 at 11 (quoting *Gitson*, 2013 WL 5513711 at *6).) There was no mention in *Gitson* of *Kwikset*, *Hinojos*, *Stearns*, or *Tobacco II*. (The court did note that, while it is normally a fact question, whether a misbranding is "likely to deceive" the "reasonable consumer" can be decided as a matter of law. *Gitson*, 2013 WL 5513711 at *6.) Like all the cases that Hain cites, *Gitson* involved not a specific statutory proscription like the one found in COPA, but allegedly

United States District Court
Northern District of California

violated FDA regulations and, with regard to one type of product, only "informal and advisory"

FDA "warning letters." *See id.* at \*7. Last, consistent with Judge Breyer's comment in *Jones* about

the "multiformity" of food-labeling cases, Judge Orrick wrote this about one of the products

involved in *Gitson*:

> This is one of those rare cases where the ***accused label itself makes it impossible for the plaintiff to prove that a reasonable consumer is likely to be deceived*** . . . . [T]he packaging at issue here explicitly states that Organic Soy Milk is *not* what the plaintiffs allegedly believed that it was: cow's milk. The packaging states, on its front and back, that Organic Soy Milk is "LACTOSE & DAIRY FREE," and, on its side, that it is an "alternative to dairy milk." In light of this explicit disclaimer, a reasonable consumer could not believe that Organic Soy Milk is cow's milk and has the same qualities as cow's milk.

*Id.* at \*7 (record citation omitted) (first emphasis added). This case does not present the same

circumstances, nor any similar reason to rule out a presumptive connection between the material

COPA violation and the likely deception of ordinary consumers.

\* \*

**E. CLRA Reliance**

The plaintiffs' final issue is that material misrepresentations create a "classwide" presumption

of reliance under the CLRA. (*See* ECF No. 296 at 2-3, 10.) "California's CLRA prohibits 'unfair

methods of competition and unfair or deceptive acts or practices.'" *Stearns*, 655 F.3d at 1022

(quoting Cal. Civ. Code § 1770(a)). "The CLRA allows suits by a 'consumer who suffers any

damage as a result of the use or employment by any person of a method, act, or practice declared

to be unlawful by [the CLRA].'" *Stearns*, 655 F.3d at 1022 (quoting Cal. Civ. Code § 1780).

"[P]laintiffs in a CLRA action [must] show not only that a defendant's conduct was deceptive but

that the deception caused them harm." *Stearns*, 655 F.3d at 1022 (quoting *In re Vioxx Class Cases,*

180 Cal. App. 4th 116, 129 (2009)).

The plaintiffs are right: If a misrepresentation is material — and, again, COPA violations are

deemed material — then under the CLRA an "inference of reliance arises as to the class." *Stearns*,

655 F.3d at 1022. The *Stearns* court more fully said:

> A CLRA claim warrants an analysis different from a UCL claim because the CLRA requires each class member to have an actual injury caused by the unlawful practice. But "[c]ausation, on a

United States District Court
Northern District of California

1
2

classwide basis, may be established by *materiality.* If the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class." [*In re Vioxx Class Cases,* 180 Cal. App. 4th 116, 129 (2009)].

*Id.* at 1022 (some citations omitted) (emphasis in original). The plaintiffs' argumentative thread is thus complete: From a COPA violation, there is UCL materiality, and from that materiality there follows an inference of classwide CLRA reliance. The court has seen nothing suggesting that (unlike the situation under the UCL) this inference under the CLRA is conclusive. It therefore remains open to Hain to show that, in individual transactions, given plaintiffs did not in fact rely on the "organic" representation.

One might ask: Can the legislative determination of materiality recognized in UCL cases, on the question of standing, supply the materiality element for CLRA claims? Is materiality the same under these statutes? Does materiality translate from the UCL to the CLRA without difficulty? Nothing in the case law (that the court has seen) discusses this. But there is no clear reason to conclude that materiality is somehow different under these statutes. The root materiality determination comes not from the UCL but from the underlying substantive statute: COPA. The legislature and courts have recognized that organic representations are material, not just with respect to a given statutory remedy, but because they make certain substantive claims in a certain class of transactions. (*I.e.,* "organic" claims made in organic-product sales.) The materiality of the representation, in other words, springs through COPA from the nature of the underlying transaction. There is therefore not much reason to view COPA's materiality as being confined to the UCL.

* * *

**III.SUMMATION**

The court concludes by addressing two of Hain's main responses to the plaintiffs' proposed conclusions — conclusions that, by and large, the court has now endorsed. Hain's first point is essentially that the court's holding is striking. From a basic COPA violation, albeit mainly through established precedent, there has followed a course of what might seem to be runaway inferences. From that basic mislabeling, the court has found classwide materiality and likely deception under the UCL and classwide reliance under the CLRA. From the basic mislabeling, in other words, the

United States District Court
Northern District of California

United States District Court
Northern District of California

law has carried the plaintiffs a long way toward proving much of their case. (At least in the abstract.) No other district court, Hain contends, has followed such an analytical chain in (what Hain views as) any similar case.

Second, more narrowly, Hain argues that the four major appellate cases that have guided this inquiry — *Kwikset*, *Hinojos*, *Stearns*, and *Tobacco II* — do not support the conclusions for which the plaintiffs have argued. These cases are "pleadings cases," Hain observes, not summary-judgment cases, and did not deal with the merits of UCL claims. (*See* ECF No. 303 at 9 (discussing *Kwikset* and *Hinojos*).) That is mostly correct. *Kwikset* and *Hinojos* discussed the components of UCL standing in reviewing motions to dismiss. For their part, *Stearns* and *Tobacco II* discussed common-issue predominance in the context of class-certification motions involving UCL claims. (Though the latter, to make a familiar point, is not wholly divorced from merits questions; certification analyses depend in large part on the merits elements of the given claims.)

