
Steven F. Helfand, SBN 206667
HELFAND LAW OFFICES
1400 SW 137th Avenue, Unit F112
Hollywood, FL 33027

Telephone:   415.596.5611
Email:          sh4078@gmail.com

*In propria persona*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROSMINAH BROWN and ERIC LOHELA; on behalf of themselves and all others similarly situated<br><br>            Plaintiff,<br>    *vs*.<br><br>THE HAIN CELESTIAL GROUP, INC.,<br><br>            Defendant. | Case No.: CV 11-03082 LB, CV 13-02237 LB<br><br>**OBJECTION AND NOTICE OF INTENT TO APPEAR**<br><br>Hon.   Laurel Beeler<br>Date:  February 11, 2016<br>Time: 9:30 a.m. |

**COMES NOW**, absent class member, Steven Helfand [hereafter "Helfand"] and objects to the proposed class action settlement [hereafter the "Settlement"] as follows:

### I. **OBJECTION**

**A. Introduction**

The Court should decline to grant final approval to this proposed class action settlement [hereafter "S.A"].  The settling parties ensnared class members with a misleading settlement notice, ensuring the real beneficiaries of this settlement are the *cy pres* beneficiaries, along with Class counsel.  The Notice at page 2 falsely asserts, "Hain shall also spend up to $2 million to make available up to $1.85 million in coupons."  This statement is demonstrably untrue.  While the coupons may have a net face value of $ 2 million, the foundationless statement as to the amount of "spending" is, to put it mildly, very loose. The class has been misled.  Not only this, claims for personal injuries are released by this settlement and the notice fails to disclose this fact to the class.

Most egregious, the attorneys fees are far too excessive and comprise the bulk of the payments from the common fund.  $4 million represents over half the fund.  The settling parties, as of this date, have not filed their fee applications and this is disturbing because of the upcoming calendar.  Slipping in an excessive fee application over an important holiday period is calculated to defeat rigorous scrutiny.  The deadlines should be extended if necessary.  There is little reason or explanation to justify Class counsel's delay and botched calendaring.

Attorneys' fees should be paid, at least, in part, in coupons that are not stackable, just like for the class.  The lack of stackability of the coupons confirms that they are not worth the paper the coupons are printed upon.  If the coupons

were stackable or redeemable for cash exclusive of purchase, there might be support for the false statement in the notice. However, that is not this deal.

As a precondition, the court should require stackability of the coupons so that they are actually useful. A settlement should not be a marketing ploy by the settling defendant. By the same token, coupons should not be used as a bootstrap for excessive attorneys' fees.

The attorneys fees are to be paid before the deal is confirmed on appeal, if necessary. However, this creates a conflict of interest and raises questions of both adequacy and collusion. How could fees have been negotiated after the settlement was achieved when the entire settlement is expressly conditioned on approval of the untoward payment to Class counsel in exchange for some sort of promissory note? The improper early payment defeats the deal because it is inherently collusive. See, e.g., Section VIII, subd. A (1) "The parties agree that any award of attorneys' fees and expenses to Class Counsel ***must*** be approved by the Court as set forth herein." (emphasis added).

Class counsel is confirmed to be inadequate as no legitimate counsel for the class would enter into an agreement with an opposing party to, in essence, borrow money, albeit presumably without interest. The interest free loan is patently collusive and raises very troubling questions about Class counsel's motives.

Class counsel should know better and has attempted to improperly leverage the settlement against their own clients by forcing the court to specifically approve the untoward fee-scheme the settling parties hatched. If the deal were so firm, why the need for early payment? If class counsel were adequate, why the need for early payment? Why would the settling defendant agree to this? The answer is collusion. This is even worse than the implicit clear-sailing provision found within the S.A that is not disclosed to the class.

The settlement contains a warning sign of an unfair deal: a "clear sailing" agreement. *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011). A clear sailing clause stipulates that attorney awards will not be contested by opposing parties. "Such a clause by its very nature deprives the court of the advantages of the adversary process." *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991). The clause "suggests, strongly," that its associated fee request should go "under the microscope of judicial scrutiny." *Id*. at 518, 525; *Childs v. United Life Ins. Co.*, No. 10-CV-23-PJC, 2012 U.S. Dist. LEXIS 70113, at *13-*14 & n.6 (N.D. Okla. May 21, 2012). The clear sailing clause lays the groundwork for lawyers to "urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees." *Weinberger*, 925 F.2d at 524; accord *Bluetooth*, 654 F.3d at 948. *Gooch v. Life Investors Ins. Co. of Am*. found that a clear-sailing agreement that awarded class

counsel disproportionate fees could be evidence of settlement unfairness. 672 F.3d 402, 425 (6th Cir. 2012) (finding potentially problematic clear-sailing clause acceptable because class counsel received only 2.3% of settlement value; reversing on other grounds).

