# Exhibit 2

Steven F. Helfand, SBN 206667
HELFAND LAW OFFICES
1400 SW 137th Avenue, Unit F112
Hollywood, FL 33027

Telephone:   415.596.5611
Email:        sh4078@gmail.com

Attorney for absent class member Hannah Tanner

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| PAUL PERKINS, PENNIE SEMPELL, ANN BRANDWEIN, ERIN EGGERS, CLARE CONNAUGHTON, JAKE KUSHNER, NATALIE RICHSTONE, NICOLE CROSBY and LESLIE WALL; individually, and on behalf of all others similarly situated.<br><br>     Plaintiff,<br>  *vs*.<br><br>LINKEDIN CORPORATION,<br><br>     Defendant. | Case No.: 13-CV-04303 LHK<br><br>**OBJECTION AND NOTICE OF INTENT TO APPEAR**<br><br>Ctrm.  8<br>Hon.   Lucy H. Koh<br>Date:  February 11, 2016<br>Time: 1:30 p.m. |

  **COMES NOW**, absent class member, Hannah Tanner [hereafter "Tanner"]

and objects to the proposed class action settlement [hereafter the "Settlement"] as

follows:

# I.  <u>OBJECTION</u>

## A.  Introduction

The Court should decline to grant final approval to this proposed class action settlement [hereafter "S.A"].  The settling parties ensnared class members with a convoluted claims process [seven pages to read, understand and complete to *possibly* receive just ten dollars] and misleading settlement notice, ensuring the real beneficiaries of this settlement are the three *cy pres* beneficiaries, along with Class counsel.

The *cy pres* beneficiaries are murky organizations that are nakedly political. These organizations are not shy about weighing in on controversial political matters.

The first organization is overseen by Defendant.  This is not disclosed to the class.

The second organization is notable for spending less than two percent of its programming resources in the United States.  This organization has a penchant for hosting conferences in exotic locations.  This is not disclosed to the class.

The third organization is a repeat-player.  It has been involved in countless privacy cases.  It has received millions of dollars in *cy pres* grants and has nothing to show for it.

The three *cy pres* beneficiaries are as follows:

- Access Now, Inc. [hereafter "Access"]

- Electronic Privacy Information Center [hereafter "EPIC"].

- Network for Teaching Entrepreneurship [hereafter "NTFE"].

**B.  The Claim Form is convoluted and needlessly lengthy.  It serves only to increase the amount of money to be given to the *cy pres* beneficiaries.**

A class member must wade through a voluminous and wordy seven pages in order to be eligible to possibly receive just ten dollars.  In the attestation, the class members must swear under penalty of perjury that he/she has been "injured" in some manner.  The word "injury" is not explained.  Does it mean emotional distress?  Does it mean physical injury?  Does it mean reputational harm?  It is unknown how a class member would or could know whether or not an "injury" has taken place.  The concerns are compounded by the fact the Notice states, "**No one knows in advance whether or in what amount payments will be made to claimants**."   Email Notice, p. 1.  If too many claimants file claims, it is possible no claimants will receive any money.  All of it instead will be given to *cy pres* beneficiaries.  Why bother?

**B.  The *Cy Pres* Beneficiaries are Nakedly Political Organizations**

**1.  Access**

Put simply, class money **should be inaccessible to Access**.

*First*, Access purports that it is "an international human rights organization premised on the belief that the realization of human rights and democracy in the twenty-first century is increasingly predicated on access to the internet and other forms of information technology."  Exhibit A, p. 2.

*Second*, Access lobbies the federal government.  See, Ex. A, p. 37, line 4.

*Third*, Access is overtly political: "**ACT NOW TO # STOPCISA The dangerous CISA cyber-surveillance bill is on the move AGAIN.  Send U.S. Rep. Michael McCaul a tweet and ask him to stand strong for privacy …**" See, Exhibit A, p. 23.1 - 23.3.  By way of further example, Access opposes French security measures implemented after the recent Paris terrorist assaults.  Exhibit A, p. 23.4.

*Fourth*, Access is anti-American and supported by utopian leftists with a decidedly progressive agenda.  Access asserts for example, "In enforcing the acts such as ACTA, PIPA or SOPA, the government [of the United States] is ruining our culture, our freedom, our lives."

*Fifth*, Access purportedly "defends and extends the digital rights of users at risk around the world."  Virtually all of Access' programming is overseas.  See, e.g., Exhibit A, p. 64 [reflecting expenditures for programming].  This is critical and underscores the disconnect between Access and the class. For instance,

Access' geographic funding for programming as per its most recent tax filing is as follows:

| Geographic Location | Amount of Expenditure |
|---|---|
| Europe | $131,000 |
| South America | $29,000 |
| East Asia & The Pacific | $7,000 |
| North America | $3,000 |
| Russia | $2,000 |
| Middle East & North Africa | $199,000 |
| TOTAL | $371,000 |
| **Percentage to North America** | **1.9 %** |

Of course, North America consists of more than twenty countries spanning from Canada to Panama. The amount of programming directed to the United States is not broken out but appears to be minimal, if any.

*Sixth*, one of the largest consumption of resources by Access is for travel expense, including to exotic locations such as Rio, Brazil for its executive director. See, Exhibit A, p. 79; Compare p. 69 ["Access held an educational conference, the Silicon Valley Human Rights Conference, on May 31st and June 1, in Rio De Janeiro, Brazil."] Why a Silicon Valley conference was venued in Brazil is not explained. Funding a frivolous organization run by jet-setting progressives is not a valid use of *cy pres* funds.

*Seventh*, as to advocacy, Access "teams with digital activists and civil society groups internationally to build their technical capacity and to help them advocate globally for their digital rights." Exhibit A, p. 13. Its blog weighs in on controversial subjects such as anti-terrorism monitoring by a variety of governments.

*Eigth*, Access implicitly supports a boycott against the United States of America while inconsistently seeking to profit from class proceeds originating from it. See, e.g., Exhibit A, p. 11 ["We call on you to stand up to governments who use your services for censorship, surveillance, and to otherwise violate the rights of their citizens. If the conditions in a country in which you operate make it impossible to respect human rights, it's time to end your operations there."]

*Ninth*, Access' does not promote democratic values; its mantra is "**Respect rights or get out!**" In other words, class members who disagree with Access should presumably get out too by seeking exclusion. As shall be shown, this contention is not persuasive.

*Finally*, most of the money it raised last year was devoted to salaries of its employees. See, e.g., Exhibit A, p. 44 [reporting salaries of $98, 886 plus other wages of $584,030]. When rent, management expenses, and ancillary services are included, the financial picture of Access becomes even more bleak.

Class funds should not be used as a bailout for a political organization and its bloated staff. Class counsel must explain the following:

- Why was this organization was selected?

- How shall class proceeds be used by Access?

- How are Access' activities to be monitored, if at all?

- Shall the class receive anything tangible for the grant?

- What value, if any, will the class realize for the money.

Class counsel should also disclose why this group was selected and whether any of the attorneys involved have connections to the organization, directly or indirectly. In fact, according the tax records, a major contributor to Access is another entity called Humanity United. Humanity United appears to have shadowy and undisclosed connections with Lieff Cabraser. Lieff Cabraser should acknowledge its connections, if any, however indirect, to Access or leading funders for Access, such as Humanity United. If confirmed, Class counsel has a disabling conflict of interest which precludes an award of fees in their favor. *Rodriguez v. West Publ'g. Corp.* (9th Cir. 2009) 563 F.3d 948.

