# Exhibit 3

### Page 1

```
            UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA

ROSMINAH BROWN and ERIC     )
LOHELA, on behalf of        )
themselves and all others   ) Case No.
similarly situated,         ) CV11-03082 LB
                            ) CV13-02237 LB
        Plaintiff,          )
                            )
   vs.                      ) Volume I
                            )
THE HAIN CELESTIAL GROUP,   )
INC.,                       ) Pages 1 - 37
        Defendants.         )
_____)

              DEPOSITION OF
            SHERI LEE WILLIAMS
            JANUARY 22, 2016


Reported by:
APRIL WOOD, CSR #13782
-------------------------------------------------------
         JAN BROWN & ASSOCIATES
   WORLDWIDE DEPOSITION & VIDEOGRAPHY SERVICES
  701 Battery Street, 3rd Floor, San Francisco, CA 94111
        (415) 981-3498 or (800) 522-7096
```

### Page 2

```
                      I N D E X
                                              PAGE
   Examination by Mr. Williams                  5
   Reporter's Certificate                      37

                   I N D E X  O F
                    E X H I B I T S
   DEPOSITION NO.                             PAGE
   Exhibit 1    Ten-page Objection to Proposed  26
                Class Action Settlement

   Exhibit 2    One-page United States District 27
                Court Claim Form
   Exhibit 3    Five pages of black and white   34
                photographs of JASON products
```

### Page 3

1  
2       BE IT REMEMBERED that, pursuant to  
3  Notice of Deposition, and on Friday, January 22, 2016,  
4  commencing at the hour of 12:30 p.m., at Umpqua Bank,  
5  303 Corte Madera Town Center, Corte Madera, California  
6  94925, before me, April Wood, a certified  
7  shorthand reporter in the state of California, there  
8  personally appeared  
9  
10  
11             SHERI LEE WILLIAMS  
12  
13  called as a witness by Plaintiffs, who, having been duly  
14  sworn, was examined and testified as is hereinafter set  
15  forth.  
16             ---o0o---

### Page 4

1  
2       LUCAS C. WILLIAMS, Attorney at Law, of the  
3  Lexington Law Group, 503 Divisadero, San Francisco,  
4  California 94117, appeared as counsel on behalf of the  
5  Plaintiffs, Rosminah Brown and Eric Lohela.  
6  Telephone: (415) 913-7800    Fax: (415) 759-4112  
7  E-mail: lwilliams@lexlawgroup.com  
8  
9       BRADLEY D. SALTER, Attorney at Law, of Salter  
10  Law, 24 Malialani Place, Lahaina, Hawaii 96761, appeared  
11  telephonically as counsel on behalf of Objector Sheri  
12  Lee Williams.  
13  Telephone: (808) 298-7873    Fax: (650) 669-0800  
14  E-mail: brad@salterlaw.com  
15             ---o0o--

---

**Page 5**

JANUARY 22, 2016 - TUESDAY        12:30 P.M.
                P R O C E E D I N G S
    MR. LUCAS: I'll state my appearance just for
the record. I'm Lucas Williams. I'm an attorney with
the Lexington Law Group, and I represent the plaintiffs,
Rosminah Brown and Eric Lohela in this case.
                  EXAMINATION
    BY MR. WILLIAMS:
Q.  Ms. Williams, will you please state your full
name and address for the record.
A.  Yes. Sheri Lee Williams. That's S-H-E-R-I,
second word L-E-E, and Williams, 2432 1/2, 5th Avenue,
San Rafael, California 94901.
Q.  Great. So I'm just going to go over some basic
ground rules --
A.  Sure.
Q.  -- for the deposition.
A.  Yes.
Q.  So I'll be asking the questions. If you don't
understand a question, just let me know; otherwise, I'll
assume you understand the question.
    Please provide verbal responses to my questions
for the court reporter; so answer yes or no.
A.  Sure.
Q.  Don't nod or shake your head.