Hain's points are well taken. The court agrees that the result that it has reached here is striking. One may fairly worry that the consequences will be far-reaching. It is moreover true that the four cases just mentioned do not speak to the precise situation at hand — and, to some significant degree, address different issues, so that *Kwikset* and *Hinojos* speak past *Stearns* and *Tobacco II*. The court has been aware of these difficulties. They have complicated analysis. They have made it hard to draw easy conclusions from the clear language of the case law. Decision has been made harder still by the steep consequences of the inferential chain that the plaintiffs have advocated, and which the case law ultimately seems to support.

The following, concluding comments are intended to respond to Hain's concerns and to relate the overarching factors that have guided the court through its specific analytical decisions to its ultimate conclusions. Backdrop to the whole analysis have been the specific legislative determination embodied in COPA (that "organic" claims are materially false if a product does not meet the 70% mark), and the defendant-focused orientation of the UCL, with all that caselaw tells us the latter implies.

Taking Hain's concerns in reverse order, then, consider first the fact that *Kwikset* and *Hinojos* and, to a lesser extent, *Stearns* and *Tobacco II* are "pleadings" cases. Even accepting that to be so,

United States District Court
Northern District of California

the strength and clarity of what these cases say about the substance of UCL claims make it practically impossible to wall these off as mere "pleadings cases." These cases have an explanatory inertia that carries their lessons past their immediate bounds. To read them too restrictively would, in a sense, be to not read them at all. Reaching a conclusion different from the one that the court has reached would be problematically contrary to the precedent that these cases overtly express.

Furthermore, Hain's focus on the pleading status of these cases fails to recognize the abstract nature of the plaintiffs' present motions. The plaintiffs will eventually have to *prove* that specific products violated COPA, that they bought those products in reliance on the "organic" representation, and so on. They will have to go beyond their allegations and beyond their inquiry into the abstract effects of California law. This case therefore comports with *Kwikset's* admonition that UCL plaintiffs must support "[e]ach element" of UCL standing "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Kwikset*, 51 Cal. 4th at 327. Hain's effort to distinguish these cases because they addressed the sufficiency of pleadings (*Kwikset*, *Hinojos*) or their certifiability (*Stearns, Tobacco II*) therefore misses the mark.

Of the second concern — that the conclusion here (from mislabeling to nearly proven claim) is striking — several things might be said. All figured into the court's thinking. First, this court is cabined by the Ninth Circuit's understanding of the UCL as expressed in *Stearns*. Where a person has been defrauded in a way that is actionable under the UCL, *Stearns* wrote, California law effectively creates a "conclusive presumption" that restitution is appropriate. *See Stearns*, 655 F.3d at 1021 n. 13. (The conclusion under the CLRA — that the material COPA yields presumptive classwide reliance — is less problematic, because the law on that head is clearer.) Were this court writing without the benefit of *Stearns*, it might have found a different answer in the junctions and gaps of the case law.

Second, to reach different conclusions at certain points in this analysis would have put this court at loggerheads with the California legislature. Given COPA, could the court defensibly hold that organic-content misrepresentations are not "material" or "likely to deceive" the ordinary

consumer? It could not.

Third, as suggested earlier, the result here would be more troubling if the UCL were keyed in the normal way to individual plaintiffs and recoveries. But the UCL focuses on the defendant's conduct and so generally limits its remedies to injunctions and restitution. It is therefore less surprising that a basic statutory violation should trigger an inferential cascade that runs quickly through to the available remedy.

Fourth, the holdings reached here are more limited than they may at first appear. As Judge Breyer recognized in *Jones*, 2014 WL 2702726 at *1, food-labeling cases are "multiform[]." Perhaps uncommonly so. The details of, and differences between, mislabeling cases can impede easy translation of all but the most basic legal rules from one case to the next. This court expressly limits its holding to the situation before it: Where the legislature has proscribed (here, through COPA) using a specific word ("organic") to sell products unless they meet a specific definition (at least 70% organic). The courts in *Hinojos*, and especially *Kwikset*, faced such situations (though admittedly *Rahman* did not). This court confines its decision to analogous cases. They should not be too numerous. The effect of this decision consequently should not carry as far as might first appear.

Finally, the overarching conclusion here — the analytical chain from COPA violation to significant presumptions under the UCL and CLRA; maybe even to the "conclusive presumption" that *Stearns* perceives — is from broader perspectives not so jarring. It embodies something like strict liability. If you mislabel a product and violate COPA, then the law will deem the offending representation material, and will assume that it deceived (UCL) and was relied upon by (CLRA) those who bought the product. Statutory remedies will follow. That remains striking but is not unprecedented.

It is a fair question whether this chain of presumptions and inferences is something that California's legislature and courts have (more or less) consciously forged, or whether it is mostly the inadvertent confluence of different strands of somewhat related law. Whatever the answer, this court is not free to dismiss the precedential explanations laid down by the Ninth Circuit and California's state courts. Even if inadvertently far-reaching, the conclusions that that precedent

compels are in keeping with the purposes and remedies of COPA, the UCL, and the CLRA.

* * *

## CONCLUSION

The court therefore grants the plaintiffs' motions for partial summary judgment. This disposes of ECF Nos. 244 and 296.

**IT IS SO ORDERED.**

Dated: May 26, 2015

_____

LAUREL BEELER
United States Magistrate Judge

United States District Court
Northern District of California