The fees payable to the named representations are excessive and suggest a warning sign of inadequacy and collusion.

Finally, the *cy pres* beneficiaries are murky organizations and the money is to be farmed out to a variety of organizations later under a cloak of secrecy.  Nobody knows who will get the money or when, let alone how it will be spent.  It is tantamount to a slush fund.  What assurances does the class have that the money will actually be spent in an appropriate manner?  Is Class counsel to receive some of the money?  There is no transparency.  There needs to be oversight and imprudent delegation of traditional Court responsibilities to shadowy third party organizations is plainly improper.

## II.   DISCUSSION

**A.  Notice is not adequate**

A notice may not be misleading.  The notice is misleading.  It violates due process and Fed. R. Civ. Proc., Rule 23.  *Molski v. Gleich* (9th Cir. 2003) 318 F.3d 937, 952 [Notice is not adequate if it misleads the class]; *In re Motor Fuel Temperature Sales Practices Litig.*, 286 F.R.D. 488, 504 (D. Kan. 2012) (denying

approval where *cy pres* beneficiaries were not designated); see also, *In re Thornburg Mortg., Inc. Secs. Litig.*, 885 F. Supp. 2d 1097, 1111 (D.N.M. 2012) (outlining *cy pres* defects).

**B. The S.A. Purports to Violate the First and Fifth Amendments**

    **1.**    *Cy Pres* **reversion to a third party is not appropriate**

  **a. What is *cy pres*?**

The term *cy pres* is derived from a French phrase meaning "as near as." In the class action context, the reason for appealing to *cy pres* is to prevent the defendant from walking away from the litigation scot-free because of the infeasibility of distributing the proceeds of the settlement to the class. *Hughes v. Kore of Indiana Enter., Inc.*, 731 F.3d 672, 676 (7th Cir. 2013); *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004) ["'[C]y pres' is the name of a doctrine of trust law that allows the funds in a charitable trust, if they can no longer be devoted to the purpose for which the trust was created, to be diverted to a related purpose; and, so, when the polio vaccine was developed the March of Dimes Foundation was permitted to redirect its resources from combating polio to combating other childhood diseases."]

When class actions are settled or tried, there are times that it's not possible to distribute all of the money recovered to some or all of the class members. They may be difficult to identify or find or it may not be economically feasible to

distribute the funds to them.  For example, the cost of distributing 50 cents to each of 6 million class members may preclude individual distribution, even though the defendant has been held accountable for cheating the class out of $3 million.  When that is so, the *cy pres* doctrine allows the funds to be distributed to a nonprofit charitable organization to support work that indirectly benefits the class and advances the public interest.

### b.  What kinds of *cy pres* distributions are appropriate?

Where it is not possible to directly distribute all of the money to the class members, a *cy pres* distribution to a non-profit organization may be appropriate. "The fairness of the settlement must be evaluated primarily based on how it compensates class members." *Pampers*, 724 F.3d at 720 (emphasis in original). Although this Court cannot compel the settling parties to employ a direct payment process, it can and should refuse to approve a settlement until the parties do so of their own accord.  Another viable option for the parties is limiting the release to those class members who submit claims forms. See *Fraser v. Asus Computer Int'l*, No. C 12-00652 WHA, 2012 U.S. Dist. LEXIS 181315, at *7-*10 (N.D. Cal. Dec. 21, 2012) (release should be limited to those who submit claim forms), revised settlement granted preliminary approval at 2013 U.S. Dist. LEXIS 22338 (N.D. Cal. Feb. 19, 2013); *Ross v. Trex Co.*, No. C 09-00670 JSW, 2013 U.S. Dist. LEXIS 74720, at *5 (N.D. Cal. May 28, 2013) (same as Fraser).