Free speech is a wonderful thing. This objection does not take issue with Access' right, along with the two other beneficiaries, guaranteed by the Constitution, to pursue whatever political or social policies it finds appropriate. By the same token, class members have Constitutional rights as well; they may not be

compelled to fund political advocacy or a world wide policy agenda of any stripe. Put even more simply, free speech should not be underwritten by the class. Moreover, both parties have misled the class by failing to disclose their connections with the beneficiaries.

### 2.  EPIC

The organization, EPIC, often appears in cases such as this one as a beneficiary of class settlement proceeds.  Yet, in spite of it being a repeat-player, there is virtually nothing tangible to show for its activities.  It's about time an organization that repeatedly utilizes *cy pres* funds make a proffer specifically demonstrating how it used prior *cy pres* awards.

### 3.  NTFE

NTFE is affiliated with LinkedIn.  LinkedIn is a member of its "Board of Overseers."  See, Exhibit A, p. 162 [indicating Reid Hoffman].  This fact is not disclosed to the class.  It also creates a conflict of interest.

### 4.  Miscellaneous concerns

So as to defeat transparency:

- no web addresses are provided for the *cy pres* recipients; and

- no descriptions as to how funds are to be utilized [restricted or unrestricted] are set forth.

In short, there is no meaningful nexus between the claims here and the proposed *cy pres* beneficiaries in the Notice.

## C. Concluding introductory comments

The Court has a choice. It can, as urged by the settling parties, close its eyes to reality, defer to settling counsel and reflexively adopt the unsupportable notion that this settlement provides a benefit to class members. Or it can, as required by Fed. R. Civ. P. 23, scrutinize the facts, closely inspect the terms of settlement, and demand explanations and evidence from the settling parties, all to faithfully discharge its fiduciary duty to class members and ferret out the true state of affairs.

## II.    DISCUSSION

## A. Notice is not adequate

A notice may not be misleading. The notice is misleading. It violates due process and Fed. R. Civ. Proc., Rule 23. *Molski v. Gleich* (9th Cir. 2003) 318 F.3d 937, 952 [Notice is not adequate if it misleads the class]; *In re Motor Fuel Temperature Sales Practices Litig.*, 286 F.R.D. 488, 504 (D. Kan. 2012) (denying approval where *cy pres* beneficiaries were not designated); see also, *In re Thornburg Mortg., Inc. Secs. Litig.*, 885 F. Supp. 2d 1097, 1111 (D.N.M. 2012) (outlining *cy pres* defects).

## B. The S.A. Purports to Violate the First and Fifth Amendments

1. ***Cy Pres* reversion to a third party, political advocacy group, is not appropriate**

a. **What is *cy pres*?**

The term *cy pres* is derived from a French phrase meaning "as near as." In the class action context, the reason for appealing to *cy pres* is to prevent the defendant from walking away from the litigation scot-free because of the infeasibility of distributing the proceeds of the settlement to the class. *Hughes v. Kore of Indiana Enter., Inc.*, 731 F.3d 672, 676 (7th Cir. 2013); *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004) ["'[C]y pres' is the name of a doctrine of trust law that allows the funds in a charitable trust, if they can no longer be devoted to the purpose for which the trust was created, to be diverted to a related purpose; and, so, when the polio vaccine was developed the March of Dimes Foundation was permitted to redirect its resources from combating polio to combating other childhood diseases."]

When class actions are settled or tried, there are times that it's not possible to distribute all of the money recovered to some or all of the class members. They may be difficult to identify or find or it may not be economically feasible to distribute the funds to them. For example, the cost of distributing 50 cents to each of 6 million class members may preclude individual distribution, even though the defendant has been held accountable for cheating the class out of $3 million.

When that is so, the *cy pres* doctrine allows the funds to be distributed to a nonprofit charitable organization to support work that indirectly benefits the class and advances the public interest.

**b.  What kinds of *cy pres* distributions are appropriate?**

Where it is not possible to directly distribute all of the money to the class members, a *cy pres* distribution to a non-profit organization may be appropriate. "The fairness of the settlement must be evaluated primarily based on how it compensates class members." *Pampers*, 724 F.3d at 720 (emphasis in original). Although this Court cannot compel the settling parties to employ a direct payment process, it can and should refuse to approve a settlement until the parties do so of their own accord.  Another viable option for the parties is limiting the release to those class members who submit claims forms. See *Fraser v. Asus Computer Int'l*, No. C 12-00652 WHA, 2012 U.S. Dist. LEXIS 181315, at *7-*10 (N.D. Cal. Dec. 21, 2012) (release should be limited to those who submit claim forms), revised settlement granted preliminary approval at 2013 U.S. Dist. LEXIS 22338 (N.D. Cal. Feb. 19, 2013); *Ross v. Trex Co*., No. C 09-00670 JSW, 2013 U.S. Dist. LEXIS 74720, at *5 (N.D. Cal. May 28, 2013) (same as Fraser).

The alternative, in some cases, is that parties may enter into settlements that allow all of the unclaimed money to go back to the defendant. This has the effects of enormously reducing the benefit the settlement confers on the class and letting the defendant keep the benefit of much (and sometimes nearly all) of the money it wrongfully took from the class.  Courts generally have approved *cy pres* distributions in two circumstances. Am. Law Inst. ("ALI"), Principles of Law of

Aggregate Litig. § 3.07, comment a (2010) ["First, many courts allow a settlement that directs funds to a third party when funds are left over after all individual claims have been satisfied…. Second, some courts allow a settlement to require a payment only to a third party, that is, to provide no recovery at all directly to class members."]  See, *e.g.*, *In re Lupron Marketing and Sales Prac. Litig.*, 677 F.3d 21, 25 (1st Cir. 2012) (involving settlement that allowed consumers to claim 30% of their total out-of-pocket payments or $100, whichever sum was greater).

Courts generally require that, if feasible. "unclaimed funds" should be distributed to class members first rather than to a third party.  See *In re Bank of Am. Corp. Sec. Litig.*, 775 F.3d at 1064 (holding unclaimed funds should be distributed to the class "except where an additional distribution would provide a windfall to class members with liquidated damages claim that were 100 percent satisfied by the initial distribution"); *In re Lupron*, 677 F.3d at 32 (noting the ALI principles' policy that unclaimed funds be redistributed to ensure class members recover their full losses); *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 173 (3d Cir. 2013) (cautioning that direct distributions to the class are preferred to *cy pres* distributions but holding that a district court does not abuse its discretion by approving a class action settlement agreement that includes a *cy pres* component); *Klier v. Elf Atochem North Am. Inc.*, 658 F.3d 468, 478–79 (5th Cir. 2011) (holding that district court abused its discretion by not redistributing funds left unclaimed by one segment of the class to another segment of the class).

Because the concept of a *cy pres* distribution is, that it should be, "as near as" giving the money to the class members, *cy pres* distributions should relate to the

purposes of the case. For instance, in a case that challenges predatory lending practices that, result in many people losing their homes, for example, it might be appropriate for residual funds to be distributed to organizations that address housing problems. In a class action involving overcharges for pharmaceutical products, however, it would make little sense to distribute funds to such organizations. The parties here have violated this rule.