---

**Page 6**

A.  Yes.
Q.  Okay. And then try to let me finish the
question before you answer. The court reporter can only
get one of us at a time.
    If you need a break, just let me know. Not a
problem at all.
    Remember that you're under oath as if in a
court of law; so you must answer truthfully and to the
best of your knowledge.
    If you don't know or can't recall the answer to
a question, just say so. We don't want you to guess;
however, we are entitled to get your best recollection.
A.  Sure.
Q.  Do these ground rules make sense?
A.  Absolutely.
Q.  Great. And is there anything that we should
know today that would prevent you from testifying
truthfully and to the best of your knowledge?
A.  No. No.
Q.  Have you ever been deposed before?
A.  No.
Q.  Have you ever given testimony under oath?
A.  Testimony under oath. Many, many years ago,
yes. Yes. Yes.
Q.  Okay. Can you identify what that matter was?

---

**Page 7**

A.  I'd rather not unless it's totally necessary.
That was almost 30 years ago, and I'd just rather not
unless it's necessary, in which case I will.
Q.  Can you tell me if it was a civil lawsuit?
A.  No, it was not, definitely not.
Q.  Okay. That's fine. Have you ever -- let me
ask that more specifically.
A.  Sure.
Q.  Have you ever been a plaintiff or a defendant
in a civil action?
A.  No.
Q.  Okay.
A.  No.
Q.  And have you ever been involved in a bankruptcy
proceeding?
A.  No.
Q.  Okay. Let me ask. What did you do to prepare
for your deposition today?
A.  I wrote a few notes down and of course I spoke
with my attorney, you know, but truly not even at great
length. Speaking with the attorney was pretty brief.
Q.  Okay. And other than your attorney, did you
speak with anyone else?
A.  Let me think about that because I want to be
honest. No. No.

---

**Page 8**

Q.  Did you look at any documents to prepare?
A.  Well, I looked at -- I mean, of course I looked
at the settlement, read the claim, read our objection,
and what else did I read? I think that was it. I read
the settlement, the claim, understood it to the best of
my ability, and our objection.
Q.  Okay. Please tell me about your educational
background beginning with college, if you can.
A.  I only have -- I've been to school for many,
many years, but I don't have a degree.
Q.  Okay.
A.  So I've taken many courses at many different
colleges, but I have no degree.
Q.  Okay. Do you have any other licenses or
advanced studies?
A.  Yes. I'm a yoga teacher.
Q.  Okay.
A.  So I have -- that's a certification.
Q.  Got it.
A.  I'm trying to think. I've had so many jobs in
my life. I don't know that any of them were something I
needed a certification for though, no.
Q.  Okay. And who's your current employer?
A.  Myself.
Q.  And do you have a current title or position?

**Page 9**

A. I'm a yoga teacher.
Q. Great. Have you ever purchased an Avalon Organics product?
A. I actually have. I did not write that on the original claim because this -- I just wanted to put the one that I was totally certain of, and the truth is I know that I purchased the other products. I just don't remember in detail which ones. I do remember specifically the JASON product, the Ester-C product line that they have for the face. I think that's on the list, but I didn't want to write all that out because this toothpaste I have used daily for years and years and years for a very, very long time exclusively; so I just wanted to stick with, you know, that, which is -- and the truth is for certain, I really did use the Ester-C products as well and one or two of the Avalon products, but I couldn't remember which of those.
Q. Do you remember around when you would have purchased the Avalon Organics products?
A. The Avalon ones?
Q. Yes.
A. Let's see. It would have been in your time frame that you're speaking of because at that time I did use some of those products, but as I said, that's not really -- I didn't put that on my claim; so I guess, you

**Page 10**

know, we don't need to talk about that.
Q. Okay. And do you remember about how many times or how many --
A. I used to use that Ester-C product a lot. I used that cleanser specifically, the JASON Ester-C. I used that for quite some time, I would say for probably a year or two.
Q. So I think the question wasn't clear.
A. Okay.
Q. On the Avalon Organics --
A. Yes.
Q. -- products --
A. Yes.
Q. -- do you remember how many products?
A. Truthfully, only about one or two.
Q. Okay.
A. I didn't use much of those because the JASON products are totally separate from the Avalon products, correct? Those are different things?
Q. Correct.
A. Yes. So the Avalon products, I've only used once or twice.
Q. So can you tell me which JASON products you purchased?
A. The toothpaste, the oral B -- the oral comfort