The alternative, in some cases, is that parties may enter into settlements that allow all of the unclaimed money to go back to the defendant. This has the effects

of enormously reducing the benefit the settlement confers on the class and letting the defendant keep the benefit of much (and sometimes nearly all) of the money it wrongfully took from the class. Courts generally have approved *cy pres* distributions in two circumstances. Am. Law Inst. ("ALI"), Principles of Law of Aggregate Litig. § 3.07, comment a (2010) ["First, many courts allow a settlement that directs funds to a third party when funds are left over after all individual claims have been satisfied.... Second, some courts allow a settlement to require a payment only to a third party, that is, to provide no recovery at all directly to class members."] See, *e.g.*, *In re Lupron Marketing and Sales Prac. Litig.*, 677 F.3d 21, 25 (1st Cir. 2012) (involving settlement that allowed consumers to claim 30% of their total out-of-pocket payments or $100, whichever sum was greater).

Courts generally require that, if feasible. "unclaimed funds" should be distributed to class members first rather than to a third party. See *In re Bank of Am. Corp. Sec. Litig.*, 775 F.3d at 1064 (holding unclaimed funds should be distributed to the class "except where an additional distribution would provide a windfall to class members with liquidated damages claim that were 100 percent satisfied by the initial distribution"); *In re Lupron*, 677 F.3d at 32 (noting the ALI principles' policy that unclaimed funds be redistributed to ensure class members recover their full losses); *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 173 (3d Cir. 2013) (cautioning that direct distributions to the class are preferred to *cy pres* distributions but holding that a district court does not abuse its discretion by approving a class action settlement agreement that includes a *cy pres* component); *Klier v. Elf Atochem North Am. Inc.*, 658 F.3d 468, 478–79 (5th Cir. 2011)

(holding that district court abused its discretion by not redistributing funds left unclaimed by one segment of the class to another segment of the class).

Because the concept of a *cy pres* distribution is, that it should be, "as near as" giving the money to the class members, *cy pres* distributions should relate to the purposes of the case. For instance, in a case that challenges predatory lending practices that, result in many people losing their homes, for example, it might be appropriate for residual funds to be distributed to organizations that address housing problems. In a class action involving overcharges for pharmaceutical products, however, it would make little sense to distribute funds to such organizations. The parties here have violated this rule.

   c. What kinds of *cy pres* distributions are inappropriate?

When possible, monies recovered in class actions should go directly to the class members themselves. It is inappropriate for a settlement to pay out all or nearly all of the money in *cy pres* distributions when it is possible to distribute significant sums to the class members themselves. It is also, not appropriate, for the settling parties to attempt to direct *cy pres* distributions to personal favorite charities (such as one's alma mater) or political advocacy organizations that have no relationship to the issues addressed by the underlying lawsuit.

**2. The Cy Pres funds have no limits on use and may be made to unquestionably and nakedly political organizations and this raises constitutional issues**

Making a political contribution is First Amendment protected, expressive and associational activity. *Buckley v. Valeo*, 424 U.S. 1, 21 (1976) (per curiam). Concomitantly, individuals have a right to refrain from making such a donation, a right to not be compelled to engage in expressive and associational activity. See, e.g., *Knox v. Service Employees Int'l Union, Local 1000*, 132 S. Ct. 2277, 2288 (2012) (the government "may not…compel the endorsement of ideas it approves.").

"First Amendment values are at serious risk if the government can compel a particular citizen, or a discrete group of citizens, to pay special subsidies for speech on the side that it favors." *United States v. United Foods, Inc.*, 533 U.S. 405, 411 (2001); *Keller v. State Bar of California*, 496 U.S. 1 (1990) (attorney bar dues cannot be used for political or ideological purposes); *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 235 (1977) (teacher union dues cannot be used for ideological activities not "germane" to their bargaining representative duties); *Wooley v. Maynard*, 430 U.S. 705, 715 (1977) (recognizing the right of an individual to reject a state measure that forces him "as a part of his daily life…to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable.").

In articulating this right, the Supreme Court has acknowledged Thomas Jefferson's view that "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves[] is sinful and tyrannical." *Abood*, 431 U.S. at 234 n. 31, (quoting I. Brant, James Madison: The Nationalist 354 (1948)) (internal quotation marks omitted). *Abood* allowed room for charging dues for uses related to collective bargaining. *Id*. at 232. Recently, however, the

Supreme Court cast doubt upon even this exception to the First Amendment right against compelled speech subsidy. *Harris v. Quinn*, 134 S. Ct. 2618, 2632 (2014) ("*Abood* failed to appreciate the conceptual difficulty of distinguishing in public-sector cases between union expenditures that are made for collective-bargaining purposes and those that are made to achieve political ends"). *Harris* refused to extend *Abood* to regulated occupations that were not "full-fledged public employees." *Id*. at 2638.