### c. What kinds of *cy pres* distributions are inappropriate?

When possible, monies recovered in class actions should go directly to the class members themselves. It is inappropriate for a settlement to pay out all or nearly all of the money in *cy pres* distributions when it is possible to distribute significant sums to the class members themselves. It is also, not appropriate, for the settling parties to attempt to direct *cy pres* distributions to personal favorite charities (such as one's alma mater) or political advocacy organizations that have no relationship to the issues addressed by the underlying lawsuit.

### 2. The Cy Pres funds nakedly political organizations and this raises constitutional issues

Making a political contribution is First Amendment protected, expressive and associational activity. *Buckley v. Valeo*, 424 U.S. 1, 21 (1976) (per curiam). Concomitantly, individuals have a right to refrain from making such a donation, a right to not be compelled to engage in expressive and associational activity. See, e.g., *Knox v. Service Employees Int'l Union, Local 1000*, 132 S. Ct. 2277, 2288

(2012) (the government "may not…compel the endorsement of ideas it approves.").

"First Amendment values are at serious risk if the government can compel a particular citizen, or a discrete group of citizens, to pay special subsidies for speech on the side that it favors." *United States v. United Foods, Inc.*, 533 U.S. 405, 411 (2001); *Keller v. State Bar of California*, 496 U.S. 1 (1990) (attorney bar dues cannot be used for political or ideological purposes); *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 235 (1977) (teacher union dues cannot be used for ideological activities not "germane" to their bargaining representative duties); *Wooley v. Maynard*, 430 U.S. 705, 715 (1977) (recognizing the right of an individual to reject a state measure that forces him "as a part of his daily life…to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable.").

In articulating this right, the Supreme Court has acknowledged Thomas Jefferson's view that "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves[] is sinful and tyrannical." *Abood*, 431 U.S. at 234 n. 31, (quoting I. Brant, James Madison: The Nationalist 354 (1948)) (internal quotation marks omitted). *Abood* allowed room for charging dues for uses related to collective bargaining. *Id*. at 232. Recently, however, the Supreme Court cast doubt upon even this exception to the First Amendment right against compelled speech subsidy. *Harris v. Quinn*, 134 S. Ct. 2618, 2632 (2014) ("*Abood* failed to appreciate the conceptual difficulty of distinguishing in public-sector cases between union expenditures that are made for collective-bargaining purposes and those that are made to achieve political ends").

Objection and Notice of Intent to Appear

*Harris* refused to extend *Abood* to regulated occupations that were not "full-fledged public employees." *Id*. at 2638.

"[E]xcept perhaps in the rarest of circumstances, no person in this country may be compelled to subsidize speech by a third party that he or she does not wish to support." *Id*. at 2644. These principles render class action, third-party awards (at least those awards like this one that will be reserved for lobbying, litigation, or other First Amendment political activity, whether termed "cy pres" or not) unconstitutional. Three premises support this conclusion.

The first premise is that "[t]he settlement-fund proceeds, generated by the value of the class members' claims, belong solely to the class members." *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011) (citing ALI Principles of the Law of Aggregate Litigation § 3.07 cmt. (b)).

The second premise is that a third-party donation is an expression of support, association, and endorsement of the third-party's political agenda and activities. See, e.g., *Buckley, supra*; *In re Asbestos Sch. Litig.*, 46 F.3d 1284, 1294 (3d Cir. 1994) (Alito, J.) ("Joining organizations that participate in public debate, making contributions to them, and attending their meetings are activities that enjoy substantial First Amendment protection.").

And the third and final premise is that absent class members are being compelled into participating in the donations.

The S.A.'s "opt out" right is not an opportunity to merely abstain from the political donation, it is simply the right to exit the class action entirely. The settling

parties are conditioning class members' right to participate in the action on their acceptance of the compelled donation, tantamount to telling union members or regulated professionals that their dues are not mandatory because they are always free to quit and find a new profession. This is a *Hobson's choice*, not a true opt-out. See *Keller*, 496 U.S. at 10 ("Claimants cannot be required by government action to relinquish First Amendment rights as a condition of retaining employment."); *Wash. Legal Found. v. Mass. Bar Found.*, 993 F.2d 962, 978 (1st Cir. 1993), superseded on other grounds by Phillips v. Washington Legal Foundation, 524 U.S. 156 (1998) (where the burden to avoid is "more than an inconvenience" a rule requiring monetary contribution should be viewed as compulsory).

The above discussion presumes that a noncoercive opt-out scheme would satisfy the First Amendment concerns, but recent jurisprudence has suggested that even an actual opt-out scheme may be too burdensome and that an opt-in scheme may be required by the First Amendment. *Knox v. SEIU*, 132 S. Ct. 2277, 2290-96 (2012). Because silence does not equate to consent, "[a]n opt-out system creates a risk that the fees paid by nonmembers will be used to further political and ideological ends with which they do not agree." *Id*. at 2290; see generally Christopher R. Leslie, The Significance of Silence: Collective Action Problems and Class Action Settlements, 59 FLA. L. REV. 71, 73 (2007) ("Silence may be a function of ignorance about the settlement terms or may reflect an insufficient

amount of time to object. But most likely, silence is a rational response to any proposed settlement even if that settlement is inadequate. For individual class members, objecting does not appear to be cost-beneficial. Objecting entails costs, and the stakes for individual class members are often low.").

### III.  CONCLUSION

The Court should deny final approval to the S.A.  Free expression of ideas is what this country is about.  Ideas of all political stripes are welcome.  However, the class should not have to pay for either left wing or right wing social theorists in their embrace of political frivolity, "real" or "imagined" issues or anything else. Class money cannot be misused in this fashion and the Court has a responsibility to prevent it.


Respectfully submitted,


Dated: December 11, 2015          _____/s/_____

                              Steven Franklyn Helfand

                              1400 SW 137th Avenue, Apt. F112
                              Hollywood, FL 33027
                              Telephone:  415.397.0007
                              Email:      sh4078@gmail.com

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO.: 0:14-CV-60604-KMM

FILED by _____ D.C.

DEC 0 1 2015

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

*Gay, et al.,*

**OBJECTION AND
NOTICE OF INTENT
TO APPEAR**

*Plaintiff,*

*vs.*

*Tom's of Maine, Inc.,*

*Defendant.*

**COMES NOW**, absent class member, Steven Franklyn Helfand [hereafter

"Helfand"],[1] by and through himself, in *propria persona*, and objects to the

proposed class action settlement [hereafter the "Settlement"] as follows:

## I.   OBJECTIONS

### A.  Introduction

The Court should decline to grant final approval to this proposed class action

settlement.  Class counsel seek to reap over one million dollars in fees while

keeping class members in the dark as to the existence of their so-called

"clear-sailing" agreement.[2]

---

[1] Helfand is a member in good standing of the State Bar of California.  Helfand
purchased countless products from Tom's of Maine in light of his chronic health
condition which made him particularly vulnerable.