**Page 11**

one, and then I have on occasion used the Ester-C, I think it is. I think that's what it's called, something that has vitamin C in it, and I think it has orange in it. Let's see. That is what I have used exclusively for sure, and then I did at some point use the Ester-C cleansing line of JASON.
Q. Okay. And about how many of those Ester-C line products --
A. That's why I didn't even put it. I used that for probably a year or two.
Q. Okay.
A. Truthfully. It was awhile ago, and I think it was when that product first came out; so I don't -- I don't know.
Q. Okay. Let me back up to the Avalon Organics --
A. Okay.
Q. -- products. Do you remember where you purchased them?
A. If I was here -- at some point I lived in Hollywood; so I buy all of my products either -- it would be at Erewhon in Los Angeles or a place called Mother's, Mother's Market, which is in Laguna or Costa Mesa, either one of those. Here in Marin I buy my products at Good Earth Natural Foods.
Q. Okay.

**Page 12**

A. And Whole Foods.
Q. So did you purchase the JASON products also at those --
A. Yes.
Q. -- locations?
A. Absolutely, yeah.
Q. So we've kind of touched on this, but I just want it on the record. Have you identified on your claim form all of the JASON and Avalon brand products you purchased --
A. No, only one.
Q. -- in California?
A. Only one.
Q. Do you recall how much you paid or approximately how much you paid for the JASON tooth gel?
A. I'm one of those people that, believe it or not, does not look at prices; so I think it's 5.99 to 7.99. Don't quote me on that. It's somewhere in that range. I just don't -- my mother was a coupon person, and I have a thing against it; so it's sort of a childhood trauma. I don't want to look at prices.
Q. No problem.
A. When it comes to food and that sort of thing. Other things, I absolutely pay attention.
Q. Why did you choose the JASON tube gel over

**Page 13**

similar products?

A. Because I truly believed that it was a really clean, organic product. That is why I chose it, and also specifically the oral comfort one because I have sensitive gums, but mostly because I truly believed that it was a hundred percent organic.

Q. Did you also believe that it was natural?

A. See, those things are two different things, and, you know, living in California, most people understand that "natural" doesn't mean much; however, in my opinion, it should mean something. It is misleading, that word. For me, I thought that it was at least 70 percent organic, which really it should be 100 percent organic. If it's labeled "organic," it should be one hundred percent; so I really did think that, and that is the reason that I brought the product.

Q. Have you objected to settlements, class action settlements in other cases?

A. No. As we said in the beginning, I've never been involved in a class action settlement.

Q. How did you first learn about this settlement? I'm sorry. Let me strike that.

How did you first learn about this lawsuit?

A. In this very bizarre way. I was looking online for something -- I don't remember what -- and it popped

**Page 14**

up, and I just read it because it involved products that I used; so I just read it, and I -- my problem with it was I did not think it was fair. What I don't think is fair about it is the labeling.

I am tired of companies getting away with misleading consumers with their labeling. That's my huge issue with it. I just think that it's wrong that they should -- I understand that it was a huge settlement, you know, whatever, but I know also that cases set precedent, and I'm tired of companies getting away with labeling things improperly. It needs to be very clear what something is and what it isn't, even to the layman, not people that live in California, but to everyone. It should be very clear.

Q. So when was that that you learned about the lawsuit?

A. A couple of weeks, I guess. This, I'm vague on. It was a couple of weeks ago. It was literally I just happened to come across it and then filed the claim and realized that I could -- when I really deeply read into it, I saw that I could object, and truly what I object to is the labeling.

Q. What do you mean by that, the labeling?

A. The fact that they can use the words "organic," "natural," or "pure" and that it misleads customers into

**Page 15**

believing that it is a hundred percent any of those things.

Q. Okay. Have you read the complaint, Plaintiffs' complaint in this action?

A. I believe I did, yes, I think. I think, yes.

Q. And what's your understanding of Plaintiffs' legal claims?

A. Let me think about that. So I don't -- that, I can't get into. I'm not going to be -- I'm going to be like Sarah Palin here bouncing all over the place. I don't think I can describe that very well. I'll have to pass on that question. I don't think -- I don't want to sound like -- I just don't think that I can put that into words in a way that's going to make a whole lot of sense.