"[E]xcept perhaps in the rarest of circumstances, no person in this country may be compelled to subsidize speech by a third party that he or she does not wish to support." *Id*. at 2644. These principles render class action, third-party awards (at least those awards like this one that will be reserved for lobbying, litigation, or other First Amendment political activity, whether termed "cy pres" or not) unconstitutional. Three premises support this conclusion.

The first premise is that "[t]he settlement-fund proceeds, generated by the value of the class members' claims, belong solely to the class members." *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011) (citing ALI Principles of the Law of Aggregate Litigation § 3.07 cmt. (b)).

The second premise is that a third-party donation is an expression of support, association, and endorsement of the third-party's political agenda and activities. See, e.g., *Buckley, supra*; *In re Asbestos Sch. Litig.*, 46 F.3d 1284, 1294 (3d Cir. 1994) (Alito, J.) ("Joining organizations that participate in public debate, making

contributions to them, and attending their meetings are activities that enjoy substantial First Amendment protection.").

And the third and final premise is that absent class members are being compelled into participating in the donations.

The S.A.'s "opt out" right is not an opportunity to merely abstain from the political donation, it is simply the right to exit the class action entirely. The settling parties are conditioning class members' right to participate in the action on their acceptance of the compelled donation, tantamount to telling union members or regulated professionals that their dues are not mandatory because they are always free to quit and find a new profession. This is a *Hobson's choice*, not a true opt-out. See *Keller*, 496 U.S. at 10 ("Claimants cannot be required by government action to relinquish First Amendment rights as a condition of retaining employment."); *Wash. Legal Found. v. Mass. Bar Found.*, 993 F.2d 962, 978 (1st Cir. 1993), superseded on other grounds by Phillips v. Washington Legal Foundation, 524 U.S. 156 (1998) (where the burden to avoid is "more than an inconvenience" a rule requiring monetary contribution should be viewed as compulsory).

The above discussion presumes that a noncoercive opt-out scheme would satisfy the First Amendment concerns, but recent jurisprudence has suggested that even an actual opt-out scheme may be too burdensome and that an opt-in scheme may be required by the First Amendment. *Knox v. SEIU*, 132 S. Ct. 2277, 2290-96

(2012). Because silence does not equate to consent, "[a]n opt-out system creates a risk that the fees paid by nonmembers will be used to further political and ideological ends with which they do not agree." *Id*. at 2290; see generally Christopher R. Leslie, The Significance of Silence: Collective Action Problems and Class Action Settlements, 59 FLA. L. REV. 71, 73 (2007) ("Silence may be a function of ignorance about the settlement terms or may reflect an insufficient amount of time to object. But most likely, silence is a rational response to any proposed settlement even if that settlement is inadequate. For individual class members, objecting does not appear to be cost-beneficial. Objecting entails costs, and the stakes for individual class members are often low.").

### III.  CONCLUSION

The Court should deny final approval to the S.A.  Class money cannot be misused in this fashion and the Court has a responsibility to prevent it.  The Notice should not have misled the class.


Respectfully submitted,



Dated: December 23, 2015            _____/s/_____

                                    Steven Franklyn Helfand

                                    1400 SW 137th Avenue, Apt. F112
                                    Hollywood, FL 33027
                                    Telephone:  415.397.0007

Email: sh4078@gmail.com

### Attestation of Steven Franklyn Helfand

I, Steven F. Helfand, declare as follows:

    1. I purchased one of the Avalon Organics® brand cosmetic products at issue in the litigation in California during the during the time period of May 11, 2007 through May 11, 2011 and/or one of the JASON® brand cosmetic products at issue in the litigation in California during the during the time period of May 11, 2007 through January 30, 2011.

    2. My address and contact information is on the caption page.

    3. I object. I intend to appear.

Dated: December 23, 2015         /s/

                                          Steven Franklyn Helfand

                                          1400 SW 137th Avenue, Apt. F112
                                          Hollywood, FL 33027
                                          Telephone: 415.397.0007
                                          Email: sh4078@gmail.com