[2] The settlement contains a warning sign of an unfair deal: a "clear sailing"
agreement. *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 947 (9th
Cir. 2011).  A clear sailing clause stipulates that attorney awards will not be
contested by opposing parties.  "Such a clause by its very nature deprives the court
of the advantages of the adversary process." *Weinberger v. Great Northern
Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991).  The clause "suggests, strongly,"
that its associated fee request should go "under the microscope of judicial
scrutiny." *Id.* at 518, 525; *Childs v. United Life Ins. Co.*, No. 10-CV-23-PJC, 2012
U.S. Dist. LEXIS 70113, at *13-*14 & n.6 (N.D. Okla. May 21, 2012). The clear
sailing clause lays the groundwork for lawyers to "urge a class settlement at a low
figure or on a less-than-optimal basis in exchange for red-carpet treatment on
fees." *Weinberger*, 925 F.2d at 524; accord *Bluetooth*, 654 F.3d at 948.  *Gooch v.
Life Investors Ins. Co. of Am.* found that a clear-sailing agreement that awarded
class counsel disproportionate fees could be evidence of settlement unfairness. 672
F.3d 402, 425 (6th Cir. 2012) (finding potentially problematic clear-sailing clause

According to the settlement proponents, ninety-seven to ninety-nine percent of Class members are expected to take a pass on participation, less than half the weighted average claims filing rates for consumer settlements. The settling parties offer no suggestions to improve the expected claims rate through, for example, reconfiguration of notice or revamped administration procedures.

The settling parties ensnared class members with a convoluted claims process and misleading settlement notice, ensuring the real beneficiary of this settlement is the liberal advocacy behemoth, "Consumer (sic) Union"[3] along with Class counsel. Consumers Union is not shy about weighing in on controversial political matters. It previously supported Obamacare. Exhibit A, pp. 1-3. It has supported cap and trade. It opposed the Keystone Pipeline. It opposes fracking. There are countless other examples. Exhibit A, pp. 4-11. Free speech is a wonderful thing. This objection does not take issue with Consumers Union right, guaranteed by the Constitution, to pursue whatever political or social policies it finds appropriate. By the same token, class members have Constitutional rights as

---

acceptable because class counsel received only 2.3% of settlement value; reversing on other grounds).

[3] The correct name of the organization is "Consumers Union," not "Consumer Union." The incorrect spelling in the S.A. confirms the *cy pres* beneficiary met little rigorous analysis by the settling parties.

well; they may not be compelled to fund political advocacy of any stripe. Put even more simply, Consumers Union free speech should not be underwritten by the class.

Seeking to cloak a botched case, likely poor results and defeat transparency, the claims period is to remain open until May 7, 2016. The final approval hearing is January 28, 2016. What is the real urgency? The existing time schedule order makes it virtually impossible for the Court to ascertain precise individual recoveries, let alone, assess accurate claims data or analyze how much class money is to be misdirected to political speech. An "ostrich head in the sand" approach is not justified.

The Court has a choice. It can, as urged by the settling parties, close its eyes to reality, defer to settling counsel and reflexively adopt the unsupportable notion that this settlement provides a benefit to class members. Or it can, as required by Fed. R. Civ. P. 23, scrutinize the facts, closely inspect the terms of settlement, and demand explanations and evidence from the settling parties, all to faithfully discharge its fiduciary duty to class members and ferret out the true state of affairs.

## B. Overview

The proposed agreement is for settlement purposes only; no class was previously certified. Settlement Agreement [hereafter "S.A."], § 3, ¶ 1, p. 15. The S.A. purports to create a settlement fund of $4.5 million from which eligible claims, attorneys fees and expenses, costs of notice and class administration and service awards are deducted. S.A., § 2, ¶ 39, p. 14. "The Settlement Fund is non-revisionary, and any monies remaining in the Settlement Fund after all Eligible Claims have been paid will be distributed through a *cy pres* process to an entity mutually agreed to by the Parties and approved by the Court." S.A., § 2, ¶ 39, p. 14.

### 1. **Class Benefit**

A Settlement Class Member is eligible to obtain up to or greater than $4.00 for each purchase of a Covered Product for up to seven (7) Covered Products. S.A., § 4, ¶ 4, p. 18. Covered Products include a variety of personal hygiene products, including, deodorant, soap, sunscreen, lip balm, etc. S.A., § 2, ¶ 16, p. 9. [4]

---

[4] This case falls far short in compensating class members. For example, a class member, like Helfand, covered product purchases amount to several each month. This means at least 390 covered purchases over the class period - not just seven - or even fourteen. In other words, the S.A. provides scant relief when contrasted

The S.A. offers token injunctive relief. S.A., § 4, subdivision B, pp. 19-20.

If the total amount of timely, valid and approved eligible Claims submitted results in there being any remaining value in the Net Settlement Fund, it shall be used to increase the relief of up to one hundred percent. S.A., § 4, subdivision C, p. 21.

### 2. *Cy Pres* Beneficiary is Consumers Union

Any amount remaining after distributions in the Net Settlement Fund shall, subject to Court approval, be paid to Consumers Union. S.A., § 4, subdivision C, pp. 22. There is no way to know, at the time of final approval, precisely how much money, if any, Consumers Union shall receive.

### 3. Consumers Union Is a Progressive Organization Outside the Mainstream of American Politics

Consumers Union has an untapped $150 million war chest, making it the least likely candidate to be selected if based on need alone. Exhibit A, pp. 28-39. The related website of Consumers Union, ConsumerReport.org claims more paid subsribers than any other publication based websiter. **Most of its information is available only to paid subscribers**. Ex. A, p. 53-54. How class members fit into

---

with actual purchases. Class members who were cheated the most get the least; class members with only a handful of purchases reap the most.

this subscription base is unknown. What benefit the class shall gain is also unknown. Consumers Union has used its resources to push for politically divisive issues; including endorsing the Affordable Care Act. It leadership is decidedly left. Exhibit A, pp. 40-48.

This Court should be hesitant to allow Class proceeds to be directed to political advocacy which is precisely what Consumers Union does. *Consumer Reports* magazine has a reputation, as a consumer champion, providing unbiased reviews of products and services. Unknown to many, however, is *Consumer Reports* magazine's direct link to a larger organization with a liberal policy agenda that openly advocates for progressive causes.

*Consumer Reports* (and its website) is a division of Consumers Union, a consumer advocate organization founded in 1936. According to their mission statement, the union works "for a fair, just, and safe marketplace for all consumers and to empower consumers to protect themselves." While some of the efforts of Consumers Union have been constructive and nonpartisan, there have been many instances of a decided progressive agenda.

The line between the efforts of Consumers Union and the readership of Consumer Reports is murky, as the union has openly advocated, for issues directly to the readers. In October 2009, for example, Consumers Union sent out a mass

email from Consumers Union President Jim Guest to paid members of Consumer Reports.org, asking them to support health care reform. A link in the email directed them to a website, PrescriptionforChange.com, where readers could sign an online petition that was later presented to members of Congress.

While the email did not specifically advocate for ObamaCare, the language used, sounded like President Obama's talking points for his plan. Consumers Union stated: "In the health care reform we envision, you can keep good insurance coverage if you've got it, or choose reliable alternatives that cover what you need at affordable rates. No one is denied for pre-existing conditions; no one goes bankrupt because of illness...insurance companies should be required to take all applicants (sic), employers should be required to cover their employees or pay into the system, and we need to allow people to buy into something like Medicare." The implied support of President Obama's reform plan may be due to the fact that many of the Consumers Union staff have extensive connections to the Obama Administration.

For instance, Consumers Union Board Member and liberal provocateur, Micah Sifry, is a former writer for the liberal magazine, The Nation. Mr. Sify had stints working for Howard Dean and Dick Gephardt, hardly known as nonpartisan or independent politicians worthy of being stewards of class proceeds. Mr. Sify

has mused: "**You know our awful governor Andrew Cuomo is a manipulative, lying control freak . . .**" November 2, 2014, Micah.Sifry.com (emphasis added). Exhibit A, pp. 14-19. Ms. Sifry concedes his oversight is far from neutral, claiming that "civic tech cannot be neutral."