MR. SALTER: Just to be clear, I want to make sure Sheri understands that the complaint that we're talking about is the original complaint that was filed against Avalon Organics.

THE WITNESS: Yeah. I know that I read that, and I read the settlement more thoroughly; so I don't have the complaint stuff in my head as much.

BY MR. WILLIAMS:

Q. Okay. So just to confirm, you have read the settlement?

**Page 16**

A. I did read the settlement, and I did read the complaint. I just don't think that I can intelligently speak about that.

Q. Have you talked to anyone about the settlement outside of your attorney?

A. No.

Q. And when did you retain Mr. Salter to represent you?

A. A couple of weeks ago.

Q. How did you find him?

A. I found him through -- I don't remember specifically who, but I reached out to a lot of friends who teach yoga and just random friends and was talking about it, and someone gave me his name, and he seemed like -- you know, I'm just not a litigious person. You know, I don't like this sort of thing.

I'm doing it for moral reasons because I really want this labeling issue handled. You know, we can all sit in our armchairs and talk about the things that we don't like that are going on in the world, but to actually do something about it is a different thing; so it has nothing to do with anything other than I'd really like labeling to be accurate in this country.

Q. Okay.

A. So Mr. Salter was found through friends, and I

**Page 17**

don't recall exactly who.
Q. Has he represented you in other cases?
A. No.
Q. What is your understanding of this settlement?
A. To me, there were -- what I'll tell you is the points that I was not happy with. Again, it's the labeling. Secondly, I did not -- I'm going to go to my notes here if you don't mind. Let's see here. The cy-pres funds. Okay? To me, I would rather it go to something called Truth in Advertising, and it's TINA.org, T-I-N-A, dot-org, because I feel that better represents the consumer rather than the two places that you -- and I think this all is actually written in our objection; so that, to me, was the important thing, as well as the labeling. Attorneys fees -- I think that's been taken care of or something.
Q. Let me stop you.
A. Yeah.
Q. So the question -- let me try to ask the question --
A. Also the coupon relief. I'm sorry. I'm interrupting you.
Q. Let me ask the question a bit more specifically.
A. Okay.

**Page 18**

Q. So what is your understanding of what Hain agreed to provide to class members under the settlement?
A. That they were providing coupon relief; so basically you're having to do business with the same company that quote-unquote wronged you by false advertising; so I didn't like -- I thought the coupon relief was not a great idea, and I just didn't feel that they did enough for the plaintiffs. I didn't feel they did enough for the class.
Q. And anything else that Hain agreed to provide?
A. Let me think about that. One of the things that I read in there was that they were admitting no fault and that it looked to me -- and I could be wrong on this -- they didn't have to change their labeling much at all. I mean, they could do whatever they wanted to do with labeling; so I just have an issue with that.
Q. Okay. So let me ask: Do you think the class members would be better off if instead of settling the case that Plaintiffs continued to litigate the case through trial?
        MR. SALTER: I'm going to object.
        THE WITNESS: I can't really answer that.
        MR. SALTER: You're really asking her for a legal conclusion, you know, and I think those are things that she has discussed with us but --

**Page 19**

        THE WITNESS: Yeah. I can't really say whether they would be better off. No one wants to go to litigation, in my mind, in general. I don't know. I can't answer. I'm not an attorney.
        MR. WILLIAMS: Okay.
        THE WITNESS: I don't know if they would be, and we're also speculating on future outcome of something that we know nothing about.
        BY MR. WILLIAMS:
Q. Okay. What is your concern with the injunctive relief in the settlement?
A. I want to make sure that I understand the question. So the injunctive relief is what they're going to do, what they agreed to, which is the coupon relief, correct, and some amount of -- let me read my -- what does it say here? So either cash payment and product voucher or cash payment only option.
Q. Let me stop you.
        MR. SALTER: You need to define "injunctive relief" --
        MR. WILLIAMS: Yeah.
        MR. SALTER: -- a little better for her. I think you're talking about what the company has to do with regards to the product; is that correct, Lucas?
        MR. WILLIAMS: That's correct.