Board Member, Heather McGhee is from a group called *Demos*. *Demos* claims: "We champion ideas powerful enough to improve the lives of millions, shift the narrative to clear the way for their acceptance, and advocate until they take effect. We use the right strategy for the right moment, whether it's research or communications, supporting organizers or litigating. This commitment to the full cycle of change has resulted in real victories, such as landmark credit card reforms and nearly 2 million new low-income voter registrations." Championing "ideas" with which class members may disagree is entirely appropriate; just not with class money.

Board member Marcia Aronoff serves as Vice President of Programs of Environmental Defense Fund, Inc. Ms. Aronoff serves as Director of Consumers Union of U.S., Inc. She served as the Chief of staff for former U.S. Senator Bill Bradley from 1978 to 1991. Ms. Aronoff supports cap and trade and so does Consumers Union. What assurances do class members have that its money is not devoted to further the progressive/left-wing environmental agenda? None.

Yet another board member of Consumers Union is a well-known, anti-American agitator, running the so-called "Center for Investigative Reporting." One recent so-called "expose" was an anti-American rant, dated October 15, 2015, and purports to blame the United States of America for the origin of a "modern day surveillance state" and its manipulation of the global population through a variety of channels, including cell-phones. Exhibit A, pp. 20-27. Frankly, these positions are offensive and should offend the sensibilities of this Court.

Board member, Annette LoVoi, is from a group that calls itself, "National Appleseed." Its strategy is to "focus on broad systemic social initiatives, rather than the traditional model of providing legal services to individuals." The group embraces socialism. See Exhibit A, p. 12-13.

Chairperson of Consumers Union Board, Diane Archer, is a founder of the so-called "Medicare Rights Center." One of the primary tasks of this group is social policy initiatives designed to promote the expansion of Medicare and adoption of a single payer health care system.

Reasonable people might tend to disagree. The Court should not wade into the dangerous arena of funding politically motivated speech with class money.

### 4. **Notice Shortcomings**

The Notice fails to disclose Consumers Union as the *cy pres* beneficiary. Notice, *generally*.

The S.A. includes a so-called "clear-sailing" provision in which "Class Counsel shall make, and Tom's agrees not to oppose, an application for an award of Attorneys' Fees and Expenses not to exceed $1.5 million." S.A. § X, ¶ A, p. 39. The Notice fails to disclose the clear-sailing provision. Notice, *generally*.

A substantive requirement of the Long Form Notice includes that it "explain the scope of the release." S.A., § VII, subdivision B, p. 30. The Release is reflected at S.A. § IX, pp. 35-39. The Notice merely states as to the release: "**In return for these benefits, what am I giving up?** If the Court approves the proposed settlement and you do not request to be excluded from the Class, you must release (give up) all claims that are subject to the Release, and the case will be dismissed on the merits and with prejudice. **If you remain in the Class, you may not assert any of those claims in any other lawsuit or proceeding. This includes any other lawsuit or proceeding already in progress.**" Notice, § 17, p. 6. The scope of the release is not discussed. Notice, *generally*.

The Notice provides, "The Claims Administrator's determination [on a claim] is final. Neither you nor Tom's can appeal or contest the decision of the

Page 11

Claim (sic) Administrator." Notice, § 8, p. 4. The S.A. does not preclude appeal. S.A., *generally*. On the contrary, the Court expressly retains jurisdiction as to the implementation and enforcement of the terms of the Agreement. S.A., § XV, ¶ P, p. 48.

The Notice misconstrues the Objection Procedure. Compare, S.A. § VIII, pp. 32-33; Notice, § 20 ["Be sure to include your name, address, telephone number, your signature, and *a statement under penalty of perjury that you are a member of the Class* (i.e., that you purchased one of the Covered Products during the class period.")]. This is not required. S.A. § VIII, pp. 32-33.

### 5. **Claim Form Violates the S.A.**

The claim form omits the required "penalty of perjury" attestation. S.A. § V, ¶ A, p. 22 ["The Claim Form shall be signed under an affirmation stating the following or substantially similar language: 'I declare, **under penalty of perjury**, that the information in this Claim Form is true and correct to the best of my knowledge, and that I purchased the Covered Products claimed above during the Class Period for personal or household use and not for resale. I understand that my Claim Form may be subject to audit, verification, and Court review.'"] (emphasis added). This failure shall likely corrupt the claims process. Ex. A, pp. 49-50.

Affirmation, "under penalty of perjury," is not required to file a claim and receive cash; it is only required, according to Class counsel, to voice criticism. Class counsel has it backwards.

### 6. Class Size is Unascertainable

The Settlement Administrator [hereafter "Dahl"] states, "I understand that Settlement Class members generally are persons in the United States who purchased Tom's of Maine 'natural' products between March 25, 2009 and the date the Court enters the Preliminary Approval Order. **It is not possible to determine the Settlement Class size because no mechanism exists to track exactly how many households have purchased Tom's of Maine 'natural' products**. However, estimates from GfK MRI and comScore indicate that there are approximately 11.6 million purchasers of these products. Thus, the best ballpark estimate that exists is that membership in the Settlement Class may include approximately 11.6 million persons." Affidavit of Jeffrey D. Dahl with Respect to Settlement Notice Plan [hereafter "Dahl Decl."], ¶ 11, pp. 3-4 (emphasis added).

### 7. Expected claim rate gloomy

Dahl expects that "[a] claim filing percentage of 1% to 3% would be reasonable." Dahl Decl., ¶ 33, p. 11.[5]

Dahl shall provide periodic updates regarding claim form on a weekly basis after September 23, 2015. S.A., § 5, subdivision C, p. 23.[6]

---

[5] *DeLeon v. Bank of Am.*, No. 6:09-cv-1251, 2012 U.S. Dist. LEXIS 91124, at *62 (M.D. Fla. Apr. 20, 2012) (finding that a low-value claims-made settlement would "surely result in a low claims rate" and rejecting the claims procedure as "not reasonable"). Empirical evidence reveals claims rates in these types of consumer settlements are exceedingly low. See *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2011) (en banc) (noting evidence that "consumer claim filing rates rarely exceed seven percent, even with the most extensive notice campaigns."). If recent cases are any indication, the rate will likely be well below 7%, perhaps even under 1%. See *Spillman v. RPM Pizza, LLC*, No. 10-349-BAJ-SCR, 2013 U.S. Dist. LEXIS 72947, at *8 (M.D. La. May 23, 2013) (.27% claims rate); *Lagarde v. Support.com, Inc.*, No. 12-0609 JSC, 2013 U.S. Dist. LEXIS 67875, at *7 (N.D. Cal. May 13, 2013) ("[A] mere 1,259 timely claims were submitted for the $10 refund, which represents 0.17% of the total number of class members and 0.18% of the total number of class members who received notice."); *In re Livingsocial Mktg. & Sales Practices Litig.*, MDL No. 2254, __F.R.D__, 2013 U.S. Dist. LEXIS 40059, at *52 (.25% claims rate). These rates accord with intuition. See *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 952 (7th Cir. 2006) ("Given the tiny sum per person, who would bother to mail a claim?"). Naturally low claims rates are the "[t]he reality" here, and mean that "this settlement benefits class counsel vastly more than it does the consumers who comprise the class." *Pampers*, 724 F.3d at 721.