**Page 20**

        THE WITNESS: So the question is what is my issue with that?
        BY MR. WILLIAMS:
Q. Correct.
A. So my issue is if something says that it's organic that truthfully, I feel it should be a hundred percent organic, processed in a certain way. For all kinds of reasons I think this, because it's a much larger picture here. How those things are harvested -- if you have pesticides on them, it's getting it in your body. It's hurting organic farming. It's hurting the soil. It's killing the bees. It's a much larger issue than just -- do you see what I'm saying?
Q. I do.
A. And a customer should be able to go somewhere, look at a label, and say, "That's organic. I can trust that," you know, and not have to second-guess it, and I realize that the FDA -- I think that you can claim something's organic even if it's only 70 percent, but that's their fault. You know what I mean? That's because they're in somebody's pockets, I'm sure, but if it's organic, it should be organic, I mean, period, the end.
        Even the words "natural" and "pure," I have a problem with because just because people in California

**Page 21**

generally understand that wording and know that it doesn't mean much, not everyone does, and everyone, no matter how well-schooled or intelligent you are or not, should be able to trust what the packaging says, period.

Q. Okay. Do you know whether California law requires cosmetic products to be a hundred percent organic?

A. I do not. I don't think that it does, but honestly I don't know. I don't know for sure.

Q. And let me ask. Do you know if federal law requires --

A. I do not. I think the FDA only says 70 -- you can claim it's organic if it's 70 percent, but I don't -- honestly, I can't -- don't even quote me on that because I don't know that for sure.

Q. Let me ask. What are the "natural" representations on Hain's products that you're concerned about?

A. Like -- I mean, as I said, what I said specifically. It's as simple as that. If something says "natural" or "pure" or "organic," it should be those things without question. I can't get into such detail. I mean --

Q. Okay. That's fine.

A. To me, that's a black and white thing.

**Page 22**

Q. Fair enough.

Do the Avalon Organics products say they are natural?

A. I have no idea. I do not know. As I said, I used one of those one or two years ago. I do not know what they currently say.

Q. Do the JASON products say they're natural?

A. Currently my toothpaste does not, to my knowledge, but there's also the issue that that company is -- because I've -- I'm pretty sure I read this in the settlement that they're admitting no fault and that no one pinned them to the wall saying, "You must label things correctly. It must be to this standard." I didn't see that. Is that in the settlement? I mean, did they say that?

Q. I'm sorry, but I have to ask the questions.

A. I'm sorry.

Q. It's okay.

A. I mean, I genuinely want to know, you know?

Q. Let me ask. Is it your understanding that this case involved allegations that the "natural" claims were unlawful?

A. That was my understanding, yeah, that that was part of it, but I don't know, to be honest. I can't stick to that. I don't really recall.

**Page 23**

Q. Okay. Let me go back to the coupons. Can you just tell me what you believe is wrong with allowing the class members to receive coupons?

A. Because it then causes them to have to do business with the company that has -- if they feel wronged, has lied to them basically; so why is that a good thing? It's also a great marketing ploy for them. So here they have -- you know, they're making people re-buy their products. I don't think that's great at all.

Q. Did you elect to receive coupons under the settlement?

A. Unfortunately, I checked the wrong box, and I think I did put the coupons and shouldn't have.

Q. That wasn't intentional?

A. That was not intentional. That was not intentional. I noticed that I put that. I do have issue with it.

Q. Is it your understanding that class members are required to receive coupons?

A. No. I see that there's another box that says "cash payment only."

Q. Okay. There are a number of places in your objection you ask the court to delay making a determination about whether to approve the settlement

**Page 24**

based on other cases that are pending right now?

A. Mm-hmm.

Q. So let me ask. What do you know about the Brazil v. Dole Food Company case?

A. I know that Dole is usually -- I mean, in my mind, that particular company does not -- is not friendly to the consumer; so that's all I know about Dole. Those things were when I contacted brad and we talked about it, and he did the objection. The only knowledge that I have -- I'm not an attorney -- is that I know certain cases will set precedent for other cases. Most people know that. And I agreed with it when I read it that that was something he put in the objection which I thought was perfectly fine because I realized that it could affect how this goes.