[6] The parties may retort that a claims process is unexceptional in class action settlement administration. As a general matter they are correct, but in this particular context they are not. When a claims-made process is employed—in lieu of direct payment mechanisms—the court should assure itself that there is a valid reason for its use. Often, a claims-made structure can be justified by the fact that the defendant either is unable to identify specific class members or is unable to identify the value of those class members' claims. Helfand questions the need for a statement on the Claim form averring that it is made "under penalty of perjury."

## II.    DISCUSSION

### A.  Notice is not adequate

A notice may not be misleading.  The notice is misleading.  It violates due

process and Fed. R. Civ. Proc., Rule 23.  *Molski v. Gleich* (9th Cir. 2003) 318 F.3d

937, 952 [Notice is not adequate if it misleads the class]; *In re Motor Fuel*

*Temperature Sales Practices Litig.*, 286 F.R.D. 488, 504 (D. Kan. 2012) (denying

approval where *cy pres* beneficiaries were not designated); see also, *In re*

*Thornburg Mortg., Inc. Secs. Litig.*, 885 F. Supp. 2d 1097, 1111 (D.N.M. 2012)

(outlining *cy pres* defects).

### B.  Settlement class cannot be certified

"Class-action settlements are different from other settlements."  *In re Dry*

*Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013).[7] "[I]n class-action settlements

---

However, both the S.A. and preliminary approval order entered by this court
required it.

[7] "The parties to an ordinary settlement bargain away only their own rights—which
is why ordinary settlements do not require court approval. In contrast, class-action
settlements affect not only the interests of the parties and counsel who negotiate
them, but also the interests of unnamed class members who by definition are not
present during the negotiations. And thus there is always the danger that the parties
and counsel will bargain away the interests of unnamed class members in order to
maximize their own." *Pampers*, 724 F.3d at 715. "Because class actions are rife
with potential conflicts of interest between class counsel and class members,
district judges presiding over such actions are expected to give careful scrutiny to
the terms of proposed settlements in order to make sure that class counsel are

the district court cannot rely on the adversarial process to protect the interests of the persons most affected by the litigation—namely, the class. Instead, the law relies upon the fiduciary obligations of the class representatives and, especially, class counsel, to protect those interests. And that means the courts must carefully scrutinize whether those fiduciary obligations have been met." *Id.* at 718. (internal quotation omitted).[8] Thus, through its oversight responsibility, the court itself assumes a derivative fiduciary obligation to the class. *McNeil v. Guthrie*, 945 F.2d 1163, 1167 (10th Cir. 1991); *Gottlieb v. Barry*, 43 F.3d 474, 490 (10th Cir. 1994) ("[T]he importance of safeguarding the class' interests cannot be underestimated."). This judicial duty to vouchsafe the rights of the absent plaintiffs extends to the decision to grant class certification, obliging district courts to

---

behaving as honest fiduciaries for the class as a whole." *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 785 (7th Cir. 2004). "Both the class representative and the courts have a duty to protect the interests of absent class members." *Silber v. Mabon*, 957 F.2d 697 (9th Cir. 1992).

[8] "In reviewing a proposed settlement, a court should not apply any presumption that the settlement is fair and reasonable." Am. Law Institute, Principles of the Law of Aggregate Litig. § 3.05(c) (2010) ("ALI Principles"). "The burden of proving the fairness of the settlement is on the proponents." *Pampers*, 724 F.3d at 718 (compiling cases and authorities). In this case, that burden is yet heightened because this settlement has been proposed before class certification. Delaying certification until settlement poses various problems, see *In re Gen. Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 786-800 (3d Cir. 1995) ("GM Trucks"), and calls for heightened judicial scrutiny of the certification and the accompanying settlement. *Id.* at 807; *Pampers*, 724 F.3d at 721; Federal Judicial Center, Manual for Complex Litigation § 21.612 (4th ed. 2004).

Page 16

conduct a "rigorous analysis" to ensure compliance with the Rule 23 certification prerequisites. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). A proponent of class certification "must affirmatively demonstrate his compliance with the Rule." *Id.*

Aside from trial manageability concerns, that burden is no lighter when the Court is confronted with a settlement-only class certification. In fact, the specifications of rules Rule 23(a) and (b)(3) are "designed to protect absentees by blocking unwarranted or overbroad class definition" and "demand undiluted, even heightened, attention in the settlement context." *Amchem Prods., Inc. v. Windsor.* 521 U.S. 591, 620 (1997); see also *Pampers*, 724 F.3d at 721 ("These requirements are scrutinized more closely, not less, in cases involving a settlement class"); *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 380 (3d Cir. 2013) (the "policy in favor of voluntary settlement does not alter the 'rigorous analysis' needed to ensure that the Rule 23 requirements are satisfied."). Put another way, "it is not the mission of Rule 23(e) to supply the cohesion that legitimizes a settlement-only class action." *Gunnells v. Healthplan Servs.*, 348 F.3d 417, 451 (4th Cir. 2003) (Niemeyer, J., concurring in part and dissenting in part). Fed. R. Civ. P. 23(b)(3) allows a class action to be maintained if 23(a)(1)-(4) are satisfied, "questions of law or fact common to class members predominate over any questions affecting

only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The burden of proving these prerequisites resides with the proponents of certification. *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213, 1218 (10th Cir. 2013).

The proposed settlement class falls short.

Rule 23(b)(3) requires the parties to demonstrate the superiority of the class action device for adjudication of class members' claims. As discussed below, where it is impracticable or impossible for class members to attain any compensatory benefit from the class action, 23(b)(3) superiority is not satisfied. Where "individual distributions to class members are not feasible" because class members "cannot be identified through reasonable effort," "individual damages would be if not impossible to calculate" and "individual distributions would be too small to be economically viable," certification is not appropriate. The S.A. fails to square with any of these concerns.[9]

---

[9] See, e.g., *Supler v. FKAACS, Inc.*, No. 5-11-CV-00229-FL, 2012 U.S. Dist. LEXIS 159210, at *10- *11 (E.D.N.C. Nov. 6, 2012) (holding that, because "benefits to putative class members" from cy pres payments "are attenuated and insignificant…, class certification does not…promote judicial efficiency.") (internal quotations, ellipses, and citations omitted); see also *Quinn v. Nationwide Ins. Co.*, 281 Fed. Appx. 771, 777 (10th Cir. 2008) (affirming finding of non-superiority where defendant "would have to engage in a significant amount of

No matter how slim the possibility of attaining, for example, statutory damages, that possibility is superior to releasing those claims for no or little compensation. See *Brown v. Wells Fargo & Co.*, No. 11-1362 (JRT/JJG), 2013 U.S. Dist. LEXIS 181262, at *16-*17 (D. Minn. Dec. 30, 2013) (concluding that superiority was not satisfied where individuals would be "entitled to between $100 and $1,000 dollars in statutory damages" in successful individual litigation, but