Q. Okay. And I'm not trying to be annoying here, but --

A. Yeah.

Q. -- I'm going to ask you about the other cases, and you can --

A. Okay.

Q. -- just let me know --

A. Sure.

Q. -- what, if anything, you know about them.

A. I know nothing about them, but go ahead.

**Page 25**

Q. So what do you know about Jones v. ConAgra Foods?
A. Don't know.
Q. What do you know about Kosta v. Del Monte Foods Inc. --
A. Do not know.
Q. -- case?
A. Do not know.
Q. The last one is Laffitte, et al. v. Robert Half case.
A. Don't know.
Q. Okay.
A. The only thing I have any clue of is Dole, and only because it's a large company that's been around forever and doesn't have a good reputation for consumers.
Q. Okay.
A. Certainly not for being organic anything.
Q. Okay. And can you tell me what you think is wrong with the settlement's release of Hain's liability?
A. Because they're admitting no wrong, I have a problem with that and because it did not -- again, I'm just -- I'm sorry to keep harping on this. It's the reason I'm in this room, because I feel they did not do enough to have proper labeling, period. That's it.

**Page 26**

I -- you know, like, the cash payments and all that -- that's neither here nor there. That has -- I don't care.
Q. So just to get it in the record, I'd like to introduce your objection --
A. Sure.
Q. -- to the settlement.
A. Okay.
    MR. WILLIAMS: So I'll mark that as Exhibit 1.
    (Exhibit 1 marked for identification.)
    BY MR. WILLIAMS:
Q. And you have a copy?
A. I do right here in front of me.
Q. Okay. So I'm going back to the release of Hain's liability --
A. Yes.
Q. -- in the settlement, and the question is why do you think that the settlement releases claims for negligence and personal injury?
A. Okay. So I think it's negligent to mislead consumers, and I think that's what they did, which could potentially cause people harm for all kinds of reasons. I mean, some people are environmentally sensitive. There may be some pesticide in that thing that they're going to be allergic to. I mean, there's -- I just

**Page 27**

object to that.
Q. Okay. Let me ask you about another case you referred to in your objections. Do you know what the Astiana v. Hain Celestial Group case was about?
A. I do not. As I said, after discussing it with my attorney, it seemed like a good idea to -- hopefully those cases would have effect on this one.
Q. Okay.
A. But I do not know the details of that. I'm not an attorney.
Q. Fair enough. Fair enough.
    It just occurred to me we were talking about your claim form earlier; so we should probably introduce that --
A. Okay.
Q. -- as Exhibit 2, just so we have that in the record.
A. Okay.
    (Exhibit 2 marked for identification.)
    BY MR. WILLIAMS:
Q. Okay. Did you review Plaintiffs' motion to recover their attorneys fees?
A. Let me think about that. I think that I briefly read that in the settlement you're talking about, right?

**Page 28**

Q. So this was separate than the settlement.
A. Okay.
Q. It was filed at the end of last year, and it's Plaintiffs are seeking to recover a portion of their attorneys fees in the case.
A. Okay.
Q. And I'm sorry. Do you recall reading that?
A. I don't recall reading that. I don't know. I could have read that. I might not have. My only issue is -- I feel that everyone who is trained, well-trained and good at their job should be paid well; however, in this situation, it seems to me, because I didn't feel they did enough for the class, that maybe their fees should not be as high. That's the only thing I can say about that.
Q. Another question on the fees, only if you know, why do you think that the percentage of the fund method of calculating attorneys fees should be used?
A. Why should that percentage be used? I have no idea.
Q. And again, only if you know.
A. But I think -- I could have read something. I mean -- well, let me think about that. It seems as if, if I recall correctly, there's some sort of standard for what attorneys fees should be in that, correct? And

**Page 29**

that in this case you guys were a little above that, if I remember correctly, above that standard or whatever, and because I don't feel that not enough was done for the class, then, you know, that should probably be a little less. Not that I'm not all for people getting paid well.