---

work simply to identify the purported class members."); *Smith v. Georgia Energy USA, LLC*, 2014 U.S. Dist. LEXIS 166367, at *7 (S.D. Ga. Dec. 1, 2014) (decertifying class where defendants' financial insolvency made clear no benefit could inure to class members); *Ballard v. Branch Banking & Trust Co.*, 284 F.R.D. 9, 15-16 (D.D.C. 2012) (denying certification where identification and notification of individual consumer ATM users was impracticable). The Ninth Circuit reached a similar conclusion in *In re Hotel Tel. Charges*, 500 F.2d 86 (9th Cir. 1974). There, the court reasoned that "[w]henever the principal, if not the only, beneficiaries to the class action are…not the individual class members, a costly and time-consuming class action is hardly the superior method for resolving the dispute," and that, "[w]hen, as here, there is no realistic possibility that the class members will in fact receive compensation, then monolithic class actions raising mind boggling manageability problems should be rejected." Id. at 91-92. In this case, the proposed settlements fall into that category. They provide at most an indirect and attenuated benefit to the class, justified on the grounds that individual distributions would be too costly because of the size of the class. Due to the impracticality of class member redress, these claims should proceed as individual actions if at all. Under state consumer protection laws, certain class members can seek statutory damages of up to $2,000. Ryan P. O'Quinn & Thomas Watterson, Fair is Fair: Reshaping Alaska's Unfair Trade Practices and Consumer Protection Act, 28 ALASKA L. REV. 295, 305-06 (2011) ("Twenty states set a minimum damages award for successful plaintiffs to encourage litigation of harms normally too insignificant to litigate. The minimum damages award varies from as low as $25 to as high as $2000, and the plaintiff is awarded the higher of the actual or statutory damages.").

only $55 as a class member); *Sonmore v. CheckRite Recovery Servs.*, 206 F.R.D.

257, 265-66 (D. Minn. 2001) (holding that the discrepancy between the $25 that

class members could recover and the $1000 in statutory damages they could

recover individually meant that a class action was not superior); cf. also *Wilcox v.*

*Commerce Bank of Kansas City*, 474 F.2d 336 (10th Cir. 1973) (affirming finding

of non-superiority where individual statutory damages claims were available;

overruling the objection that the district court had failed to consider the

nonexhaustive factors listed in (b)(3)(A)-(D).

### B. The S.A. Purports to Violate the First and Fifth Amendments

**1.** ***Cy Pres* reversion to a third party, political advocacy group, is not appropriate**

#### a. What is *cy pres*?

The term *cy pres* is derived from a French phrase meaning "as near as." In

the class action context, the reason for appealing to *cy pres* is to prevent the

defendant from walking away from the litigation scot-free because of the

infeasibility of distributing the proceeds of the settlement to the class. *Hughes v.*

*Kore of Indiana Enter., Inc.*, 731 F.3d 672, 676 (7th Cir. 2013); *Mirfasihi v. Fleet*

*Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004) ["'[C]y pres' is the name of a

doctrine of trust law that allows the funds in a charitable trust, if they can no longer

Page 20

be devoted to the purpose for which the trust was created, to be diverted to a related purpose; and, so, when the polio vaccine was developed the March of Dimes Foundation was permitted to redirect its resources from combating polio to combating other childhood diseases."]

When class actions are settled or tried, there are times that it's not possible to distribute all of the money recovered to some or all of the class members. They may be difficult to identify or find or it may not be economically feasible to distribute the funds to them. For example, the cost of distributing 50 cents to each of 6 million class members may preclude individual distribution, even though the defendant has been held accountable for cheating the class out of $3 million. When that is so, the *cy pres* doctrine allows the funds to be distributed to a nonprofit charitable organization to support work that indirectly benefits the class and advances the public interest.

**b. What kinds of *cy pres* distributions are appropriate?**

Where it is not possible to directly distribute all of the money to the class members, a *cy pres* distribution to a non-profit organization may be appropriate.[10]

---

[10] "The fairness of the settlement must be evaluated primarily based on how it compensates class members." *Pampers*, 724 F.3d at 720 (emphasis in original). Although this Court cannot compel the settling parties to employ a direct payment process, it can and should refuse to approve a settlement until the parties do so of their own accord. Another viable option for the parties is limiting the release to those class members who submit claims forms. See *Fraser v. Asus Computer Int'l*,

The alternative, in some cases, is that parties may enter into settlements that allow all of the unclaimed money to go back to the defendant. This has the effects of enormously reducing the benefit the settlement confers on the class and letting the defendant keep the benefit of much (and sometimes nearly all) of the money it wrongfully took from the class. Courts generally have approved *cy pres* distributions in two circumstances. Am. Law Inst. ("ALI"), Principles of Law of Aggregate Litig. § 3.07, comment a (2010) ["First, many courts allow a settlement that directs funds to a third party when funds are left over after all individual claims have been satisfied.... Second, some courts allow a settlement to require a payment only to a third party, that is, to provide no recovery at all directly to class members."] See, *e.g.*, *In re Lupron Marketing and Sales Prac. Litig.*, 677 F.3d 21, 25 (1st Cir. 2012) (involving settlement that allowed consumers to claim 30% of their total out-of-pocket payments or $100, whichever sum was greater).

Courts generally require that, if feasible. "unclaimed funds" should be distributed to class members first rather than to a third party. See *In re Bank of Am. Corp. Sec. Litig.*, 775 F.3d at 1064 (holding unclaimed funds should be distributed to the class "except where an additional distribution would provide a windfall to class members with liquidated damages claim that were 100 percent satisfied by the initial distribution"); *In re Lupron*, 677 F.3d at 32 (noting the ALI

No. C 12-00652 WHA, 2012 U.S. Dist. LEXIS 181315, at *7-*10 (N.D. Cal. Dec. 21, 2012) (release should be limited to those who submit claim forms), revised settlement granted preliminary approval at 2013 U.S. Dist. LEXIS 22338 (N.D. Cal. Feb. 19, 2013); *Ross v. Trex Co.*, No. C 09-00670 JSW, 2013 U.S. Dist. LEXIS 74720, at *5 (N.D. Cal. May 28, 2013) (same as Fraser).

principles' policy that unclaimed funds be redistributed to ensure class members recover their full losses); *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 173 (3d Cir. 2013) (cautioning that direct distributions to the class are preferred to *cy pres* distributions but holding that a district court does not abuse its discretion by approving a class action settlement agreement that includes a *cy pres* component); *Klier v. Elf Atochem North Am. Inc.*, 658 F.3d 468, 478–79 (5th Cir. 2011) (holding that district court abused its discretion by not redistributing funds left unclaimed by one segment of the class to another segment of the class).

Because the concept of a *cy pres* distribution is, that it should be, "as near as" giving the money to the class members, *cy pres* distributions should relate to the purposes of the case.[11]

### c. What kinds of *cy pres* distributions are inappropriate?

When possible, monies recovered in class actions should go directly to the class members themselves. It is inappropriate for a settlement to pay out all or nearly all of the money in *cy pres* distributions when it is possible to distribute significant sums to the class members themselves. It is also, not appropriate, for the settling parties to attempt to direct *cy pres* distributions to personal favorite

[11] For instance, in a case that challenges predatory lending practices that, result in many people losing their homes, for example, it might be appropriate for residual funds to be distributed to organizations that address housing problems. In a class action involving overcharges for pharmaceutical products, however, it would make little sense to distribute funds to such organizations

charities (such as one's alma mater) or political advocacy organizations that have no relationship to the issues addressed by the underlying lawsuit.