Q. Okay. Then a related question, if you know: Why do you think that the fee calculation should be based on the claims participation rate?

A. I don't even understand that question. I'm sorry.

Q. Okay. In your objection, you argue --

A. Okay. Wait. Let me see.

Q. So it's on page 6 of your objection.

A. All right.

Q. You argue that the percentage of the fund -- I'm sorry. Let me strike that.

You argue that the court should base the calculation of the attorneys fees on the claims participation rate.

A. Yeah. I'm sorry. I just can't speak to that. I'm --

Q. Okay.

A. Yeah.

Q. No problem.

**Page 30**

A. As I said, I'm not an attorney. My attorney drew this up. There's certain parts of legalese that, you know, just don't make sense to a non-attorney.

Q. Fair enough.

And I'm sorry. This is the last case I will ask you about, but what do you know about the In Re Inkjet Printer case?

A. Nothing, although I totally resent that they make us pay lots of money for those little cartridges, those ink cartridges, but I know nothing about any of that.

Q. You mentioned that you thought that the class counsel didn't do enough for the class.

A. Mm-hmm.

Q. Is there anything you can tell me about why?

A. As I said, I did not like the coupon issue. I don't feel that's great. I do not like where the cy-pres funds are going, and I did not feel that -- but that's not really -- I mean, that is for the class. It really is for the class. I do not like the labeling issue. I really have a strong -- a strong attitude towards that. The labeling should be correct, and it should be -- if it says "organic," it should be organic. If it says "natural," that should be clearly defined, what that means.

**Page 31**

Q. By that, do you mean it should be a hundred percent organic?

A. Yes.

Q. Or a hundred percent natural?

A. Yes. Yes.

Q. Are you familiar -- let me back up.

MR. SALTER: I'm going to interject that Sheri's already indicated that she's aware of the fact that organic labeling requires 70 percent under certain standards; so I just want to make that clear, that she's already indicated that. Even though she feels that yeah, it would be great if it's organic, it should be a hundred percent, she has indicated that she's aware that 70 percent is allowed to be called "organic," but I just want to point that out.

BY MR. WILLIAMS:

Q. What do you know about the Jessie Smith Noyse Foundation?

A. The only thing that I know is what I read in the settlement. I really know nothing about it. It sounded like some good foundation and like it does good things, but to me, that had nothing to do with this particular -- what's going on here. Even though that's a lovely foundation -- or it appears to be. I don't know that much about it.

**Page 32**

Q. Okay.

A. As I said earlier, I felt that the money going to a place called TINA, Truth in Advertising, is a much better idea for this kind of case and for these -- this class. That's just my humble and honest opinion because I also feel the California Consumers -- whatever that establishment is called, is -- I don't think they do enough. I just don't think they're good enough; so let's go with somebody who is, who's going to be more on top of it, who's going to watch really what's going on more closely and do what they can about it.

Q. Okay. So let me ask. What do you know about the California Consumer Protection Foundation?

A. Not a lot, but what I do know -- the little bit that I know, which I can't give you some grand explanation, is I -- in my opinion, they don't do enough for the consumer.

Q. And can you tell me what you mean by "don't do enough for the consumer"?

A. For instance, I think that it should be a crime that they're having -- you know, that organic farmers are having to pay all of this money to call themselves organic, and meanwhile Monsanto is, you know, killing our earth, and they get away with it. You know what I mean? Like, there's so many issues. I could go -- we

**Page 33**

1  could sit here for two hours and talk about that; so,
2  you know -- and also, as it goes to this case, the fact
3  that the labeling, if it says "organic," should mean
4  organic, one hundred percent, period, the end.  If they
5  were doing a good job, that would already be in place.
6  Q.   Okay.  So on the cy-pres award, why do you
7  believe that the unclaimed funds should go to the class
8  members, if that makes sense?
9  A.   I don't know that's in here, that the unclaimed
10 funds should go to the class members.  Let me see that.
11 Where is that?
12      MR. SALTER:  As opposed to one of the cy-pres
13 recipients?  Is that what you're referring to, Lucas?
14      MR. WILLIAMS:  Correct.
15      THE WITNESS:  Got it.  Well, I honestly didn't
16 know that, to be honest.
17      MR. WILLIAMS:  Okay.
18      THE WITNESS:  So -- yeah.  I don't know.
19      MR. WILLIAMS:  That's fine.
20      THE WITNESS:  I didn't know that.
21      MR. WILLIAMS:  Okay.
22      THE WITNESS:  But, you know, I can understand
23 it.  I mean, you know, why shouldn't the people who have
24 gone to the effort -- I doubt anyone has involved
25 themselves with this for money's sake.  I mean, it's not