**2. Since Consumers Union is nakedly political, this raises constitutional issues**

Making a political contribution is First Amendment protected, expressive and associational activity. *Buckley v. Valeo*, 424 U.S. 1, 21 (1976) (per curiam). Concomitantly, individuals have a right to refrain from making such a donation, a right to not be compelled to engage in expressive and associational activity. See, e.g., *Knox v. Service Employees Int'l Union, Local 1000*, 132 S. Ct. 2277, 2288 (2012) (the government "may not…compel the endorsement of ideas it approves.").

"First Amendment values are at serious risk if the government can compel a particular citizen, or a discrete group of citizens, to pay special subsidies for speech on the side that it favors." *United States v. United Foods, Inc.*, 533 U.S. 405, 411 (2001); *Keller v. State Bar of California*, 496 U.S. 1 (1990) (attorney bar dues cannot be used for political or ideological purposes); *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 235 (1977) (teacher union dues cannot be used for ideological activities not "germane" to their bargaining representative duties); *Wooley v. Maynard*, 430 U.S. 705, 715 (1977) (recognizing the right of an individual to reject a state measure that forces him "as a part of his daily life…to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable.").

Page 24

In articulating this right, the Supreme Court has acknowledged Thomas Jefferson's view that "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves[] is sinful and tyrannical." *Abood*, 431 U.S. at 234 n. 31, (quoting I. Brant, James Madison: The Nationalist 354 (1948)) (internal quotation marks omitted). *Abood* allowed room for charging dues for uses related to collective bargaining. *Id*. at 232. Recently, however, the Supreme Court cast doubt upon even this exception to the First Amendment right against compelled speech subsidy. *Harris v. Quinn*, 134 S. Ct. 2618, 2632 (2014) ("*Abood* failed to appreciate the conceptual difficulty of distinguishing in public-sector cases between union expenditures that are made for collective-bargaining purposes and those that are made to achieve political ends"). *Harris* refused to extend *Abood* to regulated occupations that were not "full-fledged public employees." *Id*. at 2638.

"[E]xcept perhaps in the rarest of circumstances, no person in this country may be compelled to subsidize speech by a third party that he or she does not wish to support." *Id*. at 2644. These principles render class action, third-party awards (at least those awards like this one that will be reserved for lobbying, litigation, or other First Amendment political activity, whether termed "cy pres" or not) unconstitutional. Three premises support this conclusion.

The first premise is that "[t]he settlement-fund proceeds, generated by the value of the class members' claims, belong solely to the class members." *Klier v.*

Page 25

*Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011) (citing ALI Principles of the Law of Aggregate Litigation § 3.07 cmt. (b)).

The second premise is that a third-party donation is an expression of support, association, and endorsement of the third-party's political agenda and activities. See, e.g., *Buckley, supra*; *In re Asbestos Sch. Litig.*, 46 F.3d 1284, 1294 (3d Cir. 1994) (Alito, J.) ("Joining organizations that participate in public debate, making contributions to them, and attending their meetings are activities that enjoy substantial First Amendment protection.").

And the third and final premise is that absent class members are being compelled into participating in the donations.

The S.A.'s "opt out" right is not an opportunity to merely abstain from the political donation, it is simply the right to exit the class action entirely. The settling parties are conditioning class members' right to participate in the action on their acceptance of the compelled donation, tantamount to telling union members or regulated professionals that their dues are not mandatory because they are always free to quit and find a new profession. This is a *Hobson's choice*, not a true opt-out. See *Keller*, 496 U.S. at 10 ("Claimants cannot be required by government action to relinquish First Amendment rights as a condition of retaining employment."); *Wash. Legal Found. v. Mass. Bar Found.*, 993 F.2d 962, 978 (1st

Cir. 1993), superseded on other grounds by Phillips v. Washington Legal

Foundation, 524 U.S. 156 (1998) (where the burden to avoid is "more than an

inconvenience" a rule requiring monetary contribution should be viewed as

compulsory).

The above discussion presumes that a noncoercive opt-out scheme would

satisfy the First Amendment concerns, but recent jurisprudence has suggested that

even an actual opt-out scheme may be too burdensome and that an opt-in scheme

may be required by the First Amendment. *Knox v. SEIU*, 132 S. Ct. 2277, 2290-96

(2012). Because silence does not equate to consent, "[a]n opt-out system creates a

risk that the fees paid by nonmembers will be used to further political and

ideological ends with which they do not agree." *Id*. at 2290; see generally

Christopher R. Leslie, The Significance of Silence: Collective Action Problems

and Class Action Settlements, 59 FLA. L. REV. 71, 73 (2007) ("Silence may be a

function of ignorance about the settlement terms or may reflect an insufficient

amount of time to object. But most likely, silence is a rational response to any

proposed settlement even if that settlement is inadequate. For individual class

members, objecting does not appear to be cost-beneficial. Objecting entails costs,

and the stakes for individual class members are often low.").

### III. **CONCLUSION**

Page 27

The Court should deny final approval to the S.A. Free expression of ideas is what this country is about. Ideas of all political stripes are welcome. However, the class should not have to pay for either left wing or right wing social theorists in their embrace of political frivolity, "real" or "imagined" issues or anything else. Class money cannot be misused in this fashion and the Court has a responsibility to prevent it.

Respectfully submitted,

Dated: November 27, 2015

Steven Franklyn Helfand
*In propria persona*
1400 SW 137th Avenue, Apt. F112
Hollywood, FL 33027
Telephone: 415.397.0007
Email: sh4078@gmail.com

Page 28

## AFFIRMATION BY STEVEN HELFAND

1.  I am a class member having purchased and used the relevant Covered Products during the relevant class period.

2.  Attached as **Exhibit A** is a true and correct copy of a variety of documents printed off the web concerning Consumer Reports. It also includes a copy of a blank claim form.

3.  Pursuant to Section II of the claim form and the Notice, *generally*, I am a class member.

4.  The objection procedure requests that I disclose "objections" I have made over the past five years. I am not sure what this means as in my practice I have had the pleasure of representing objectors to class action settlements. If the objections refer to those by me in an individual capacity, I gather I have filed a handful of them. I do not recall the cases. I believe one was a securities class action in Homestore in Federal Court. I have attached a relevant order at Exhibit A, pages 51-52. The Court noted, "Here, the Court finds that a substantial benefit was conferred on the class when Helfand raised serious questions about the timing of the class notice. As a direct of Helfand's objections, the Court ordered that the class be re-noticed, on a finding that a strong likelihood existed that a substantial portion of the class would not have received timely notice of the class action settlement. This was crucial to the ability of the class members' ability to recover money from the general fund, as many members likely received notice <u>after</u> the due date for submission of proof of claim. By bringing about re-notice of the class and extension of the due date, Helfand conferred a substantial benefit on the class."

5. Decisions of Note: *Rodriguez v. West Publ'g. Corp.* (9th Cir. 2009) 563 F.3d 948; and *Lane, et al. v. Facebook* (9th Cir. 2012) 709 F.3d 791; *Marek v. Lane, et al.* (2013) 134 S. Ct. 8 [Statement of Chief Justice Roberts respecting the denial of certiorari].

6. I have handled other cases and they are widely reported and therefore equally available by simply running my name on Westlaw or Lexis. Should there be any need for specific cases, the settling parties may meet and confer with me. Suffice it to say, over nearly fifteen years, I have handled approximately 20 to 30 objections on behalf of absent class members or myself.

7. I shall be appearing at the hearing to argue the objections. I respectfully request that the Court provide me with six to eight minutes of time.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration is executed in Hollywood, Florida on November 30, 2015.

Steven F. Helfand