**Page 34**

1  going to -- it's not a fun process.
2      MR. WILLIAMS:  We are very close to being done.
3      THE WITNESS:  Okay.
4      MR. WILLIAMS:  Okay.  So I am going to
5  introduce one final exhibit.
6      THE WITNESS:  Okay.
7      (Exhibit 3 marked for identification.)
8      BY MR. WILLIAMS:
9  Q.   It's Exhibit 3.
10 A.   Yes.
11 Q.   It consists of five screenshots that I pulled
12 off of the Hain Celestial Group's --
13 A.   Yes.
14 Q.   -- website --
15 A.   Yes.
16 Q.   -- this morning.
17 A.   Yes.
18 Q.   And I'll ask you to look at these.  They're
19 photographs of various JASON --
20 A.   Yes.
21 Q.   -- toothpaste products.
22 A.   Okay.
23 Q.   And let me ask the question before you review
24 them.  I just want you to, if you can, indicate whether
25 any of these products say that they're natural.

**Page 35**

1  A.   Okay.
2  Q.   And I apologize that they're not crystal clear,
3  but I think --
4  A.   No.  That's all right.
5  Q.   -- you can read them.
6  A.   Nope.  Does not say that.  Does not say that.
7  Well, let's see.  Nope.  Oh, no.  That one doesn't.  No.
8  However, to my knowledge -- so what part of the
9  packaging I can see, it does not say those things;
10 however, I do want to state with other products from
11 Avalon as well as JASON, I don't know that their
12 products still do not say those things, and I have an
13 issue with it if they do or if they're even allowed to,
14 if they decide to, even if it's currently not on there.
15 Do you see what I'm saying?
16 Q.   Yes.
17 A.   Okay.
18 Q.   And I'm sorry if you answered this already, but
19 do you know whether they, the current products --
20 A.   I do not.  I do not.
21 Q.   Okay.
22 A.   I actually -- you know what?  That's not true.
23 I actually do think -- I don't -- I'm not sure which --
24 let me look at this very quickly because I actually
25 think that there are some that currently say "organic"

**Page 36**

1  or "natural" on them of the Avalon and possibly the
2  JASON.  I think there are, but don't quote me on that.
3  It's part of the reason I'm here, to be honest with you,
4  as you can tell, because I've repeated myself many
5  times.
6      MR. WILLIAMS:  I believe we're done.
7      THE WITNESS:  All right.
8      (The deposition concluded at 1:13 p.m.)
9
10
11
12       _____
13              SHERI LEE WILLIAMS

```
 1                CERTIFICATE OF REPORTER
 2
 3        I, APRIL WOOD, CSR No. 13782, a Certified
 4   Shorthand Reporter in and for the State of California,
 5   so hereby certify:
 6        That prior to being examined, the witness
 7   named in the foregoing deposition was by me duly sworn
 8   to testify the truth, the whole truth, and nothing but
 9   the truth;
10        That said deposition was taken before me at
11   the time and place set forth and was taken down by me in
12   shorthand and thereafter reduced to computerized
13   transcription under my direction and supervision, and I
14   hereby certify the foregoing transcript is a full, true,
15   and correct report of my shorthand notes so taken.
16        And I further certify that I am neither
17   counsel for nor related to any party to said action nor
18   in any way interested in the outcome thereof.
19        IN WITNESS WHEREOF, I have hereunto set my
20   hand this 26th day of January, 2016.
21
22              _____
23               APRIL WOOD, CSR No. 13782
24
25
                                                      37
```